# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| JAIME PIERO COLE, | § | |
| | § | |
| Petitioner | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:17-cv-940 |
| | § | |
| LORIE DAVIS, | § | **THIS IS A CAPITAL CASE** |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

_____

## CONSOLIDATED AND AMENDED PETITION
### FOR A WRIT OF HABEAS CORPUS AND
### MEMORANDUM OF LAW BY A PRISONER IN STATE
### CUSTODY PURSUANT TO 28 U.S.C. § 2254 *ET SEQ.*

SHAWN NOLAN
Pa. Bar No. 53565
PETER WALKER
Tex. Bar No. 24075445
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West, The Curtis Center
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520
shawn_nolan@fd.org
peter_walker@fd.org

Dated:  June 15, 2020

## PRELIMINARY STATEMENT

Petitioner's citations to transcripts or court records already filed with this Court will be cited as the docket entry ("DE") followed by the page number.  Mr. Cole filed an Appendix (DE-32) with his Amended Petition (DE-30).  Documents in the Appendix are cited as "A" followed by the page number.

The opinion of the Texas Court of Criminal Appeals (hereafter "CCA") denying Mr. Cole's direct appeal is *Cole v. State*, No. AP-76,703, 2014 WL 2807710 (Tex. Crim. App. June 18, 2014) ("*Cole I*") (DE-19).  The order of the CCA denying habeas relief is *Ex Parte Cole*, No. 84,332-01, 2017 WL 562725 (Tex. Crim. App. Feb. 8, 2017) ("*Cole II*") (DE-13). The order of the CCA denying Mr. Cole's subsequent application for writ of habeas corpus is *Ex Parte Cole*, No. 84,332-02, 2020 WL 1542118 (Tex. Crim. App. Apr. 1, 2020) ("*Cole III*") (attached as Exh. A).

# TABLE OF CONTENTS

## Federal Cases

*Adams v. Quarterman*, 324 F. App'x 340 (5th Cir. 2009) .................................................. *passim*

*Ake v. Oklahoma*, 470 U.S. 68 (1985) ........................................................................... 90

*Alcock v. Small Bus. Admin.*, 50 F.3d 1456 (9th Cir. 1995) ................................................ 11

*Alexander v. Johnson*, 211 F.3d 895 (5th Cir. 2000) ......................................................... 168

*Allen v. Stephens*, 805 F.3d 617 (5th Cir. 2015) ................................................................ 172

*Allen v. United States*, 164 U.S. 492 (1896) ..................................................................... 181

*Anderson v. City of Bessemer*, 470 U.S. 564 (1985) ........................................................... 10

*Anderson v. Sirmons*, 467 F.3d 1131 (10th Cir. 2007) ........................................................ 73

*Andres v. United States*, 333 U.S. 740 (1948) ........................................................ 134, 136, 137

*Andrus v. Texas*, No. 18-9674, 2020 WL 3146872 (U.S. June 15, 2020) ................. 23-24, 25, 27

*Apodaca v. Oregon*, 406 U.S. 404 (1972) ....................................................................... 169

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) .................................................................. *passim*

*Arizona v. Washington*, 434 U.S. 497 (1978) ................................................................... 181

*Atkins v. Virginia*, 536 U.S. 304 (2002) ......................................................................... 14

*Baldwin v. Maggio*, 704 F.2d 1325 (5th Cir. 1983) ........................................................... 59

*Banks v. Dretke*, 540 U.S. 668 (2004) ............................................................................ 7

*Barefoot v. Estelle*, 463 U.S. 880 (1983) ........................................................................ 90

*Batson v. Kentucky*, 476 U.S. 79 (1986) .............................................................. 97, 99, 113

*Beck v. Alabama*, 447 U.S. 625 (1980) .......................................................................... 175

*Bloom v. Calderon*, 132 F.3d 1267 (9th Cir. 1997) ........................................................... 83

*Bond v. Beard*, 539 F.3d 256 (3d Cir. 2008) .................................................................... 85

*Boyde v. California*, 494 U.S. 370 (1990) ............................................................... 131, 149

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ................................................................... 143

*Brownlee v. Haley*, 306 F.3d 1043 (11th Cir. 2002) ........................................................... 71

*Brumfield v. Cain*, 135 S. Ct. 2269 (2015) ................................................................ 13, 14

*Bruton v. United States*, 391 U.S. 123 (1968) ................................................................. 143

*Buck v. Davis*, 137 S. Ct. 759 (2017) ............................................................................ 22

*Burger v. Kemp*, 483 U.S. 776 (1987) ........................................................................... 19

*Caldwell v. Mississippi*, 472 U.S. 320 (1985) ................................................................ *passim*

*California v. Green*, 399 U.S. 149 (1970) ....................................................................... 114

*Canales v. Stephens*, 765 F.3d 551 (5th Cir. 2014) ............................................................. 5

*Caro v. Woodford*, 280 F.3d 1247 (9th Cir. 2002) ....................................................................... 85

*Carpenter v. Vaughn*, 296 F.3d 138 (3d Cir. 2002) .................................................................. 122

*Chamberlin v. Fisher*, 885 F.3d 832 (5th Cir. 2018) ........................................................ 115, 116

*Christeson v. Roper*, 574 U.S. 373 (2015) ................................................................................. 18

*Coble v. Davis*, 728 F. App'x 297 (5th Cir. 2018) ............................................................... 91, 93

*Cole v. Texas*, 135 S. Ct. 1154 (2015) ......................................................................................... 2

*Cole v. Texas*, 138 S. Ct. 90 (2017) ............................................................................................. 3

*Coleman v. Thompson*, 501 U.S. 722 (1991) ...................................................................... 6, 151

*Cone v. Bell*, 556 U.S. 449 (2009) .............................................................................................. 8

*Cueva v. Davis*, 750 F. App'x 330 (5th Cir. 2018) .................................................................... 47

*Cuthbertson v. Biggers Bros.,* 702 F.2d 454 (4th Cir. 1983) .................................................... 11

*Davila v. Stephens*, No. 4:13-CV-506-O, 2015 WL 1808689 (N.D. Tex. Apr. 21, 2015) ........ 168

*Davis v. Sec'y for the Dep't of Corr.*, 341 F.3d 1310 (11th Cir. 2003) .................................... 111

*Derden v. McNeel*, 978 F.2d 1453 (5th Cir. 1992) ................................................................. 184

*Dist. Att'y Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52 (2009) ................................ 13

*Downum v. United States*, 372 U.S. 734 (1963) ..................................................................... 181

*Drain v. Woods*, 902 F. Supp. 2d 1006 (E.D. Mich. 2012) ..................................................... 111

*Driscoll v. Delo*, 71 F.3d 701 (8th Cir. 1995) ........................................................................ 120

*Dugger v. Adams*, 489 U.S. 401 (1989) .................................................................................. 119

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) ........................................................................... 148

*Edwards v. Arizona*, 451 U.S. 477 (1981) .............................................................................. 142

*Edwards v. Vannoy*, No. 19-5807, 2020 WL 2105209 (U.S. May 4, 2020) ............................. 183

*Estelle v. McGuire*, 502 U.S. 62 (1991) .................................................................................. 150

*Evitts v. Lucey*, 469 U.S. 387 (1985) ...................................................................................... 165

*Fahy v. Horn*, 516 F.3d 169 (3d Cir. 2008) ........................................................................ 15, 16

*Farkus v. Delo*, 33 F.3d 933 (8th Cir. 1994) .............................................................................. 7

*Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011) ............................................... 75-76, 77, 79

*Flowers v. Mississippi*, 139 S. Ct. 2228 (2019) ................................................................... 97-98

*Ford v. Wainwright*, 477 U.S. 399 (1986) ............................................................................... 12

*Fulminante v. Arizona*, 499 U.S. 279 (1991) ........................................................................ 143

*Furman v. Georgia*, 408 U.S. 238 (1972) ...................................................................... 158, 176

*Georgia v. McCollum*, 505 U.S. 42 (1992) ............................................................................. 113

*Gimbel v. Commodity Futures Trading Comm'n,* 872 F.2d 196 (7th Cir. 1989) ........................ 11

*Glenn v. Tate*, 71 F.3d 1204 (6th Cir. 1995) ............................................................................ 75

*Glossip v. Gross*, 135 S. Ct. 2726 (2015) ............................................................................ 161

*Godfrey v. Georgia*, 446 U.S. 420 (1980) ........................................................................ *passim*

*Gray v. Branker*, 529 F.3d 220 (4th Cir. 2008) ...................................................................... 71

*Green v. Thaler*, 699 F.3d 404 (5th Cir. 2012) .................................................................. 9, 10

*Gregg v. Georgia*, 428 U.S. 153 (1976) ...................................................................... 12, 131, 157

*Hardwick v. Crosby*, 320 F.3d 1127 (11th Cir. 2003) ............................................................ 71

*Harmelin v. Michigan*, 501 U.S. 957 (1991) ........................................................................... 12

*Harris v. Texas*, 467 U.S. 1261 (1984) ................................................................................... 109

*Herman v. Claudy*, 350 U.S. 116 (1956) ................................................................................. 17

*Hinton v. Alabama*, 571 U.S. 263 (2014) .......................................................................... *passim*

*Hurst v. Florida*, 136 S. Ct. 616 (2016) ......................................................................... 180, 181

*In re Complaint of Luhr Bros.*, 157 F.3d 333 (5th Cir. 1998) ........................................... 10-11

*Irvin v. Dowd*, 366 U.S. 717 (1961) ....................................................................................... 126

*Jackson v. Virginia*, 443 U.S. 307 (1979) .............................................................................. 12

*Jefferson v. Upton*, 560 U.S. 284 (2010) ............................................................................. 9-10

*Jenkins v. Anderson*, 447 U.S. 231 (1980) ............................................................................. 7

*Johnson v. Mississippi*, 486 U.S. 578 (1988) ...................................................................... 130

*Jones v. Polk*, 401 F.3d 257 (4th Cir. 2005) ..................................................................... 18-19

*Jones v. United States*, 526 U.S. 227 (1999) ........................................................................ 153

*Jones v. United States*, 527 U.S. 373 (1999) ........................................................................ 182

*Jurek v. Texas*, 428 U.S. 262 (1976) ............................................................... 86, 158, 159

*Kyles v. Whitley*, 514 U.S. 419 (1995) ................................................................................. 184

*Lawlor v. Zook*, 909 F.3d 614 (4th Cir. 2018) ....................................................................... 95

*Lewis v. Dretke*, 355 F.3d 364 (5th Cir. 2003) ...................................................................... 85

*Lockett v. Anderson*, 230 F.3d 695 (5th Cir. 2000) ................................................. 27, 75, 80, 91

*Lockett v. Ohio*, 438 U.S. 586 (1978) ........................................................................ 134, 147

*Louis Dreyfus & Cie. v. Panama Canal Co.*, 298 F.2d 733 (5th Cir. 1962) .............................. 11

*Loving v. Virginia*, 388 U.S. 1 (1967) ................................................................................. 176

*Marbury v. Madison*, 5 U.S. 137 (1803) ....................................................................... 160-161

*Martinez v. Ryan*, 566 U.S. 1 (2012) ............................................................................. *passim*

*McDonald v. Pless*, 238 U.S. 264 (1915) .............................................................................. 133

*McKoy v. North Carolina*, 494 U.S. 433 (1990) .................................................................... 134

*Michigan v. Mosley*, 423 U.S. 96 (1975) ............................................................... 139, 140, 145

*Middleton v. Dugger*, 849 F.2d 491 (11th Cir. 1988) ............................................................ 71

*Miller-El v. Cockrell*, 537 U.S. 322 (2003)  ............................................................... 7, 9

*Miller-El v. Dretke*, 545 U.S. 231 (2005)  ............................................................ *passim*

*Mills v. Maryland*, 486 U.S. 367 (1988)  ............................................................ 134, 146

*Miranda v. Arizona*, 384 U.S. 436 (1966)  ......................................................... 138, 144

*Mitcham v. Davis*, 103 F. Supp. 3d 1091 (N.D. Cal. 2015)  ............................... 111-12

*Moore v. Texas*, 137 S. Ct. 1039 (2017)  ................................................................... 166

*Moore v. Texas*, 139 S. Ct. 666 (2019)  ..................................................................... 166

*Moran v. Burbine*, 475 U.S. 412 (1986)  ............................................................ 138, 139

*Nichols v. Scott*, 69 F.3d 1255 (5th Cir. 1995)  ......................................................... 9, 13

*Oliver v. Quarterman*, 541 F.3d 329 (5th Cir. 2008)  .................................. 127, 127-28

*Palmer v. Ashe*, 342 U.S. 134 (1951)  ......................................................................... 17

*Panetti v. Quarterman*, 551 U.S. 930 (2007)  ............................................................. 15

*Penry v. Johnson*, 532 U.S. 782 (2001)  .................................................................... 166

*Penry v. Lynaugh*, 492 U.S. 302 (1989)  ................................................................... 166

*Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309 (Fed. Cir. 1985)  ................... 11

*Peña-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017)  ............................. 131, 133, 176

*Porter v. McCollum*, 558 U.S. 30 (2009)  .......................................................... *passim*

*Prible v. Davis*, No. 09-CV-1896, 2020 WL 2563544 (S.D. Tex. May 20, 2020)  .................... 109

*Ramey Constr. Co. v. Apache Tribe*, 616 F.2d 464 (10th Cir. 1980)  .......................... 11

*Ramos v. Louisiana*, 140 S. Ct. 1390 (2020)  .................................................... *passim*

*Reed v. Louisiana*, 137 S. Ct. 787 (2017)  ......................................... 161, 171, 177

*Reed v. Quarterman*, 555 F.3d 364 (5th Cir. 2009)  ..................................... 98, 99, 116

*Reed v. Ross*, 468 U.S. 1 (1984)  .................................................................................. 6

*Remmer v. United States*, 347 U.S. 227 (1954)  ....................................................... 126

*Rhode Island v. Innis*, 446 U.S. 291 (1980)  ............................................................. 142

*Ring v. Arizona*, 536 U.S. 584 (2002)  ................................................................ *passim*

*Rivera v. Quarterman*, 505 F.3d 349 (5th Cir. 2007)  ................................................. 15

*Rompilla v. Beard*, 545 U.S. 374 (2005)  ..................................................... 22, 68, 81

*Saffle v. Parks*, 494 U.S. 484 (1990)  .................................................................. 183-84

*Saranchak v. Sec'y, Pa. Dep't of Corr.*, 802 F.3d 579 (3d Cir. 2015)  ....................... 83

*Sawyer v. Smith*, 497 U.S. 227 (1990)  ..................................................................... 123

*Schlup v. Delo*, 513 U.S. 298 (1995)  ........................................................................... 7

*Scott v. Hubert*, 610 F. App'x 433 (5th Cir. 2015)  .................................................. 112

*Sears v. Upton*, 561 U.S. 945 (2010)  ................................................................ *passim*

v

*Simmons v. South Carolina*, 512 U.S. 154 (1994) ................................................... 128

*Skipper v. South Carolina*, 476 U.S. 1 (1986) ................................................ 23, 146

*Smith v. Cain*, 708 F.3d 628 (5th Cir. 2013) ............................................................ 15

*Smith v. Campbell*, 620 F. App'x 734 (11th Cir. 2015) .................................... 14, 15

*Smith v. Robbins*, 528 U.S. 259 (2000) ................................................................. 112

*Smith v. Texas*, 543 U.S. 37 (2004) ...................................................................... 166

*Smith v. Texas*, 550 U.S. 297 (2007) ..................................................................... 166

*Snyder v. Louisiana*, 552 U.S. 472 (2008) ...................................................... 98, 99

*Starr v. Lockhart*, 23 F.3d 1280 (8th Cir. 1994) ................................................. 122

*Strickland v. Washington*, 466 U.S. 668 (1984) ............................................. *passim*

*Taylor v. Kentucky*, 436 U.S. 478 (1978) ............................................................. 184

*Tennard v. Dretke*, 542 U.S. 274 (2004) ..................................................... 147, 166

*Tercero v. Stephens*, 738 F.3d 141 (5th Cir. 2013) ................................................ 13

*Townsend v. Burke*, 334 U.S. 736 (1948) .................................................... 130-131

*Townsend v. Sain*, 372 U.S. 293 (1963) .................................................................... 6

*Trevino v. Thaler*, 569 U.S. 413 (2013) ......................................................... *passim*

*Turner v. Louisiana*, 379 U.S. 466 (1965) ............................................. 125-26, 131

*United States v. Armstrong*, 517 U.S. 456 (1996) ...................................... 162, 164

*United States v. El Paso Natural Gas Co.*, 376 U.S. 651 (1964) ............................. 10

*United States v. Hernandez*, 574 F.2d 1362 (5th Cir. 1978) ................................ 145

*United States v. Howard*, 506 F.2d 865 (5th Cir. 1975) ...................................... 127

*Walbey v. Quarterman*, 309 F. App'x 795 (5th Cir. 2009) ............................. 24, 72

*Wardrip v. Davis*, No. 7:01-CV-247-G-BF, 2017 WL 8677939 (N.D. Tex. Nov. 29, 2017) .................................................................................................................. 17, 118

*Washington v. Davis*, 426 U.S. 229 (1976) ......................................................... 179

*Washington v. Davis*, 715 F. App'x 380 (5th Cir. 2017) .................................... 111

*Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017) .................................... 113, 122

*Wellons v. Hall*, 558 U.S. 220 (2010) ...................................................................... 6

*Wheat v. Thigpen*, 793 F.2d 621 (5th Cir. 1986) ................................................ 120

*Whorton v. Bockting*, 549 U.S. 406, 421 (2007) ................................................ 184

*Wiggins v. Smith*, 539 U.S. 510 (2003) .......................................................... *passim*

*Wiley v. Epps*, 625 F.3d 199 (5th Cir. 2010) .................................................... 13-14

*Williams v. Taylor*, 529 U.S. 362 (2000) ....................................................... *passim*

*Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997) ..................................... 57, 58

*Wilson v. Sellers*, 138 S. Ct. 1188 (2018) ...................................................... 47, 67, 113

*Woodson v. North Carolina*, 428 U.S. 280 (1976) ................................................. 157

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ............................................................ 164

**Federal Statutes**

28 U.S.C. § 2244 .................................................................................................. 183

28 U.S.C. § 2254 ............................................................................................ *passim*

**State Cases**

*Berry v. State*, 233 S.W.3d 847 (Tex. Crim. App. 2007) ....................................... 150

*Charles v. State*, 146 S.W.3d 204 (Tex. Crim. App. 2004) .............................. 19, 21

*Coble v. State*, 330 S.W. 3d 253 (Tex. Crim. App. 2010) ............................... 94, 149

*Cole v. State*, No. AP-76,703, 2014 WL 2807710 (Tex. Crim. App. June 18, 2014) ......... *passim*

*Draughon v. State*, 831 S.W.2d 331 (Tex. Crim. App. 1992) ................................. 168

*Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004) ......................................... 17

*Ex Parte Cole*, No. 84,332-01, 2017 WL 562725 (Tex. Crim. App. Feb. 8, 2017) ........... *passim*

*Ex Parte Cole*, No. 84,332-02, 2020 WL 1542118 (Tex. Crim. App. Apr. 1, 2020) ............. 3, 72

*Ex parte Medina*, 361 S.W.3d 633 (Tex. Crim. App. 2011) ..................................... 17

*Ex parte O'Brien*, 190 S.W.3d 677 (Tex. Crim. App. 2006) .................................... 17

*Ex parte Temple*, No. WR-78, 545-02, 2016 WL 6903758 (Tex. Crim. App. Nov. 23, 2016) .................................................................................................. 109, 110

*Garza v. State*, No. AP-75, 217, 2008 WL 1914673 (Tex. Crim. App. Apr. 30, 2008) ............ 168

*Granviel v. State*, 552 S.W.2d 107 (Tex. Crim. App. 1976) ................................... 152

*Martin v. State*, No. AP-76, 317, 2012 WL 5358862 (Tex. Crim. App. Oct. 31, 2012) ........... 168

*Martinez v. State*, 327 S.W.3d 727 (Tex. Crim. App. 2010) .................................. 150

*Martinez v. State*, 924 S.W.2d 693 (Tex. Crim. App. 1996) .................................. 121

*Mendenhall v. State*, 15 S.W.3d 560 (Tex. App. 2000) ..................................... 59, 65

*Moore v. State*, 265 S.W.3d 73 (Tex. App. 2008) .................................................. 111

*Perry v. State*, 158 S.W.3d 438 (Tex. Crim. App. 2004) ....................................... 149

*Raby v. State*, 970 S.W.2d 1 (Tex. Crim. App. 1998) .............................................. 59

*Rayford v. State*, 125 S.W.3d 521 (Tex. Crim. App. 2003) .................................... 153

*Renteria v. State*, 206 S.W.3d 689 (Tex. Crim. App. 2006) ................................... 152

*Roberts v. State*, 220 S.W.3d 521 (Tex. Crim. App. 2007) .................................... 149

*State v. Dixon*, 206 S.W.3d 587 (Tex. Crim. App. 2006) ................................... 121-22

*State v. Thomas*, 209 S.W.3d 268 (Tex. App. 2006) ............................................... 111

*Tompkins v. State*, 774 S.W.2d 196 (Tex. Crim. App. 1987) .................................................... 109

*Williams v. State*, 273 S.W.3d 200 (Tex. Crim. App. 2008) ..................................................... 121

**State Statutes**

Tex. Code Crim. Proc. art. 11.071 ........................................................................................ 16, 84

Tex. Code Crim. Proc. art. 37.071 ......................................................................................... *passim*

Tex. Gov't Code § 78.056 (a)(2) ................................................................................................ 19

Tex. Pen. Code § 8.04 ................................................................................................................ 59

**Other**

Tex. R. Evid. 606(b) ........................................................................................................ 127, 132

William J. Bowers & Wanda D. Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing*, 39 Crim. L. Bull. 51 (2003) .......................................... 174

William J. Bowers & Benjamin D. Steiner, *Death by Default: An Empirical Demonstration of False and Forced Choices in Capital Sentencing*, 77 Tex. L. Rev. 605 (1999)......................... 174

Eric F. Citron, *Sudden Death: The Legislative History of Future Dangerousness and the Texas Death Penalty*, 25 Yale L. & Pol'y Rev. 143 (2006) ................................................................. 177

Kathryn Roe Eldridge, *Racial Disparities in the Capital System: Invidious or Accidental?*, 14 Cap. Def. J. 305 (2002).............................................................................................................. 177

William J. Bowers, Benjamin D. Steiner & Marla Sandys, *Death Sentencing in Black and White: An Empirical Analysis of the Role of Jurors' Race and Jury Racial Composition*, 3 U. Pa. J. Const. L. 171 (2001) ................................................................................................................... 177

Stephen P. Garvey, Sheri Lynn Johnson, and Paul Marcus, *Correcting Deadly Confusion: Responding to Jury Inquiries in Capital Cases*, 85 Cornell L. Rev. 627 (2000) ....................... 174

Ian F. Haney López, *"A Nation of Minorities": Race, Ethnicity, and Reactionary Colorblindness*, 59 Stan. L. Rev. 985, 1062 (2007) ................................................................... 177

Scott Phillips, *Continued Racial Disparities in the Capital of Capital Punishment: The Rosenthal Era*, 50 Hous. L. Rev. 131 (Fall 2012) ..................................................................................... 157

Scott Phillips, *Racial Disparities in the Capital of Capital Punishment*, 45 Hous. L. Rev. 807 (Summer 2008) .................................................................................................................... 161, 162

Jordan M. Steiker et al., *The Problem of "Rubber-Stamping" in State Capital Habeas Proceedings: A Harris County Case Study*, 55 Hous. L. Rev. 889, 925 (2018) ........................... 10

Robin Walker Sterling, *"Children Are Different": Implicit Bias, Rehabilitation, and the "New" Juvenile Jurisprudence*, 46 Loy. L.A. L. Rev. 1019 (2013) ...................................................... 177

## INTRODUCTION

Jaime Piero Cole was convicted and sentenced to death for the killings of his estranged wife and step-daughter.  The jury heard that Mr. Cole was born in Ecuador, was adopted by an American family at a young age, was a hard worker, suffered from alcohol addiction, and had two families that loved him.  The jury never heard that as a child Mr. Cole lived in extreme poverty in Ecuador, was continuously exposed to harmful neurotoxins in Ecuador, and suffers from organic brain damage.  The jury also never heard that Mr. Cole's adoption was an extremely traumatic event: he was ripped from the arms of his mother and brought to a country where he did not speak the language.  That event deeply affected the rest of his life.  Despite living with his birth family until the age of seven, after he turned eight, he did not see them again until he was an adult.  Once in the United States, for his entire childhood and beyond, Mr. Cole believed that his birth mother had sold him to his new family.  The jury never heard any of this information.

Although the case in aggravation was substantial, one juror believed that a sentence of life imprisonment was the appropriate sentence.  That juror, however, was informed by other jurors that if the sentence was death, it would be automatically reviewed on appeal.  The jurors learned that information from the trial court.  During voir dire, the trial court had informed 11 of the 12 seated jurors that if Mr. Cole was sentenced to death, the decision would be automatically reviewed.

Both Mr. Cole's trial counsel and post-conviction counsel failed to raise these and several other meritorious issues.  The issues that post-conviction counsel did raise in state court received almost no process.  Despite disputed issues of fact, the trial court relied on and credited untested affidavits from interested parties and adopted the prosecution's proposed findings of fact and

conclusions of law in toto (affixing his signature on the prosecution's filing) only eleven days after they were filed.  The CCA relied on the trial court's findings and denied relief.  Mr. Cole has yet to receive a full and fair review of his claims.

## PROCEDURAL HISTORY

On March 25, 2010, a Texas grand jury indicted Mr. Cole for capital murder for the killings of his estranged wife, Melissa Cole, and Alecia Castillo.  DE 6-6 at 272.  Trial commenced on October 17, 2011.  DE 6-91 at 20.  Mr. Cole entered a plea of not guilty.  DE 6-91 at 12.  At the guilt phase of Mr. Cole's trial, his counsel neither gave an opening statement nor presented any witnesses.  DE 6-91 at 10; DE 6-94 at 82.  On October 20, 2011, the jury found Mr. Cole guilty of capital murder.  DE 6-94 at 117-18.  The punishment phase began on October 24, 2011.  DE 6-95 at 9.  On October 27, 2011, the jury voted to sentence Mr. Cole to death, and the trial court formally entered that sentence.  DE 6-98 at 76-78, 80.

Mr. Cole filed a timely appeal to the CCA.  In the appeal, he raised seventeen claims. *See* DE 6-37 (direct appeal brief).  On June 18, 2014, the CCA affirmed Mr. Cole's conviction and sentence.  *Cole I*, 2014 WL 2807710, at *1.  Mr. Cole petitioned the United States Supreme Court for a writ of certiorari, which was denied on January 20, 2015.  *Cole v. Texas*, 135 S. Ct. 1154 (2015) (DE 6-15).

On December 4, 2013, while his direct appeal was pending, Mr. Cole filed an initial application for writ of habeas corpus in the 230th Judicial District Court, Harris County Texas, in which he raised eight claims.  DE 6-3 at 6.  On February 24, 2016, the state court, without holding a hearing on any claim and over Mr. Cole's objections, ordered both parties to file proposed findings of fact and conclusions of law.  DE 6-5 at 221.  On June 3, 2016, Mr. Cole filed a motion to vacate the trial court's February 24, 2016, order.  DE 6-6 at 2.  On June 14,

2016, eleven days after the state filed its proposed findings of fact and conclusions of law, the state court, without holding a hearing on the disputed issues of fact, resolved the disputed issues based on extra-record evidence (which Mr. Cole did not have the opportunity to challenge), adopted the State's Proposed Findings of Fact and Conclusions of Law in toto, and affirmed Mr. Cole's conviction and sentence.  DE 6-6 at 141-94.

On October 24, 2016, Mr. Cole filed in the CCA objections to the trial court's findings of fact and conclusions of law.  DE 7-14.  On February 8, 2017, the CCA affirmed the trial court's decision denying Mr. Cole relief and upholding his conviction and sentence.  *Cole II*, 2017 WL 562725, at *2.  A dissenting opinion was also issued.  *Id.* at *2-3.  Mr. Cole petitioned the United States Supreme Court for a writ of certiorari, which was denied on October 2, 2017.  *Cole v. Texas*, 138 S. Ct. 90 (2017).

On March 30, 2017, this Court appointed the Federal Community Defender Office for the Eastern District of Pennsylvania to represent Mr. Cole on a petition for writ of habeas corpus. Mr. Cole filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this Court on February 6, 2018.  DE-10.  After several motions were filed, Mr. Cole filed an amended petition for writ of habeas corpus on February 6, 2019.  DE-30.  On September 20, 2019, following briefing by the parties, this Court ordered Mr. Cole to attempt to exhaust potentially unexhausted claims raised in his amended petition in state court.  DE-49 at 10.

On December 9, 2019, Mr. Cole filed a subsequent application for writ of habeas corpus in the CCA in an attempt to exhaust the potentially unexhausted claims.  On April 1, 2020, the CCA dismissed Mr. Cole's subsequent application for writ of habeas corpus without considering the merits of the claims. *Cole III*, 2020 WL 1542118, at *1.  This Court ordered Mr. Cole to file his second amended petition for writ of habeas corpus by June 15, 2020.  DE-54.

## STATEMENT REGARDING EXHAUSTION AND PROCEDURAL DEFAULT

Federal habeas petitioners are generally required to exhaust state court remedies in order to obtain relief in federal court.  28 U.S.C. § 2254(b)(1)(A).  Mr. Cole submits that each of his claims is either exhausted or falls within the exceptions to the exhaustion requirement as permitted by law.  To the extent that Claim XV is potentially unexhausted, Mr. Cole requests the opportunity to exhaust that claim in state court.

None of Mr. Cole's claims is procedurally barred from federal merits review.  To the extent the state court deemed any claim procedurally barred, one or more of the following are true: (1) that ruling was mistaken; (2) that ruling was not an adequate and independent state law ground; and /or (3) Mr. Cole can show cause and prejudice and/or a miscarriage of justice.  Because procedural default—like non-exhaustion—is an affirmative defense that Respondent must assert and can waive, Mr. Cole reserves his right to respond on Reply to any default and procedural bar arguments that Respondent may assert.

## EXCEPTIONS TO PROCEDURAL DEFAULT

The doctrine of procedural default is judge-made law designed "to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism."  *Martinez v. Ryan*, 566 U.S. 1, 9 (2012).  The doctrine imposes a bar on federal review of claims that "a state court declined to hear because the prisoner failed to abide by a state procedural rule."  *Id.*  This bar does not apply, however, if certain prerequisites are not satisfied.   The bar may be applied only if "the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed."  *Id.* (citations omitted).  Finally, a state prisoner may overcome this default in federal court by showing "cause" for the default and "prejudice"

from the violation of federal law, among other ways.  *Id.* at 10 (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

The Supreme Court has ruled that post-conviction counsel's ineffective assistance can constitute "cause" to overcome a default.  In *Martinez*, the Court held that when an initial-review collateral proceeding is the first time a petitioner can raise a claim for ineffective assistance of trial counsel, state habeas counsel's ineffective assistance at that stage could supply "cause" for the default of the trial ineffectiveness claim.  566 U.S. at 17.  The next term, the Court clarified that this rule applied to Texas, because Texas's "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal."  *Trevino v. Thaler*, 569 U.S. 413, 429 (2013).

To establish cause for the default, the Fifth Circuit has held that *Martinez* requires Petitioner to show that (1) state habeas counsel's performance at an initial collateral-review proceeding was deficient as defined in *Strickland v. Washington*, 466 U.S. 668 (1984), and (2) an ineffective-assistance-of-trial-counsel claim that state habeas counsel failed to raise has "some merit."  *Canales v. Stephens*, 765 F.3d 551, 567-68 (5th Cir. 2014).  Petitioner makes these showings as to select claims below.  In addition, Petitioner must demonstrate prejudice, which "requires a showing that there is 'a reasonable probability that, but for [trial] counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 568 (quoting *Strickland*, 466 U.S. at 694) (alteration in original).  The meritorious claims of trial ineffectiveness outlined in this pleading establish prejudice.

Likewise, the Court has also concluded that "where a constitutional claim is so novel that its legal basis [wa]s not reasonably available to counsel, a defendant has cause for his failure to

raise the claim in accordance with applicable state procedures." *Reed v. Ross*, 468 U.S. 1, 16 (1984); *see also, e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 753 (1991) ("'showing that the . . . legal basis for a claim was not reasonably available to counsel would constitute cause'") (internal citation omitted).  Regarding Claim XV, Petitioner can establish cause and prejudice to excuse any procedural default.

### STATEMENT OF PRIOR COUNSEL

At trial, Mr. Cole was represented by Robert Loper and Gerald Graber.  On direct appeal, Mr. Cole was represented by Robert Morrow, Amy Martin, and Heather Lytle.  In state post-conviction proceedings, Mr. Cole was represented by Brad Levenson, Sam Farina-Henry, Janet Gilger-Vanderzanden, and Robert Romig.  On appeal from the denial of state post-conviction relief, Mr. Cole was represented by Benjamin Wolff and Derek Verhagen.  In his subsequent petition for post-conviction relief in state court, Mr. Cole was represented by undersigned counsel.

### REQUEST FOR EVIDENTIARY HEARING

Because the facts alleged herein would entitle Petitioner to relief, this Court should grant a hearing.  As a general rule, an evidentiary hearing is appropriate when the facts alleged in the habeas petition, if true, would entitle the petitioner to relief and there is a material dispute about those facts.  *See Townsend v. Sain*, 372 U.S. 293, 312-19 (1963), *overruled in part on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1, 5 (1992); *Wellons v. Hall*, 558 U.S. 220, 226 (2010) (per curiam) (remanding for determination "whether petitioner's allegations, together with the undisputed facts, warrant discovery and an evidentiary hearing").  When evaluating a habeas petitioner's proffer, the court accepts as true his factual allegations and views his factual assertions in the light most favorable to him.  *Id.* at 312.  Evidentiary "hearings are particularly

important in capital cases . . . , where the 'irremediable' penalty demands factfinding at a 'heightened standard of reliability.'" *Farkus v. Delo*, 33 F.3d 933, 939 n.6 (8th Cir. 1994) (quoting *Ford v. Wainwright*, 477 U.S. 399 (1986)); *cf. Banks v. Dretke*, 540 U.S. 668, 675 (2004) ("[T]hrough discovery and an evidentiary hearing . . . in a federal habeas corpus proceeding, . . . long-suppressed evidence came to light" and death sentence was vacated.).

To the extent this Court believes that any of Petitioner's claims may be procedurally defaulted, this Court should grant a hearing so that Petitioner can show cause and prejudice and/or a fundamental miscarriage of justice to overcome any default. *See Jenkins v. Anderson*, 447 U.S. 231, 234 n.1 (1980) (application of cause and prejudice may require district court fact finding); *see also Trevino*, 569 U.S. at 428-29 (ineffective assistance of state post-conviction counsel can establish cause for procedural default); *Schlup v. Delo*, 513 U.S. 298, 332 (1995) (remanding to district court to determine whether to hold hearing on fundamental miscarriage of justice).

## STANDARD OF REVIEW UNDER AEDPA

### A. General Standards

This Court's review is conducted pursuant to the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). While AEDPA places certain limitations on a federal court's ability to grant habeas relief, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (*Miller-El I*).

28 U.S.C. § 2254(d), which provides the standard of review for federal courts reviewing habeas petitions challenging state convictions, states:

> (d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect

to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As the text of § 2254(d) makes clear, AEDPA's deferential standard of review applies only to those claims that were adjudicated on the merits in state court.  Any claim that was not adjudicated on the merits in state court is reviewed de novo.  *Cone v. Bell*, 556 U.S. 449, 472 (2009).

For any claim upon which a state court has ruled on the merits, a federal court may nonetheless grant relief under § 2254(d)(1) and/or (d)(2).  Under § 2254(d)(1), a federal court may grant relief where the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions at the time of the relevant state-court decision."  *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  A state court ruling is "contrary to" clearly established federal law where it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  *Id.* at 412-13.  Under the "'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.*  A court may grant

relief under § 2254(d)(2) where a state court merits determination is "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El I*, 537 U.S. at 340.

The relevant adjudication as to the claims raised on direct appeal is the 2014 opinion of the CCA. *See Cole I.* For any claim adjudicated in state-habeas proceedings, the relevant adjudication is the 2017 order of the CCA, together with the Texas district court's ruling, which the CCA incorporated in its final order denying relief. *Cole II*; DE 6-6 at 141-94 (State's Proposed Findings of Fact, Conclusions of Law and Order).

> **B.      Because *Cole II* Adopted the Lower Court's Findings, Which Were Adopted Verbatim from the State's Proposed Findings of Fact and Conclusions of Law, AEDPA Deference Should Not Apply to Claims That Were Adjudicated in State Habeas Proceedings.**

Claims I, II, V, VII, VIII, XI, and XIV of Petitioner's federal habeas petition were raised and adjudicated in his initial application for state habeas relief. *See* DE 6-3 (application); DE 6-1 (order). The state court's order adopted verbatim the proposed findings of fact and legal conclusions written by the State's attorneys. Because the trial court, and by extension the CCA, abdicated their adjudicatory roles, this Court should exercise de novo review over these claims. Deferring to an order drafted by a party-opponent is inappropriate and inconsistent with due process.

Mr. Cole acknowledges that the Fifth Circuit and the federal district courts in Texas have sometimes accorded AEDPA deference to state court factual findings, even where those findings were verbatim adoptions of proposed orders written by the State. *See, e.g.*, *Green v. Thaler*, 699 F.3d 404, 416 (5th Cir. 2012); *Nichols v. Scott*, 69 F.3d 1255, 1277 (5th Cir. 1995). The Supreme Court, however, has questioned whether such a practice is proper: "Although we have stated that a court's 'verbatim adoption of findings of fact prepared by prevailing parties' should be treated as findings of the court, we have also criticized that practice." *Jefferson v. Upton*, 560

9

U.S. 284, 293-94 (2010) (vacating denial of habeas petition in pre-AEDPA case and remanding

for district court to determine whether presumption of correctness applied to factual findings in

state court order adopted verbatim from proposed order authored by state's attorneys).

Although it appears that the Texas state-habeas courts have made a practice of denying

relief by adopting the State's proposed orders,[1] a practice is not legitimate merely because it is

repeated.  In non-habeas cases, the United States Supreme Court and the Fifth Circuit have

criticized the adoption of a party's proposed order as a court's reasoned opinion on multiple

occasions.  *See Anderson v. City of Bessemer*, 470 U.S. 564, 572 (1985) ("We, too, have

criticized courts for their verbatim adoption of findings of fact prepared by prevailing

parties . . . . We are also aware of the potential for overreaching and exaggeration on the part of

attorneys preparing findings of fact when they have already been informed that the judge has

decided in their favor."); *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 657 n.4 (1964)

(noting that lawyers who draft proposed orders "in their zeal and advocacy and their enthusiasm

are going to state the case for their side . . . as strongly as they possibly can.  When these

[opinions] get to the courts of appeals they won't be worth the paper they are written on as far as

assisting the court of appeals in determining why the judge decided the case."); *In re Complaint

of Luhr Bros.*, 157 F.3d 333, 338 (5th Cir. 1998) ("[I]n cases such as the instant one, where the

district court's Findings of Fact and Conclusions of Law are near-verbatim recitals of the

prevailing party's proposed findings and conclusions, with minimal revision, we should

---

[1] *See, e.g.*, *Green*, 699 F.3d at 416 (noting state habeas court requested a proposed order
from state ex parte and then adopted it); *see also* Jordan M. Steiker et al., *The Problem of
"Rubber-Stamping" in State Capital Habeas Proceedings: A Harris County Case Study*, 55
Hous. L. Rev. 889, 925 (2018) ("So long as rubber-stamping continues to receive the imprimatur
of the CCA and the federal courts, state post-conviction judges have little incentive to abandon
the practice.").

approach such findings with 'caution.'") (quoting *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 574 (5th Cir. 1996)).

The Fifth Circuit has made clear that where, as here, a court adopts verbatim a party's lengthy proposed findings without making a single change to them, the findings are entitled to little weight in non-habeas cases:

> When the findings have been drafted by the trial judge himself, they carry a certain badge of personal analysis and determination that may dissuade an appellate court from reversing in a doubtful case. When that badge is missing, the appellate court can feel slightly more confident in concluding that important evidence has been overlooked or inadequately considered—if the evidence supporting the decision is of a doubtful nature. . . .
>
> The findings also will carry more of a badge of personal determination when the trial judge has selected certain of the proposed findings but written others himself or when he has revised and edited the proposed findings, than they will when he has adopted a slate of findings verbatim.

*Louis Dreyfus & Cie. v. Panama Canal Co.*, 298 F.2d 733, 738-39 (5th Cir. 1962).[2]

---

[2] In at least four other circuits, courts mandate stricter appellate scrutiny of "rubber-stamped" findings by the district courts. *See, e.g., Cuthbertson v. Biggers Bros.*, 702 F.2d 454, 458-59 (4th Cir. 1983) ("The adversarial zeal of counsel for the prevailing party too often infects what should be disinterested findings to entrust their preparation to the successful attorney. Although findings of fact should not be set aside unless clearly erroneous, where, as here, plaintiffs' counsel has prepared the findings and the district court has adopted them verbatim, we accord the findings less 'weight and dignity [than] . . . the unfettered and independent judgment of the trial judge.'") (citation omitted)); *Gimbel v. Commodity Futures Trading Comm'n*, 872 F.2d 196, 199 (7th Cir. 1989) ("Although we recognize the time constraints under which most [administrative law judges] operate, we strongly disapprove of the practice of adopting the findings submitted by one party and will scrutinize these findings closely. Among other things, this practice may create a negative impression about the [administrative law judge]'s diligence and impartiality.") (citations omitted)); *Alcock v. Small Bus. Admin.*, 50 F.3d 1456, 1459 n.2 (9th Cir. 1995) ("Findings of fact prepared by counsel and adopted by the trial court are subject to greater scrutiny than those authored by the trial judge."); *Ramey Constr. Co. v. Apache Tribe*, 616 F.2d 464, 467 & n.3 (10th Cir. 1980) ("Wholesale adoption of such proposals by the court cannot generally convert them into a form 'reflect(ing) impartiality and restrained, objective judicial attitude.'") (alteration in original) (citation omitted); *cf. Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 313 (Fed. Cir. 1985) (indicating the "adoption of proposed findings verbatim may increase wariness on review").

Judicial independence is always vital, but it is even more important in a capital habeas case than in a civil case.  First, a state-habeas court's order necessarily deals with the possible violation of a person's constitutional rights in the course of a criminal trial; our legal system has a long history of according more—not less—protection to the rights of a criminal defendant than a civil litigant.  *See, e.g.*, *Jackson v. Virginia,* 443 U.S. 307, 315 (1979) ("[P]roof beyond a reasonable doubt has traditionally been regarded as the decisive difference between criminal culpability and civil liability.").  Second, as the Supreme Court has repeatedly expressed, "death is different," meaning that procedural and substantive safeguards in capital cases must be robust to prevent the imposition of a death sentence in a way that is arbitrary and capricious.  *See, e.g.*, *Ring v. Arizona,* 536 U.S. 584, 605-06 (2002); *Harmelin v. Michigan*, 501 U.S. 957, 993-94 (1991); *Ford v. Wainwright*, 477 U.S. 399, 411 (1986); *Gregg v. Georgia*, 428 U.S. 153, 188 (1976).

The State and Petitioner each submitted proposed orders to the state habeas judge, who was not the trial judge.  *See* DE 6-6 at 2-140 (Motion to Vacate Order [and] Petitioner's Proposed Findings of Fact and Conclusions of Law); DE 6-6 at 141-93 (State's Proposed Findings of Fact and Conclusions of Law).  The State's proposed order was 54 pages long and filed on June 3, 2016.  Petitioner's proposed order was 138 pages long and was also filed on June 3, 2016.  On June 14, 2016, just eleven days after receiving the proposed findings of fact and conclusions of law, the state habeas court adopted the State's order verbatim without making a single endorsement, correction, appendix, or substitution, aside from affixing its signature on the last page.  DE 6-6 at 194; *see id.* at 141-93.  The state habeas court's final order was written entirely by the State's attorneys.

While circuit precedent suggests that this Court should give deference even to a state court order that adopts wholesale the State's proposed order, *see Nichols*, 69 F.3d at 1277, Petitioner contends that such precedent is erroneous. A state court decision addressing the constitutional rights of a criminal defendant in a death penalty case should not be accorded deference by the federal courts when it is the mere adoption of an order (and proposed findings of fact and conclusions of law) written unilaterally by his adversary, particularly when, as discussed below, the state court made fact findings without evidentiary development and adversarial testing.

### C.    Because the State Court Made Unreasonable Factual Determinations of Petitioner's Claims and Denied Evidentiary Development in Violation of the Due Process Clause, AEDPA Deference Should Not Apply to Claims That Were Adjudicated in State Habeas Proceedings.

A petitioner may overcome the limitation on relief in § 2254(d) by demonstrating that a state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). An "unreasonable determination of the facts" may occur in a state court's decision on the merits. *See, e.g.*, M*iller-El v. Dretke*, 545 U.S. 231, 236-37 (2005) (*Miller-El II*). But it may also occur in a state court's earlier decision whether to grant or deny evidentiary development to a petitioner's claims. *See Brumfield v. Cain*, 135 S. Ct. 2269, 2273 (2015) (discussed below). Where the state court process is procedurally unfair, the state court's decision should not receive deference under § 2254(d). *See Dist. Att'y Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 69 (2009) (petitioner entitled to due process in post-conviction procedures); *Tercero v. Stephens*, 738 F.3d 141, 148 (5th Cir. 2013) ("[T]he state court's decision is . . . deprived 'of the deference normally due' where the state court has failed 'to provide [petitioner] with the opportunity to develop his claims[.]'"); *Wiley v. Epps*, 625 F.3d

199, 207 (5th Cir. 2010) ("'When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied.'").

In *Brumfield*, petitioner sought an evidentiary hearing to prove his intellectual disability after *Atkins v. Virginia*, 536 U.S. 304 (2002). The state court summarily denied the application. 135 S. Ct. at 2275. The Supreme Court ruled that none of the factual determinations on which the state court had relied could "foreclose" relief, because the state court ruling denying a hearing rested on an unreasonable determination of the facts. *Id.* at 2277-78. It was "critical to remember" that Brumfield did not have to prove his case or even show that he "likely" was intellectually disabled to obtain a hearing. Instead, applying the state-law standard for whether an *Atkins* hearing should be granted, the Supreme Court held that he needed only to raise a reasonable doubt. *Id.* at 2281.

This holding is not limited to the facts of *Brumfield*. For example, in *Smith v. Campbell*, 620 F. App'x 734 (11th Cir. 2015), the Eleventh Circuit applied *Brumfield* to a determination by the Alabama Court of Criminal Appeals. The Alabama Court of Criminal Appeals held that a petitioner raising an *Atkins* claim had failed to comply with a state-law factual pleading requirement. In doing so, the Alabama Court of Criminal Appeals made the "underlying factual determination that '[t]he only grounds offered in support' of Smith's claim were his conclusory allegations that he met the three requirements of intellectual disability under *Atkins* . . . ." *Id.* at 748. Under (d)(2), the Eleventh Circuit reviewed "the underlying factual determination about whether Smith's second amended petition recounted any facts at all or only conclusory allegations." *Id.* Finding that the state court had overlooked at least seven factual allegations that supported the *Atkins* claim, the court concluded that "the Alabama appellate court's factual

14

determination—that the 'only grounds' Smith pled were conclusory allegations that he met each

of the three requirements—is unsupported by the record and therefore unreasonable." *Id.* (citing

*Wiggins v. Smith*, 539 U.S. 510, 528-29 (2003), and *Brumfield*, 135 S. Ct. at 2276-77).

Likewise, in *Panetti v. Quarterman*, 551 U.S. 930 (2007), the Supreme Court found that

the state court "failed to provide petitioner with a constitutionally adequate opportunity to be

heard." *Id.* at 952.  Finding the state court's denial of the claim "cannot be reconciled with any

reasonable application of the controlling standard" under § 2254(d), *id.* at 952-53, the Court

considered Panetti's claim on the merits without deferring to the state court's competency

finding, *id.* at 954.

The Fifth Circuit draws from *Panetti* "the lesson . . . that, where a petitioner has made a

prima facie showing [of a constitutional violation], the state court's failure to provide him with

the opportunity to develop his claim deprives the state court's decision of the deference normally

due." *Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir. 2007) (citing *Panetti*, 551 U.S. at 954);

*see also Smith v. Cain*, 708 F.3d 628, 633-35 (5th Cir. 2013) (no review under § 2254(d) or (e)

because state court unreasonably denied petitioner opportunity to develop factual basis of his

*Batson* claim).[3]

Here, the state court denied Petitioner an evidentiary hearing on all of his claims.  *See* DE

6-9 (transcript of Feb. 24, 2016 status conference).  This denial was inherent in the court's

ordering both sides to submit proposed findings of fact and conclusions of law without even first

determining whether there were controverted issues of fact to be resolved, designating which of

---

[3] *Cf. Fahy v. Horn*, 516 F.3d 169, 183 (3d Cir. 2008) (no presumption of correctness
applied to state court ruling that petitioner waived state appellate and post-conviction rights
because proceedings in state court procedurally unfair).

those issues of fact were to be resolved and by what manner, or providing Mr. Cole an opportunity to be heard, present evidence, and rebut the state's extra-record evidence. *See id.* at 3-9. As the State argued to the court, "by going ahead and signing an order to proceed on findings, you're essentially finding that there are no longer any factual issues that need to be resolved. And that you are satisfied with the affidavits that have been submitted." *Id.* at 5.

Where, as here, the resolution of factual issues required extra-record evidence (i.e., affidavits), by law, the court should have issued an order designating the issues of fact that were to be resolved and announcing the manner by which those issues would be resolved. Tex. Code Crim. Proc. art. 11.071 § 9(a). This process is mandated as it provides an applicant notice and an opportunity to be heard, consistent with due process.[4]

The court's denial of evidentiary development of the controverted issues of fact was unreasonable in light of the record and proffers presented to it. The Texas capital habeas statute requires a state habeas court to "determine whether controverted, previously unresolved factual issues material to the legality of the applicant's confinement exist and . . . issue a written order of the determination" following the filing of the State's answer to the state habeas application. Art. 11.071, § 8(a). If the court determines there are no such factual issues, the parties submit proposed findings of fact and conclusions of law, *id.* § 8(b), and the case is ripe for disposition, *id.* § 8(c). If, on the other hand, the court determines that such issues do exist, the court is required "to enter an order . . . designating the issues of fact to be resolved and the manner in which the issues shall be resolved," including by "affidavits, depositions, interrogatories, [or]

---

[4] This was especially crucial here, as the state habeas judge had not sat at trial. Ordinarily, the state habeas judge could use "personal recollection" as another method of resolving a claim. Tex. Code Crim. Proc. art. 11.071, § 9(a). Here, however, the state habeas judge had no firsthand knowledge of the trial proceedings.

evidentiary hearings," *id.* § 9(a).  This procedure reflects that an applicant need only file an application "contain[ing] sufficient specific facts that, if proven to be true, might entitle the applicant to relief."  *Ex parte Medina*, 361 S.W.3d 633, 640 (Tex. Crim. App. 2011).  An application must merely make a "threshold showing, however minimal, of an evidentiary basis before requiring a . . . court to undertake the task of evaluating the allegations."  *Id.* (quoting *Kafo v. United States*, 467 F.3d 1063, 1069 (7th Cir. 2006)).

It follows that a court may not summarily dismiss a well-pleaded application.  *See, e.g.*, *Herman v. Claudy*, 350 U.S. 116, 119 (1956); *Palmer v. Ashe*, 342 U.S. 134, 135-36, 138 (1951); *Ex parte O'Brien*, 190 S.W.3d 677, 684 (Tex. Crim. App. 2006) (Price, J., dissenting) ("It is manifestly unfair . . . to fault the applicant for a failure of proof without first affording him an opportunity to present evidence . . . once it is determined that facts have been *alleged*, which, if true, may entitle the applicant to relief."); *Ex parte Briseno*, 135 S.W.3d 1, 3 (Tex. Crim. App. 2004) ("Based upon applicant's prima facie showing, we remanded his writ application . . . for further proceedings.").  A dispute over material facts "should be decided only after a hearing."  *Herman*, 350 U.S. at 121.

In *Wardrip v. Davis*, the court found that the petitioner satisfied § 2254(d)(2) where, as here, the state court denied him an evidentiary hearing, credited unchallenged trial counsel affidavits, and relied on those affidavits to resolve disputed issues of fact against the petitioner. *Wardrip v. Davis*, No. 7:01-CV-247-G-BF, 2017 WL 8677939 (N.D. Tex. Nov. 29, 2017), *report and recommendation adopted as modified*, No. 7:01-CV-247-G, 2018 WL 1536279 (N.D. Tex. Mar. 29, 2018).  In *Wardrip*, the petitioner alleged that trial counsel was ineffective.  *Id.* at *6.  The state court denied an evidentiary hearing finding that there were no disputed issues that were material to petitioner's confinement.  *Id.*  "Even though the state court found that no fact

17

issues existed and denied any evidentiary development it then proceeding to make findings that resolved disputed factual issues against [the petitioner], accepting the state's version as true and finding [petitioner's] version to be false." *Id.* at \*7 ("After denying [petitioner] any opportunity to cross-examine trial counsel Curry, the state court quoted from the affidavit that Curry provided to the State[.]").  For two independent reasons, that are both present here, the court found the petitioner satisfied § 2254(d): (1) the state court denied the claim "without any supporting evidence regarding the thoroughness of trial counsel's investigation or that he made any decision to limit the investigation before the state court[,]" and (2) the state court's determination that no disputed fact issues existed "cannot be reconciled with the same court's findings resolving those disputed fact issues against [petitioner]." *Id.* at \*10.

In Petitioner's case, the State contended that none of Petitioner's claims deserved evidentiary development.  DE 6-9 at 3.  The State's position was that "this can be resolved just based on the affidavits without the necessity of a hearing." *Id.*  As discussed above, the court then adopted the State's proposed findings of fact, crediting the State's affidavits and discrediting the affidavits submitted by Petitioner.

However, affidavits are a disfavored method of taking evidence where a judge must resolve controverted factual issues involving credibility determinations.  In the post-conviction context, when claims of ineffective assistance of trial counsel are raised, trial counsel often occupy a position that is adverse to their former client.  *Cf. Christeson v. Roper*, 574 U.S. 373, 378-80 (2015) (recognizing the importance of policing conflicts of interest that can arise in capital post-conviction representation); *see also Jones v. Polk*, 401 F.3d 257, 274 (4th Cir. 2005) (discussing trial counsel's well known "natural reluctance" to cooperate with habeas counsel in

ineffectiveness claims).  As adverse witnesses, defense counsel become interested parties,[5] and affidavits from interested witnesses are an inadequate fact-finding mechanism.  As the CCA observed in *Charles v. State*¸

> Affidavits . . . are widely and appropriately used in criminal and civil proceedings to determine if there are material disputed facts and to define exactly which facts are disputed.  They are not always well-suited for resolving disputed facts.

146 S.W.3d 204, 210 (Tex. Crim. App. 2004) (citation omitted).

The statements in affidavits of interested witnesses concerning their own state of mind are incontestable because "the mental workings of an individual's mind are matters about which adversaries have no knowledge or ready means of confirming or controverting."  *Id.*  For that reason, rather than blindly crediting the affidavits of interested witnesses, such as trial counsel, the court should *discount* any factual allegations offered by such witnesses in affidavit form.  *See id.*  By contrast, "with witnesses on the stand, such ambiguities may be cleared up by follow-up questions, pressing for the factual basis of a conclusion, and by cross-examination."  *Charles*, 146 S.W.3d at 209-10.

This case provides a textbook example of why affidavits from interested witnesses are inadequate as the exclusive means of fact-finding.  For instance, Mr. Cole alleged that trial

---

[5] If a court were to find either trial counsel to have rendered ineffective assistance of counsel, trial counsel would be ineligible for appointment in future cases.  *See* Tex. Gov't Code § 78.056 (a)(2).  Thus, each trial counsel had a conflict of interest with respect to Mr. Cole's allegations, since a finding for Mr. Cole would adversely affect counsel's reputational and pecuniary interests.  *See Burger v. Kemp*, 483 U.S. 776, 806 n.11 (1987) (Blackmun, J., dissenting) ("Counsel is not a fully disinterested party to this proceeding due to the collateral consequences that could result from a determination that he rendered ineffective assistance of counsel. He certainly has an interest in disavowing any conflict of interest so that he may receive other court appointments that are a source of clients for the criminal defense work of the partners' practice.")

counsel failed to adequately investigate and present mitigation evidence of Mr. Cole's social

history.  In particular, Mr. Cole claimed that trial counsel performed deficiently by failing to

investigate Mr. Cole's pre-adoption life in the rainforests of eastern Ecuador, as well as failing to

call an expert, such as Dr. David Wachtel, to provide testimony about the adoption-related and

other traumas that Mr. Cole survived, and their effect on him.  In response to this claim, both

trial counsel submitted self-serving affidavits asserting that they had strategic rationales for

failing to investigate and for failing to call a trauma expert such as Dr. Wachtel.  *See* DE 6-6 at

201 (Robert K. Loper Aff. at 2) ("We believed that presenting . . . lay witnesses who actually

knew Mr. Cole was a very effective strategy, rather than using an expert on childhood trauma

who did not personally know Mr. Cole."); DE 6-5 at 216 (Jerald K. Graber Aff. at 2) (same).  As

in *Wardrip*, trial counsel did not even respond to the allegation that they were ineffective for

failing to investigate and present testimony from numerous additional witnesses who knew Mr.

Cole in Ecuador.

The trial prosecutors also filed affidavits, which contain self-serving protestations of

race-neutrality, in response to Petitioner's claim that his trial counsel were ineffective for failing

to challenge the prosecutors' discriminatory jury selection pursuant to *Batson*.  *See, e.g.*, DE 6-5

at 191 (Natalie Tise Aff. at 4) ("Ms. Mitchell and I did not exercise a peremptory strike against

Robinson or Roberts, or any other juror, based on their race.  Instead, the above-stated concerns,

when coupled with both Robinson and Roberts' demeanor and when viewed in their entirety, led

us to strike them."); DE 6-5 at 195-96 (Anshu "Sunni" Mitchell Aff. at 2-3) ("Ms. Tise and I did

not exercise a peremptory strike against Robinson or Roberts, or any other juror, based on their

race.  Instead, the above-stated concerns, when coupled with both Robinson and Roberts'

demeanor and when viewed in their entirety, led us to strike them.").

The resolution of Petitioner's ineffective assistance of counsel claims under *Wiggins* and *Batson* depends in part on what was in the minds of the trial counsel and prosecutors.  The only direct evidence on those matters was the affiants' lock-step, conclusory assertions of litigation strategy and race neutrality, respectively.  The state courts accepted and credited these affidavits without subjecting the affiants to cross-examination or otherwise allowing Petitioner to challenge their credibility.  Without offering *any* explanation for finding the affidavits of these witnesses credible, or conducting any critical analysis of their credibility, the trial court simply repeatedly referred to the affidavits as "credible."  *See, e.g.*, DE 6-6 at 155, 156, 165, 166, 174 (basing findings on the "credible" affidavits of trial counsel); *see also, e.g., id.* at 169, 170, 173, 174 (basing findings on the "credible" affidavits of ADA Tise and ADA Mitchell).  There is no articulated basis in the record supporting the court's credibility determination.  Petitioner was denied the opportunity to contest the credibility of these interested witnesses through examination, which would have enabled him to press for, obtain, and ultimately dispute their assertions.

Compounding this error, the trial court seemingly judged the affidavits offered by witnesses in support of Mr. Cole's application by a higher standard than those of the interested witnesses procured by the State.  For example, while the court repeatedly characterized the self-serving affidavits of the trial counsel and prosecutors as "credible," the court cast aspersions on the affidavit of Dr. William Morton, a psychopharmacologist, who provided an affidavit supporting Mr. Cole's *Wiggins* claim.  Dr. Morton opined that Mr. Cole's significant abuse of alcohol, stimulants, and other substances would have likely caused him to experience impulsivity, agitation, paranoia, and aggression at the time of the crime, significantly impairing

21

his mental state and raising reasonable doubt that he formed an intent to kill.  The court curtly

dismissed Dr. Morton's expert opinion as "habeas affidavit speculations."  DE 6-6 at 157.[6]

      The court unreasonably deprived Petitioner of the opportunity to develop his claims on

disputed factual issues.  Accordingly, the trial court's findings of fact, based on unreasonable

credibility determinations, should be accorded no deference.

### STANDARDS RELATING TO INEFFECTIVE ASSISTANCE OF COUNSEL UNDER *STRICKLAND V. WASHINGTON*

      Under *Strickland v. Washington*, 466 U.S. 668 (1984), a habeas petitioner seeking to

establish the ineffective assistance of trial counsel must demonstrate: (1) that counsel's

performance fell below "an objective standard of reasonableness," (i.e., deficient performance);

and (2) that but for counsel's deficient performance, there is a reasonable probability that the

factfinder would have had a reasonable doubt with respect to the defendant's guilt or the

appropriate punishment (i.e., prejudice).  *Id.* at 688, 695; *see also Sears v. Upton*, 561 U.S. 945

(2010); *Porter v. McCollum*, 558 U.S. 30, 32 (2009); *Rompilla v. Beard*, 545 U.S. 374, 390

(2005); *Wiggins*, 539 U.S. at 538; *Williams*, 529 U.S. at 398.  A petitioner need only demonstrate

a reasonable probability that, but for counsel's errors, at least one juror would have come to a

different result.  *Buck v. Davis*, 137 S. Ct. 759, 776 (2017).

      A reasonable probability of a different result is assessed by considering "'the totality of

the available mitigation evidence—both that adduced at trial, and the evidence adduced in the

habeas proceeding'—and 'reweighing it against the evidence in aggravation.'"  *Porter*, 558 U.S.

at 41 (quoting *Williams*, 529 U.S. at 397-98).

---

[6] The state habeas court also mischaracterized Claim II, and failed to consider or adjudicate the guilt-phase aspect of this claim.  *See infra* Claim II.

**CLAIMS FOR RELIEF**

**I.    TRIAL COUNSEL INEFFECTIVELY FAILED TO FULLY INVESTIGATE AND ACCURATELY PRESENT PIERO COLE'S LIFE HISTORY OF TRAUMA AT THE PUNISHMENT PHASE OF HIS CAPITAL TRIAL.**

In a capital case, the defendant has an Eighth Amendment right to present as a mitigating factor any aspect of the defendant's character or record that "might serve 'as a basis for a sentence less than death.'"  *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)).  As a result of trial counsel's deficient performance, Petitioner was denied that opportunity; but for counsel's deficient performance, it is reasonably likely that he would have been sentenced to life imprisonment.  Therefore, he was deprived of his Sixth Amendment right to the effective assistance of counsel.

**A.    Counsel's Investigation and Presentation of Mitigating Evidence Were Deficient.**

**1.    Trial counsel's duty to investigate**

As the Supreme Court has made clear in its decisions from *Strickland* to *Sears*, the duty to thoroughly investigate and reasonably prepare is fundamental to counsel's role as an advocate. Counsel has "a duty to bring to bear such skill and knowledge as will render the [proceeding] a reliable adversarial testing process."  *Strickland*, 466 U.S. at 688.  Reliable adversarial testing will take place only if counsel prepares and investigates *thoroughly*.  *Williams*, 529 U.S. at 397; *accord Porter*, 558 U.S. at 39.  Failure to conduct a thorough investigation constitutes deficient performance under *Strickland*.  *See Wiggins*, 539 U.S. at 523 (focus is on "whether the investigation supporting counsel's decisions . . . *was itself reasonable*") (emphasis in original). Counsel may not "ignore[] pertinent avenues for investigation of which he should have been aware."  *Porter*, 558 U.S. at 40; *see Andrus v. Texas*, No. 18-9674, 2020 WL 3146872, *5 (U.S.

23

June 15, 2020) (per curiam) (finding counsel's performance deficient where "counsel disregarded, rather than explored, . . . multiple red flags," among other things ).

The Fifth Circuit has found that controlling Supreme Court precedent required habeas relief where counsel's investigation was similarly inadequate.  *See Adams v. Quarterman*, 324 F. App'x 340, 349 (5th Cir. 2009) ("In the absence of a sufficient investigation of Adams's background, it was impossible for [counsel] to make a strategic decision to pursue his stated mitigation theory . . . ."); *Walbey v. Quarterman*, 309 F. App'x 795, 801 (5th Cir. 2009) (Supreme Court case law "firmly establishes a duty to investigate the background and character of a capital defendant, along with his family and social circumstances and mental health history.").  Trial counsel here failed to conduct the required investigation.

The need for mitigation investigation in this case was particularly acute because (a) counsel did not present any defense to the charges at trial, and (b) there was significant aggravation, both from the facts of the case itself and from Mr. Cole's history.  *See Andrus*, 2020 WL 3146872, *6 ("Th[e] failure [to investigate] is all the more alarming given that counsel's purported strategy was to concede guilt and focus on mitigation.").

With regard to the facts of the case, in January 2010, Mr. Cole's wife Melissa moved out of the family house with their two sons and her daughter from a prior relationship.  A few weeks later, Mr. Cole returned their sons to Melissa's apartment after they had spent a couple of days with him.  Melissa was in the apartment with her daughter, Alecia "Desirae" Castillo, and her niece, Chloe Mahalec.  Mr. Cole and Melissa began arguing inside the apartment and continued their argument outside.  Mr. Cole suddenly shot Melissa, then entered the apartment and shot Desirae as well.  He left the apartment with his two-year-old son Lucas, and was eventually apprehended without incident in Wharton County.

24

In addition to the circumstances of the offense, the State's case for death also relied on the State's characterizations of who Mr. Cole was and who, it contended, he had always been. DE 6-95 at 9, 14. The State presented multiple witnesses who testified that Mr. Cole had been possessive, controlling, and violent in two previous romantic relationships. The State also presented officers who arrested Mr. Cole several years previously for public intoxication; and Mr. Cole's daughter, who testified regarding his drinking, violent behavior, and an incident involving alleged sexual impropriety. *See id.* at 22-196, 272-305. Furthermore, the State argued that Mr. Cole became the person so portrayed despite the fact that he had "two families that tried to teach him right from wrong, two families who provided for him and gave him everything that he needed." DE 6-98 at 16.

In the absence of a thorough investigation for more significant mitigation, the defense case consisted of lay witnesses who spoke briefly about various aspects of Mr. Cole's life, including friends, co-workers, his adoptive parents, and his biological mother and sister.[7] Collectively, these witnesses told the story of a man who may have had a bumpy start in life but eventually became a hard worker and good friend who was loved by both his biological and his adoptive families. The defense primarily focused on Mr. Cole's success as a manager with the Mister Car Wash franchise, to show that he was a "productive member of our society." DE 6-98 at 38. This evidence regarding Mr. Cole's positive qualities did nothing to rebut or explain the State's evidence.

---

[7] One investigator, who was the primary contact with Mr. Cole's adoptive family, had never worked on a capital case before Mr. Cole's and had no formal training in mitigation investigation. A1(Margarett Vozar Decl. ¶ 2, 4, 5); *see* A1(Vozar Decl. ¶ 7) ("[M]y lack of training on issues of mitigation and issues related to mental illness affected my ability to develop such issues with respect to both Piero and his family.").

### 2.      Counsel breached the duty to investigate.

Trial counsel failed to conduct a professionally reasonable mitigation investigation. Some mitigating evidence dropped into counsel's lap.  Mr. Cole's biological mother Sonia and sister Carina traveled to Houston in July 2011 to visit him after his arrest.  While they were there, they spoke to the mitigation investigator, and briefly to counsel.  From them, and from Mr. Cole himself, counsel knew that Mr. Cole's early childhood was in Ecuador, but that when he was still a child he was brought to the United States and adopted by Jim and Hazel Cole.

Professionally reasonable counsel would have realized that Mr. Cole's early life was a fertile source of potential mitigation, and would have thoroughly explored the mitigation that was available from Sonia and Carina, as well as evidence from other witnesses about Mr. Cole's early childhood in Ecuador.  Trial counsel, however, failed to accomplish either of those critical tasks.

Trial counsel had only two brief conversations with Sonia and Carina.  Counsel neither explored in any detail what information would be helpful, nor informed them what questions they would be asked at trial.  DE 6-4, Carina Moran Aff. ¶¶ 3-4; Sonia Araujo Aff. ¶ 3.[8]  Mr. Cole's cousin, Dunnya Araujo, had planned to accompany Sonia and Carina to the trial, but ended up cancelling her trip because she did not believe she would be presented as a witness. Dunnya Araujo Aff. ¶¶ 26-28.

In Ecuador, numerous lay witnesses were ready, willing, and able to provide critical mitigating evidence regarding Mr. Cole's early childhood.  Had trial counsel conducted a

---

[8] All of the affidavits proffered in support of the state habeas application are collected in DE 6-4.  Hereafter, we cite to those affidavits by the name of the affiant and the relevant paragraph number(s).

thorough investigation into Mr. Cole's background, they would have found witnesses to provide evidence concerning the trauma and abandonment that he suffered, as well as the impact of that trauma on his adult life.[9]  *See, e.g.*, *Andrus*, 2020 WL 3146872, *6 ("[C]ounsel performed virtually no investigation . . . of the many circumstances in Andrus' life that could have served as powerful mitigating evidence. The untapped body of mitigating evidence was, as the habeas hearing revealed, simply vast.").  Because counsel failed to investigate, counsel did not make an informed decision not to call these witnesses.  *See Lockett v. Anderson*, 230 F.3d 695, 715 (5th Cir. 2000) ("[T]he assertion of a 'strategic decision' must be rejected because no informed decision was made.") (emphasis in original).

In addition to counsel's failure to investigate Mr. Cole's early childhood in Ecuador, counsel also failed to thoroughly investigate available mitigation from Mr. Cole's adoptive family and friends.  Mr. Cole's adoptive parents, family friend Mark Bartlett, and co-worker Don Hill received only limited pre-trial contact from trial counsel.  *See* Jim Cole Aff. ¶ 4; Hazel Cole Aff. ¶ 3; Mark Bartlett Aff. ¶ 2; Don Hill Aff. ¶ 3.  Numerous other friends and co-workers who lived in Texas were available and willing to testify for Mr. Cole, but were never contacted by counsel.[10]

---

[9] The following friends and family who lived in Ecuador either were never contacted by anyone on the defense team, or were never asked to testify, despite the fact that they were available and willing to travel to Houston to testify: maternal aunt, Carmen Araujo Aff. ¶ 31; biological sister, S. Elizabeth Araujo Aff. ¶ 22; maternal cousin, Geoconda Araujo Aff. ¶ 30; maternal uncle, Hugo Franco Araujo Aff. ¶ 7; maternal aunt, Lucia Araujo Aff. ¶ 33; family friends, Rocio de Bohorquez Aff. ¶ 9, and Piedad Villa Aff. ¶ 6; maternal niece, Michelle Carrera Aff. ¶ 13; and brother-in-law, Pedro Pozo Aff. ¶ 14.

[10] *See* Ramiro Alvarez Aff. ¶ 2; Scott Buchar Aff. ¶ 2; Carl Freeman Aff. ¶¶ 4-5; John Starks Aff. ¶ 2; Charlie Saenz Aff. ¶ 3; and Jose Valdez Aff. ¶ 2.

Because of counsel's deficient investigation, counsel was unable to present this information to a mental health expert who could opine concerning the medical and psychological effects of trauma on Mr. Cole as an adult, including around the time of the offense. At trial, the defense presented expert testimony that Mr. Cole was alcohol dependent, DE 6-96 at 183-239, but because counsel had not developed the evidence of trauma, counsel could not present expert testimony concerning the effects of that trauma.

### B. Mr. Cole Was Prejudiced by Counsel's Failure to Develop and Present Powerful Mitigating Evidence.

Had trial counsel undertaken a thorough investigation of Mr. Cole's early childhood trauma and its effects, and elicited additional important information from witnesses who already testified, the jury would have heard powerful mitigating evidence regarding Mr. Cole's damaging history and the effects that it had on his behavior and psychological health. This evidence establishes prejudice: "Had the jury been able to place [this evidence] on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537; *see Adams*, 324 F. App'x at 352 (finding prejudice where counsel's deficient investigation "prevented his discovery of substantial, readily available evidence of Adams's childhood abuse, neglect, and abandonment").

### 1. Early childhood in Ecuador

The jury heard brief testimony from Mr. Cole's biological mother and sister about his adoption and his visits with them as an adult. Counsel never investigated and never presented evidence concerning Mr. Cole's early life in Ecuador or the effect on him of his abandonment by his biological father and a surrogate father, or of his adoption. Had counsel undertaken the required thorough investigation, they would have learned and presented the following:

28

Sonia Araujo was the second of five children in a poor family living outside Loja, Ecuador.  When she was seven, her father left the family.  Her mother, Enma, worked long hours to enable them to survive.  When Sonia was a teenager, Enma died of pancreatic cancer.  After Enma died, Sonia and her sister Lucia were forced to parent the younger siblings.  Lucia Araujo Aff. ¶¶ 4-6; Hugo Araujo Aff. ¶¶ 3-5; Carmen Araujo Aff. ¶¶ 3-8; Sonia Araujo Aff. ¶¶ 6-7; Rocio de Bohorquez Aff. ¶ 4.

After losing her first child to bronchitis when the baby was only six months old, Sonia became pregnant with Piero.  Piero's father was a cousin of Sonia's, Hugo Riofrio, who was married to another woman.  Hugo gave Sonia a little money but did not earn much, did not live with her, and could not support her.  Although Hugo and Sonia had another child, Elizabeth, Hugo never saw Piero after he was a baby.  Sonia Araujo Aff. ¶¶ 9-12; Carmen Araujo Aff. ¶ 9; Lucia Araujo Aff. ¶ 8.

When Piero was five years old, Sonia and her sisters Lucia and Carmen moved with their children to Shushufindi, a village in the Oriente jungle where oil drilling was the main industry.  Sonia took on a second job washing and ironing laundry for the oil workers.  Sonia Araujo Aff. ¶ 18; Michelle Carrera Aff. ¶ 4. Later, the family moved to a small house closer to the oil companies.  The house had two bedrooms.  Sonia, Piero, and Elizabeth slept on the bed in one room, while Lucia, Carmen and their daughters slept in the other room.  Sonia Araujo Aff. ¶ 14; S. Elizabeth Araujo Aff. ¶ 3.

They opened a restaurant, which they ran from the living room of their small house.  They worked from dawn until late at night, serving food and beer.  The restaurant did not have electricity, so they would send Piero to get ice from several blocks away.  Sonia Araujo Aff. ¶¶ 12-13, 16; Carmen Araujo Aff. ¶¶ 16-17, 19-21; Lucia Araujo Aff. ¶¶ 10, 14-16.  Similarly,

when a customer ordered a beer, Sonia sent Piero to a small grocery store nearby to get it.  Jim Cole Aff. ¶ 13.

Despite their hard work, the family remained very poor.  Rocio de Bohorquez Aff. ¶ 5. There was not always money for food; sometimes the family had to eat the food left on the plates by the restaurant patrons.  Michelle Carrera Aff. ¶ 4.  If there was not enough food to go around, the children were fed first and the adult women went hungry.  Geoconda Araujo Aff. ¶ 10.

Sonia met a man named Manuel Moran in Shushufindi and had a daughter named Carina with him.  Manuel moved into the family house for a little while, and both Elizabeth and Piero believed he was also their father.  Sonia Araujo Aff. ¶ 17; Carmen Araujo Aff. ¶ 15.  Manuel, however, then left Sonia and her children for a younger woman.  Piero hated Manuel for abandoning the family.  S. Elizabeth Araujo Aff. ¶ 7; Geoconda Araujo Aff. ¶ 6.  Aside from Manuel's brief presence, there was no father or father figure in Piero's life.  S. Elizabeth Araujo Aff. ¶ 10.

Piero attended a school about fifteen miles from Shushufindi.  He had to get up early to make it to school by 7:00 a.m.  School ended by 1:30 p.m., but it took him hours to get back because he had to hitchhike home.  He would return home sunburnt and hungry.  Geoconda Araujo Aff. ¶¶ 12-14; Sonia Araujo Aff. ¶ 22.

### 2.     Piero's adoption and resulting trauma

Trial counsel presented Piero's adoptive parents and family friend Mark Bartlett, as well as Sonia and Carina, to testify about his adoption.  The jury never heard, however, how Piero was traumatized by the adoption.  Thus, the State was able to characterize the evidence as showing that Piero was the product of two loving families.  DE 6-98 at 16.  In fact, the adoption

30

was extremely traumatic for Mr. Cole, and represented for him yet another abandonment.

Professionally reasonable counsel would have learned and presented the following evidence:

Jim Cole was a customer at Sonia's restaurant who often came in to drink beer. Lucia Araujo Aff. ¶ 22. Jim was doing contract work in the Oriente for Texaco. He lived with his wife Hazel in Quito, but traveled to the Oriente for work for weeks at a time. Jim Cole Aff. ¶ 10. Jim brought a relative, Mark Bartlett, with him. They stayed in workers' barracks when they were in Shushufindi. Mark Bartlett Aff. ¶¶ 8-9.

Jim ate and drank beer at Sonia's restaurant almost every day. Unlike most Ecuadorians, Piero had blonde hair and light skin. Jim became very fond of him. Sonia Araujo Aff. ¶ 23; Dunnya Araujo Aff. ¶ 12. When Piero was about seven years old, Jim proposed bringing Piero to Quito so that he could go to school there. Jim's wife Hazel supported the idea because she was often lonely in Quito, and Sonia agreed because Piero could go to a better school. Hazel Cole Aff. ¶ 11; Sonia Araujo Aff. ¶ 24.

When Piero first got to Quito, he was scared and could not sleep alone. Jim slept with him for a couple of nights and then Hazel did for several more weeks. Hazel Cole Aff. ¶ 12.

When the Coles were ready to return to the United States, they set in motion a process to adopt Piero and bring him with them. Hazel Cole Aff. ¶¶ 15-16. None of Piero's biological family understood that the Coles were adopting him permanently. Sonia Araujo Aff. ¶¶ 27-28; Lucia Araujo Aff. ¶¶ 25-26; Carmen Araujo Aff. ¶¶ 25-26. After bringing Piero to the United States, the Coles thought that he was adjusting to his new life, but he had a hard time sleeping and did not like to be alone. Jim Cole Aff. ¶ 20.

After Piero had been in the United States for a year, Hazel brought him back for a visit. Hazel stayed with a friend and Piero stayed with Sonia. Hazel Cole Aff. ¶ 20. Piero told his

mother and his cousin that he wanted to stay in Ecuador.  Sonia Araujo Aff. ¶ 31; Dunnya Araujo Aff. ¶¶ 16-18.  He called Hazel and told her that he wanted to stay a year at a time in each place, but she responded that it did not work that way and instituted proceedings to force him to return to the United States.  Hazel Cole Aff. ¶ 21.

Sonia had her brother hide Piero in a nearby town.  Lucia Araujo Aff. ¶ 27; Sonia Araujo Aff. ¶ 31.  Hazel contacted her Ecuadorian lawyer and a court date was set.  Hazel Cole Aff. ¶¶ 20-21.  Sonia brought Piero to court after the police threatened to throw her in jail if she did not.  Sonia Araujo Aff. ¶ 31.  Although Piero told the judge he wanted to stay in Ecuador, the judge ruled in the Coles' favor.  Hazel Cole Aff. ¶ 22.

The police told Piero that Sonia would be put in jail if he did not leave with them and physically removed him from Sonia's arms.  Piero cried as he was driven away in a police car.  Sonia was hysterical and fainted.  S. Elizabeth Araujo Aff. ¶ 15; Geoconda Araujo Aff. ¶ 24; Carmen Araujo Aff. ¶ 27; Sonia Araujo Aff. ¶ 31.

After Piero left Ecuador the second time, he stopped speaking to Sonia and the rest of his biological family on the phone.  Sonia would write letters to Piero in Spanish and have a friend translate them into English.  Piero or Hazel would write back in English.  Sonia Araujo Aff. ¶ 32; Hazel Cole Aff. ¶ 24.  Because there was no way for the extended family to call or write to Piero, all contact between them was lost.  Dunnya Araujo Aff. ¶ 20.

Piero was put into a regular elementary school classroom with one period of bilingual instruction a day.  He was held back the first year because of his poor English.  Because he did not speak English, some of his classmates thought he was stupid.  Hazel Cole Aff. ¶ 27; Jim Cole Aff. ¶¶ 21-22.  He did not get any counseling about how to deal with the adoption and his new life in the United States.  He did not talk about his past and strove to distance himself from other

Hispanic children.  Carl Freeman Aff. ¶ 8; Jim Cole Aff. ¶¶ 22, 25; *see also* A4 (Mary Helen

Tate Decl. ¶ 8); *but see* A4 (Mary Helen Tate Decl. ¶ 7) (recalling Piero's adopted grandmother

saying "'he's not one of us' and that was the general feeling in the family").  He turned against

Sonia because he believed she had "sold" him.  Hazel Cole Aff. ¶ 25.

Piero was scared at night and often needed to get in bed with Jim and Hazel.  He did this

for several years.  Mark Bartlett Aff. ¶ 27.  Piero had a difficult time being by himself and was

scared to be alone.  His fear was worse in the dark.  The Coles did not leave him alone until he

was fifteen or sixteen years old.  Hazel Cole Aff. ¶ 32.  Piero lived with the Coles until he was

twenty-seven years old.  Jim Cole Aff. ¶ 29.

### 3.      Impact of the adoption and related trauma on Piero as an adult

Trial counsel ineffectively failed to investigate, or present any evidence concerning, the

traumatic effect of his adoption on Piero as an adult.  The adoption resulted in anxiety and

depression, and confusion about culture and identity, as Piero tried to come to terms over the

years with unanswered questions about his adoption.  Professionally reasonable counsel would

have developed and presented the following evidence:

Piero went by himself to Ecuador to visit his biological family when he was in his late

teens.  It was the first time he had gone back since the court upheld the adoption and he was

returned to the Coles.  He spoke almost no Spanish, and it was difficult for him to communicate

with the family.  It was especially difficult for Sonia to understand Piero.  When family members

could not understand him, he would grab his head in distress.  Dunnya Araujo Aff. ¶ 22; Lucia

Araujo Aff. ¶ 30; S. Elizabeth Araujo Aff. ¶ 17; Geoconda Araujo Aff. ¶ 26; Sonia Araujo Aff. ¶

34.  After that visit, Piero called members of his family in Ecuador from time to time, but

because he spoke so little Spanish it remained hard for the family to understand him.  Michelle Carrera Aff. ¶ 11.

Piero was confused and hurt regarding the circumstances of his adoption.  He believed that Sonia had "sold" him to the Coles.  Hazel Cole Aff. ¶ 25.  He talked to his brother-in-law Pedro Pozo about this.  Although Pozo assured Piero that Sonia was poor and never received any money, Piero was angry and resentful about what he believed had happened.  Pedro Pozo Aff. ¶ 10.  Piero also talked to other family members about the adoption.  He did not understand why he was sent to the United States; it caused him a great deal of stress.  S. Elizabeth Araujo Aff. ¶ 20; Dunnya Araujo Aff. ¶ 23.

Piero made subsequent visits to Ecuador, but they always caused him stress.  As an adult, when he brought his own children, he was afraid they would be kidnapped.  When the children went to get ice cream, Piero looked out the window for them until they came back.  Pedro Pozo Aff. ¶ 12; Geoconda Araujo Aff. ¶ 27.

Piero was also troubled by what he understood, based on the family history, to be a pattern of Ecuadorian men abandoning their families.  He told Carina that he resented the way such men left their wives and children.  He noted that his biological grandfather had left his grandmother, his biological father left his mother, and his aunt raised her children without help from their father.  Carina Moran Aff. ¶ 17.

### 4.    Alcoholism

At trial, there was expert testimony from Dr. Rustin that Mr. Cole is alcohol dependent, and some lay testimony that he drank, but only occasionally to excess.  The prosecution, however, thoroughly impeached Dr. Rustin because he relied almost entirely on Mr. Cole's self-report, with no corroboration or support from, e.g., lay witnesses.  DE 6-96 at 210-27.  Trial

counsel failed to support that testimony with the wealth of available lay witness testimony showing how profound Piero's dependence truly was and the devastating effect it had on his physical, emotional, and psychological well-being.  Professionally reasonable counsel would have presented the following:

Piero was exposed to alcohol from the beginning of his life.  As a child in Ecuador, he was responsible for buying beer from a local store and bringing it to customers at Sonia's restaurant.  Jim Cole Aff. ¶ 13.

In Texas, the Coles owned and operated a bar called "The End of the Trail."  Piero was always around the bar from the time he was twelve or thirteen years old.  He drank beer there as early as sixteen years old.  Greg Meade Aff. ¶ 6.  Hazel let Piero drink as a teenager in her presence because she believed if you let children drink in front of you they would not sneak off to do it.  Hazel Cole Aff. ¶ 30.  During high school, Piero also drank beer at his friend Carl Freeman's house.  When they turned twenty-one, they began drinking more heavily and more often.  They would go to the Coles' bar to shoot pool and drink beer two or three nights a week.  On those nights, they would each drink twelve beers or so, drinking until the bar ran them out.  Carl Freeman Aff. ¶ 10.

As he got older, Piero drank more.  By the time he was thirty, he was a "heavy" drinker who often needed alcohol in order to sleep.  Hazel Cole Aff. ¶ 31.  After working long hours at Mister Car Wash, he would stay and drink with his co-workers in the parking lot after the business closed.  Piero frequently drank a twelve pack of beer by himself and would buy more beer if they ran out.  Don Hill Aff. ¶ 7; Jose Valdez Aff. ¶ 10; Ramiro Alvarez Aff. ¶ 6.  Co-workers were surprised he could drink as much as he did and still show up for work the next morning.  Edward Fernandez Aff. ¶ 8; Jose Valdez Aff. ¶ 10.

Piero drank like an "animal."  He chugged beer, and would drink six to eight beers very quickly.  Ramiro Alvarez Aff. ¶ 6.  Piero had a high tolerance for alcohol and drank to get drunk. Fellow workers worried about how he would get home after drinking so heavily.  Jose Valdez Aff. ¶ 10.  When his sister Carina visited, Piero would drink another ten cans of beer or so a night after he came home.  Carina Moran Aff. ¶ 12.  Piero also used stimulants during this same time.  He drank several high caffeine energy drinks during the day.  Don Hill Aff. ¶ 6; Ramiro Alvarez Aff. ¶ 7.

### 5.    Unstable interpersonal relationships

Had counsel conducted a thorough investigation, they could have presented abundant evidence that Piero suffered from unstable interpersonal relationships, and was incapable of dealing with real or imagined abandonment.  When things did not go well for him in romantic relationships, he became sad, angry, and depressed.  Jim Cole Aff. ¶ 28.

In the weeks before the crime, Piero did not know that Melissa planned to leave him; her departure came as a shock to him.  He did not know what to do after Melissa left him.  Mark Bartlett Aff. ¶ 37.  His personal life was a mess, but he hid what was going on from his co-workers because he was afraid they would think less of him if they knew his personal life was in shambles.  *Id.* ¶¶ 37-38.  Piero lost a significant amount of weight shortly before the crime.  Don Hill Aff. ¶ 9; Charlie Saenz Aff. ¶ 9.  His behavior also changed; he became less talkative and people sensed that something was wrong without knowing what it was.  Jose Valdez Aff. ¶¶ 13-15; Scott Buchar Aff. ¶ 14.  After the offense, his parents found out that he had seen a counselor and been prescribed anti-depressants.  Jim Cole Aff. ¶ 38; Hazel Cole Aff. ¶¶ 38, 40.

### 6.    Expert testimony concerning the effects of the trauma

Had trial counsel interviewed all of Petitioner's biological family, as well as the individuals who saw his suffering around the time of the crime, and provided the results of such interviews to appropriate mental health experts, counsel could have presented powerful mitigating evidence concerning his psychological impairment resulting from childhood trauma. Even trial counsel's partial investigation revealed evidence that Petitioner's childhood was rife with trauma that continued to affect him as an adult.  Therefore, it was unreasonable for trial counsel not to seek out, prepare, and present the testimony of expert witnesses with expertise in the area of trauma-related disorders and trauma related to adoption.

For example, counsel could have retained an expert such as Dr. David Wachtel, an experienced forensic psychologist in Houston, Texas.  Dr. Wachtel specializes in understanding the role of trauma, including adoption-related trauma, on childhood development.  Dr. Wachtel Aff. ¶ 5.  With the information on Piero's life history summarized above, Dr. Wachtel could have presented important mitigating evidence.  As Dr. Wachtel explains, it is impossible to arrive at a full understanding of Petitioner and his behavior without an understanding of trauma and its consequences.  Dr. Wachtel provides the following overview of trauma:

> Trauma is the result of extraordinarily stressful events that overwhelms an individual's capacities and resources to cope constructively with life. . . .  While traumatic experiences are frequently thought of as in relation to a physical threat or action to one's life or safety, it is more frequently due to emotional neglect and/or abuse and physical neglect.  Any situation that leaves an individual feeling alone and overwhelmed to cope with life can be traumatic, even if it does not cause physical harm.
>
> If not identified and treated, particularly with respect to early childhood trauma, the situation can result in increasingly problematic emotional, occupational, and relationship difficulties later in life. . . .
>
> Experiencing trauma in early childhood has severe and long-lasting effects on an individual.  As a result of trauma, children can develop intense, deep-seated

feelings of insecurity and intense low self-esteem, significant difficulties with impulse control, mistrust, depression, fears, rage, and helplessness and powerlessness. . . . When childhood trauma is not identified and treated such that the trauma is resolved, the above-referenced feelings usually manifest in difficulties in self-regulation of mood and behavior and in an individual's social relationships throughout their adult life.

Children who have been traumatized often grown into adults who suffer from depression and/or anxiety, they frequently develop substance abuse problems, and have significant difficulties in relationships and in coping with stressful situations. Further, they often can act impulsively without regard to the consequences of their actions. In relationships they frequently alternate between avoiding conflicts on one hand (often by acting submissive and going to extensive lengths to try to please others), but on the other hand, impulsively lashing out both verbally and physically when they feel trapped and threatened in emotionally-charged situations.

Dr. Wachtel Aff. ¶¶ 12-15.

Dr. Wachtel interviewed Mr. Cole and reviewed life history records, the testimony from the punishment phase of trial, and numerous witness affidavits. Dr. Wachtel Aff. ¶¶ 9-10. He found that Mr. Cole had all the hallmarks of someone who suffered from profound emotional and psychological trauma as a child and who has continued to suffer from its effects as an adult. *Id.* ¶ 16. Those findings are supported by Mr. Cole's well-documented history and Dr. Wachtel's evaluation of Mr. Cole.

Effective counsel would also have explored retaining an expert who specializes in adoption related trauma to explore the long-term effects of that trauma on Mr. Cole. Undersigned counsel retained Tracy Carlis, Ph.D., a psychologist and expert specializing in adoptions, to interview Petitioner and review records related to his adoption. Dr. Carlis found, and would have testified, that while most adoptees have some degree of trauma related to the adoption process, Mr. Cole has "extreme adoption related psychopathology." A20 (Tracy Carlis, Ph.D., Decl. 15) (hereafter "Carlis Decl.).

38

### a.   Piero suffered trauma as the result of his adoption and relocation.

Dr. Wachtel found that Piero "suffered from profound emotional and psychological trauma as a child," as a result of "profound early childhood losses, including the complete loss of his biological family through his adoption and permanent relocation from Ecuador to the United States . . . ." Dr. Wachtel Aff. ¶ 16.

In general, adoption raises serious issues for everyone involved, "including feelings of loss, grief, rejection, identity and problems with intimacy." Dr. Wachtel Aff. ¶ 34. The loss of a biological parent and other biological family members as the result of adoption can cause both tremendous grief and acute feelings of rejection for the adopted child. *Id.* ¶¶ 35-36. This often results both in extreme sensitivity to rejection and in feelings of guilt regarding the adoption, particularly when the new environment is considered to be "better" than the biological one. *Id.* ¶ 36. Adopted children also have fundamental issues regarding identity. *Id.* ¶ 38.

Piero "was particularly vulnerable to the effects of trauma because of his early childhood circumstances." Dr. Wachtel Aff. ¶ 18. As discussed above, Piero was born into an impoverished family in rural Ecuador. He was cared for by his biological mother and aunts, and lived with several siblings and cousins. However, he never met his biological father. For a time, he believed that Manuel, a man who lived with the family and was the father of his youngest sister, was his father as well. Sonia Araujo Aff. ¶ 17. When Manuel left the family, Piero learned that Manuel was not his father. As Dr. Wachtel noted, this "double loss of a stable paternal figure would be catastrophically traumatic to any child, especially to a boy." Dr. Wachtel Aff. ¶ 18.

In addition, Piero's life was exceedingly difficult in other respects. Piero's mother, both of her sisters, and all of their children lived together in poverty in a two-room wooden house

with a tin roof.  Piero attended a rural school that was hours away on foot; he would hitchhike when he could.  Dr. Wachtel noted that such a background is itself damaging:

> Studies show that growing up in this type of setting can severely undermine a child's sense of security, limiting the child's ability to develop skills necessary to effectively regulate his or her emotional, cognitive, behavioral functioning and engage in stable, satisfying relationships with others that are essential to cope with both internal and external stressors.  This was the case with Piero.

Dr. Wachtel Aff. ¶ 18.

Piero's childhood foundation thus was already precarious.  When he was about seven years old, he was taken from his home in a rural, jungle village to the city of Quito to live with an American couple and attend school.  Because Piero did not speak English and the Coles did not speak Spanish, they could not communicate with each other.  After several months, arrangements were made for the Coles to legally adopt Piero and take him to the United States.  Piero likely did not understand that he was being permanently removed from his biological family.  Dr. Wachtel Aff. ¶ 22.

When he arrived in the United States, Piero spoke only Spanish.  He did not get any special instruction in English, but learned it in school and by watching TV.  While living with the Coles, Piero did not talk about his family in Ecuador.  Hazel Cole Aff. ¶ 19.  Dr. Wachtel opines that this was a symptom known as dissociation, in which an individual blocks a source of trauma "because the pain of the losses was too great."  Dr. Wachtel Aff. ¶ 24.  This symptom "typically increases in both intensity and in frequency . . . as an individual gets older."  *Id.*

Dr. Carlis would have testified that Petitioner did not receive any of the necessary services to ensure a normal adjustment after his arrival in the United States.  Current standards provide for evaluation of the prospective adoptive home, supervision of the adoptive home, educational services to the adoptive parents and adoptee, and counseling for older adopted

children.  A10-11 (Carlis Decl. 5-6).  No such services were provided to Piero or to his adoptive

family.

Hazel and Jim Cole, Petitioner's adoptive parents, did not seek therapy services for Piero

after his adoption.  Instead, Piero was taught not to show how he felt about his losses and

separation from his mother and family.  Following the example set by his adoptive parents, Piero

repressed all of the confusion, negative feelings, anger, hostility, disappointment, and grief that

he felt over his adoption:

> Piero . . . came to believe that his birthmother sold him. . . .  Hazel corroborated
> that she knew, "Piero believed Sonia sold him," yet there was no correction from
> her surrounding that misinformation and toxic fantasy.
>
> For Piero, the cumulative trauma of two separations coupled with the
> feeling of being rejected and sold, were compounded by the climate of denial in the
> adoptive family. . . .
>
> According to their declarations, both Hazel and Jim stated that Piero
> adjusted well and suffered no pain, "Piero transitioned to life in the States fine and
> was not bothered by anything."  Hazel Cole believed, "out of sight, out of mind"
> and Jim Cole stated, "I cannot remember a time when he even mentioned them." . . .
>
> . . . Piero developed an inability to show how he felt about his losses and his
> separation from his mother and family.  It meant repressing any confusion, negative
> feelings, anger, fear, hostility, disappointment, or grief.  But taking its place was a
> noxious fantasy that he had been rejected by his birthmother and sold to the
> American family.

A14 (Carlis Decl. 9).

Dr. Carlis would have testified that Piero did not receive any support in navigating the

grief and loss that he experienced after being removed and cut off from his biological family.

Without counseling or even an explanation of the adoption process, Piero responded to the

toxicity of his trauma by avoidance—he stopped speaking about his Ecuadorian family—and he

began to exhibit signs of hypervigilance and fear:

> The Coles were unequipped, unaware and unprepared to understand the severity of the many psychological problems that Piero represented. They missed many opportunities for intervention or the help of mental health experts. They knew that Piero's initial adjustment to school and to the neighborhood was fraught with name-calling and bullying. They saw that he used alcohol excessively and at a young age. They saw his intense fear of sleeping alone and they saw the dysfunction in his teenage intimate relationships. But they failed to intervene or obtain counseling . . . .

A21-22 (Carlis Decl. 16-17).

As discussed above, Hazel brought Piero back to Ecuador after one year to visit his family. During the visit, there was an open conflict between Sonia and the rest of his biological family and Hazel Cole, who eventually used the court and the police to remove Piero from his biological family. This was an additional highly traumatic event:

> The forcible removal of Piero from his biological mother's arms was an additional specific and exacerbating traumatic event of profound separation and loss. In addition, Piero's transition to life with the Coles in Quito and then the United States was an on-going trauma.

Dr. Wachtel Aff. ¶ 27.

People who experience such a traumatic event "typically have an intense physiological reaction to that event." *Id.* ¶ 28. After the traumatic event itself ends, the child "retains the emotional memories from the event," but "is unlikely to have the resource to reduce the arousal to a calmer state." *Id.* ¶ 29. Because recurring thoughts and memories about the trauma are painful, the child "will likely use a variety of protective avoidance mechanisms in order to escape reminders of the original trauma," including "active avoidance of any reminders of the trauma" and "mechanisms of numbing and disassociation." *Id.* ¶ 30.

Once in the United States, Piero neither talked about his family in Ecuador nor sought to have any contact with them, indicating that he responded to the trauma by retreating and dissociating. *Id.* ¶ 31. For many years, Piero had a difficult time sleeping alone or being alone,

"reflecting his intense feelings of abandonment and loneliness." *Id.* ¶ 32.  Despite the difficulties

Piero was facing, the Coles "did not address issues implicit in the adoption or the acute trauma

that Piero suffered." *Id.* ¶ 33.

Another salient feature of trauma is that it can distort memory.  Dr. Carlis would have

testified that, in order to deal with the pain of his biological mother's perceived abandonment,

Piero created a toxic fantasy that his birth mother had sold him.  *See* Hazel Cole Aff. ¶ 25; Pedro

Pozo Aff. ¶ 10.  Dr. Carlis would testify that although both his mothers have denied that Piero

was sold, he has persisted in believing this narrative.  A21 (Carlis Decl. 16).

In addition to feelings of abandonment, Piero also struggled with feelings of grief and

shame:

> . . . [Piero] felt a responsibility and desire to financially provide for the family
> members that were left behind.  Further complicating his already conflicting
> feelings about his origins, as he matured Piero became focused on the idea that his
> biological mother "sold" him to the Coles.  He spoke to various family members,
> usually in a state of extreme emotion, wrestling with the idea that money might
> have been the reason that his family rejected, or gave him up.

Dr. Wachtel Aff. ¶ 37.

Moreover, while all adopted children face identity issues, these are particularly profound

for children who are adopted internationally and trans-racially, as Piero was.  *Id.* ¶ 38.  Piero was

forced to give up his language, customs, and national identity.  *Id.* ¶ 39.  As a child, he faced

difficulties with other children because of the language divide; as an adult, he was frustrated

because he could no longer communicate with his biological family.  *Id.*

### b.    The effect of trauma on Piero as an adult

Dr. Wachtel summarized as follows how this history of profound trauma affected Piero as

an adult:

Piero's behavior and experiences throughout his adolescence and adulthood are indicative of someone who suffered from profound early childhood trauma, severely hampering his ability to deal with stressful situations and interpersonal conflict.  Childhood trauma can derail a healthy developmental trajectory by overwhelming a person's ability to cope with stressful situations, particularly ones involving intimacy. . . .

Complicating the situation . . . was the lack of understanding by Piero or his adoptive family regarding the duration, severity, and complexity of his emotional and interpersonal difficulties. . . .

Piero experienced difficulties in his romantic relationships as an adult, particularly when he anticipated and/or felt abandoned, not understood, and rejected.  In situations in which he believed someone in his life was at risk of leaving or abandoning him (especially a woman), his emotional response was triggered and be became highly stressed, volatile, or even violent.  This response is consistent with what would be expected of someone who had experienced the profound maternal "abandonment" that Piero suffered as a child . . . .

Additionally, Piero suffered from alcoholism.  Individuals with a history of trauma will often abuse substances as a means by which to self-medicate and . . . to block out and suppress overwhelmingly painful feelings.

When a child is subjected to trauma, the brain does not develop effective self-regulatory mechanisms . . . .  Consequently, an affected individual does not learn it is appropriate and necessary to seek out help and support to develop constructive strategies to manage feelings of rejection, loss, grief, anger, or fear, and self-soothing. . . .

Moreover, the brain development of a trauma victim has been sabotaged by the experience and part of the brain that releases hormone in response to pain or pleasure is subverted.  Piero turned to alcohol at a young age in part because his access to it was prolific, it provided a major way of feeling connected to others, and it was modeled to him as a way of managing stress and providing comfort . . . .  Early trauma establishes a lower "set point" for a person's internal stress system and such a person becomes stressed more easily than normal throughout their life.  Alcohol and other substances are utilized more often than in someone with a typical internal stress system because it provides short-term relief and less interest in the long-term consequences from the stressful situation.

Dr. Wachtel Aff. ¶¶ 40-45.

Dr. Wachtel concluded as follows:

. . . Piero Cole suffered from the life-long effects of the emotional and psychological trauma he suffered as a child.  This trauma is reflected in Piero's compromised

> emotional functioning, difficulties with interpersonal relationships, and chronic abuse of alcohol.  Ultimately, Piero found himself in a great deal of unidentified and unrecognized pain, with no one to understand or acknowledge the depths and complexity of his early life experiences and without the skill set to regulate his behavior accordingly.

*Id.* ¶ 46.  Dr. Wachtel's opinions were based on information available at the time of trial and could have been testified to by him or a similarly qualified witness at the time of trial.  *Id.* ¶ 47.

Dr. Carlis found that Mr. Cole's adoption trauma profoundly affected his mental state beginning on January 14, 2010, when he returned home to find that his wife had moved out of their home.  A17 (Carlis Decl. 12).  Mr. Cole's anger and hurt toward his birthmother for her perceived abandonment of him, coupled with the belief that she had sold him, was displaced onto other women.  His wife's departure triggered a mental health crisis, including undergoing a Major Depressive Episode with Psychotic Features.  A18 (Carlis Decl. 13).

Dr. Carlis found that immediately after his wife left, Mr. Cole began to have recurrent thoughts of suicide and became increasingly frightened.  A17 (Carlis Decl. 12).  Mr. Cole slept alone for one of the first times in his life, and his paranoia increased.  Mr. Cole lost forty pounds in the twenty-one days between his wife's departure and the crime.  Dr. Carlis notes that this is a typical symptom of major depression.  Indeed, Mr. Cole showed all the hallmark symptoms of a major depressive episode, including depressed mood most of the day, nearly every day, marked diminished interest or pleasure in all or almost all activities, significant weight loss, insomnia, feelings of worthlessness, diminished ability to think or concentrate, recurrent thoughts of death, and recurrent suicidal ideation.  Accordingly, Dr. Carlis found that during this time Mr. Cole suffered from a major depressive disorder with psychotic features.  A17-19 (Carlis Decl. 12-14).

Dr. Carlis would have used Mr. Cole's Harris County Jail records to support her diagnosis.  Those records indicate that Mr. Cole was presenting symptoms of visual

hallucinations, illogical and inconsistent thought processing and poor reality testing.  A19 (Carlis Decl. 14); *see* DE 6-30 at 169 (Harris County Jail therapist noted that Cole exhibited "delusional thinking and episodes of visual hallucination.").

Trial counsel's deficient performance prejudiced Petitioner because the jury never received a full and accurate picture either of the trauma he suffered as a child or of the effects of that trauma on him as an adult.  The jury was essentially told that Piero was "lucky" to have had a poor but loving family in Ecuador and a second loving and better off family in the United States.  The jury did not hear about how he was abandoned by his biological father and then by a surrogate father; or how he was taken to the United States when he was about eight years old by a woman he had only recently met and who did not speak his language, returned to Ecuador a year later, and then was ripped from his biological mother's arms by the police.  Nor did the jury hear expert testimony about how long-lasting such trauma is, or about how his adoptive parents failed to take any steps to alleviate the effects of the trauma on him.  Similarly, the jury did not hear about his identity disturbance, or about how the combination of these factors predisposed him to alcohol abuse and eventual dependence.  Nor did trial counsel present the jury with evidence that would have explained Petitioner's extreme reaction to his wife's departure and request for a divorce.  Had the jury been able to place this evidence "on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537.

### C.    State Court Proceedings

Mr. Cole raised this claim in his Initial Application for Writ of Habeas Corpus.  *See* DE 6-3.  The trial court denied the state habeas application, adopting verbatim the State's proposed findings of fact and conclusions of law.  *Ex parte Cole*, No. 1250754-A, State's Proposed

Findings of Fact, Conclusions of Law and Order (230th Dist. Ct., Harris Cnty., Tex.) (hereafter "FFCL"); *see* DE 6-6 at 141-94 (signed by trial court judge at 194).  The CCA affirmed, relying on the trial court's findings and conclusions.  *Cole II*, 2017 WL 562725, *1-2.

In *Wilson v. Sellers*, 138 S. Ct. 1188 (2018), the Court held that when a federal court applies 28 U.S.C. § 2254(d) and the "relevant state-court decision on the merits" of a federal habeas claim "does not come accompanied with" an explanation of the state court's reasons for denying relief, the "federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale."  *Id.* at 1192; *accord Cueva v. Davis*, 750 F. App'x 330, 333 n.2 (5th Cir. 2018). That reasoning should apply here.  Although the CCA decision is not a one-word denial order, with respect to this claim the CCA simply described the claim and then asserted that Mr. Cole did not meet his burden under *Strickland*, with no further analysis.  *Cole II*, 2017 WL 562725, *1.  Moreover, the CCA explicitly relied on the trial court's findings and conclusions.  *Id.* at *2.  Accordingly, we focus herein on those findings and conclusions.  We show that the state court decision was at best unreasonable in light of clearly established Supreme Court precedent, and in light of the state court record. Furthermore, to the extent that any aspect of this claim was defaulted during the state habeas proceedings, we show that there is cause and prejudice for any such default.

> **1.      The state court process was unreasonable because the state courts denied relief without a hearing, and because the trial court adopted the State's proposed findings and conclusions verbatim.**

One of the ways in which a state court ruling may be found unreasonable under § 2254(d) is when the state court decision was procedurally unfair.  When procedural unfairness in the state court deprives the petitioner of a fair opportunity to develop the facts, that ruling does not require deference or bar a federal evidentiary hearing, because § 2254(d) has been satisfied.

The state court process was unreasonable and unfair because the trial court never held an evidentiary hearing to consider Petitioner's well pled claim, which was supported by lay witness affidavits and expert reports, and because the trial court adopted verbatim the State's proposed findings of fact and conclusions of law.  *See* Standard of Review, § B, *supra*.

### 2. The state court decision was unreasonable.

To the extent that the state court ruling is nevertheless reviewed under 28 U.S.C. § 2254(d), the decision was unreasonable as a matter of fact and law.  Where, as here, defense counsel fails to undertake a thorough investigation, it is unreasonable to rule that counsel's performance was not deficient.  *See Wiggins*, 539 U.S. at 527-28.  Similarly, where, as here, the state court unreasonably discounts proffered mitigating evidence, its decision is unreasonable. *Porter*, 558 U.S. at 42-44.

The state habeas court denied this claim, finding that trial counsel presented essentially the same evidence as that proffered by Petitioner, and that trial counsel conducted a thorough investigation and made reasonable decisions.  FFCL, DE 6-6 at 164-66, 184.  The state court's analysis was at best unreasonable.

### a. The state habeas proffer was not cumulative of the mitigating evidence presented at trial.

The linchpin of the state habeas court's ruling was the following assertion:

> [T]rial counsel presented essentially the same evidence at trial that the habeas affidavit of Dr. David Wachtel, psychologist, discusses: that the applicant lived in poverty in Ecuador; that the applicant did not have a father figure in his life; that he applicant was exposed to alcohol at an early age; that the applicant was adopted and relocated to the United States; that the applicant had limited contact with his biological family; that the applicant's initial return to Ecuador was traumatic because his biological mother did not want to return the applicant to his adoptive parents; that the applicant had difficult romances; and, that the applicant suffered from alcoholism.

FFCL, DE 6-6 at 164-65.

This is a grossly inaccurate characterization of the state court record (which of course, as far as the state habeas proceedings are concerned, consisted solely of affidavits and other paper filings, as opposed to testimony). It is true that the penalty phase witnesses called by the defense gave the jury an outline of Mr. Cole's life history. It is false—and unreasonable in light of the state court record, 28 U.S.C. § 2254(d)(2)—to suggest that such an outline is "essentially the same" as Dr. Wachtel's affidavit and the other state habeas proffers (let alone the additional evidence presented in support of this Amended Petition).[11]

The life history outline presented at trial was basic and limited. The prosecutor summarized the testimony of the penalty phase witnesses as follows:

> We heard he had a mother who loved him enough to want to give him a better life. And that he had a second family that loved him, provided for him, and cared for him. We heard he worked. So do all of us. We heard he liked alcohol. Is any of that mitigating. No. Is it even close to sufficiently mitigating?

DE 6-98 at 72.

The concept of trauma went virtually unmentioned in the penalty phase testimony.[12] Mr. Cole's therapist, Sharon Boyd, testified generally that her job is to help people "process their

---

[11] We concentrate here on Dr. Wachtel's affidavit because it synthesizes the information provided by other witnesses concerning Mr. Cole's life history and experiences of trauma. But the lay witness accounts—summarized in § B, *supra*—both provide support for Dr. Wachtel's findings and themselves are powerful evidence that Mr. Cole experienced repeated, devastating traumatic experiences, and that those experiences affected his functioning throughout his life. The defense did not present any such evidence at penalty phase.

[12] The state habeas court indicated that there was penalty phase evidence that Mr. Cole's "initial return to Ecuador was traumatic because his biological mother did not want to return the applicant to his adoptive parents." FFCL, DE 6-6 at 164. This is inaccurate. Mr. Cole's biological mother, Sonia Araujo, testified that *she* was heartbroken by those events. DE 6-97 at 214-16, 219-20 (testimony interrupted after witness starts "crying uncontrollably"). She did not testify that it was traumatic for Mr. Cole. Mr. Cole's adoptive parents minimized any impact on him of the adoption process. *See* DE 6-97 at 21, 39-41 (Jim Cole testified that Piero had normal childhood in Texas and was product of two loving families); *id.* at 53, 58 (testimony of Hazel Cole that she and Piero "fell in love with each other" and he had a typical childhood in Texas).

history and their traumas." DE 6-96 at 153. She did not testify about Mr. Cole's history or

traumas. The addiction expert, Dr. Rustin, mentioned that many patients with addiction have

other disorders, including posttraumatic stress disorder. *Id.* at 186. Dr. Rustin also testified that

at the time of the offense Mr. Cole was going through a "traumatic experience," i.e., his

separation from his wife. *Id.* at 232.[13] Otherwise, there was no mention of trauma or its effects

on Mr. Cole.

Trauma and its effects on Mr. Cole, however, form the centerpiece of Dr. Wachtel's

expert opinion. The heart of his affidavit is an eight-page section titled "Childhood and

Adoption Trauma and its Effects." He summarized that discussion as follows:

> As a young boy, Piero suffered a series of traumatic events that had a long-term impact on his development, psychological and emotional maturation, and capacity to deal with stress. It began with his impoverished upbringing in rural Ecuador, continued with the initial relocation of Piero from the Oriente to Quito, and was significantly exacerbated by the permanent relocation of Piero to the United States following a legal adoption by an American family. The trauma culminated with the forcible removal of Piero's person from his birth mother and biological family during a return visit to Ecuador, and then was aggravated by the adoption in general and resulting lack of acknowledgment by the adults in Piero's life of the trauma and losses he had suffered.

Dr. Wachtel Aff. ¶ 17.

Following that introduction, Dr. Wachtel elaborated on Mr. Cole's difficult early

childhood circumstances in Ecuador, *id.* ¶ 18; the impairments in development that result from

such circumstances, *id.* ¶ 19; the "tremendously traumatic experience" of "being adopted by

---

[13] Accordingly, the state habeas court's assertion that trial counsel presented "essentially the same evidence," in part through the testimony of Ms. Boyd and Dr. Rustin, FFCL, DE 6-6 at 184, is unreasonable in light of the state court record. Neither Ms. Boyd nor Dr. Rustin testified about Mr. Cole's history of trauma or the effects of those traumatic experiences on him as an adult.

American parents and torn from his biological family" after his "already precarious childhood foundation," *id.* ¶ 20; Piero's likely dissociation as a means of coping with the pain of his separation from his Ecuadorian family, *id.* ¶¶ 24, 31;[14] Piero's "forcible removal from his biological mother's arms" during a return visit to Ecuador "was an additional specific and exacerbating traumatic event of profound separation and loss," and his "transition to life with the Coles in Quito and then the United States was an on-going trauma," *id.* ¶ 27; the physiological and emotional reactions to such traumatic events have "profound implications for the child's long-term functioning," *id.* ¶ 29; Piero had difficulty sleeping alone, "reflecting his intense feelings of abandonment and loneliness, *id.* ¶ 32; and the fact that feelings of grief, loss, and guilt are inherent in adoption, but were exacerbated for Piero by his prior losses, by the inability of his adoptive family to respond constructively to his feelings, and by his lack of understanding about how the adoption happened, *id.* ¶¶ 33-37.  Nothing like this appears anywhere in the trial testimony.

Dr. Wachtel also explained that Piero continued to suffer from the effects of his profound early childhood trauma throughout his life.  His inability to deal appropriately with feelings of abandonment or rejection by romantic partners was consistent with what would be expected of someone who had experienced "the profound maternal 'abandonment' that Piero suffered as a child."  *Id.* ¶ 42.  Furthermore, he turned to alcohol at least in part in order to "block out and suppress overwhelmingly painful feelings."  *Id.* ¶ 43.

---

[14] Dissociation is defined as follows: "Unconscious defense mechanism involving the segregation of any group of mental or behavioral processes from the rest of the person's psychic activity; may entail the separation of an idea from its accompanying emotional tone . . . ."  1 *Kaplan & Sadock's Comprehensive Textbook of Psychiatry* 852 (8th ed. 2005).  There is a "strong case for significant trauma as a necessary antecedent to the development of pathological dissociation."  *Id.* at 1855.

Dr. Wachtel concluded the following to a reasonable degree of certainty:

> . . . Piero Cole suffered from the life-long effects of the emotional and psychological trauma he suffered as a child.  This trauma is reflected in Piero's compromised emotional functioning, difficulties with interpersonal relationships, and chronic abuse of alcohol.  Ultimately, Piero found himself in a great deal of unidentified and unrecognized pain, with no one to understand or acknowledge the depths and complexity of his early life experiences and without the skill set to regulate his behavior accordingly.

Dr. Wachtel Aff. ¶ 46.

The defense did not present anything similar at penalty phase.  While Dr. Rustin testified that Mr. Cole was alcohol dependent and had an adjustment reaction with depressed mood at the time of the offense, *see* DE 6-96 at 194-95, he did not testify about trauma or its effects, about any factors that predisposed Mr. Cole to develop alcohol dependence, or about Mr. Cole having an overpowering reaction to feelings of abandonment or rejection.

Accordingly, the state court record is inconsistent with the state habeas court's assertion that the post-conviction proffer was cumulative of the mitigating evidence presented at trial.  FFCL, DE 6-6 at 164-65.  Thus, the state court decision is unreasonable in light of the state court record.  28 U.S.C. § 2254(d)(2).

To the extent that the state court decision relied on the notion of cumulative evidence as a basis for rejecting deficient performance, *see* FFCL, DE 6-6 at 165, it was also an unreasonable application of Supreme Court precedent.  28 U.S.C. § 2254(d)(1).  Going back to *Strickland* itself, deficient performance analysis centers on whether trial counsel committed errors that were "professionally unreasonable."  466 U.S. at 691.  The reviewing court must "evaluate the conduct from counsel's perspective at the time," *id.* at 689, and the focus is typically on "whether the investigation supporting counsel's decision[s] . . . *was itself reasonable*."  *Wiggins*, 539 U.S. at 523; *see also Williams*, 529 U.S. at 396 (finding deficient performance: "Whether or

not [counsel's] omissions were . . . prejudicial, they clearly demonstrate that counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background.").  A hindsight conclusion that counsel performed adequately because a reasonable investigation would not have found substantially more evidence is inconsistent with this precedent.

To the extent that the state court decision relied on the notion of cumulative evidence as a basis for rejecting prejudice, it was also unreasonable.  The Supreme Court has "never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient investigation might have prejudiced the defendant."  *Sears*, 561 U.S. at 955.  Where counsel's investigation is shown to be deficient, it is incumbent on the reviewing court to reweigh against the evidence in aggravation "the totality of the available mitigation evidence— both that adduced at trial, and the evidence adduced in the [post-conviction] proceeding . . . ." *Williams*, 529 U.S. at 397-98.  The state court manifestly failed to do this.  The trial evidence about Petitioner's history and particularly about his multiple experiences of life-altering trauma was far less extensive, detailed and documented than that presented post-conviction.  Under these circumstances, it would be manifestly unreasonable to dismiss all of the post-conviction evidence as "cumulative" merely because it overlapped to some extent with the trial evidence.

### b.   The state court unreasonably relied on trial counsel's affidavits as establishing that counsel's performance was not deficient.

Both of Mr. Cole's trial attorneys filed short affidavits asserting in conclusory fashion that they were not ineffective.  DE 6-6 at 196-98 (Graber Aff.); *id.* at 200-02 (Loper Aff.).  The state court credited those affidavits and found, based solely on the affidavits, that counsel's investigation was reasonable and they made reasonable strategic decisions based on that investigation.  FFCL, DE 6-6 at 165-66.  The state court ruling was unreasonable.

First, the state court ruling was procedurally unfair because the state habeas court found counsel's affidavits credible and relied on them to find facts without allowing a hearing or any other minimally adequate process to test the reliability and credibility of the affidavits. *See* Standard of Review, § C, *supra*.

Second, the state court decision was an unreasonable application of Supreme Court precedent.  In *Strickland* and its progeny, the Supreme Court has made clear that adequate investigation is the sine qua non for adequate representation.  For example, in *Williams*, the Court found that counsel's performance was deficient because "trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background."  *Williams*, 529 U.S. at 396.  Similarly, in *Wiggins*, the Court held that the reviewing court's focus in such cases should be on "whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . *was itself reasonable*."  539 U.S. at 523.

The affidavits presented by counsel are virtually identical.[15]  With respect to this issue, counsel essentially make two points: (1) they hired Dr. Rustin, an addiction expert, and provided him with background materials, and Dr. Rustin provided expert mitigation testimony concerning the effects of drugs on Mr. Cole, DE 6-6 at 196-97, 200-01; and (2) they investigated Mr. Cole's life history and presented witnesses to testify about it; they believed that presenting lay witnesses (rather than a trauma expert) was an effective strategy.  *Id.* at 197, 201.  The affidavits do not meaningfully answer the questions asked by *Strickland* and its progeny.

On the facts of this case, it was reasonable for counsel to hire an addiction expert and interview lay witnesses.  The fact that counsel took those steps does not mean that it was

---

[15] Mr. Loper's affidavit was signed over a year after Mr. Graber's affidavit, and Mr. Loper acknowledges consulting Mr. Graber in preparing his affidavit.  DE 6-6 at 200.  In itself, this casts doubt on the independence and credibility of Mr. Loper's affidavit.

reasonable to stop there.  A crucial question for *Strickland* purposes is whether the "scope" of counsel's investigation was reasonable "in light of what counsel actually discovered" in the investigation they did conduct.  *Wiggins*, 539 U.S. at 525.  In *Wiggins* itself, counsel's investigation uncovered numerous leads for mitigating evidence, and "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses."  *Id.*  The same thing was true here.

The only Ecuadorian witnesses counsel spoke to were Mr. Cole's biological mother, Sonia Araujo, and his sister, Carina Moran.  While trial counsel asserted their "belie[f]" that all witnesses were "fully prepared to testify," DE 6-6 at 197, 201, Ms. Araujo and Ms. Moran reported limited contact with counsel.  Sonia Araujo Decl. ¶ 3; Carina Moran Decl. ¶¶ 3-4.  Both witnesses also attest that they could have provided far more extensive testimony about Mr. Cole's life history if they had been asked to do so by counsel.  Sonia Araujo Decl. ¶¶ 6-38; Carina Moran Decl. ¶¶ 5-17.  Thus, the adequacy of counsel's preparation of those witnesses is a disputed factual issue.

Even if it is assumed that counsel adequately prepared Ms. Araujo and Ms. Moran to testify, it must also be assumed that counsel were aware pretrial of the evidence those witnesses presented at trial.  Their trial testimony contained numerous leads regarding Mr. Cole's childhood of poverty and exposure to toxins in Ecuador, and concerning the traumatic effects of the adoption on him.  After speaking to Ms. Araujo and Ms. Moran, professionally reasonable counsel would have sought to interview other witnesses with information about Mr. Cole's life in Ecuador.  Counsel did not speak to a single such witness.  *See* n.9, *supra*.

Similarly, Mr. Cole's adoptive parents, a family friend, and a co-worker had limited pretrial contact with counsel.  *See* Jim Cole Aff. ¶ 4; Hazel Cole Aff. ¶ 3; Mark Bartlett Aff. ¶ 2;

Don Hill Aff. ¶ 3.  Again, the testimony of those witnesses contained numerous leads and unanswered questions about how Mr. Cole's adoption and other traumatic experiences affected his life in Texas.  After speaking to those witnesses, professionally reasonable counsel would have sought to interview other witnesses with information about Mr. Cole's life in Texas.  Counsel did not speak to a single such witness.  *See* n.10, *supra*.

As discussed above, trial counsel did not present any actual testimony that Mr. Cole's adoption—or any other aspect of his life—was particularly traumatic, or about the effects of such trauma on him as an adolescent and adult.  The facts that counsel did know from both Mr. Cole's biological and adoptive families contained red flags that such trauma was likely.  If counsel had conducted a reasonable investigation of the lay witnesses and consulted an expert with knowledge of child trauma, counsel would have been in a position to make an informed decision whether to present no such evidence, evidence from lay witnesses only, evidence from one or more experts only, or evidence from both lay and expert witnesses.  Owing to counsel's failure to conduct a reasonable investigation into trauma and its effects on Mr. Cole, however, counsel was not in a position to and did not make an informed and reasonable decision.

The state court's contrary ruling was an unreasonable application of *Williams* and *Wiggins*, as the Fifth Circuit explained in *Adams*:

> In the absence of a sufficient investigation of Adams's background, it was impossible for [counsel] to make a strategic decision to pursue his stated mitigation theory . . . . When, as here, counsel does not conduct an investigation sufficient to enable him to reach an *informed decision,* we must reject the assertion that counsel made a strategic choice not to emphasize the defendant's background. . . .
>
> [Counsel] failed to make even the most cursory inquiry into the existence of potentially mitigating evidence in Adams's background. The contrary state habeas court and TCCA rulings are not merely incorrect; both are contrary to and unreasonable interpretations of clearly established federal law.

*Adams*, 324 F. App'x at 349-50 (footnotes omitted); *see Lockett v. Anderson*, 230 F.3d at 715 ("[T]he assertion of a 'strategic decision' must be rejected because no *informed* decision was made.") (emphasis in original) (quotation marks omitted).

## II.    TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO ADEQUATELY INVESTIGATE, DEVELOP AND PRESENT EXPERT TESTIMONY CONCERNING THE EFFECT OF MULTIPLE SUBSTANCES ON PETITIONER'S COGNITION AND BEHAVIOR BEFORE AND AT THE TIME OF THE OFFENSE.

In a capital case, defense counsel has a duty to conduct a reasonable investigation for evidence to negate guilt and to dissuade the jury from sentencing the defendant to death. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 690-91; *see Williamson v. Ward*, 110 F.3d 1508, 1514 (10th Cir. 1997) ("[I]n a capital case, counsel's duty to investigate all reasonable lines of defense is strictly observed.").  Mr. Cole's trial counsel rendered ineffective assistance of counsel by failing to investigate, retain, and present an expert on psychopharmacology who would have explained the effect of phentermine, Zoloft, and alcohol on Mr. Cole's ability to form the requisite intent for murder.  A psychopharmacologist would have also provided powerful mitigation evidence at sentencing concerning Mr. Cole's state of mind and behavior at the time of the offense.

### A.    Deficient Performance

At least a year before the trial, defense counsel were informed that Mr. Cole had abused diet pills containing phentermine, an amphetamine-like drug, in the weeks leading up to and on the day of the crime.  Counsel also possessed evidence that Mr. Cole was prescribed Zoloft a mere two weeks before the incident, *see* Def. Trial Ex. 9 (medical records of Dr. Orsak), DE-101 at 140, and, as evidenced by mitigation specialist Gina Vitale's letter to the prosecution, *see* DE 6-4 at 242-44, defense counsel knew that Mr. Cole was an alcoholic.

In April 2010, the defense hired Dr. Steve Rubenzer, a forensic psychologist, to evaluate Mr. Cole.  Dr. Rubenzer reported an extensive drug and alcohol history, diagnosed Mr. Cole with alcohol dependence, and reported that Mr. Cole had consumed at least six amphetamine-based diet pills, twelve beers, and several mixed drinks on the day of the crime.  DE 6-3 at 47.  He noted that Mr. Cole's alcoholism and "use of diet pills also probably contributed to his volatility, impulsivity, and failure to consider the consequences of his actions."  *Id.*  Dr. Rubenzer's report triggered trial counsel's duty to investigate further the impact of these substances on Mr. Cole's cognitive abilities.

Counsel had ample notice that Mr. Cole's use of diet pills, alcohol, and Zoloft affected his behavior and decision-making.  Counsel had access to articles explaining that violence can be a side effect of prescription drugs, and articles on "delirium tremens" or severe alcohol withdrawal.  These articles demonstrate that trial counsel were aware of the negative impact that drugs such as Zoloft and phentermine can have on mental functioning.  Yet, counsel failed to pursue this issue, which was significant for both guilt and sentencing proceedings.

Less than a month before the trial, trial counsel retained Dr. Terry A. Rustin, who specializes in addiction medicine.  Dr. Rustin provided the defense with his evaluation of Mr. Cole nine days before the trial started, leaving counsel with little time to follow up on his findings. This prevented counsel from exploring some of the important facets of addiction, such as genetic factors of alcoholism, brain development issues stemming from childhood alcohol use, and the effect that relapse has on an addict's brain after several weeks of abstinence.

Moreover, counsel asked Dr. Rustin to focus almost solely on Mr. Cole's alcohol dependence, but did not ask him to address the interaction of drugs such as Zoloft and phentermine with alcohol or the effects of that interaction on Mr. Cole's mental functioning, and

did not ask him to express any opinion on whether the effects of that interaction could negate criminal intent.  *See* DE 6-96 at 187.  Given that defense counsel raised no defense to the charges of first-degree murder, counsel could have had no strategic reason for failing to investigate such a defense.

Texas law does not include voluntary intoxication as a defense to criminal liability.  *See* Tex. Pen. Code § 8.04; *Raby v. State*, 970 S.W.2d 1, 6 (Tex. Crim. App. 1998).  However, expert testimony about Mr. Cole consuming Zoloft, diet pills, and alcohol could have negated the element of criminal intent.  Mr. Cole's use of Zoloft could have been considered involuntary intoxication, because he was taking "medically prescribed drugs according to the prescription." *Mendenhall v. State*, 15 S.W.3d 560, 565-66 (Tex. App. 2000), *aff'd*, 77 S.W.3d 815 (Tex. Crim. App. 2002).  Mr. Cole's use of over-the-counter diet pills and prescription medication caused significant impairments to his cognitive abilities when combined with his alcohol abuse, in ways that Mr. Cole did not anticipate.  Mr. Cole's use of prescription medication would have been considered involuntary because it caused unexpected intoxication or mental impairments. Thus, evidence of Mr. Cole's use of Zoloft, alcohol, and diet pills could have been a defense to criminal liability under Texas law.  *Id.*

Counsel's decision to limit investigation must be rooted in reasonable evaluations of the evidence.  *Baldwin v. Maggio*, 704 F.2d 1325, 1332-33 (5th Cir. 1983).  Attorneys must first "undertake a reasonably thorough pretrial inquiry into the defenses which might be offered" and select the defense based on an "informed, professional evaluation" of the success of the strategy. *Id.*  Whether counsel's failure to pursue such a defense resulted from failure to follow up on the facts in Dr. Rubenzer's report, ignorance of the law, or both, it constituted deficient performance.

Given the wealth of evidence of Mr. Cole's substance abuse, trial counsel performed deficiently by failing to investigate further and present expert testimony to disprove intent.  Like *Hinton v. Alabama*, 571 U.S. 263 (2014), this is a case in which "the only reasonable and available defense strategy require[d] consultation with experts or introduction of expert evidence."  *Id.* at 273 (citation and internal quotation marks omitted).  Here, counsel should have consulted an expert to determine the effect of diet pills, Zoloft, and alcohol on Mr. Cole's brain and behavior.  Defense counsel's failure to explore the effect that phentermine, alcohol, and Zoloft had on Mr. Cole's ability to form intent for murder was unreasonable and deficient.

Counsel did present testimony from Dr. Rustin at penalty phase, but counsel's presentation and preparation of that testimony were deficient.  Dr. Rustin had never testified in a capital case before, DE 6-96 at 207, and counsel failed to adequately prepare him for trial.  For example, Dr. Rustin did not explain to the jury the importance of Mr. Cole's self-reported alcohol and substance abuse.  The prosecution seized this opportunity to dismiss Dr. Rustin's examination of Mr. Cole, diminishing the self-reported data.  *See* DE 6-96 at 210-27.  The defense should have prepared Dr. Rustin for cross-examination and gathered information from Mr. Cole's family, friends, and co-workers to support Dr. Rustin's testimony.  Had Dr. Rustin been prepared by the defense, he would have been able to respond to cross-examination without undermining the credibility of his report and minimizing Mr. Cole's alcoholism.  *See id.* at 226-29 (noting collateral sources would have been helpful).

Counsel did not present testimony from Dr. Rustin concerning the biological effects of Mr. Cole's alcohol dependence or concerning Mr. Cole's drug abuse.  Dr. Rustin testified about the characteristics of alcoholism in general, and explained that alcohol lowers inhibitions, increases aggression, and affects coordination.  Reasonable counsel would have presented mental

60

health expert testimony that explained in detail how Mr. Cole's long-term history of alcohol and drug dependence, his emotional state at the time of the offense, and the substances he was using at and near the time of the offense mitigated his conduct and supported a sentence of life rather than death.

### B.      Available Testimony

But for counsel's failure to investigate the effects of multiple substances on Mr. Cole, counsel could have presented a wealth of lay and expert testimony in order both to disprove criminal intent and establish mental health mitigation.

### 1.      Testimony concerning Mr. Cole's use of alcohol, stimulants, and Zoloft

Trial counsel could have retained an expert such as Dr. William Alexander Morton, Professor Emeritus in Pharmacy and Clinical Sciences at the Medical University of South Carolina (MUSC), to explain the interactive effects of the drugs and alcohol on Mr. Cole's cognitive functioning. Dr. Morton has over thirty-five years of experience in his specialty of psychopharmacology. Dr. Morton Aff. ¶ 1. Dr. Morton teaches, consults, practices, and conducts research on how medications affect behavior.

Dr. Morton found that Mr. Cole remembers sitting at the bar with his adoptive father in Ecuador and drinking a beer at the age of six. Dr. Morton Aff. ¶ 13. Both Mr. Cole's biological mother and his adoptive parents owned bars. He began to drink alcohol regularly by his mid-teens. In high school, Mr. Cole purchased his own liquor. *Id.* ¶ 14. Mr. Cole's parents allowed him to drink in their bar, and eventually began to charge him money because of the large amount of alcohol that he consumed. *Id.* ¶ 15. As an adult, Mr. Cole's alcoholism resulted in a charge of driving while intoxicated. Though Mr. Cole retained employment, he drank as many as twelve

beers a day before driving home from work.  Once home, Mr. Cole drank until he fell asleep.  On average, he consumed twelve to twenty-four beers daily.  *Id.* ¶¶ 17-18.

For most of his life, Mr. Cole remained in denial about his drinking, did not believe that he had a problem, and underreported the amount that he drank.  *Id.* ¶ 19.  Soon after Melissa, Mr. Cole's wife, left, he attempted to stop drinking.  On the day of the crime, Mr. Cole relapsed and began to drink again after weeks of abstinence.  *Id.* ¶¶ 33-37.

In his late thirties, Mr. Cole began to abuse over-the-counter diet pills that his wife procured from weight loss clinics or friends.  The drugs acted as stimulants, increasing Mr. Cole's energy in his stressful workplace and balancing the effects of his heavy use of alcohol.  Initially, he took one pill daily, but Mr. Cole began to consume upwards of ten to twenty pills a day after his wife left him.  *Id.* ¶¶ 27-32.

The effects were dramatic.  Mr. Cole lost a substantial amount of weight in a short period of time.  Don Hill Aff. ¶ 9; Charlie Saenz Aff. ¶ 9.  His coworkers and friends described him as "depressed," "distracted," "almost-in-tears," and "disoriented," Scott Buchar Aff. ¶ 14; Jose Valdez Aff. ¶¶ 14-15; Mark Bartlett Aff. ¶¶ 37-40; Ramiro Alvarez Aff. ¶ 8; and he suffered from insomnia.  Dr. Morton Aff. ¶¶ 31-32.  Mr. Cole sought help from his physician, and he was prescribed sertraline, the generic form of the antidepressant Zoloft.  Mr. Cole continued to use the diet pills while taking sertraline.  *Id.* ¶¶ 34-36.

### 2.    Expert testimony concerning the effects of drugs on Mr. Cole's cognitive functioning

After meeting with Mr. Cole and reviewing his records, Dr. Morton reached the following conclusions regarding the effects of alcohol, stimulants, and drugs on Mr. Cole:

> Cole's mental state would have been substantially impaired on the day of the crime.  He would be expected to have been experiencing impulsivity, agitation, paranoia, and aggression based on the pharmacological properties of the alcohol

and stimulant substances he was consuming, his past history, and the observation by others of his impulsivity and aggression.  All of these symptoms are well documented and expected when these substances are abused together.  It is reasonable to believe the paranoid, aggressive, and anxious behavior witnessed in Cole can be attributed to the substances he was consuming.

Further, Cole's mental state at the time of the crime would have been impaired as to making logical, informed decisions, as he was most likely in an aggressive, survival state.  During this state, his cognitive functioning would have been impaired such that he would not have utilized the cortical areas of his brain to make this type of assessment.

Dr. Morton Aff. ¶¶ 37-38.

Dr. Morton's testimony would have served as convincing evidence to disprove Mr. Cole's intent on the day of the crime.  Dr. Morton would have explained that phentermine stimulates the central nervous system, and is a drug related to amphetamines, including dextro-amphetamine and methamphetamine.  These drugs lead to high incidences of impulsivity, paranoid psychoses, and aggressive violence when abused.  *Id.* ¶ 29.  Paranoia, a side effect of phentermine, is consistent with Mr. Cole's behavior leading up to the crime.  His desire to buy a weapon and his discussion with his son could have been explained as symptoms of his paranoia—a side effect of the diet pills, Zoloft, and alcohol.  His cycle of staying awake because of the drugs and fighting his insomnia with alcohol could have led to other adverse reactions such as agitation, restlessness, and aggression.  *Id.* ¶¶ 31-32.

Dr. Morton also would have been qualified to present evidence of the pharmacological effects that prolonged alcoholism and drug abuse had on Mr. Cole.  Alcohol depresses the central nervous system.  Short-term and prolonged alcohol use can profoundly affect the cerebral cortex, the portion of the brain that controls memory, cognition, and consciousness, and inhibits aggression.  *Id.* ¶ 23.  Stimulants such as phentermine activate the nervous system, releasing and increasing stimulation of brain neurotransmitters such as dopamine, norepinephrine, and

epinephrine.  Phentermine abuse frequently results in increased impulsivity, paranoid psychoses, and violence.  *Id.* ¶ 29.  When Mr. Cole used both alcohol and phentermine, these substances did not balance each other out; rather, the loss of inhibition, irritability, impulsivity, and aggression were compounded.  *Id.* ¶ 24.

Dr. Morton would have been able to testify that Mr. Cole was experiencing several of the harmful effects of stimulant use.  When Mr. Cole sought medical treatment to combat these problems, he was prescribed Zoloft, which acts as a stimulant in patients with preexisting anxiety.  The antidepressant likely exacerbated Mr. Cole's problems by causing greater anxiety, restlessness, and agitation.  *Id.* ¶ 34.  The combination of alcohol, stimulants, and antidepressant medication would have produced a situation fraught with adverse reactions.  *Id.* ¶ 35.  Dr. Morton would have testified that on the day of the crime, Mr. Cole had approximately seventeen to nineteen twelve-ounce beers and fifteen to twenty diet pills.   Dr. Morton Aff. ¶ 36.  With this amount of intoxicants in his system, Mr. Cole would have suffered from impaired cognitive functioning.  *Id.* ¶ 38.

### C.    Prejudice

#### 1.    Guilt phase

Trial counsel did not present a defense for the element of intent, or any defense at all for the charges of capital murder.  The prosecution argued that Mr. Cole's intent was readily apparent when he pulled the trigger of the gun.  During its summation, the prosecution asked the jury, "Who's going to [pull a trigger] if they don't intend that the person on the other end of it dies?"  DE 6-94 at 112.  Defense counsel had the opportunity to answer this question by presenting evidence that Mr. Cole's cognitive functioning was impaired so that he was incapable of forming the intent to kill even though he pulled the trigger.  Mr. Cole's paranoia, triggered by

the stimulants and Zoloft, would have explained much of the prosecution's evidence of intent, such as the purchase of the gun before the incident and the conversation with his son.  Dr. Morton Aff. ¶ 36 ("In the days leading up to the crime, Cole's mental state appears to have continued to deteriorate, as he continued to self-medicate with alcohol and stimulants in addition to the Zoloft.").  Instead, counsel could only tell the jury that "this was a crime of passion," while admitting that "passion is [not] necessarily a defense."  DE 6-94 at 99.

Trial counsel's failure to present evidence on the effect of Zoloft, phentermine, and alcohol on Petitioner's cognitive functioning or to retain an expert psychopharmacologist prejudiced Petitioner.  Had counsel presented this evidence, there is a reasonable probability that this information would have led to at least one juror finding that Mr. Cole did not form the requisite intent for capital murder.  *See Mendenhall*, *supra* (discussing defense based on involuntary intoxication by prescribed medicine).

## 2.    Penalty phase

The prejudice prong of trial counsel's ineffectiveness is not limited to cases where "little or no mitigation evidence [was] presented."  *Sears*, 561 U.S. at 954.  The Supreme Court has "found deficiency and prejudice in other cases in which counsel presented what could be described as a superficially reasonable mitigation theory during penalty phase."  *Id*. (citing *Williams*, 529 U.S. at 398, and *Rompilla*, 545 U.S. at 378).  Defense counsel's failure to prepare Dr. Rustin or call another expert was deficient performance, and prejudiced Petitioner.

If the evidence concerning the profound effects of Mr. Cole's abuse of multiple substances had been introduced in sentencing, there is a reasonable probability that a juror would have found that Mr. Cole had lowered culpability and sentenced him to life.  Testimony from an expert like Dr. Morton would have explained to the jury that Mr. Cole's paranoid, aggressive,

65

and anxious behaviors leading up to the crime were explainable as the result of the substances he was consuming.  Dr. Morton Aff. ¶¶ 35, 37.  Dr. Morton could also have testified that in a closed, supervised facility Mr. Cole would not be exposed to substance abuse, and hence that he would be unlikely to be a threat to others while incarcerated.  *Id.* ¶ 39.

As the result of counsel's failure to prepare adequately, counsel presented no testimony through Dr. Rustin concerning the interaction between alcohol, Zoloft, and stimulants.  Counsel's failure to prepare also resulted in Dr. Rustin failing to offer any testimony concerning the development and course of addiction to multiple substances.  Furthermore, Dr. Rustin's testimony was undercut by the prosecution's suggestion that he should not have relied on self-reporting by Mr. Cole.  *See* DE 6-96 at 209-11.  Had counsel prepared adequately, counsel could have rebutted this suggestion with evidence that self-reported data is the cornerstone of medical practice and professionals have training to determine when self-reporting is unreliable, *see* Dr. Morton Aff. ¶ 44, as well as by introducing evidence from family and friends that confirmed much of Mr. Cole's self-report.

Had trial counsel retained a psychopharmacologist, or had they retained and prepared Dr. Rustin adequately, the jury would have heard convincing evidence about the effect of Mr. Cole's alcoholism, abuse of stimulants, and the effects of Zoloft on his cognition and behavior.  There is a reasonable probability that at least one juror would have found Mr. Cole less morally culpable based on this evidence, and voted for a life sentence.

### D.      State Court Proceedings

Mr. Cole raised this claim in his Initial Application for Writ of Habeas Corpus.  *See* DE 6-3.  The trial court denied the state habeas application, adopting verbatim the State's proposed findings of fact and conclusions of law.  FFCL, DE 6-6 at 141-94 (signed by trial court judge at

194).  The CCA affirmed, relying on the trial court's findings and conclusions.  *Cole II*, 2017 WL 562625, *1-2.  As with Claim I, *supra*, under *Wilson*, 138 S. Ct. at 1192, this Court's AEDPA review should focus on the trial court's findings and conclusions.

Also as with Claim I, *supra*, the state court process was unreasonable and unfair because the trial court never held an evidentiary hearing to consider Petitioner's well pled claim, which was supported by lay witness affidavits and expert reports, and because the trial court adopted verbatim the State's proposed findings of fact and conclusions of law.  *See* Standard of Review, § B, *supra*.

To the extent that the state court ruling is nevertheless reviewed under 28 U.S.C. § 2254(d), the decision was unreasonable as a matter of fact and law.  Where, as here, defense counsel fails to undertake a thorough investigation, it is unreasonable to rule that counsel's performance was not deficient.  *See Wiggins*, 539 U.S. at 527-28.  Similarly, where, as here, the state court unreasonably discounts proffered mitigating evidence, its decision is unreasonable. *Porter*, 558 U.S. at 42-44.

The state habeas court denied this claim, finding that trial counsel presented essentially the same evidence as that proffered by Petitioner, and that trial counsel conducted a thorough investigation and made reasonable decisions.  FFCL, DE 6-6 at 155-56, 183.  The state court's analysis was at best unreasonable.

The state habeas court ruled that counsel's performance could not have been deficient, because counsel hired and presented testimony from an addiction expert, Dr. Rustin, at penalty phase.  FFCL, DE 6-6 at 155-56.[16]  The fact that counsel hired an expert, however, is not

---

[16] The state habeas court relied in part on the affidavits filed by trial counsel.  FFCL, DE 6-6 at 156.  The untested affidavits of trial counsel are an inadequate basis on which to make findings.  *See* § I.C.2.b, *supra*.  Moreover, those affidavits provide no information beyond the

dispositive of whether counsel conducted a reasonable investigation and then made reasonable decisions based on that investigation. *See, e.g.*, *Hinton*, 571 U.S. at 273-75 (counsel's performance deficient where counsel relied on expert he knew was inadequate based on misunderstanding of Alabama law regarding expert funding); *Rompilla*, 545 U.S. at 382-90 (counsel's performance deficient because of inadequate investigation, despite hiring "cadre of three mental health witnesses").

Here, Petitioner alleged in state court (and here) that trial counsel was ineffective (despite hiring Dr. Rustin and presenting his testimony) in two respects: (1) failing to investigate a mental health-based defense to first degree murder, and (2) failing to investigate and present available evidence confirming Mr. Cole's long-term substance dependence and the effect on him of all of the substances he was using at and near the time of the offense.

The state habeas court simply failed to address the former allegation. Nothing in counsel's affidavits or elsewhere provides any basis for concluding that counsel conducted a reasonable investigation or otherwise made a reasonable decision not to pursue an involuntary intoxication defense based on the effects of Mr. Cole's ingestion of alcohol, diet pills and Zoloft, a prescription medication. To the extent, if any, that counsel failed to pursue such a defense based on a misunderstanding of Texas law regarding such a defense, counsel's failure was unreasonable. *Hinton*, 571 U.S. at 273-74.

The state habeas court also failed to address whether counsel's failure to pursue such a defense at the guilt phase of the trial prejudiced Petitioner. *Cf.* FFCL, DE 6-6 at 156-57 (rejecting prejudice at penalty phase, based on Dr. Rustin's penalty phase testimony). For the

---

facts that counsel hired Dr. Rustin, that he reviewed records and evaluated Mr. Cole, and that he testified for purposes of mitigation. DE 6-6 at 196-97, 200-01.

reasons set forth in § C.1, *supra*, Petitioner was prejudiced by counsel's deficient performance. At a minimum, this Court cannot appropriately address this aspect of the claim, which was not meaningfully addressed in state court, without holding an evidentiary hearing.

As to the second allegation, the defense presented relatively limited testimony from Dr. Rustin at penalty phase.  Dr. Rustin testified that Mr. Cole is alcohol dependent, that his mood was depressed at the time of the offense, that he habitually drank 12 to 24 beers a day, and about the general effects of consuming that much alcohol on emotion and cognition.  DE 6-96 at 192-201.  His testimony about the amount of alcohol that Mr. Cole consumed was based solely on Mr. Cole's self-report.  *Id.* at 193.  Dr. Rustin was aware from records review and interviewing Mr. Cole that Mr. Cole was also taking prescription Zoloft and amphetamines at the time of the offense.  *See* A27-28 (Report of Terry Rustin, M.D., 5-6).  Dr. Rustin did not, however, testify about the interactions of these medications with alcohol, or about the specific effects on Mr. Cole of the alcohol he consumed on the day of the offense.

The prosecution cross-examined and impeached Dr. Rustin for his heavy reliance on Mr. Cole's self-report.  DE 6-96 at 208-28.  Professionally reasonable counsel would have realized that this was possible, indeed likely, and would have secured corroboration of Mr. Cole's self-report from other sources.  State habeas counsel did so.  *See, e.g.*, Edward Fernandez Aff., ¶ 8; Don Hill Aff., ¶ 7; Jose Valdez Aff. ¶ 10.  There was no reasonable basis for counsel's failure to corroborate Mr. Cole's self-report; the state court made no finding to the contrary.

It is clear from trial counsel's affidavits that they were trying to establish mitigation through Dr. Rustin's testimony.  Their affidavits do not offer any reason for their apparent decision not to present evidence about the effects of Mr. Cole's consumption of amphetamines and Zoloft, as well as alcohol, around the time of the offense.  Nor do their affidavits offer any

explanation for their failure to present testimony—whether from Dr. Rustin or another expert—about the actual effects on Mr. Cole at the time of the offense of his consumption of alcohol and drugs.  There is no apparent reason for counsel's failure to present such testimony, nor did the state habeas court make any finding about counsel's reasons, if any.[17]

The state habeas court asserted that Petitioner was not prejudiced at penalty phase by counsel's deficient performance, because Dr. Morton's affidavit contained "essentially the same information" as Dr. Rustin's testimony.  FFCL, DE 6-6 at 183.  For several reasons, that assertion was unreasonable.

First, as discussed above, Dr. Rustin's testimony was heavily impeached for over-reliance on Mr. Cole's uncorroborated self-report.  While Dr. Rustin's testimony was unreasonably limited, here, as in *Hinton*, Dr. Rustin's testimony could potentially have helped Mr. Cole—but only if the jury believed Dr. Rustin.  If counsel's deficient performance results in the jury discrediting an expert, then the defendant may be prejudiced, even if effective counsel would have presented "essentially the same information," as the Court explained in *Hinton*:

> It is true that [trial expert] Payne's testimony would have done Hinton a lot of good *if the jury had believed it*.  But the jury did not believe Payne.  And if there is a reasonable probability that Hinton's attorney would have hired an expert who would have instilled in the jury a reasonable doubt as to Hinton's guilt [but for counsel's deficient performance], then Hinton was prejudiced by his lawyer's deficient performance . . . .

*Hinton*, 571 U.S. at 275-76 (emphasis in original).

Second, the characterization of Dr. Rustin's testimony as "essentially the same information" as Dr. Morton's affidavit is unreasonably inaccurate.  Dr. Morton's affidavit

---

[17] As discussed above, trial counsel's untested affidavits do not provide a basis for reliable findings of fact.  Moreover, on this issue even the untested affidavits provide no information.  In the absence of a hearing, the trial court had no reasonable basis for asserting that trial counsel had a strategic reason for limiting the mitigation presentation in this fashion.

addresses the combined effects of alcohol, amphetamines, and Zoloft, something Dr. Rustin never addressed.  Even more importantly, Dr. Morton opines about the effect of those substances on Mr. Cole at the time of the offense, something Dr. Rustin never did.

It is well recognized that expert testimony regarding the effect of a defendant's impairments on him at the time of the offense is powerfully mitigating.  *See, e.g.*, *Gray v. Branker*, 529 F.3d 220, 236 (4th Cir. 2008) (finding prejudice where unpresented evidence "would have provided the jury with a medical explanation for Gray's compulsive behavior"); *Hardwick v. Crosby*, 320 F.3d 1127, 1167 n.154 (11th Cir. 2003) (petitioner prejudiced by counsel's failure to present expert testimony regarding effects of alcohol and drugs on petitioner at time of offense: "An expert witness could have provided mitigating testimony that Hardwick was 'significantly impaired . . . at the time of the crime,' which would have caused him to have 'difficulty conforming his behavior' to law.") (quoting *Brownlee v. Haley*, 306 F.3d 1043, 1071 (11th Cir. 2002)); *Middleton v. Dugger*, 849 F.2d 491, 495 (11th Cir. 1988) (petitioner prejudiced by counsel's failure to present expert testimony that petitioner "was under extreme emotional duress at the time of the homicide").  The state habeas court unreasonably discounted the mitigating significance of Dr. Morton's proffered testimony.  *See Porter*, 558 U.S. at 42 (state court "unreasonably discounted the mitigation evidence" presented in post-conviction proceedings).

## III.   TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE, DEVELOP, AND PRESENT EVIDENCE OF EXPOSURE TO NEUROTOXINS AND BRAIN DAMAGE.[18]

### A.   Deficient Performance

Trial counsel were ineffective for failing to investigate and present mitigating evidence to Mr. Cole's jury.  Specifically, trial counsel failed to investigate and present evidence of Mr. Cole's exposure to neurotoxins and brain damage.  With regard to deficient performance, the focus is on whether defense counsel's investigation was reasonable.  *Walbey*, 309 F. App'x at 800.  In *Walbey*, the court found that trial counsel's decision to limit their expert's area of inquiry was unreasonable.  *Id*. ("Reasonable professional judgment could not support such a limitation . . . [that resulted in] the failure to investigate a mitigation defense thoroughly.").

In Mr. Cole's case, there were numerous red flags suggesting the likelihood that Mr. Cole suffered from organic brain damage.  Counsel, however, failed to adequately investigate and were therefore unable to present this profoundly mitigating evidence.  Mr. Cole's counsel had a constitutional duty to conduct a thorough investigation of his background and identify all reasonably available mitigating evidence.  *See* Claim I.A.1, *supra*.  Counsel unreasonably breached their duty to investigate.

Counsel were or should have been aware of numerous red flags signaling the need for neuropsychological testing and thorough investigation of Mr. Cole's executive functioning.  First, counsel should have known that Mr. Cole's parents were cousins.  *See* Claim I.B.1, *supra*.  But counsel did not inquire into this, nor did they even attempt to speak with Mr. Cole's birth

---

[18] Claims III, IV, and VI were exhausted in state court in Mr. Cole's subsequent application for writ of habeas corpus.  The CCA dismissed the application without considering the merits of the claims. *Cole III*, 2020 WL 1542118, at *1.  Mr. Cole can overcome any procedural bar because: (1) he can establish "cause" and "prejudice"; and/or (2) he can establish a "fundamental miscarriage of justice."

father.  A31-32 (Statement of Hugo Riofrio); A36-37 (Statement of Sonia Araujo).  Second,

counsel knew from multiple sources that Mr. Cole spent his early childhood living close to

Ecuadorian oil fields.  *See* DE 6-95 at 16-17 (defense counsel refers to fact that Mr. Cole's

adoptive father and another defense witness were in area doing oil field service work); DE 6-97

at 9-11 (testimony of Jim Cole).  Counsel also knew that Mr. Cole may have been exposed to

toxins in his childhood environment in Ecuador.  A49-50 (Handwritten note from trial counsel

Graber's file (dated Aug. 6, 2010)) (notes from a call with Dr. Steven Rubenzer including "re

Equadorian [*sic*] toxins caused by river pollution – from drilling.").  Exposure to neurotoxins

such as petrochemicals, especially as a child, is a known risk factor for organic brain damage.

*See, e.g.*, Muriel D. Lezak, et al., *Neuropsychological Assessment* 269-81 (4th ed. 2004).  Yet,

counsel never inquired into whether Mr. Cole was exposed to harmful neurotoxins from the oil

fields and, if so, what effects such exposure likely had on his developing brain.  Third, counsel

knew that Mr. Cole regularly consumed alcohol from his childhood on.  DE 6-4 at 242-244

(Letter from defense mitigation specialist Gina Vitale to District Attorney Patricia Lykos).

Consumption of alcohol as a youth is another risk factor for brain impairment.  *See Anderson v.

Sirmons*, 467 F.3d 1131, 1144 (10th Cir. 2007) (explaining that brain damage likely resulted

from, inter alia, consumption of alcohol as a child).  Fourth, counsel knew or should have known

that Mr. Cole suffered two serious head injuries as a child.  *See* A56 (Report of Daniel Martell,

Ph.D., 5); A67 (Harris Cnty. Sheriff Office Health Assessment, Feb. 18, 2010).

Nevertheless, counsel failed to arrange for neuropsychological testing, or otherwise

investigate whether Mr. Cole suffered from neuropsychological impairments.  Prior to trial,

counsel hired Steven J. Rubenzer, Ph.D., a psychologist.  On August 6, 2010, over a year before

trial, Dr. Rubenzer told trial counsel that they should retain a neuropsychologist to investigate

whether Mr. Cole suffered from organic brain damage.  A50 (Handwritten note from trial counsel Graber's file (dated Aug. 6, 2010)).  Dr. Rubenzer explained that Mr. Cole may have been exposed to toxins and that such exposure can be a red flag for brain damage.  A50.

Trial counsel, however, failed to heed their expert's advice.  By the end of August of 2011, with less than a month before voir dire was to begin, Dr. Rubenzer, who was the only psychologist that defense counsel retained at the time, informed trial counsel he would likely be unavailable to testify in Mr. Cole's trial.  A64-66 (Emails between Dr. Rubenzer and Jerald Graber (Aug. 2011)).  With Dr. Rubenzer unavailable, trial counsel retained Gilbert Martinez, Ph.D.,[19] a psychologist and clinical neuropsychologist, but failed to ask Dr. Martinez to perform neuropsychological testing.  *See* A68 (Report of Gilbert Martinez, Ph.D., 1-2) ("Mr. Jaime Cole was referred for psychological assessment"); A86 (Dr. Martinez Aff. ¶ 3) ("In 2011, I was hired by attorney Jerald Graber to do only a psychological evaluation of Mr. Jaime Piero Cole.  I was not asked to do a neuropsychological evaluation.").  Instead, Dr. Martinez, like Dr. Rubenzer, conducted only psychological testing.  A78 (Martinez Report at 11) (listing tests conducted); A86 (Dr. Martinez Aff. ¶ 3).

Despite Dr. Rubenzer's recommendation that counsel conduct neuropsychological testing, Mr. Cole was never tested for neuropsychological impairments, and thus counsel never learned that he suffered from such impairments.  This was deficient.  *See Wiggins*, 539 U.S. at 525 (scope of counsel's investigation was unreasonable in light of what counsel learned); *Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir.1998) ("When experts request necessary information and are denied it, when testing requested by expert witnesses is not performed, . . . a capital

---

[19] Dr. Martinez performed his assessment of Mr. Cole a month before trial began.  *See* DE 6-3 at 48.

defendant has not received effective penalty phase assistance of counsel.").  Because of counsel's deficient performance, the jury never heard that Mr. Cole suffers from executive functioning impairments.

Similarly, counsel failed to investigate or consult with experts regarding Mr. Cole's childhood environment despite being aware that he grew up in an area where toxins were prevalent.  Had they done so, they would have learned that Mr. Cole was continuously exposed to harmful neurotoxins, which is a red flag for brain damage.  Trial counsel's failure to conduct an adequate investigation, and to develop and present evidence that Mr. Cole suffered from brain dysfunction, was deficient performance.

### B.    Prejudice

As a result of counsel's deficient failure to investigate, they failed to develop and present evidence that Mr. Cole was continuously exposed to neurotoxins as a child, and that he suffers from executive functioning and memory impairments and has a learning disability.  But for counsel's failure to develop and present this evidence, "there is a reasonable probability that at least one juror would have struck a different balance."  *Wiggins*, 539 U.S. at 537.

Organic brain damage is a highly mitigating condition.  Jurors are "likely to react sympathetically when their attention is drawn to organic brain problems."  *Glenn v. Tate*, 71 F.3d 1204, 1211 (6th Cir. 1995); *cf. Lockett*, 230 F.3d at 716 ("If the medical opinion testimony in this case—that Lockett suffered from some organic brain disorder that tended to explain his violent conduct and made his less able to control his behavior than a normal person—had been presented to the jury, we think a reasonable juror could have found this his particular medical condition, which resulted from no fault of his own, made him less morally culpable for his cruel and senseless crime."); *Ferrell v. Hall*, 640 F.3d 1199, 1235 (11th Cir. 2011) (noting "that organic

brain damage to Ferrell's frontal lobe has led to impaired insight, impaired judgment, increased impulsiveness and explosiveness, emotional and mental dysfunctions, decreased ability to plan and understand consequences, and inability to process information in stressful situations").

### 1.    Exposure to neurotoxins

Counsel knew that Mr. Cole grew up near oil fields in Ecuador.  DE 6-95 at 16.  Counsel was also aware that the toxic byproducts of oil drilling polluted Ecuadorian rivers (among other things).  A50 (Handwritten note from trial counsel Graber's file (dated Aug. 6, 2010)).  A professionally reasonable investigation of Mr. Cole's early childhood environment and home life would have revealed that Mr. Cole was chronically exposed to neurotoxic industrial petrochemicals as a young child during the most vital developmental periods of his life.  An expert in toxicology could have testified that exposure to such chemicals can adversely affect cognitive functions that regulate and control normal behavior.  A95-97 (Report of Andrés Lugo, M.D., 9-11).  This is especially true in individuals, like Mr. Cole, who were exposed to such toxins as children.  *Id.*

Current counsel retained Dr. Andrés Lugo, M.D., M.P.H., M.S., FACMT, a Medical Toxicologist and Fellow of the American College of Medical Toxicology, to assess Mr. Cole's exposure to neurotoxins.  Dr. Lugo found that Mr. Cole suffered chronic environmental exposure to neurotoxic and neuro-endocrine disrupting chemicals that are capable of causing brain damage and neuropsychiatric health problems.  A95-98 (Lugo Report at 9-12).  Trial counsel never developed this important evidence because they never conducted any investigation related to Mr. Cole's childhood environment.  This evidence of repeated exposure to harmful toxins is mitigating in and of itself.  It is also a glaring red flag for brain damage, which would have led

reasonable counsel to investigate Mr. Cole's neurocognitive deficits.  Had trial counsel retained a toxicologist, he would have testified as follows.

Crude oil and its byproducts contain both hydrocarbons and neurotoxins.  Prolonged exposure to hydrocarbons can cause permanent damage to the nervous system and development of peripheral neuropathy.  A95 (Lugo Report at 9).  Organic solvents found in crude oil and its byproducts cause many central nervous system changes, such as anxiety, neurobehavioral changes and impairment in cognitive performance.  A96 (Lugo Report at 10).  Prolonged exposure to hydrocarbons and neurotoxins, particularly when that exposure is to children, is a red flag for brain damage and other neurocognitive deficits.  A95-97 (Lugo Report at 9-11).

In the early 1970s, as a young child, Mr. Cole lived in Shushufindi, Ecuador.  There, Mr. Cole lived only two blocks (100 yards) from an oil exploration and refinery site on the largest oil field in Ecuador.  A92 (Lugo Report at 6).  The oil field, which was owned by Chevron, contained a refinery that produced smoke and chemical odor on a continuous basis.  *Id.*  The refinery also produced substantial toxic waste material, which included crude oil, petrochemicals, and industrial wastewater.  *Id.*  To dispose of the waste, Chevron built hundreds of dumping sites in and around Shushufindi. *Id.* During that period, Ecuador's environmental laws and regulations were non-existent, so Chevron dumped its toxic waste without regard to environmental concerns.   A88, 90, 98 (Lugo Report at 2, 4, 12).  Chevron has since admitted that there were multiple oil spills in Shushufindi under its operation, both inside its operation area as well as in neighboring zones.  Because of these widespread releases of toxic chemicals, local sources of water and the soil were also contaminated.  A87-88 (Lugo Report at 1-2).  As a result, toxins would have been ingested by contact with the soil, by drinking from local water sources, and by eating food grown from the contaminated soil.  A89 (Lugo Report at 3).

Chevron also sprayed the road leading from the oil field to Mr. Cole's home with crude oil to reduce the dust flow, thus increasing the level of toxic chemicals in the air.  A92 (Lugo Report at 6).  The inside of Mr. Cole's home was no escape from the toxic chemicals.  One of Mr. Cole's mother's jobs was to wash the uniforms of the oil workers (fifty per day), including drying and ironing them at her house.  The uniforms were usually covered in chemicals, tar and oil products, so that washing them in the home would have released toxic chemicals inside the home.  A88 (Lugo Report at 2).  To make matters worse, when Mr. Cole's mother cleaned the floors in their home, she used diesel fuel to make the floors shine.  A92 (Lugo Report at 6).

Like other Ecuadorians who lived in the area, Piero and his family drank, bathed in, and washed with water taken directly from local rivers and streams.  A88-89 (Lugo Report at 2-3).  Because of the presence of numerous oil wells, Shushufindi was then and remains "one of the most contaminated places in Ecuador, with extremely high levels of neurotoxic petrochemicals contaminating water, soil, plants and wildlife (including animals used for human consumption)."  A87-88 (Lugo Report at 1-2).  Workers who were present at the oil fields during the late 1970s confirm that the water was heavily contaminated and considered completely unsafe as the result of contamination from pipeline breaks and routine operations.  A104-05 (Vernon Bertrand Decl. ¶¶ 2-6); A108-09, 111 (Gary Milam Decl. ¶¶ 10, 12-14); A113-14 (Dale Sowell Decl. ¶¶ 2-4); A116-17 (Shirley Wiggins Decl. ¶¶ 8-10).

Dr. Lugo conducted an investigation of Piero's exposure to neurotoxins in Ecuador.  Dr. Lugo's investigation confirmed that, while Piero was growing up in Shushufindi, he was chronically exposed to neurotoxic petroleum compounds:

Piero was raised in the Shushufindi area from 1972 to 1979/80 (from age 2 or 3 to 7 or 8).  Throughout this time, Piero was constantly exposed to neurotoxic substances.  Piero's home in Shushufindi was located within 100 yards of an oil

refinery, which constantly burned torches that released large amounts of neurotoxic hydrocarbons, heavy metals, dioxins, and other toxic substances. . . .

Environmental pathways of exposure occurred every day through contaminated air, contaminated water, and contaminated plants and animals. The exposure occurred through the inhalation of contaminated air, drinking contaminated water and eating contaminated food (plants and animals to include fish and wild animals), as well as exposure to contaminated soil. . . .

. . . . In addition to being exposed through residential proximity to the refinery, the streets on the front of the house were covered with crude oil sprayed by the refinery to reduce dust blow from truck traffic. Also, to protect wood floor against termites and make it shine Piero's mother used to clean the floor with diesel.

A94-95 (Lugo Report at 8-9).

As a result, Mr. Cole was constantly exposed to these toxins day and night. He was exposed to those toxins by breathing the air, drinking well water and river water (which were Mr. Cole's only sources of water and were contaminated by the unsafe disposal of the refinery's waste and their spills), playing on contaminated soil, and eating indigenous food.[20]

Mr. Cole was also exposed to highly toxic pesticides in Shushufindi. In the 1970s, pesticides that were capable of causing severe brain defects, brain damage, and neurotoxicity were regularly sprayed in Shushufindi. A90, 96 (Lugo Report at 4, 10). Most of the pesticides that were used in Shushufindi in the 1970s have been severely restricted or banned in the United States. A96 (Lugo Report at 10). The pesticides that were used in Shushufindi included, but are not limited to: Chlordane, which has been banned in the U.S. since 1983; Heptachlor, which was banned in the U.S. in the 1980s; and Toxaphene, which has been banned in the U.S. since 1982. *Id.*

---

[20] Dr. Lugo notes that the Ecuadorian Ministry of Environment now considers Shushufindi one of the most contaminated areas in Ecuador, with extremely high levels of neurotoxic and carcinogenic petrochemicals that have contaminated the water, soil, plants, and wildlife. A94-95 (Lugo Report at 8-9).

## 2.       Impairments in cognitive functioning

A thorough investigation of Mr. Cole's mental health would have revealed a wealth of mitigating evidence, including that Mr. Cole suffers from brain damage.  This evidence is unquestionably mitigating and should have been the centerpiece for Mr. Cole's penalty phase presentation.  *See Lockett*, 230 F.3d at 716.

Undersigned counsel has retained neuropsychologist Daniel Martell, Ph.D., ABPP, who would have testified that neuropsychological testing has demonstrated that Mr. Cole has impairments of his executive functioning and his memory functioning, and that he suffers from a learning disability.  A60-61 (Martell Report at 9-10).  A neuropsychological evaluation of Mr. Cole revealed that his memory and executive functioning impairments include, among other deficits, proactive memory interference, confabulation, perseveration, difficulty with dividing attention, impaired problem solving and abstract reasoning, diminished cognitive flexibility, and intermittent loss of cognitive set.  A60-61 (Martell Report at 9-10). Dr. Martell would have further testified that individuals, like Mr. Cole, with executive functioning impairments lack the impulse control of most people and have an increased risk for behavior dyscontrol.  A61-62 (Martell Report at 10-11).

The fact that Mr. Cole is the product of inbreeding further increased the risk for adverse neurocognitive outcomes and behavior.  A61 (Martell Report at 10)  Specifically, Mr. Cole's father is his mother's first cousin.  A31 (Statement of Hugo Riofrio); A36-37 (Statement of Sonia Araujo).  Additional risk factors for brain damage in Mr. Cole's history include exposure to neurotoxins as a child, abuse of multiple substances with dependence on alcohol, and head injuries.

Additionally, there is evidence that Mr. Cole may have possessed an adverse vulnerability to Zoloft, a medication which he was prescribed for the first time only weeks before the offense.   Studies have concluded that SSRI medications, a class of medications to which Zoloft belongs, double the risk of occurrence of events in healthy adults that can lead to violence or suicide.  *See* A. Bielefeldt, et al., *Precursors to suicidality and violence on antidepressants: systematic review of trials in adult healthy volunteers*, 109(10) J. of the Royal Soc'y of Med. 381-92 (2016).

Had counsel conducted a reasonable investigation into Mr. Cole's environment and childhood, they would have been able to present this powerful mitigating evidence that the jury never heard.  Accordingly, counsel's deficient failure to develop and present evidence of organic brain damage has frequently been found prejudicial.  *See, e.g.*, *Sears*, 561 U.S. at 949 (trial counsel ineffective for failing to present evidence of defendant's brain damage and frontal lobe impairments); *Porter*, 558 U.S. at 41-43 (finding prejudice from failure to present evidence or brain abnormality and cognitive defects); *Rompilla*, 545 U.S. at 392-93 (failure to present evidence of organic brain damage linked to fetal alcohol exposure); *Williams*, 529 U.S. at 370, 398 (failure to present evidence that defendant "might have mental impairments organic in origin").

### C.  State Habeas Counsel Were Ineffective for Failing to Raise this Claim.

For the reasons above, Mr. Cole's ineffective-assistance-of-trial-counsel ("IATC") claim is meritorious.  This claim was presented in subsequent state habeas proceedings.  The CCA dismissed the application without considering the merits of the claim. Although the claim was exhausted, to the extent the claim is deemed procedurally defaulted, the ineffective assistance of

initial state habeas counsel establishes cause and prejudice that overcome the default.  *Martinez*, 566 U.S. at 17; *Trevino*, 133 S. Ct. at 1918, 1921.

### 1.    Deficient performance

Unlike trial counsel, state habeas counsel did conduct an investigation in Ecuador, and took a tentative step towards investigating for brain damage.  Before state habeas counsel got far enough on either prong of the investigation to make reasonable decisions, however, they unreasonably terminated both investigations.

As a result of their limited investigation, counsel became aware of the likelihood that Mr. Cole had been exposed to neurotoxins during his childhood living next to an oil refinery.  The mitigation specialist assigned to the case proposed investigating Mr. Cole's possible neurotoxin exposure, but counsel decided not to pursue the issue. A119-20 (Ariane Eigler Decl. ¶ 7).  The "only reason" that counsel "did not hire a toxicologist is because the office did not want to spend money on an expert on toxicology without any other evidence of brain dysfunction."  A122 (Sam Woodburn-Henry Decl. ¶ 6); *see* A124 (Robert Romig Decl. ¶ 7).  The head of the office, Brad Levenson, will testify at a hearing that if they had known of tests showing frontal lobe impairment, they would have investigated further regarding toxin exposure.

However, counsel's failure to obtain "other evidence of brain dysfunction" was itself the result of deficient performance.  State habeas counsel tried to investigate brain damage on the cheap.  State habeas counsel hired a neuropsychologist, Dr. James Underhill, and asked him to do testing.  A121 (Woodburn-Henry Decl. ¶ 4).  They hired Dr. Underhill because Mr. Levenson believed that the office had to use its own limited funds for this purpose, and because Dr. Underhill "was cheap and would save the office money."  A123 (Romig Decl. ¶ 5).  The office

later stopped using Dr. Underhill "because of concerns about his thoroughness."  A123 (Romig

Decl. ¶ 5).

Dr. Underhill failed to score all of the tests he conducted.  *See* A57 (Martell Report at 6)

("several tests were left unscored and uninterpreted").  State habeas counsel were not aware that

Dr. Underhill had not scored all of the tests.  If counsel had been aware of that fact, they would

have "instructed him to score his tests."  A123 (Romig Decl. ¶ 6).  And if scoring the tests

showed impairments, counsel would have investigated further:

> If I knew that [Dr. Underhill's] tests indicated that Mr. Cole suffered from
> impairments in frontal lobe and executive functioning, I would have investigated
> this further. . . .  We had no strategic or tactical reason for failing to raise a claim
> related to Mr. Cole's brain dysfunction.
>
> Had we known tests indicated Mr. Cole may have suffered from frontal lobe
> impairment, we would have conducted further investigation which would have
> included hiring a toxicologist to review Mr. Cole's childhood exposure to toxins.

A123-24 (Romig Decl. ¶¶ 6-7).

State habeas counsel's interactions with Dr. Underhill constitute deficient performance.

Counsel who are working with an expert cannot make reasonable decisions based on the expert's

work without knowing what work the expert has (and has not) done, and what the expert's actual

findings are.  *Cf. Saranchak v. Sec'y, Pa. Dep't of Corr.*, 802 F.3d 579, 594 (3d Cir. 2015)

(unreasonable for counsel not to pursue mental health mitigation based on report from expert

who evaluated only competency to stand trial); *Bloom v. Calderon*, 132 F.3d 1267, 1277 (9th

Cir. 1997) (finding deficient performance based in part on "counsel's failure to adequately

prepare his expert").  Post-conviction counsel's failure to obtain, and learn the results of, a

complete neuropsychological battery of Mr. Cole was deficient.

Moreover, to the extent that counsel used an inadequate expert based on an unfounded

belief that there was no way to obtain additional funding for an appropriate expert, counsel's

performance was deficient.  *Hinton*, 571 U.S. at 274 (counsel's "failure to request additional funding to replace an expert [counsel] knew to be inadequate . . . constituted deficient performance").

Counsel's belief that they could not obtain additional funding from the state court was wrong.  This mistake of law is in and of itself deficient.  *Id.* (counsel's decision was unreasonable because based on misunderstanding of the law).  Post-conviction counsel is entitled to funding, from the District Court, for necessary expert services.  *See* Tex. Code Crim. Proc. art. 11.071 §3(b) ("Not later than the 30th day before the date the application for a writ of habeas corpus is filed with the convicting court, counsel may file with the convicting court an ex parte, verified, and confidential request for prepayment of expenses, including expert fees, to investigate and present potential habeas corpus claims.").

As described by the current director of the Office of Capital and Forensic Writs ("OCFW"):

> OCFW's budget includes a line item for professional fees and services, which is historically how the office paid for expert witnesses under Mr. Levenson, notwithstanding the clear statutory authority for OCFW to seek to have reasonable and necessary expert expenses defrayed by the District Court. . . . I have observed several OCFW cases where professional guidelines required a particular type of expert assistance but OCFW failed to retain any such expert.

A141 (Benjamin B. Wolff Decl. ¶ 39).  Once the OCFW began petitioning the state courts for expert funding, many of those budgetary requests were granted.  A142 (Wolff Decl. ¶ 40).

Furthermore, state habeas counsel's failure to investigate Mr. Cole's exposure to neurotoxins and provide that evidence to their experts was deficient performance.  It has been recognized for decades that exposure to neurotoxins can cause long-lasting impairments in cognitive functioning.  *See, e.g.*, *Textbook of Clinical Neuropsychology* 592-94 (Joel E. Morgan & Joseph H. Ricker, eds., 2008); A100-03 (Lugo Report at 14-17) (citing numerous sources).

Accordingly, professionally reasonable state habeas counsel would have sought to obtain information of such exposure and provide it to their experts. *See Bond v. Beard*, 539 F.3d 256, 288 (3d Cir. 2008) (finding deficient performance where counsel "failed to give their consulting expert sufficient information to evaluate Bond accurately").

An investigation into Mr. Cole's exposure to toxins would have revealed that throughout his childhood in Ecuador, he was exposed to neurotoxins that impaired normal brain development and had long-term effects on his cognitive functioning. A97 (Lugo Report at 11). Information regarding Mr. Cole's exposure to toxins was readily available both at the time of trial and at the time of state habeas proceedings.

Counsel had no reasonable basis for failing to conduct a thorough investigation into such exposure or retain an expert to assess the paths of exposure. At trial, the jury would have considered Mr. Cole's exposure to toxins and the link between this exposure and brain damage when deciding Special Issue Three. Had the jury been provided with evidence of this exposure, there is a reasonable probability that Mr. Cole would have received a life sentence. State habeas counsel were ineffective for failing to raise trial counsel's ineffectiveness in not conducting such an investigation and not providing this information to the jury.[21]

State habeas counsel, like trial counsel, was also deficient for failing to interview Mr. Cole's birth father, who would have told them that he is Mr. Cole's mother's first cousin. A31

---

[21] *See Caro v. Woodford*, 280 F.3d 1247, 1255 (9th Cir. 2002) (counsel ineffective for failing to fully investigate petitioner's "history of exposure to pesticides and toxic chemicals," for failing to inform the experts who examined petitioner of this history, and for failing "to seek out an expert to assess the damage done by this poisoning"); *see also Lewis v. Dretke*, 355 F.3d 364, 366 (5th Cir. 2003) (explaining that the court had previously remanded case for evidentiary hearing on petitioner's claim of ineffective assistance of counsel in part due to concern over defense counsel's failure to investigate possible brain damage resulting from petitioner's exposure to lead poisoning).

(Statement of Hugo Riofrio ¶¶ 6-8).  It has long been recognized that inbreeding increases the risk for birth defects and brain impairments.  A54 (Martell Report at 3).  Evidence that Mr. Cole's parents were related would have provided both mitigation and support for a finding of neurocognitive defects.

### 2.     Prejudice

Had post-conviction counsel instructed Dr. Underhill to complete his work, they would have learned that Mr. Cole suffers from brain damage.  Dr. Martell explains that he has reviewed Dr. Underhill's data, and has found that several tests that Dr. Underhill performed were left unscored and uninterpreted.  A57 (Martell Report at 6).  Dr. Martell scored Dr. Underhill's data. The results support a finding of abnormal brain functioning, primarily involving frontal lobe/executive functioning and memory functioning.  A57 (Martell Report at 6).

For the same reasons that trial counsel was ineffective for failing to investigate and present evidence of neurotoxic exposure and brain damage, state habeas counsel was likewise ineffective.  Because Petitioner can establish cause and prejudice under *Martinez* and *Trevino* to overcome default, this Court's review of this claim is *de novo*.

## IV.     TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO DEVELOP AND PRESENT RELIABLE EVIDENCE THAT PETITIONER WOULD NOT BE A FUTURE DANGER TO SOCIETY.

In answering the question of future dangerousness, "it is essential . . . that the jury have before it all possible relevant information about the individual defendant whose fate it must determine."  *Jurek v. Texas*, 428 U.S. 262, 275-76 (1976).  Trial counsel rendered ineffective assistance, in violation of Petitioner's rights as guaranteed by the Sixth and Fourteenth Amendments, by failing to develop and present reliable evidence that Petitioner would not be a future danger to society.  Counsel "has a duty to bring to bear such skill and knowledge as will

render the trial a reliable adversarial testing process." *Strickland*, 466 U.S. at 688.  When counsel fails in this duty, and that failure "[falls] below an objective standard of reasonableness," counsel's performance is constitutionally deficient.  *Id.*  Had counsel adequately developed and presented reliable and meaningful evidence on the future dangerousness issue, there is a reasonable probability that the result of the proceeding would have been different.  *Id.* at 694.

### A.  Deficient Performance

Trial counsel wanted to present evidence that Petitioner would not be dangerous if sentenced to life imprisonment.  Trial counsel were also aware that if they presented such evidence, the State would likely counter with evidence concerning the number of rules violations and violent crimes that take place in the Texas prison system.  In an attempt to accomplish their goals, counsel (a) presented testimony from Frank AuBuchon, a former Texas corrections officer and expert on the Texas Department of Criminal Justice (TDCJ) classification system; and (b) sought to preclude the State from presenting statistical evidence about crimes committed in TDCJ facilities.

While counsel's strategy of presenting evidence that Petitioner would not be a future danger was reasonable, counsel's chosen approach was professionally unreasonable, for several reasons.  First, counsel failed to investigate whether an expert in violence risk assessment would be able to present more reliable evidence specifically showing that Mr. Cole would not be a dangerous inmate, and could also rebut any suggestion that statistical evidence about other inmates would establish Mr. Cole's dangerousness.  Second, counsel failed to recognize that the evidence they presented would necessarily open the door to the type of evidence they sought to exclude.

87

At the penalty phase, trial counsel called Frank AuBuchon to testify, "as a person with knowledge about the classification system there at the Texas Department Criminal Justice." DE 6-97 at 132. Mr. AuBuchon worked for TDCJ for more than 25 years, starting as a prison guard, becoming a classification case manager, and then taking on other roles regarding inmate classification that became more administrative in nature with seniority. *Id.* at 137-45. In his testimony on direct, Mr. AuBuchon discussed the type of restrictions, daily routines, and security measures Mr. Cole would face were he to be sentenced to life without parole. *See id.* at 149-50.

During cross-examination, Mr. AuBuchon confirmed that Mr. Cole would almost certainly be classified initially as G-3 (the lowest level of restriction that a capital murderer can receive). *Id.* at 160. The prosecutor then asked Mr. AuBuchon about a G-3 inmate's unrestricted movements, his ability to work in the kitchen, laundry, and outside the security perimeter, his opportunities to make homemade weapons, and his ability to have contact visits with family. *Id.* at 160-68. The prosecutor then started to ask Mr. AuBuchon about statistics from TDCJ's Emergency Action Center (EAC) report for August 2011, which documented the number of serious or unusual incidents, including escapes, attempted escapes, sexual assaults, serious staff assaults, and serious offender assaults that occurred that month and during the year to date. *Id.* at 169-88.[22] Trial counsel objected, but the court allowed cross-examination on the topic given that defense counsel had elicited from Mr. AuBuchon the opinion that TDCJ is a "fairly safe place." *Id.* at 177, 185; *see id.* at 174 (prosecutor arguing the defense "opened the door").

The prosecution then elicited from Mr. AuBuchon the following: 1,760 serious or unusual incidents took place in TDCJ facilities in August of 2011, including 108 possessions of

_____

[22] *See infra* n.25 (enumerating other types of incidents unrelated to inmate violence included in the numbers).

weapons, 24 alleged sexual assaults, 127 serious offender assaults, and 41 chunking incidents. *Id.* at 187-88.[23]   The prosecutor also went through the year to date numbers: 12,550 serious or unusual incidents, 731 possessions of weapons, 239 alleged sexual assaults, 58 serious staff assaults, 864 serious offender assaults, and 278 chunking incidents.  *Id.* at 189-90.  On redirect, trial counsel asked Mr. AuBuchon whether the statistics relative to the total number of inmates was "a relatively high ratio of number," and Mr. AuBuchon perpetuated the misconception that inmates convicted of more violent crimes are more likely to be violent in prison by replying, "around 56 percent of all the prison offenders are in for a violent 3-G type of offense, I'm surprised the numbers are as low as they are."  *Id.* at 205; *see id*. at 208-09 (eliciting same information on recross).  When asked by the prosecutor whether Mr. Cole would engage in assaultive behavior in TDCJ, Mr. AuBuchon said he could not answer that, but that he "ha[d] a feeling, I have a sense based on experience."  *Id*. at 209.

Professionally reasonable counsel would have realized that Mr. AuBuchon could only offer general testimony about the TDCJ classification system and efforts to prevent violence. While not discounting the value of such evidence altogether, professionally reasonable counsel would realize that (a) it makes no showing that their client's characteristics make it unlikely that *he* (as opposed to inmates in general) would engage in violent behavior; and (b) such general testimony about TDCJ efforts to prevent violence necessarily opens the door to equally general evidence about the failure of such efforts to entirely eliminate violence.  Such counsel would then explore whether there was more persuasive and reliable evidence available both to show

---

[23] Chunking is when an inmate mixes fluids and solids in a container, generally urine and feces, and throws it onto the chest or face of a correctional officer.  DE 6-97 at 189.

that their client would not be dangerous if confined to TDCJ, and to rebut the anticipated

evidence about acts of violence by others.

Counsel unquestionably believed that the TDCJ incident numbers were not helpful to the

defense. *See* DE 6-97 at 170-74; DE 6-30 at 63-68 (pre-trial motion and order). To avoid jurors

fundamentally misunderstanding future dangerousness and to put the TDCJ numbers in context,

trial counsel should have called an expert who could have informed the jury of scientifically

sound methodologies and empirical data used to predict an individual's risk of future violence in

the prison setting.

For example, in *Ake v. Oklahoma*, 470 U.S. 68 (1985), the Supreme Court recognized

that consultation with experts was a necessary result of the Court's decision a year earlier in

*Barefoot v. Estelle*, 463 U.S. 880 (1983), because *Barefoot* "relied, in part, on the assumption

that the factfinder would have before it both the views of the prosecutor's psychiatrists and the

'opposing views of the defendant's doctors' and would therefore be competent to 'uncover,

recognize, and take due account of . . . shortcomings' in predictions on [future dangerousness]."

*Ake*, 470 U.S. at 84 (quoting *Barefoot*, 463 U.S. at 899). Consequently, "[w]ithout a

psychiatrist's assistance, the defendant cannot offer a well-informed expert's opposing view, and

thereby loses a significant opportunity to raise in the jurors' minds questions about the State's

proof of an aggravating factor." *Id.*

Here, counsel unreasonably failed even to investigate the hiring of such an expert. To the

extent that counsel believed that presenting limited testimony and a pretrial ruling would avoid

the State's cross-examination, counsel's belief was based on a misunderstanding of the facts and

the law, and therefore was unreasonable. *Hinton*, 571 U.S. at 273-74 (counsel's decision was

unreasonable because based on misunderstanding of the law). Furthermore, while counsel

90

obviously made a decision to proceed with testimony from Mr. AuBuchon, counsel's failure to explore whether testimony from a different type of expert would be in their client's interest was uninformed, and therefore unreasonable. *Lockett*, 230 F.3d at 715.

**B.      Prejudice**

Had trial counsel presented an expert on Mr. Cole's individualized likelihood of future dangerousness as opposed to an expert on TDCJ's classifications and restrictions generally, the jury would have heard compelling evidence regarding the likelihood that Mr. Cole would adjust to prison without serious violence, given his personal characteristics and background.

Undersigned counsel retained Mark Cunningham, Ph.D., "a forensic psychologist, nationally recognized for his research concerning factors that predict violence in prison and his research in capital sentencing," *Coble v. Davis*, 728 F. App'x 297, 300 (5th Cir. 2018), to do a risk assessment and write a report outlining what his testimony at the time of trial would have been. *See* A147-233 (Report of Dr. Mark Cunningham). Dr. Cunningham would have testified that based on Petitioner's age, education, career history, ties with his community, pre-trial jail record, lack of a gang affiliation, and status as a convicted capital offender serving life without parole in TDCJ, Petitioner would present a low risk for future serious violence in prison. A160 (Cunningham Report at 14). Rather than offering generalized testimony about TCDJ's classification system and prison security measures, Dr. Cunningham would have relied on Petitioner's specific characteristics to assess his risk of violence in prison. *See* A147-48 (Cunningham Report at 1-2).

Prior to trial, Dr. Cunningham would have conducted an individualized actuarial analysis of Petitioner's probability of being a future danger.[24]  Central to this analysis is establishing historic percentages ("base rates") for the likelihood that incarcerated individuals generally, as well as those who share similar characteristics with Petitioner, would commit future criminal acts of violence in prison.  Based on a meticulous review of the literature existing at the time of Petitioner's trial, Dr. Cunningham would have established these base rates in order to determine Mr. Cole's "absolute and comparative likelihood of serious violence in prison."  *See* A159 (Cunningham Report at 13); *see, e.g.*, A219-25 (Cunningham Report at 73-79).  Having established these base rates for violence, Dr. Cunningham could have testified to his conclusion that it was quite improbable that Petitioner would commit serious acts of violence in prison.  *See, e.g.*, A210 (Cunningham Report at 64) ("No empirically-supported factors are present that would increase [Mr. Cole's] risk of serious prison violence above the described low base rates.").

Among the factors showing that Petitioner was not likely to be dangerous in the future was his age.  As Dr. Cunningham would testify, at age forty-one, "the probability of Mr. Cole committing serious acts of violence in prison was both extraordinarily remote and would have continued to decline with age."  A148 (Cunningham Report at 2); *see also* A166-69 (Cunningham Report at 20-23) (noting "[t]he inverse relationship between increasing age and decreasing rates of prison disciplinary infractions and violence is one of the best-established in penology").  He would have also explained to the jury that other factors, such as Petitioner's having a high school diploma, and maintaining contact with family members and friends while incarcerated pre-trial, would make it less likely that Petitioner would engage in serious prison

---

[24] Dr. Cunningham will testify that this approach is the most objective and scientific approach to predicting an individual's risk of future violence in the prison context.  A163 (Cunningham Report at 17).

violence.  A172-73 (Cunningham Report at 26-27) ("inmates with at least a high school diploma or GED are less likely to perpetrate assaults in prison"); A175-76 (Cunningham Report at 29-30) (noting Mr. Cole's pre-trial incarceration interactions with his biological family, adoptive parents, and friend "provide a pro-social influence and associated incentive to maintain good conduct so as to facilitate visitation and telephone access").

In addition to providing reliable, persuasive testimony establishing that Petitioner would be unlikely to commit future acts of violence in prison, Dr. Cunningham could have rebutted one of the State's primary arguments for future dangerousness.  In discussing special issue number one, the prosecutor emphasized in her closing argument that "[t]his is about whether the evidence has shown you he is a continuing threat.  And you know from everything he's done in the past and you know from everything he did that horrible day that he is."  DE 6-98 at 69.  The State capitalized on Mr. AuBuchon's testimony to remind the jury: "You've heard about all of the violence that goes on in TDC."  *Id.* at 70.  The jury found unanimously that there was a probability that Petitioner would commit criminal acts of violence that would constitute a continuing threat to society.  *Id.* at 76-77.

Thus, the State persuasively argued to the jury that (a) they could know Mr. Cole would be violent in the future because of the facts of the crime; and (b) many inmates in prison are violent, so they could assume Mr. Cole would be also.  That the State would make such arguments was entirely predictable.  When the defense knows that the State will either call an expert to discuss violence in prison or cross-examine the defense's own expert on such incidence numbers, the only safeguard is a countervailing expert's opinion that such numbers in a vacuum are not indicative of an individual capital defendant's risk of future danger.  *See* A204 (Cunningham Report at 58) (explaining "the *rate* (the foundational statistic underlying

probability) of inmate assault in TDCJ . . . [is] less than 1% of TDCJ inmates. . . ."  To attribute a

*probability* for Mr. Cole to perpetrate such an assault in light of these rates is preposterous.")[25]

Had Dr. Cunningham or a similarly-qualified expert been consulted and presented, the

future dangerousness inquiry would not have been so focused on the offense, but would have

been guided by "empirically validated" factors that have been "verified as accurate over time."

*See Coble v. State*, 330 S.W. 3d 253, 279 (Tex. Crim. App. 2010).  In particular, Dr.

Cunningham would have explained to the jury that, contrary to the arguments of the prosecution,

an offender's alleged acts of violence in the community have little value in evaluating his

prospects for violent behavior in a prison context.  A158, 163-63, 189 (Cunningham Report at

12, 17-18, 43); *see* A191 (Cunningham Report at 45) (citing 1992 Department of Justice study);

*see also United States v. Sampson*, 335 F. Supp. 2d 166, 228 (D. Mass. 2004) (finding Dr.

Cunningham's testimony debunking the misconception that past violence (and its severity)

outside of prison is associated with prison violence was appropriate as it tended to "show that the

government had failed to meet its burden of proof because the facts it presented did not establish

the likelihood that defendant would commit criminal acts of violence in prison").  Risks of prison

violence are lower for long-term inmates, such as Petitioner, and rapidly decrease as an inmate

ages.  A202, 209 (Cunningham Report at 56, 63).  Moreover, Dr. Cunningham would also have

---

[25] Moreover, Dr. Cunningham would have explained that the "serious or unusual
incidents" the State asked Mr. AuBuchon about, "included incidents not related to inmate
violence in TDCJ, including: attempted suicide, suicide, accidental death, offender natural death,
execution, employee death while on duty, accident (state vehicle), private property damage,
contract employee arrest, visitor arrest/misconduct/injury, accidental discharge of weapon, and
natural disaster.  Further . . . [the EAC] report cautions that the totals may be inflated by an
incident that was reported in more than one category."  A204 (Cunningham Report at 58; *see
also* A205 (Cunningham Report at 59) (noting a less than 1% incident rate for other types of
misconduct, including possession of a weapon, alleged sexual assault, and chunking).

testified that studies of death-commuted and life-sentenced capital offenders show that capital offenders in particular are less likely to commit acts of violence.  A199 (Cunningham Report at 53).

Dr. Cunningham's findings demonstrate the prejudice that resulted from counsel's failure to consult with and present an expert in individualized violence risk assessments.  Had counsel sought such information, they would have received a compelling report and testimony, and would have enabled the defense to rebut the prosecution's arguments for future dangerousness.

Mr. Cole's jury was left with the impression that the prison system that would house him could not prevent thousands of incidents of serious violence from occurring and that this number was surprisingly low in even the defense expert's judgment.  Had counsel relied upon an actual future dangerousness expert—one who used reliable, objective methodologies to predict Petitioner's own likelihood of being a future danger—there is a reasonable probability that such a presentation and its effect on the prosecution's presentation and/or argument would have changed at least one juror's decision.  *Cf. Lawlor v. Zook*, 909 F.3d 614, 622-23, 635 (4th Cir. 2018) (granting defendant a new sentencing proceeding where trial court excluded Dr. Cunningham's testimony as to defendant's future prison adaptability).

## C.    State Habeas Counsel Were Ineffective.

For the reasons above, Mr. Cole's ineffective-assistance-of-trial-counsel ("IATC") claim is meritorious.  This claim was presented in subsequent state habeas proceedings.  The CCA dismissed the application without considering the merits of the claim. Although the claim was exhausted, to the extent the claim is deemed procedurally defaulted, the ineffective assistance of initial state habeas counsel establishes cause and prejudice that overcome the default.  *Martinez*, 566 U.S. at 17; *Trevino*, 133 S. Ct. at 1918, 1921.

As Mr. Cole's post-conviction counsel explained, there was "no strategic reason as to why we did not consult with an expert on the issue of Mr. Cole's future danger." A124 (Romig Decl. ¶ 9). Rather, in order "to save money," *id.*, post-conviction counsel took the approach that where "trial counsel [had] hired an expert on future danger, [post-conviction counsel] would not do so." *Id.*; *see* A122 (Woodburn-Henry Decl. ¶ 7).

As discussed in § III.C, *supra*, a rote decision to close off viable avenues of investigation solely for the purpose of saving money is unreasonable. Just as trial counsel was ineffective in unreasonably failing to consider hiring an expert who could opine that Mr. Cole personally was unlikely to be dangerous in prison, post-conviction counsel's failure was equally uninformed, and therefore unreasonable. *See* § IV.A, *supra*. Petitioner was prejudiced for the reasons set forth in § IV.B, *supra*.

Because Mr. Cole's post-conviction counsel failed to raise this substantial ineffective-assistance-of-trial-counsel claim in state court, their ineffective assistance establishes cause and prejudice that overcome such a procedural default. *Martinez*, 566 U.S. at 17-18; *Trevino*, 133 S. Ct. at 1918, 1921.

## V.   TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO THE STATE'S UNCONSTITUTIONAL USE OF PEREMPTORY STRIKES TO REMOVE MINORITY PROSPECTIVE JURORS.

Mr. Cole's attorneys failed to protect him from the prosecutors' discriminatory exercise of their peremptory challenges. During voir dire, the State exercised peremptory strikes against prospective jurors Rhonda Robinson and Marcelene Roberts, both forty-three-year-old African American women. Trial counsel were ineffective for failing to object to the State's purposefully discriminatory strikes. The State's strikes and counsel's failure to object constitute violations of

the Equal Protection Clause and Petitioner's Sixth Amendment right to effective assistance of counsel, respectively.

### A.     Legal Standard

The Fourteenth Amendment to the United States Constitution bars the use of peremptory challenges to exclude potential jurors on account of the juror's race. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). Excluding jurors because of their race is particularly egregious because it "undermine[s] public confidence in the fairness of our system of justice." *Id.* at 87. *Batson* sets forth a three-part test for analyzing claims of discrimination in the selection of a jury.

First, a defendant must make a prima facie showing that a peremptory challenge has been exercised based on race.[26] Second, the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light of the parties' submissions, the court must determine whether the defendant has established purposeful discrimination. *Id.* at 96-97.

Once a *Batson* challenge reaches the third step, "a defendant may rely on 'all relevant circumstances' to raise an inference of purposeful discrimination." *Id.*; *see also Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019) (enumerating relevant circumstances, including: "statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case"; "evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case"; "side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case"; and "relevant history of the State's peremptory strikes in past cases")

---

[26] At this stage, courts frequently consider, inter alia, the pattern of the prosecution's strikes. *See, e.g.*, *Miller-El II*, 545 U.S. at 240 (observing that "prosecutors used their peremptory strikes to exclude 91% of the eligible African-American venire members" and that "[h]appenstance is unlikely to produce this disparity").

(citations omitted); *Miller-El II*, 545 U.S. at 240-66 (providing similar list of non-exhaustive yet illustrative factors useful in "ferreting out" the discriminatory pretext of peremptory strikes).  For instance, a showing that the government's justifications for a strike are not supported by the record is strong evidence that the strike was impermissibly motivated by race.  *See, e.g.*, S*nyder v. Louisiana,* 552 U.S. 472, 479-86 (2008) (prosecutor's assertion that he struck black juror because of juror's conflicting obligations was pretextual where the juror discounted the conflict); *Miller-El II*, 545 U.S. at 244 (rejecting *Batson* explanations that "mischaracterized" the voir dire).  Likewise, "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step."  *Miller-El II*, 545 U.S. at 241.  The compared jurors do not need to be identical in all aspects to uphold a *Batson* claim.  *Id.* at 247 n.6 ("A per se rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters.").

In conducting a comparative analysis, the fact that a stricken black juror shares a "particular characteristic" with an accepted non-black juror "is evidence that the asserted justification was a pretext for discrimination, even if the two jurors are dissimilar in other respects."  *Reed v. Quarterman*, 555 F.3d 364, 376 (5th Cir. 2009).  Also relevant is whether the prosecutor employed disparate questioning during voir dire of black and non-black jurors.  *See Miller-El II*, 545 U.S. at 255 ("The next body of evidence that the State was trying to avoid black jurors is the contrasting voir dire questions posed respectively to black and nonblack panel members.").

98

If the defendant establishes that even a single juror was excluded based on race, a new trial is required.  *See Batson*, 476 U.S. at 100; *Snyder*, 552 U.S. at 478; *Reed*, 555 F.3d at 381 n.12.

### B.    Jury Selection in Petitioner's Case

In the voir dire process, both the defense and the prosecution had the opportunity to individually interview each prospective juror.  *See, e.g.*, DE 6-78 at 5-60.  Following the individual voir dire, the court considered challenges for cause.  *See, e.g.*, *id.* at 248-49.  If the prospective juror was not stricken by the court for cause, the State was offered the first opportunity to remove the juror with a peremptory strike.  *See, e.g.*, *id.* at 223.  If the State accepted the prospective juror, then the defense had the chance to exercise a peremptory strike. *See, e.g.*, *id.* at 119.

Petitioner's seated jury consisted of seven white jurors, three Hispanic jurors, one Asian juror, and one black juror.[27]  DE 6-78 at 58; A238 (Gilbeaux juror card); DE 6-78 at 182; A234 (Butler juror card); DE 6-79 at 176; A240 (Imola juror card); DE 6-80 at 133; A243 (Marshall juror card); DE 6-81 at 238; A252 (Rodriguez juror card); DE 6-81 at 368-69; A246 (Murphy juror card); DE 6-83 at 144-45; A237 (Edwards juror card); DE 6-85 at 97-98; A250 (Villareal juror card); DE 6-85 at 160; A239 (Gillespie juror card); DE 6-85 at 226; A247 (Perez juror card); DE 6-86 at 262-63; A245 (Moran juror card); DE 6-87 at 48; A249 (Reynolds juror card). Four of Petitioner's eligible jurors were black.  *See* DE 6-78 at 182; A234 (Butler juror card); DE

---

[27] One white juror who was originally selected as a juror was later excused by defense motion during additional voir dire.  *See* DE 6-78 at 295; DE 6-88 at 27-29; A254 (Tarrant juror card).  A white alternate juror replaced her on the jury, DE 6-88 at 29; the two remaining alternate jurors were white.  DE 6-87 at 97-98; A236 (Dawson juror card); DE 6-90 at 170; A244 (McCann juror card).

6-83 at 87-88; A251 (Robinson juror card); DE 6-84 at 86; A241 (Jones juror card); DE 6-85 at 39; A255 (Roberts juror card).

The State used peremptory challenges on three of the four black eligible jurors.  *See* DE 6-83 at 87-88; DE 6-84 at 86; DE 6-85 at 39.  The State exercised a total of only seven peremptory strikes.  DE 6-78 at 223; DE 6-81 at 277; DE 6-82 at 99; DE 6-83 at 88; DE 6-84 at 39, 86, 130.  It used peremptory strikes on four of the twenty eligible white venire members.  DE 6-78 at 223; A248 (Reilly juror card); DE 6-81 at 277; A253 (Stansky juror card); DE 6-82 at 99; A235 (Caudle juror card); DE 6-84 at 130; A242 (Knapton juror card).  The State struck 75% of eligible black jurors, as compared with 20% of eligible white jurors: in other words, a black eligible juror was three times more likely to be excluded than a white eligible juror was.  This discrepancy and was not likely produced by happenstance.  *See Miller-El II*, *supra*.

### 1. Prospective Juror Robinson

Prospective juror Robinson, a forty-three-year-old black female, answered questions from both the State and the defense before the State used its fourth peremptory strike to remove her from the jury.  DE 6-83 at 88.  Trial counsel did not object to the strike.  *Id.*

Robinson's individual voir dire and her questionnaire indicate that she considered herself a conservative, analytical, and open-minded person.  She favored the death penalty except in a few cases where it may not be appropriate.  A264 (Robinson Questionnaire at 9).  She wrote that the death penalty is appropriate when it is needed and its purpose is punishment.  A264 (Robinson Questionnaire at 9). She agreed with the following statements: (1) "Any person, man or woman, young or old, who commits capital murder should pay with his own life"; (2) "Capital punishment is just and necessary"; and (3) "Capital punishment gives the criminal what he deserves."  A267 (Robinson Questionnaire at 12).  She disagreed with the following statements:

"Capital punishment is not necessary in modern civilization" and "Life imprisonment is more effective than capital punishment." A267 (Robinson Questionnaire at 12).  During her individual voir dire, she scaled herself as a 7.5 out of ten (ten being most in favor of the death penalty) in favor of the death penalty.  DE 6-83 at 57.  The State then asked her to look at Cole, pointing out that he is a living, breathing human being who might have a past, and asked whether she could answer the two special issues in a way that would result in Cole's death sentence.  *Id.* at 59-61.  Robinson confirmed that she could.  *Id.* at 61.

Robinson described herself as an analytical person whose decisions would depend on the evidence presented to her.  She stated on her questionnaire that if she were choosing between death and life without parole, "My decision . . . would depend upon the facts and circumstances of a particular case."  A263 (Robinson Questionnaire at 8).  Asked if she could keep an open mind and listen to evidence of a defendant's character and background, she wrote, "Yes, I believe in getting all the facts before a decision is made."  A265 (Robinson Questionnaire at 10).

Likewise, during voir dire, the State asked her if she thought she could keep an open mind to the full range of punishment and base her decision on the facts presented.  DE 6-83 at 54.  Robinson confirmed that she could, especially because she reviews analytical data every day.  *Id.*  She stated, "I have to have a critical thinking mind . . . I try to not just really look at what's in front of me. . . .  But, you know, the reasoning behind that particular situation."  *Id.*  The State responded, "Right.  That's exactly one of the things you'd have to do as a juror."  *Id.*

### 2. Comparative Juror Analysis: Prospective Juror Robinson and Venire Members Accepted by the State

An analysis of Robinson's answers on her questionnaire and during voir dire reveals that her responses are favorable to and nearly indistinguishable from those of venire members accepted by the State.  The only differences between Robinson's answers and those of other

venire members were due to the State's disparate questioning of Robinson.  None of Robinson's responses justifies the prosecution's strike on race-neutral grounds because the State accepted white jurors who shared her views.  The State's peremptory strike of prospective juror Robinson was racially motivated and unconstitutional.

Venire members were asked if they or a close friend or family member had ever been involved in a criminal case as a defendant, victim, witness, or complainant or had ever been arrested or charged with an offense.  A258 (Robinson Questionnaire at 3).  Robinson indicated that her friend was on trial for Medicare fraud.  *Id.*  Though she believed that her friend was being falsely accused, she testified that any bias she might feel against the prosecution was limited to her friend's case.  DE 6-83 at 77-79.  Robinson maintained that every case is different and she could start the prosecution and defense on an even playing field.  *Id.*  She stated that the only way her friend's case would affect her as a juror was if the two trials would overlap, but Robinson repeatedly said she would not be distracted from Petitioner's case.  *Id.* at 75-76.

Seven white venire members accepted by the State also indicated that they or a close friend or family member had some involvement in a criminal case.  A273 (Fry Questionnaire at 3); A288 (Harter Questionnaire at 3); A303 (McCann Questionnaire at 3); A318 (Murphy Questionnaire at 3); A333 (Nix Questionnaire at 3); A348 (Tarrant Questionnaire at 3); DE 6-80 at 45 (Wensrich testimony).

Among these was prospective juror Nix, a white female accepted by the State, who had two family members who had been involved in criminal cases.  A333, 337 (Nix Questionnaire at 3, 7).  Nix had one uncle who was wrongfully convicted of murdering his ex-son-in-law and served at least six years in prison before the real murderer was caught and her uncle was released.  DE 6-84 at 192-94.  Another one of her uncles was convicted of indecency with a

child.  *Id.* at 190-91.  Nix expressed even greater reservations than Robinson did about whether these experiences would affect her ability to be a juror.  When asked how that experience would affect her as a juror, Nix answered, "Just to really know that I'd really have to weigh everything.  Really, really weigh it.  And for me, pray a lot, you know."  *Id.* at 194-95.  Despite Nix's reservations, the State accepted her as a juror, without asking her whether her experiences had created a bias against prosecutors, as it asked Robinson.  *Id.*

Another white female prospective juror, Ms. McCann, disclosed that her brother had been convicted of molesting her cousin, which had a huge effect on her family.  DE 6-90 at 143-44.  She claimed that the experience would make her more open-minded to the person who is accused.  The State, however, did not ask if McCann had any biases against the prosecution as it had asked Robinson.  *Id.* at 144.  McCann was accepted by the State and chosen as an alternate juror.  DE 6-90 at 170.

During voir dire, potential juror Harter, a white male, told the State that his wife's first husband was murdered and the killer was never apprehended.  DE 6-78 at 98-99.  The State did not ask if it would influence him as a juror or if he was biased against prosecutors as a result of the crime.  *Id.*  In fact, only two of the white potential jurors accepted by the State were asked if they had a bias against the prosecution based on their experiences related to criminal cases.  DE 6-81 at 327-28 (juror Murphy); DE 6-84 at 274-75 (potential juror Fry).  Both answered, like Robinson, that they could be unbiased.  *Id.*  One was accepted by the State (Fry), and the other was accepted by both sides and seated as a juror (Murphy).  DE 6-81 at 369; DE 6-84 at 313.

Venire members were asked on their questionnaires if capital punishment is justified only for premeditated murder.  A266 (Robinson Questionnaire at 11).  Robinson answered yes.  *Id.*  During voir dire, the State asked if she would require premeditation even though it is not an

element of capital murder.  DE 6-83 at 80.  Initially, Robinson indicated that she would require it, apparently believing that premeditation was an element the prosecution had the burden of proving.  *Id.* at 80-82.  After an explanation from the State and then the judge, she stated that she could convict someone of capital murder on intent alone.  *Id.*

Four white venire members accepted by the State indicated on their questionnaires that they thought capital punishment was justified only for premeditated murder.  A371 (Gilbeaux Questionnaire at 11); A385 (Gillespie Questionnaire at 11);[28] A400 (Imola Questionnaire at 11); A326 (Murphy Questionnaire at 11).

When the State asked prospective juror Murphy if he would still require premeditation after hearing the judge's voir dire, he indicated that his opinion had not really changed.  DE 6-81 at 343.  Twice, the State explained that premeditation is not required by Texas law, and both times Murphy said he would require some showing of premeditation.  *Id.* at 344.  The State gave an example of a premeditated robbery and an intentional but not premeditated murder that happens during the course of the robbery.  *Id.* at 344-45.  Murphy thought that the murder in the State's example was premeditated because the robbery was premeditated.  *Id.* at 345.  The State eventually made the distinction between intentional and premeditated murder clear and Murphy stated that proof of intent would be enough for him.  *Id.* at 346.  Murphy was accepted as a juror. *Id.* at 369.

In questioning Gillespie, the prosecutor acknowledged that many people confuse premeditation and intent.  DE 6-85 at 128.  The State further explained the difference and asked if she would hold the State responsible for proving premeditation.  *Id.* at 129.  Like Robinson,

---

[28] Juror Gillespie changed her name to McMillan before voir dire.  DE 6-85 at 105. Petitioner refers to her as Gillespie, consistent with the record.

Gillespie responded that now that she understood the distinction, she would not require proof of premeditation. *Id.* Similarly, Gilbeaux answered that she would not require the State to prove premeditation. DE 6-78 at 10. Both Gillespie and Gilbeaux were seated as jurors.

During voir dire, many venire members expressed varying degrees of reservations about imposing the death penalty. The State asked Robinson if she had a chance to give more thought to the death penalty after filling out her questionnaire. DE 6-83 at 55. While she recognized that the death penalty takes another life, she affirmed that she was still in favor of the death penalty because it takes the life only of someone who did not consider the victim's life. *Id.* at 55-56. The State continued to ask Robinson about her answer, and she further explained, "[I]f you're taking another person's life, why should you continue to live on this earth also? . . . But the emotional side comes into play. You don't want to take anybody's life." *Id.* at 58. The State asked whether, if the evidence led her there, she could answer the special issues in a way that would lead to Mr. Cole getting the death penalty, and Robinson answered, "Yes, I can." *Id.* at 61.

White jurors who were accepted by the State gave similar answers. Juror Edwards told the State she was not happy when she realized it was a death penalty case because it is not an easy decision. DE 6-83 at 91. Juror Gillespie also struggled with her feelings about being on a capital murder jury:

> [I]t's a huge responsibility. . . . And I just feel like it's one of those things where I feel – I mean, it's just very – I don't know. I mean, just really that, you know, jurors are potentially faced with making this kind of decision, just the huge responsibility of it. . . . I think it would be challenging just because, you know, a lot of initial ways that I had maybe thought about things before. I mean, I'm thinking about them a little bit differently now just because I'm trying to picture myself in that seat and how I would handle that.

DE 6-85 at 107-08.

Another white potential juror, Harter, was unsure whether he could answer the special issues in a way that would result in Cole's death. DE 6-78 at 72. "I guess what I'm thinking is, when I came in, before it was reality, that I would say yes. . . . [B]ut could I really do it?  I don't know.  I'll be honest with you.  I still have not come to that conclusion, a grip on reality." *Id.* The State tried to pin down a more firm answer, and he responded, "I understand your question and where you are coming from, but can I give you a hard answer?  I can't." *Id.* at 73.  Yet, he was accepted by the State. *Id.* at 118.

Potential juror Robinson's answers were similar to those of white potential jurors accepted by the State.  The State's peremptory strike of potential juror Robinson was made on the basis of her race, and trial counsel had a duty to object to the unconstitutional strike.

### 3.        Prospective Juror Roberts

The State used its seventh and final peremptory strike to remove prospective juror Roberts, a forty-three-year-old black woman, from the jury.  DE 6-85 at 39.  Trial counsel did not object to the strike. *Id.*

Roberts's voir dire and questionnaire reveal an open-minded and pro-death penalty potential juror.  Roberts believed that the death penalty is just and necessary and she preferred it to life without parole.  She wrote on her questionnaire, "As it relates to the death penalty, some need to be sentenced to death because some individuals commit crimes because of hatred and intentional."  A413 (Roberts Questionnaire at 9).  On a scale of one to seven (seven being the most in favor), Roberts rated herself a seven in favor of the death penalty for both capital murder and capital murder of more than one person.  A413 (Roberts Questionnaire at 9).  Roberts also agreed with the statement, "Capital punishment is just and necessary."  A416 (Roberts Questionnaire at 12).  When asked in individual voir dire to scale herself from one to ten on her

feelings about the death penalty (ten being the most in favor), she rated herself a seven.  DE 6-85 at 9-10.

### 4.  Comparative Juror Analysis: Prospective Juror Roberts and Venire Members Accepted by the State

Roberts's answers on her questionnaire and during voir dire are similar to those of venire members accepted by the State.  Her responses do not justify the prosecution's strike on race-neutral grounds because white venire members whom the State accepted shared her views.

Venire members were asked if life without parole would be sufficient or preferable to capital punishment a number of times on their questionnaires and, for some, during individual voir dire.  Several prospective jurors answered inconsistently, agreeing with statements that life without parole both is and is not enough punishment for a person convicted of capital murder.  Roberts answered this way, as did five white potential jurors accepted by the State.  A431 (Brown Questionnaire at 12); A446 (Dawson Questionnaire at 12); A372 (Gilbeaux Questionnaire at 12); A386 (Gillespie Questionnaire at 12); A297 (Harter Questionnaire at 12); A416 (Roberts Questionnaire at 12).

Roberts was asked about the inconsistency during her individual voir dire.  DE 6-85 at 14.  She responded that the questionnaire was very long and that she was exhausted by that point in her answers.  *Id.* at 15-16.  Roberts told the State that she did not believe that life without parole was enough punishment for capital murder.  *Id.* at 16.  When the State asked her to frame her answer within the questionnaire, she got confused and answered differently, re-read the question, and then answered consistently.  *Id.* at 18-20.

Only two of the five white prospective jurors accepted by the State were asked about their inconsistent answers.  DE 6-85 at 123-24; DE 6-87 at 63-64.  Both juror Gillespie and alternate juror Dawson indicated during individual voir dire that they had answered

inconsistently intentionally.  DE 6-85 at 126-27; DE 6-87 at 64.  The State also accepted a white prospective juror who stated that life without parole was not sufficient punishment for killing multiple victims, but later answered that a sentence of life without parole was sufficient punishment for capital murder.  A459, 461 (Nielson Questionnaire at 10, 12).

A number of venire members, including Roberts, indicated in responses to various questions that they were not in favor of capital punishment across the board.  Roberts answered, "I am opposed to capital punishment except in a few cases where it may be appropriate."  A412 (Roberts Questionnaire at 8).  She indicated, however, that she favored the death penalty for capital murder and preferred it to life without parole.  A413-14 (Roberts Questionnaire at 9-10).  The State accepted six white prospective jurors who similarly showed only moderate support for the death penalty, endorsing "I am neither generally opposed to nor generally in favor of capital punishment."  A442 (Dawson Questionnaire at 8); A368 (Gilbeaux Questionnaire at 8); A293 (Harter Questionnaire at 8); A397 (Imola Questionnaire at 8); A472 (Marshall Questionnaire at 8); A457 (Nielson Questionnaire at 8).

The State accepted white prospective juror Murphy, although he rated himself at 4 out of 10 during his testimony, DE 6-81 at 330, and at four out of seven on his questionnaire.  A324 (Murphy Questionnaire at 9).

The State accepted white prospective jurors whose answers were similar to Roberts's.  In the absence of race-neutral explanations for the State's peremptory strike of prospective juror Roberts, the State's strike was unconstitutional.

### C.    History of Racial Bias in Jury Selection in Harris County District Attorney's Office

As the Honorable Patricia Lykos – a district court judge in Harris County from 1980 until 1994, and then-candidate for District Attorney – remarked in 2008, Harris County prosecutors

had a "habit" of "using race as their index" for jury selection.  Alan Bernstein, *DA candidates view office in different ways*, Hous. Chron., Feb. 7, 2008, at B1, *available at* https://www.chron.com/news/houston-texas/article/DA-candidates-view-office-in-different-ways-1560779.php (last visited June 5, 2020).  Judge Lykos, who was the Harris County District Attorney at the time of Mr. Cole's trial, stated that "as a felony court judge [during a prior administration], she saw prosecutors eliminate potential jurors from a trial solely because of their race."  *Id.*[29]  The prosecutors in Mr. Cole's case use of preemptory strikes is consistent with their office's history.

Even Kelly Siegler, then-Chief of the Special Crimes Division of the Harris County District Attorney's Office, acknowledged that "racist attitudes persist in the district attorney's office," saying "'[t]alking about problems that the community perceives on whether or not racism exists at the DA's office, I think, unfortunately, that is does exist.'"[30]  Alan Bernstein,

---

[29] *See, e.g.*, *Tompkins v. State*, 774 S.W.2d 196, 203 (Tex. Crim. App. 1987), *aff'd*, 490 U.S. 754 (1989) (acknowledging that blacks appeared to be systemically excluded from Harris County capital juries); *Harris v. Texas*, 467 U.S. 1261, 1263 (1984) (Marshall, J., dissenting) (recounting testimony of Harris County judges and other informed witnesses confirming that "the exclusion of Negro juror was 'the general rule'").  Assistant District Attorneys Mitchell and Tise had been prosecutors at the Harris District Attorney's Office since 1993 and 1997, respectively.  DE 6-5 at 194 (Mitchell Aff. at 1); DE 6-5 at 188 (Tise Aff. at 1).

[30] Ms. Siegler has herself been the subject of allegations and findings of prosecutorial misconduct.  *See, e.g.*, *Prible v. Davis*, No. 09-CV-1896, 2020 WL 2563544, at *35 (S.D. Tex. May 20, 2020) ("Without question, [Siegel] engaged in a pattern of deceptive behavior and active concealment. And the evidence suppressed sufficiently serves to controvert the primary basis for Prible's conviction. Simply put, the prosecution withheld material evidence. The Constitution requires far more, especially in the case of a man sentenced to death."); *Ex parte Temple*, No. WR-78,545-02, 2016 WL 6903758, at *3 (Tex. Crim. App. Nov. 23, 2016) ("[Siegel] believed . . . that she was not required to turn over favorable evidence if she did not believe it to be relevant, inconsistent, or credible. She testified that she did not have an obligation to turn over evidence that was, based on her assessment, 'ridiculous.' She claimed that, when it came to what constituted *Brady* evidence, her opinion is what mattered. . . . The habeas judge found, and we agree, that this prosecutor's misconception regarding her duty under *Brady* was 'of enormous significance.'").

*GOP runoff opponents dispute status of DA's office*, Hous. Chron., Mar. 27, 2008, at B5,

*available at* https://www.chron.com/news/houston-texas/article/GOP-runoff-opponents-dispute-status-of-DA-s-office-1753288.php (last visited June 5, 2020).  As Judge Lykos, who was the Harris County District Attorney at the time of Mr. Cole's trial, said of racism in the District Attorney's Office, "[y]ou would have to be deaf or blind not to realize that there was that element among a certain segment at the district attorney's office."  *Id.*  African-American prosecutors and former prosecutors confirm the persistence of these racist attitudes, stereotypes, and biases in the Harris County District Attorney's Office:

- "There is a subtle pressure . . . to keep minorities off juries and what seems like a higher-level of scrutiny and second-guessing for blacks than whites at the same experience level."  Lisa Falkenberg, *A Lonely Feeling in the DA's Office*, Hous. Chron., Feb. 7, 2008, https://www.chron.com/news/falkenberg/article/A-lonely-feeling-in-the-DA-s-office-1629965.php.

- One former prosecutor recalled "a supervisor once criticized her during an evaluation debriefing for allowing too many minorities on her juries.  The written evaluation . . . was a bit more careful, saying she needed to work on the 'makeup' of her juries."  *Id.*

- Former prosecutor Carvana Cloud said "racial bias pervaded the Harris County DA's office when she first joined as a new prosecutor under former DA Chuck Rosenthal in 2005. 'I sat in trainings under the Rosenthal administration where they encouraged or taught or implied that blacks needed to be struck from juries in certain cases,' Cloud said." Michael Barajas, *Reform Candidates Are Trying to Change the Definition of a 'Progressive Prosecutor' in Texas*, Tex. Observer, Feb. 7, 2020, https://www.texasobserver.org/kim-ogg-progressive-prosecutor-harris-county/.

- "[A] dark-complexioned young prosecutor sitting in a dimly lit room said hello to a senior prosecutor and he responded with something to the effect of: 'All I see is eyes and teeth. You need to turn the light on, girl.'" Falkenberg, *supra*.

- "[T]hey've heard Hurricane Katrina evacuees referred to as 'Katrinians' or 'NFLs,' which reportedly stands for 'N-word From Louisiana.'" *Id.*

- "[T]hey've heard white prosecutors talk down to or crack jokes about black defendants." *Id.*

Such overt guidance and a culture of racial bias, insensitivity, and stereotype manifest themselves in discrimination during voir dire. The Harris County District Attorney's Office is no stranger to allegations and findings of discrimination against prospective jurors of color. *See, e.g.*, *Moore v. State*, 265 S.W.3d 73, 86-90 (Tex. App. 2008) (*Batson* violated where Harris County prosecutor's proffered justification for her strike applied to similarly-situated, accepted white prospective jurors, prosecutor used a disproportionate number of her peremptory challenges against prospective jurors of color, and prosecutor offered a false explanation for her strike), *petition dismissed as improvidently granted*, 286 S.W.3d 371 (Tex. Crim. App. 2009); *State v. Thomas*, 209 S.W.3d 268, 275 (Tex. App. 2006) (*Batson* violation where Harris County prosecutor struck six of seven qualified black venire members; the state's sole proffered reason – that the potential juror was a victim of crime – was insufficient because non-black venire members who were also crime victims were not struck). The Harris County District Attorney's Office has a long history of racial discrimination in jury selection. The State's approach during Mr. Cole's voir dire was no different.

**D.      Trial Counsel Ineffectively Failed to Object to the State's Strikes.**

It is well recognized that trial counsel's failure to preserve a meritorious *Batson* objection is deficient performance. *See Davis v. Sec'y for the Dep't of Corr.*, 341 F.3d 1310, 1314 (11th Cir. 2003); *see also Washington v. Davis*, 715 F. App'x 380, 382 (5th Cir. 2017), *as revised* (Feb. 20, 2018) (remanding for hearing on ineffective assistance claim for failure to preserve *Batson* objection); *Drain v. Woods*, 902 F. Supp. 2d 1006, 1025 (E.D. Mich. 2012) ("Counsel's passivity in light of an obvious pattern of strikes against minority prospective jurors fell below an objective standard of reasonableness and amounted to deficient performance."), *aff'd*, 595 F. App'x 558, 560 (6th Cir. 2014); *Mitcham v. Davis*, 103 F. Supp. 3d 1091, 1102-08

(N.D. Cal. 2015) (compiling cases where counsel's failure to object to racial discrimination during jury selection was found to be deficient performance under *Strickland*).  Trial counsel violated the duty to preserve error by failing to raise a *Batson* challenge when the State used its fourth and seventh peremptory strikes to remove prospective jurors Robinson and Roberts.

Trial counsel's failure to object was unreasonable.  As discussed above, the qualifications and opinions of prospective jurors Robinson and Roberts were similar to those of white venire members accepted by the State.  Trial counsel possessed the panelists' questionnaires and were present for all of the individual voir dire sessions.  Professionally reasonable counsel would have been aware that both Robinson and Roberts were similarly situated to white panelists accepted by the State.  Indeed, prior to Robinson's individual voir dire, the State had accepted six white potential jurors.  DE 6-78 at 60, 118, 295; DE 6-79 at 176; DE 6-80 at 58, 133.  By the time of Roberts's individual voir dire, the State had accepted ten white potential jurors.  DE 6-78 at 60, 118, 295; DE 6-79 at 176; DE 6-80 at 58, 133; DE 6-83 at 144; DE 6-84 at 61, 244, 313.  Trial counsel's failure to object to the State's racially discriminatory peremptory strikes was objectively unreasonable performance.[31]

Counsel's deficient failure to raise a *Batson* objection should be deemed prejudicial as a matter of law.  A *Batson* violation is structural error.  *Scott v. Hubert*, 610 F. App'x 433, 434 (5th Cir. 2015).  The Fifth Circuit has hitherto declined to presume prejudice in such a case.  *Id.* at 434-35.  The Supreme Court, however, recently indicated that while prejudice need not be presumed in all cases involving structural errors, a structural error is likely per se prejudicial

---

[31] To the extent that these arguments should have been raised on appeal, appellate counsel was ineffective for failing to present them.  *See Smith v. Robbins*, 528 U.S. 259, 285 (2000).

where it undermines the fundamental fairness of trial. *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1910-13 (2017). The Supreme Court has long recognized that a *Batson* violation undermines the fairness of trial: "It is an affront to justice to argue that a fair trial includes the right to discriminate against a group of citizens based upon their race." *Georgia v. McCollum*, 505 U.S. 42, 57 (1992). Accordingly, prejudice should be presumed.

Even if prejudice is not presumed, given the evidence of racially motivated strikes set forth above, it is reasonably likely that, had trial counsel objected, the State's strikes would not have been permitted, or that Petitioner's conviction would have been reversed on appeal. Counsel's failure to object left Petitioner with a constitutionally infirm jury, a malady that can be remedied only by a new trial. *See Strickland*, 466 U.S. at 694; *Batson*, 476 U.S. at 100.

### E.   State Court Proceedings

Mr. Cole raised this claim in his Initial Application for Writ of Habeas Corpus. *See* DE 6-3. The trial court denied the state habeas application, adopting verbatim the State's proposed findings of fact and conclusions of law. DE 6-6 at 141-94. It denied this claim, based on its acceptance – without an evidentiary hearing – of affidavits from trial counsel and the prosecutors. *Id*. at 166-75, 185-87. Essentially, trial counsel averred that they did not believe there was a *Batson* violation, while the prosecutors averred that they did not discriminate in their strikes. *See* DE 6-5 at 188-96; DE 6-6 at 196-202. The CCA affirmed, stating only that Petitioner had "fail[ed] to show by a preponderance of the evidence that his counsel's representation fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense." *Cole II*, 2017 WL 562725, at *1. As discussed in Claims I and II, *supra*, under *Wilson*, 138 S. Ct. at 1192, this Court's AEDPA review should focus on the trial court's findings and conclusions.

113

### 1.    The state court process was unreasonable.

As with Claims I and II, *supra*, the state court process was unreasonable and unfair because the trial court never held an evidentiary hearing to consider Petitioner's well-pled claim, and because the trial court adopted verbatim the State's proposed findings of fact and conclusions of law.  *See* Standard of Review, § B, *supra*.  This is particularly true here because the State (through its agents, the prosecutors) wrote the affidavits of the prosecutors, and then wrote the opinion of the trial court finding them credible.  The court's total reliance on the out-of-court statements by interested witnesses renders its opinion unworthy of deference.

Here, the prosecutors had ample opportunity to study the record and craft their affidavits to rebut the claim that they discriminated during jury selection.  Such belated statements are far from being inherently trustworthy.  *See Miller-El II*, 545 U.S. at 246 (rejecting prosecutor's explanation that "reeks of afterthought").  Yet the state courts never allowed the defense to cross-examine them, depriving the defense (and the courts) of the benefits of "the greatest legal engine ever invented for the discovery of the truth."  *California v. Green*, 399 U.S. 149, 158 (1970) (quotation marks and citation omitted).  The state court process was unreasonable.

### 2.    The state court decision was unreasonable.

To the extent that the state court ruling is nevertheless reviewed under 28 U.S.C. § 2254(d), the decision was unreasonable as a matter of fact and law.  The only "evidence" on which the state court relied was the affidavits of trial counsel and the trial prosecutors.

### a.    The state court's comparative juror analysis was unreasonable.

A prosecutor's assertion, years after the fact, that she did not discriminate does little if anything to rebut a comparative juror analysis.  *See Miller-El II*, 545 U.S. at 248 (plausibility of prosecutor's later testimony undercut by "prosecution's failure to object to other panel members

who expressed views much like" stricken African-American juror).  The state habeas court claimed that "[a] comparative analysis of jurors shows that the [Petitioner] fails to establish discrimination," FFCL, DE 6-6 at 185, but it unreasonably deemed every comparison offered by Petitioner, *see* DE 6-3 at 106-12, 113-15, a "non-issue for the purposes of a *Batson* comparative analysis."  The habeas court asserted that the prosecutors had not relied on those specific factors in choosing to strike the prospective minority jurors.  *See, e.g.*, FFCL, DE 6-6 at 173 (citing the prosecutor's affidavit); *see also id.* at 172.[32]  The state habeas court's factual determinations were unreasonable in light of the state court record—particularly the prosecutors' own affidavits—which the court not only credited but also heavily relied upon.

First, the state court found that the prosecutor "was concerned that Robinson would have some biases against the State and law enforcement because she had a friend under federal indictment for Medicare fraud."  FFCL, DE 6-6 at 169.  The court then did an about face three pages later and stated that the State "did not strike Robinson because she had a friend charged in a criminal case," purportedly making any comparison on the subject moot.  *Id.* at 172.  This was unreasonable, particularly in light of the fact that the prosecutor admitted that Robinson's alleged bias against the state and law enforcement due to her friend's involvement in a criminal case was a "concern" that led her to strike Ms. Robinson.  *See* DE 6-5 at 190-91 (Tise Aff.).  Prosecutor Tise's affidavit clearly states that she considered the fact that Robinson had a close friend charged with a crime.  The state habeas court's finding to the contrary is unreasonable.

---

[32] Therefore, the habeas court did not actually conduct a comparative analysis. Particularly here, where habeas counsel demanded a comparative analysis, the habeas court's failure to do so was an unreasonable application of *Batson* and its progeny.  The Fifth Circuit, however, has held that clearly established federal law does not require state courts to conduct comparative analyses.  *Chamberlin v. Fisher*, 885 F.3d 832, 838-39 (5th Cir. 2018) (en banc). Accordingly, Petitioner preserves this argument but does not press it further.

Likewise, the state court failed to conduct a comparison between Robinson and the "other prospective jurors [who] expressed the opinion that the death penalty was justified only for premediated [*sic*] murder," FFCL, DE 6-6 at 172, because it again found the State did not rely on that factor in choosing to strike her.  *Id.*  Several pages earlier, however, the court noted that prosecutor "Tise was concerned about Robinson's ability to be fair and impartial based on her feelings about premeditation, and that on her juror questionnaire, Robinson indicated that she would find capital punishment only justified for premeditated murder."  *Id.* at 169.  Again, the court's internal inconsistency led it to make an unreasonable fact determination in light of the state court record.[33]  *See* DE 6-5 at 190-91 (Tise Aff.) ("Although [Robinson] eventually indicated that she would not hold it against the State if we did not prove premeditation, I was not convinced of her ability to hold the State to the proper burden based on her demeanor during the questioning.").  Prosecutor Tise's affidavit clearly states that she considered Robinson's view of premeditation in choosing to strike her.  Again, the state habeas court's finding to the contrary is unreasonable.

The court's refusal to do a comparative analysis of the minority prospective jurors and the other prospective white jurors who expressed similar sentiments as the ones claimed to have resulted in the minorities' exclusion undermines any of the court's findings based on a supposed comparative analysis.  *See Reed*, 555 F.3d at 376 (citing *Miller-El II*, 545 U.S. at 241) (noting that the fact that a stricken black juror shares a "particular characteristic" with an accepted non-black juror "is evidence that the asserted justification was a pretext for discrimination, even if the two jurors are dissimilar in other respects").

---

[33] Such inconsistencies are less remarkable given that the prosecutor's office wrote the court's findings.  *See* Standard of Review, § B, *supra*.

Similarly, with regard to prospective juror Roberts, Ms. Tise stated, "[Ms. Roberts'] juror questionnaire showed conflicting and inconsistent statements and when I attempted to inquire about those inconsistencies, she became argumentative. . . . The combination of Ms. Roberts' apparent problems explaining her inconsistent answers on her juror questionnaire [among other things] . . . lead to my exercising a strike against her." DE 6-5 at 191 (Tise Aff.). The state habeas court found that "Roberts was not struck because she had inconsistent answers on her juror questionnaire," but "because of her apparent problems explaining her inconsistent answers on her juror questionnaires," among other things. FFCL, DE 6-6 at 173. However, nowhere did the court address the prosecutors' disparate questioning of those prospective jurors who answered inconsistently regarding whether life without parole would be sufficient or preferable to capital punishment. Such disparate questioning gave rise to "Ms. Roberts' apparent problems explaining her inconsistent answers." The court's failure to consider the prosecutors' disparate questioning ignores a relevant factor in determining whether the prosecutor's strikes were discriminatory. *Miller-El II*, 545 U.S. at 255. As a result, the state court's decision was an unreasonable application of *Batson*, and its resulting findings were also unreasonable in light of the state court record.

### b. The state court unreasonably relied on trial counsel's affidavits to establish that counsel's performance was not deficient.

Both of Mr. Cole's trial attorneys filed short affidavits asserting their effectiveness. DE 6-6 at 196-98 (Graber Aff.); *id.* at 200-02 (Loper Aff.). The state court credited those affidavits and found, based on the affidavits, that "counsel had numerous discussions during each prospective juror's *voir dire*, including *voir dire* of minority jurors; that counsel would have made a *Batson* challenge if counsel believed that the State improperly used a peremptory strike;

and, that counsel did not think that there was a *Batson* violation so counsel did not raise a *Batson* objection."  FFCL, DE 6-6 at 174.

Neither of trial counsel's affidavits mention anything about discussions they had during voir dire.  *See* DE 6-6 at 196-98 (Graber Aff.); *id.* at 200-02 (Loper Aff.).  Neither affidavit mentions anything about whether these purported discussions took place during either of the voir dires of the minority prospective jurors in question or the frequency or content of any such discussions.  *See* DE 6-6 at 196-98 (Graber Aff.); *id.* at 200-02 (Loper Aff.).

Trial counsel's self-serving assertions that they did not believe there was a *Batson* violation leaves open the questions whether they had a professionally reasonable understanding of the law regarding *Batson* violations, and whether they thoroughly reviewed and compared the juror questionnaires before arriving at the belief that there was no violation.  *See* Standard of Review, § B, *supra*; *Wardrip*, 2017 WL 8677939, at *9 (state court's decision was based on an unreasonable determination of the facts where trial counsel's affidavit did not address critical inquiries related to their alleged ineffectiveness and petitioner had no opportunity to examine counsel on such questions).

Given the court's unreasonable comparative analysis, its exclusive reliance on interested witnesses' affidavits, and its objectively unreasonable factual determination in light of the evidence presented in the state-court proceedings, the state courts' ruling on Petitioner's ineffectiveness of counsel claim was based on an unreasonable determination of the facts and is an unreasonable application of clearly established Supreme Court precedent.

## VI.   TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO THE COURT'S STATEMENT TO THE VENIRE MEMBERS THAT IF MR. COLE WAS SENTENCED TO DEATH, HIS CASE WOULD AUTOMATICALLY BE REVIEWED.

### A.   Deficient Performance

Trial counsel rendered ineffective assistance, in violation of Petitioner's rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments, by failing to object to the trial court's statements to venire members, including eleven of the twelve seated jurors, that if the jury sentenced Mr. Cole to death, its sentence would be reviewed automatically.  In *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985), the Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death sentence rests elsewhere."  Such comments improperly "diminish[] the jury's sense of responsibility."  *Id.* at 342 (O'Connor, J., concurring).  A *Caldwell* violation is established when a defendant shows that "the remarks to the jury improperly described the role assigned to the jury by local law."  *Dugger v. Adams*, 489 U.S. 401, 407 (1989).

The *Caldwell* Court reversed a death sentence because the prosecutor told the jury that "the decision you render is automatically reviewable by the Supreme Court."  472 U.S. at 325-26.  The Court held that because the prosecutor's statement minimized "the jury's sense of responsibility for determining the appropriateness of death," it violated the defendant's Eighth Amendment rights and thus he was entitled to a new sentencing proceeding.  *Id.* at 341 (O'Connor, J., concurring).  Justice O'Connor, who cast the controlling vote in *Caldwell*, explained that although the jury's sentence in *Caldwell* was indeed subject to automatic state review, the statements at issue improperly described local law because they "creat[ed] the mistaken impression that automatic appellate review of the jury's sentence would provide the

authoritative determination of whether death was appropriate," although automatic review was actually limited to whether the jury's verdict was "so arbitrary that it was against the overwhelming weight of the evidence." *Id.* at 342-43.

Applying *Caldwell*, the Fifth Circuit, in *Wheat v. Thigpen*, 793 F.2d 621 (5th Cir. 1986), vacated a petitioner's death sentence because the prosecutor told the jury that its sentencing decision would be reviewed on appeal. *Id.* at 627 n.6. Likewise, in *Driscoll v. Delo*, 71 F.3d 701 (8th Cir. 1995), the court found that despite the technical accuracy of a prosecutor's statements, they were impermissible because "they misled the jury as to its role in the sentencing process in a way that allowed the jury to feel less responsibility than it should for its sentencing decision." *Id.* at 713.

Here, during voir dire, the trial court told members of Petitioner's jury that Petitioner would get automatic review if the jury voted for death. DE 6-77 at 131-32; DE 6-81 at 134. The trial court told one venire panel, including six accepted jurors: "If there is a death sentence there is automatic review whether the defendant wants it or not. It's automatically reviewed if there is a death sentence in a capital case. Okay?" DE 6-81 at 134.[34]

With another venire panel, including five accepted jurors, the trial court told the panel that Petitioner would get an automatic appeal if he received the death penalty.

> THE COURT: Every death sentence is an automatic appeal. And you would want that. You are talking about someone's life. We want to make sure everything was done according to the law. So, in every death case, there is an automatic appeal.

---

[34] Six accepted jurors were part of the venire panel that was told this. *See* DE 6-81 at 231, 369 (acceptances of jurors Rodriguez and Murphy); DE 6-83 at 145 (acceptance of juror Edwards); DE 6-85 at 97, 160, 226 (acceptances of jurors Villareal, Gillespie, and Perez); DE 6-86 at 11 (start of third panel's group voir dire).

> VENIREPERSON:    It's an automatic appeal.
>
> THE COURT: Whether the defendant wants it or not, automatic appeal.
>
> . . .
>
> THE COURT: It's an automatic appeal after a conviction.  How long a case is in the Court of Appeals, none of us can give an answer to that.  That goes to a different court, different judges all of that.

DE 6-77 at 131-32.[35]

The trial court's comments to the venire are no different from the statements made by the prosecutor in *Caldwell*.  Like the statement in *Caldwell*, the trial court's statement was technically correct because Texas law provides for automatic review by the CCA.  Tex. Code Crim. Proc. Code art. 37.071(h).  However, like that of the Mississippi Supreme Court in *Caldwell*, automatic review in Texas is extremely limited.

In Texas, review of the jury's verdict is limited to whether it was arbitrarily or capriciously imposed.  When reviewing the sufficiency of the evidence to sustain the death penalty, the CCA is to determine if the evidence, when viewed in the light most favorable to the verdict, would support any rational trier of fact to answer the punishment issues in a way to impose the death penalty.  *Williams v. State*, 273 S.W.3d 200, 213 (Tex. Crim. App. 2008).  "If the evidence is insufficient to persuade a rational fact finder, the fact finder necessarily acted arbitrarily and capriciously."  *Martinez v. State*, 924 S.W.2d 693, 699-700 (Tex. Crim. App. 1996) (Baird, J., concurring in part and dissenting in part); *see also State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006) (explaining that when reviewing the record in the light most

---

[35] Five accepted jurors were part of the venire panel that was told this.  *See* DE 6-78 at 60, 182, 295 (acceptances of jurors Gilbeaux, Butler, and Tarrant); DE 6-79 at 176 (acceptance of juror Imola); DE 6-80 at 133 (acceptance of juror Marshall); DE 6-80 at 138 (start of second panel's group voir dire).

favorable to the verdict, it will "reverse the judgment only if it is outside the zone of reasonable disagreement").

Like the statement found unconstitutional in *Caldwell*, the trial court's statement here was misleading as to the scope of appellate review and improperly led the jury to believe it had less responsibility than it actually had. Despite this highly prejudicial and unconstitutional instruction, trial counsel failed to object. Counsel's failure to object was deficient because it is unreasonable for counsel to fail to raise a valid legal objection to such a violation. *See, e.g.*, *Carpenter v. Vaughn*, 296 F.3d 138, 158-60 (3d Cir. 2002) (counsel provided ineffective assistance by failing to object to trial court's misleading response to jury question); *Starr v. Lockhart*, 23 F.3d 1280, 1285-86 (8th Cir. 1994) (counsel ineffective for failing to object to erroneous jury instruction).

### B.    Prejudice

Counsel's deficient failure to raise an objection to the trial court's improper remarks should be deemed prejudicial as a matter of law. In *Caldwell*, the Court set out a "no effect" test to decide the harmlessness of this type of error. 472 U.S. at 341 ("Because we cannot say that this effort had no effect on the sentencing decision, that decision does not meet the standard of reliability that the Eighth Amendment requires). The Supreme Court recently indicated that structural errors are likely per se prejudicial where they undermine the fundamental fairness of trial. *Weaver*, 137 S. Ct. at 1910-13. Given the Supreme Court's explicit recognition that a *Caldwell* violation undermines the fundamental fairness of a sentencing, *see Caldwell*, 472 U.S. at 340 ("Such comments, if left uncorrected, might so affect the fundamental fairness of the sentencing proceeding as to violate the Eighth Amendment"), prejudice should likewise be presumed here.

Even if prejudice is not presumed, had trial counsel objected to the trial court's improper remarks, there is a reasonable probability that at least one juror would have voted for life.  As the *Caldwell* Court explained, "one can easily imagine that in a case in which the jury is divided on the proper sentence, the presence of appellate review could effectively be used as an argument for why those jurors who are reluctant to invoke the death sentence should nevertheless give in." 472 U.S. at 333.  By forgoing a harmless error analysis and simply concluding that it "cannot say this effort had no effect on the sentencing decision," the *Caldwell* Court presumed prejudice because the effects of such an error would be too hard to measure and the result would be fundamentally unfair.  *Id.* at 341.  The Supreme Court used similar language in *Sawyer v. Smith*, 497 U.S. 227 (1990), when discussing prejudice in the context of a *Caldwell* error: "Rather than focusing on the prejudice to the defendant that must be shown to establish a *Donnelly* [*v. DeChristoforo*, 416 U.S. 637 (1974)] violation, our concern in *Caldwell* was with the 'unacceptable risk' that misleading remarks could affect the reliability of the sentence."  *Id.* at 244 (quoting *Caldwell*, 472 U.S. at 343 (O'Connor, J., concurring)).

In *Caldwell*, the Court made clear that such burden-shifting prejudices a defendant in several ways.  First, jurors exposed to misleading comments will likely believe that another more qualified party will review and potentially "correct" any wrong decision—here, as in *Caldwell*, that party was the appellate court—so they may be inclined to issue a death sentence in order to "'send a message' of extreme disapproval for the defendant's acts." 472 U.S. at 331.  Jurors will likely do this relying on the assumption that if their decision was incorrect, a more qualified party (i.e., an appellate court) will rectify it.

Second, the defendant is prejudiced because jurors will likely feel that they cannot get the "more qualified" party to review their decision unless they answer the questions in such a way

that will trigger the automatic review: "If the jury understands that only a death sentence will be reviewed, it will also understand that any decision to 'delegate' responsibility for sentencing can only be effectuated by returning that sentence." *Id.* at 332.  Therefore, a death sentence is likely to be imposed without the jurors necessarily wanting to sentence the defendant to death, but rather because they mistakenly believe they must vote for it in order to trigger the more qualified party's power of review.

A concern about the reliability of the sentence is even greater where, as here, such information is furnished by the court (as opposed to the prosecutor), giving it the authority of law.

Should a showing of prejudice be required, evidence in Petitioner's case demonstrates that the information supplied by the Court actually affected the jurors' sentencing decision.  One of the jurors initially voted for a life sentence, but after discussing with other jurors the fact that Petitioner would receive an automatic appeal, that reluctant juror changed her vote to death.  *See* Claim VII.  During individual voir dire, another juror referred to the court's statement regarding an automatic appeal.  DE 6-78 at 124 ("And when you see a lot of innocent people, then at the end if we do this and then you find out that – okay.  Like the Judge said on Friday, it's an automatic appeal.  Wait a minute.  We missed something here.  We might have made a mistake.").  The presence (and knowledge) of an automatic appeal diminished the jurors' responsibility for determining the appropriateness of Petitioner's death sentence.

Had counsel objected to the trial court's statements that Mr. Cole would receive an automatic appeal if the jury voted for death, there is a reasonable probability that at least one juror would have stood firm in his or her conviction to vote for a life sentence or that the death

sentence would have been overturned on direct appeal because of the Eighth Amendment violation.  Thus, a new penalty phase is warranted.

### C.      Post-Conviction Counsel Was Ineffective.

For the reasons above, Mr. Cole's ineffective-assistance-of-trial counsel claim is meritorious.  This claim was presented in subsequent state habeas proceedings.  The CCA dismissed the application without considering the merits of the claim. Although the claim was exhausted, to the extent the claim is deemed procedurally defaulted, the ineffective assistance of initial state habeas counsel establishes cause and prejudice that overcome the default.  *Martinez*, 566 U.S. at 17; *Trevino*, 133 S. Ct. at 1918, 1921.

The failure to raise this claim in initial state habeas proceedings constitutes ineffective assistance of counsel.  Post-conviction counsel has admitted that they had no strategic reason for failing to raise this claim.  A124 (Romig Decl. ¶ 8); A122 (Woodburn-Henry Decl. ¶ 8).  Post-conviction counsel, like trial counsel, was ineffective for failing to raise this claim.

Under *Martinez* and *Trevino*, post-conviction counsel's ineffectiveness provides cause to overcome default for failing to raise this claim in state court.  Thus, this Court's review of the claim should be *de novo*.  Under that standard, Mr. Cole is entitled to relief.

## VII.    MR. COLE'S SIXTH AMENDMENT RIGHTS WERE VIOLATED WHEN THE JURY CONSIDERED EXTRANEOUS INFORMATION AND USED THAT INFORMATION AS A BASIS TO SENTENCE HIM TO DEATH.

### A.      The Jury Considered Extraneous Information to Sentence Mr. Cole to Death.

Mr. Cole's Sixth Amendment right to a fair trial was violated because the jury relied on extraneous information when it decided to impose the death penalty.  It is a basic tenet of our criminal justice system that all evidence and law that a jury is to consider during deliberations must come from the court and the witness stand.  *Turner v. Louisiana*, 379 U.S. 466, 472-73

(1965); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *Remmer v. United States*, 347 U.S. 227, 229 (1954) ("In a criminal case, any private communication . . . with a juror during a trial about the matter pending before the jury is . . . deemed presumptively prejudicial.").

A juror in this case considered extraneous information as a reason to sentence Mr. Cole to death.  Specifically, Juror Gilbeaux, during deliberations, considered the fact that Mr. Cole would receive an automatic appeal if he was sentenced to death.  During voir dire, the trial court informed several jurors that if Mr. Cole was sentenced to death, he would receive an automatic appeal.  *See* Claim VI.  The jurors, during deliberations, used the fact that Mr. Cole would receive an automatic appeal as a basis for sentencing Mr. Cole to death.  Initially, Juror Gilbeaux voted for a life sentence.  She did so because she believed that Mr. Cole would not commit future acts of violence and that sufficient mitigating circumstances warranted a lesser sentence.  A480-81 (Karyn Gilbeaux Aff. (Nov. 27, 2013) ¶¶ 3-7).  After discussing with other jurors that Mr. Cole would receive an automatic appeal if he was sentenced to death, Juror Gilbeaux changed her vote to a sentence of death.  A482 (Gilbeaux Aff. (Nov. 27, 2013) ¶ 12); *see also* A484 (Karyn Gilbeaux Aff. (1/27/2018) at 1 ("Another juror . . . told me that if I voted for death, Mr. Cole would receive an automatic appeal.  This made me change my vote from life to death.").

As the Supreme Court explained in *Caldwell v. Mississippi*, 472 U.S. 320 (1985), "[t]hat appellate review is available to a capital defendant sentenced to death is no valid basis for a jury to return such a sentence if it otherwise might not."  *Id*. at 336.  The danger, the *Caldwell* Court explained, was that a "defendant might thus be executed, although no sentencer had ever made a determination that death was the appropriate sentence."  *Id.* at 332-33.  The situation envisioned in *Caldwell* is exactly what occurred here.  Juror Gilbeaux voted for death because she was told

that appellate review was mandatory.  Because Juror Gilbeaux considered information that *Caldwell* specifically forbids, Mr. Cole is entitled to a new trial under *Turner* and its progeny.

At a minimum, this Court should grant an evidentiary hearing to resolve the issues surrounding Juror Gilbeaux.  *See United States v. Howard*, 506 F.2d 865, 866-69 (5th Cir. 1975) (defendant entitled to evidentiary hearing on allegation that juror considered extrinsic facts).  As explained below, the state court unreasonably denied relief without a hearing on this claim.

### B.    The State Court Opinion

The state court denied this claim because it found, without conducting an evidentiary hearing, that it could not consider Juror Gilbeaux's affidavit under Rule 606(b) of the Texas Rules of Evidence.  *Cole II*, 2017 WL 562725, at *1; *see also* FFCL, DE 6-6 at 153 ("Gilbeaux's inadmissible habeas affidavit that she knew the applicant would get an automatic appeal if he was sentenced to death consists of her emotional or mental processes – processes that are inadmissible pursuant to Rule 606(b).").  The state court ruling was based on an unreasonable determination of the facts and an unreasonable application of clearly established federal law. *Turner* and *Remmer* clearly established that a juror's exposure to an external influence that carries the potential to sway her is a violation of the defendant's Sixth Amendment rights.  Under clearly established federal law, an external influence is "external to the evidence and law in the case, and carr[ies] the potential to bias the jury against the defendant."  *Oliver v. Quarterman*, 541 F.3d 329, 336 (5th Cir. 2008).

Because the information that Petitioner had a right to appeal his death sentence may have originated from an external source, the state court decision was an unreasonable application of *Remmer* and its progeny.  *See Oliver*, 541 F.3d at 340 ("[a] contrary holding would eviscerate the

rule from *Remmer* that jurors must rely on only the evidence and law presented in an open court room.").

To the extent that there was a disputed issue of fact concerning the source of the information, the state court's determination of that factual issue without holding an evidentiary hearing was procedurally unreasonable. *See* Standard of Review, *supra*.

**VIII.  MR. COLE'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED BECAUSE THE TRIAL COURT DID NOT INSTRUCT THE JURY THAT A VOTE FOR LIFE BY ONE JUROR WOULD RESULT IN A LIFE SENTENCE.**

The Texas capital sentencing scheme, on its face and as applied to Mr. Cole, violates the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  The trial courts continue to instruct Texas jurors that ten of them must agree before the court will sentence a defendant to life in prison.  By law, the jury is prohibited from knowing the truth—that without a unanimous vote for death, the defendant will always be sentenced to life in prison.  By misleading holdout jurors to believe their individual votes would not change the outcome, the instruction injects arbitrariness and unfairness into the penalty phase, in violation of Mr. Cole's rights to due process.  *See Simmons v. South Carolina*, 512 U.S. 154 (1994).

**A.     The Trial Court Instructed the Jury That Ten Votes Were Required for a Life Sentence, but Did Not Inform the Jury a Vote for Life by One Juror Would Result in a Life Sentence.**

Under Texas law, up to three special issues are submitted to the jury during the sentencing phase of a capital trial: (1) whether there is a probability that the defendant constitutes a continuing threat to society; (2) whether the defendant actually caused, intended, or anticipated

the death of the deceased;[36] and (3) whether, considering all of the evidence, there are sufficient mitigating circumstances to warrant life without parole rather than death.  Tex. Code Crim. Proc. art. 37.071 § 2(b)(1)-(2), (e)(1).

The court will sentence a defendant to death if the jury answers "Yes" on the first issue, and "No" on the third issue.  If the jury returns a "No" answer to the first special issue, or a "Yes" answer to the third issue, or if the jury is unable to answer all of the questions submitted to them under the statute, the court shall sentence the defendant to life without parole.  Tex. Code Crim. Proc. art. 37.071 § 2(g).

The Texas sentencing statute requires the jury to be instructed: (1) that the prosecution must prove the first special issue beyond a reasonable doubt; and (2) the jury shall return a verdict of "yes" or "no" on the first special issue: the jury may not return a "yes" verdict on that issue unless it is unanimous, and it may not return a "no" verdict unless 10 or more jurors agree. *See* Tex. Code Crim. Proc. art. 37.071 § 2(c) & (d).

The instructions on the third special issue, the mitigation question, are similar.  The statute requires the jury to be instructed: (1) the jury shall return an answer of "yes" or "no"; and (2) the jury may not return a "no" unless it is unanimous and may not return a "yes" unless at least ten jurors agree.  Tex. Code Crim. Proc. art. 37.071 § 2(e)(2).  This is precisely how the trial court instructed Mr. Cole's jury on the mitigation question.  *See* DE 6-98 at 9 (The jury "may not answer [the issue] 'yes' unless ten (10) or more [jurors agree.").

The statute expressly bars the jury from being instructed that if the jury is unable to reach a unanimous or at-least-ten verdict on either of the special issues, the trial court must sentence

---

[36] This special issue was not at issue in Mr. Cole's case.  Mr. Cole's jury was given only the first and third statutory issues, which the trial court referred to as issues one and two.

the defendant to life in prison.  Tex. Code Crim. Proc. art. 37.071 § 2(a) (barring instruction on the effect of a failure to agree); § 2(g) (life sentence required if jury is unable to agree).  The trial court complied with the statute, and did not inform the jury that a life sentence would be imposed if the jurors were unable to agree.

The statute and the confusing instructions create a farcical scenario in which the opposite of "unanimous" is "ten people agree."  The plain language of the statute creates the impression that one juror's dissent from the remaining members of the jury, without the agreement of at least one other juror, would be insufficient to make a difference in the determination of either of these special issues or the ultimate sentence the jury imposes.  Moreover, the statute gives jurors the false impression that there will be a mistrial unless they unanimously agree to death or acquire ten out of twelve votes for life imprisonment.

Jurors remain ignorant of the fact that each of them has the individual power to ensure that the defendant receive life in prison.  The portion of the jury instruction that suggests there must be an agreement of ten out of twelve jurors to find "no" on the first special issue and to find "yes" on special issue two, unconstitutionally diminishes each juror's individual sense of responsibility in the sentencing process, in violation of the Eighth Amendment.  Therefore, the instruction also violates *Caldwell*, 472 U.S. at 328-29 ("[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere.").

The Supreme Court has repeatedly found due process violations where jurors were given inaccurate information.  *See, e.g.*, *id.* at 329-30; *cf. Johnson v. Mississippi*, 486 U.S. 578, 585-87 & 590 (1988) (finding constitutional violation where jury considered "materially inaccurate" evidence); *Townsend v. Burke*, 334 U.S. 736, 741 (1948) (due process is violated when sentences

are based on "assumptions . . . which [are] materially untrue"). "[A]ccurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die by a jury of people who may never before have made a sentencing decision." *Gregg*, 428 U.S. at 190.

### B.   As Applied in This Case, the 10-12 Rule Violated Mr. Cole's Sixth, Eighth and Fourteenth Amendment Rights.

In addition to the constitutional violation inherent in the jury instructions, Mr. Cole's Sixth, Eighth and Fourteenth Amendment rights were violated because a juror in his case believed incorrectly, based on the court's instructions, that Mr. Cole would not receive a life sentence unless she convinced nine other jurors to vote for life.

"The jury is a central foundation of our justice system and our democracy." *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 860 (2017).  A fundamental tenet of our system of trial by jury is that jurors will decide cases based only on the evidence presented to them.  *Turner*, 379 U.S. at 472-73.  Capital sentencing instructions amount to constitutional error if "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990).

In this case, however, we know that the challenged instruction did prevent a juror from considering mitigating evidence.  Juror Gilbeaux believed that Mr. Cole was not a future danger and that there was sufficient mitigating evidence to support a life sentence.[37]  A480-81 (Gilbeaux

---

[37] Juror Gilbeaux testified before the Texas House of Representatives' Criminal Jurisprudence Committee in support of proposed legislation that would require trial courts to inform jurors that a defendant would receive life imprisonment without parole if the jurors could not agree on the answers to the special questions.  Juror Gilbeaux emphasized that she should have had the opportunity to know that she could "stand [her] ground" and have the "law support [her]." *Hearing on H.B. 3054 Before the H. Comm. on Criminal Jurisprudence*, 2017 Leg., 85th

Aff. (Nov. 27, 2013) ¶¶ 3-5, 7).  Either of these determinations by itself would have resulted in a life sentence.  Tex. Code Crim. Proc. art. 37.071 § (2)(g).  At the start of punishment phase deliberations, the jurors held an initial vote.  Juror Gilbeaux was the only juror who voted for life.  A481 (Gilbeaux Aff. (Nov. 27, 2013) ¶ 6).  Juror Gilbeaux believed incorrectly, based on the instructions given, that nine other jurors would have to agree with her on one of the special issues in order for a life sentence to be imposed on Mr. Cole.  A481 (Gilbeaux Aff. (Nov. 27, 2013) ¶ 8).

After several hours of deliberations, it became clear to Juror Gilbeaux that she would not be able to convince any other juror to vote for a life sentence.  A481 (Gilbeaux Aff. (Nov. 27, 2013) ¶ 8).  Because Juror Gilbeaux mistakenly believed that she had to convince nine other jurors to vote for a life sentence, she went along with the death sentence.  Had she known that Mr. Cole would have received a life sentence if she voted for life, she would have done so. Because Juror Gilbeaux voted for the death penalty based on the trial court's misleading instructions, Mr. Cole's Sixth, Eighth, and Fourteenth Amendment rights were violated.

### C.      The State Court Opinion

Trial counsel raised this issue in a pretrial motion.  *See* DE 6-29 at 195, Motion to Declare the "10-12" Rule Unconstitutional.  The trial court erred in denying the motion.  State habeas counsel also raised this issue.

The state court denied this claim on the grounds that it had "repeatedly upheld the 10-12 rule as constitutional," and that Juror Gilbeaux's affidavit was inadmissible under Rule 606(b) of the Texas Rules of Evidence.  *Cole II*, 2017 WL 562725, at *1.  The state court's holding was

---

Sess. (Tex. 2017) (statement of Karyn Paige Gilbeaux), *available at* http://tlchouse.granicus.com/MediaPlayer.php?view_id=40&clip_id=13351 (testimony of Karyn Paige Gilbeaux found from 2:11:00 to 2:13:52).

contrary to and an unreasonable application of clearly established federal law, and was based on an unreasonable determination of the facts.

First, the state court's holding that Gilbeaux's affidavit was inadmissible is an unreasonable application of *McDonald v. Pless*, 238 U.S. 264, 269 (1915), and its progeny. *McDonald* made it plain that exceptions to the "no impeachment rule" must be made in "the gravest and most important cases." *Id.* In *Peña-Rodriguez*, 137 S. Ct. at 864-66, 869, the Supreme Court reaffirmed this principle and held that the "Sixth Amendment requires that the no-impeachment rule give way" to a trial court's consideration of juror's statements. Though the Court in *Peña-Rodriguez* focused on racial animus, it is evident that the "no-impeachment rule" does not outweigh a defendant's Sixth and Eighth Amendment rights to fair and impartial capital sentencing.

Here, a juror has averred that the sentencing statute and the court's instructions coerced and misled her, transforming a life sentence into a death sentence. In Mr. Cole's case, a constitutional violation occurred because Juror Gilbeaux was led to believe that her vote in favor of a life sentence did not matter because other jurors did not join her in this decision. *Cf. Wiggins*, 539 U.S. at 537 (finding that death sentence cannot stand if, but for error, a single juror's vote would have changed outcome at penalty phase).

Given the gravity of this case, it was an unreasonable application of *McDonald* for the state court not even to consider whether Petitioner was entitled to an exception to the "no-impeachment rule."

Second, to the extent that the state court denied the claim because it has "repeatedly upheld the 10-12 rule as constitutional[,]" its decision was an unreasonable application of *Mills*, *Lockett* and its progeny, and *Wiggins*. The "10-12" Rule violates the constitutional principles

133

discussed in *Mills v. Maryland*, 486 U.S. 367 (1988) (remand for resentencing required where substantial probability jurors thought they were precluded from considering any mitigating evidence unless they unanimously agreed on existence of particular mitigating circumstance), and *McKoy v. North Carolina*, 494 U.S. 433 (1990) (state's sentencing scheme allowing jury to consider only mitigating circumstances found unanimously impermissibly limited jurors' consideration of mitigating evidence in violation of Eighth Amendment).

Indeed, Mr. Cole's jury was instructed that it "may not answer" special issue number two "yes" (mitigation warrants a life sentence) "unless 10 or more jurors agree."  DE 6-98 at 8.  This is precisely the kind of ambiguity that the Constitution does not tolerate in a capital sentencing scheme.  *Lockett v. Ohio*, 438 U.S. 586, 605 (1978) ("[T]he risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty . . . is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments."); *Andres v. United States*, 333 U.S. 740, 752 (1948) ("That reasonable men might derive a meaning from the instructions given other than the proper meaning . . . is probable.  In death cases doubts such as those presented here should be resolved in favor of the accused.").

The "10-12" Rule violates the Eighth and Fourteenth Amendments because there is a reasonable possibility that, under the present Texas capital sentencing scheme, all twelve jurors in a capital case could believe that a life sentence would be appropriate under state law, but, because at least ten jurors could not collectively agree on their answer to any particular special issue, the jury would be unable to return a life sentence.  This is the same type of error struck down in *Mills* and *McKoy*.  The state court decision was an unreasonable application of those precedents.

This error was not harmless.  Indeed, but for the error Juror Gilbeaux would have voted for life—sparing Mr. Cole the death sentence.  Accordingly, this Court should grant relief.

## IX.   THE ADMISSION OF PETITIONER'S STATEMENTS VIOLATED HIS FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS.

### A.   Relevant Facts

Mr. Cole was arrested late in the evening of February 4, 2010, in Wharton County, Texas. At the Wharton County Jail, a justice of the peace, Cynthia Kubicek, advised Mr. Cole of the charges against him and of his rights.  DE 6-88 at 61-63.  Magistrate Kubicek read Mr. Cole his rights off of a standard form.  DE 6-99 at 4.  Because Magistrate Kubicek knew that the offenses had been committed in Harris County, she also told Mr. Cole that no attorney would be appointed for him in Wharton County, and she instructed him to initial the form where it said that the arrestee was *not* requesting representation by an attorney.  DE 6-88 at 64, 77.

Both Sergeant Chappell and Sergeant Bush of the Houston Police Department were present and witnessed the reading of Mr. Cole's rights and Magistrate Kubicek's instruction to him not to request counsel.  DE 6-88 at 75, 108-10; DE 6-89 at 19.  Seven minutes later, they began interrogating Mr. Cole in an interview room in the Wharton County Jail.  DE 6-88 at 114. At the outset of the interrogation, Sergeant Chappell stated, "I know you just left the magistrate and the magistrate just read you your rights."  A486 (Cole Wharton Cnty. Statement Tr. (hereafter "Wharton Tr.") at 1).  Sergeant Chappell then briefly advised Mr. Cole of his rights again, including his right to a lawyer.  A486 (Wharton Tr. at 1).  Given that this immediately followed the warning by Magistrate Kubicek, Mr. Cole's understanding of his right to a lawyer was restricted by the court's statement that no lawyer would be appointed in Wharton County.

When Sergeant Chappell asked Mr. Cole to give "your side of what happened," Mr. Cole responded, "It's not going to happen tonight."  A492 (Wharton Tr. at 2).  The officers understood

this as an invocation of Mr. Cole's right to remain silent, and prepared to leave.  DE 6-88 at 116-17.  They continued, however, to record the conversation.  *Id.* at 118.  Shortly thereafter, Mr. Cole stated, "You're right about one thing.  It was not planned."  A493 (Wharton Tr. at 3).  The officers continued to question Mr. Cole.  A494 (Wharton Tr. at 4).  Neither Sergeant Chappell nor Sergeant Bush advised Mr. Cole of his rights again before continuing on, or clarified whether he wanted to forego his previous assertion of his right to remain silent.  A494 (Wharton Tr. at 4).  Sergeant Chappell simply said that Mr. Cole needed to tell them what happened.  A494 (Wharton Tr. at 4).

Mr. Cole then made a number of statements indicating his belief that the police already knew what happened, and that he wanted the night to end with the police shooting him.  A494-95 (Wharton Tr. at 4-5).  Mr. Cole spoke at length, and adamantly, about not wanting his son to testify.  A495-96 (Wharton Tr. at 5-6).  When Sergeant Chappell told Mr. Cole that his son would, in fact, likely testify against him, he became distraught and began crying and asking the police to "just kill me now."  A495 (Wharton Tr. At 5).  He then said, "I don't want to talk anymore."  A496 (Wharton Tr. at 6).

The trial court found that Mr. Cole's statement, "'I don't want to talk anymore,' was an unequivocal and unambiguous assertion of his right to silence that was not honored by Sgts. Chappell and Bush."  DE 6-72 at 18.  Instead of honoring that request, Sergeant Chappell kept on eliciting statements from Mr. Cole about his children, until Mr. Cole ultimately confessed to the crime.  A496-99 (Wharton Tr. at 6-9).  Only then did Sergeants Chappell and Bush end the interview and transport Mr. Cole back to Harris County.  *Id.*

The police continued to interrogate Mr. Cole after he arrived in Houston.  Before returning to Houston, Sergeant Chappell telephoned Houston Police Officer Avila to let him

know that they were bringing Mr. Cole to Houston, and told Officer Avila that Mr. Cole had given a statement but had not discussed any details of the crime.  DE 6-89 at 30-31, 35-36.

Officer Avila attempted to begin questioning Mr. Cole, but Mr. Cole invoked his right to an attorney.  DE 6-88 at 150-51; A501 (Cole Harris Cnty. Statement Tr. (hereafter "Harris Tr.") at 2).  Officer Avila ended the interview, and left the room to stop the videotape.  DE 6-88 at 151-52; A501 (Harris Tr. at 2).  Officer Avila returned to the interview room and spoke to Mr. Cole for approximately fifteen minutes.  DE 6-88 at 156. Officer Avila testified that during that time he merely informed Mr. Cole that he would be transported to the jail and the District Attorney's Office would take over the case.  DE 6-88 at 152.  Officer Avila testified that, in response, Mr. Cole asked if his son would have to testify against him; that Officer Avila said it was possible; and that Mr. Cole then said that he "changed his mind" and wanted to make a statement.  *Id.* at 153.  None of that conversation was recorded, *id.*; purportedly it was all that took place during the fifteen minutes in which the tape was off.

After those fifteen minutes, the video was back on, and Officer Avila began the interrogation again.  *Id.* at 156.  He began by reminding Mr. Cole of the rights previously read, and reminding Mr. Cole that he had asked for an attorney.  A502 (Harris Tr. at 3).  Officer Avila read Mr. Cole his rights again, and Mr. Cole said that he was now voluntarily waiving those rights, that he was voluntarily giving a statement, and that he was the one who was initiating this resumed interview.  A502-03 (Harris Tr. at 3-4).  Officer Avila did not repeat for the recording the contents of the fifteen minute conversation that had just occurred.  He did not ask Mr. Cole why he had changed his mind, or in any way preserve for the record what had allegedly happened while the video was turned off.  Mr. Cole then gave a statement, confessing to shooting his wife and stepdaughter.  A506 (Harris Tr. at 7).

137

Prior to trial, Mr. Cole moved to suppress both the Wharton County and Harris County statements.  As relevant here, he argued that: (1) his rights were impaired by Magistrate Kubicek's statement that he could not have counsel appointed for him in Wharton County; (2) the Houston Police Department did not scrupulously honor his multiple invocations of his right to remain silent during the Wharton County statement; and (3) the Houston Police Department did not scrupulously honor his invocation of the right to counsel once in Harris County.  DE 6-89 at 46-52.  The trial court granted the motion to suppress only as to the statements made in Wharton County following Mr. Cole's statement, "I don't want to talk anymore."  DE 6-72 at 18; DE 6-91 at 8-9.

## B.    Mr. Cole Did Not Validly Waive His Right to Counsel Prior to Making the Wharton County Statement.

When a suspect is in custody, police officers are required to inform the suspect of his right against self-incrimination and right to assistance of counsel.  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  For a waiver of the right to counsel to be valid, it must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  Mr. Cole made his waivers of the right to counsel in Wharton County without such awareness; therefore, those waivers were invalid.

Magistrate Kubicek advised Mr. Cole that he would not receive appointed counsel in Wharton County, and instructed him to initial the form where it said that he was *not* requesting representation by an attorney.  DE 6-88 at 62, 75.  That advice and instruction made clear that Mr. Cole did not have an effective right to counsel as long as he was in Wharton County.

Almost immediately after the hearing before Magistrate Kubicek, Sergeants Chappell and Bush interrogated Mr. Cole.  Although Sgts. Chappell and Bush went through the motions of

advising Mr. Cole that he had a right to counsel, A486 (Wharton Tr. at 1), that was meaningless, since Mr. Cole had just been advised in the officers' presence that he actually had no right to counsel in Wharton County.  Magistrate Kubicek had advised Mr. Cole that he could request counsel once he arrived in Harris County, DE 6-88 at 77, and that is exactly what he did.  *Id.* at 151; A503 (Harris Tr. at 2).

Magistrate Kubicek and the Houston Police Department failed to ensure that Mr. Cole understood that he did, in fact, have a right to appointed counsel while in Wharton County, and that he could request an appointed lawyer prior to interrogation.  Magistrate Kubicek simply read a long list of rights from a form, and then asked one time whether he understood what she had read him.  DE 6-88 at 72.  She then told him that no counsel would be appointed while he remained in Wharton County, and instructed him not to request counsel and to initial the warnings form accordingly.  *Id.* at 64, 71-73.

A reasonable person in Mr. Cole's position would have understood that no lawyer was available for consultation before the interrogation began.  Accordingly, Magistrate Kubicek's instructions rendered Mr. Cole's waiver of his right to counsel unknowing and unintelligent.  In the absence of a valid waiver of the right to counsel, admission at trial of part of the Wharton County statement violated Mr. Cole's Fifth, Sixth, and Fourteenth Amendment rights.

### C.     The Police Failed to Scrupulously Honor Mr. Cole's Invocation of His Right to Remain Silent.

Once a person has unambiguously invoked his right to remain silent, the admissibility of any subsequent statement depends on whether the "right to cut off questioning" was scrupulously honored by the police.  *Michigan v. Mosley*, 423 U.S. 96, 104 (1975).  Whether the right was scrupulously honored depends on the totality of the circumstances, including (1) whether the suspect was informed of his right to remain silent prior to the initial questioning; (2) whether the

suspect was informed of his right to remain silent prior to the subsequent questioning; (3) the length of time between the initial questioning and the subsequent questioning; (4) whether the subsequent questioning focused on a different crime; and (5) whether the police honored the initial invocation of the right to remain silent.  *Id.* at 104-05.

Here, as the trial court found, Mr. Cole clearly and unambiguously invoked his right to remain silent when he told Sergeants Chappell and Bush, "I don't want to talk anymore."  A496 (Wharton Tr. at 6); DE 6-72 at 18.  The trial court also found that the officers did not scrupulously honor Mr. Cole's invocation of his right to remain silent.  DE 6-72 at 18. Nevertheless, the trial court allowed the admission of his subsequent Harris County statement, based on the fact that three hours had elapsed and Officer Avila administered *Miranda* warnings before questioning Mr. Cole in Harris County.  *Id.*

Sergeants Chappell and Bush continued to question Mr. Cole after he invoked his right to silence, which was a clear indication to Mr. Cole that the police did not respect his right to silence.  The totality of the circumstances shows that the Houston Police did not scrupulously honor Mr. Cole's invocation of his right to silence and, therefore, the trial court admitted the Harris County statement in violation of his Fifth and Fourteenth Amendment rights.

The third, fourth and fifth *Mosley* factors demonstrate that the Mr. Cole's statement should have been suppressed.  First, the length of time between the two interrogations was not significant.  Throughout the three hour time on which the trial court relied, Mr. Cole was in the presence of Houston Police Department officers: Sergeants Chappell and Bush during the travel from Wharton County to Harris County, DE 6-89 at 36, and then crime scene officers and Officer Avila in an interrogation room for the remainder of the time until the interrogation

continued, DE 6-88 at 147-48; DE 6-89 at 36.  Mr. Cole was never removed from the inherently pressurized and coercive interrogation environment.

The fourth *Mosley* factor weighs strongly in Mr. Cole's favor.  The continued interrogation was about the same charges, not, as in *Mosley*, about an entirely separate charge.  Continuing to interrogate a suspect as to a crime with respect to which he has invoked his right to silence is the opposite of scrupulously honoring that right.

Under the fifth *Mosley* factor, it is clear that the police did not scrupulously honor Mr. Cole's initial invocation to silence.  Sergeant Chappell did not inform Officer Avila of Mr. Cole's invocation of his right to silence in Wharton County.  DE 6-88 at 174.  Rather, Sergeant Chappell had a conversation with Officer Avila in which he discussed perceived shortcomings in the Wharton County statement with an eye towards continued interrogation of Mr. Cole in Harris County.  DE 6-89 at 30-31, 34-36.  Thus, Sergeant Chappell's failure to honor Mr. Cole's invocation of his right to silence carried over to Officer Avila.

Under all of the circumstances, neither the lapse of time nor the re-administration of warnings about rights that had already been ignored amounted to scrupulously honoring Mr. Cole's invocation of his right to silence.  Therefore, admission of the Harris County statement violated his Fifth and Fourteenth Amendment rights.

### D.	The Police Failed to Scrupulously Honor Mr. Cole's Invocation of His Right to Counsel.

Mr. Cole unambiguously invoked his right to counsel at the outset of Officer Avila's interrogation.  DE 6-88 at 151; A501 (Harris Tr. at 2).  Once Mr. Cole invoked his right to counsel, the law required Officer Avila to cease all interrogation—including all statements and actions which could reasonably elicit an incriminating response—unless Mr. Cole himself re-initiated the conversation:

> If, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be "interrogation." In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.

*Edwards v. Arizona*, 451 U.S. 477, 484-85, 486 n.9 (1981); *see also Rhode Island v. Innis*, 446 U.S. 291, 301-02 (1980) (constitutional "interrogation" may manifest through words or actions which are reasonably likely to elicit a response from the prisoner).

After Mr. Cole invoked his right to counsel, Officer Avila turned off the videotape and then re-entered the interrogation room, where he had an unrecorded conversation with Mr. Cole. DE 6-88 at 151-52. The only evidence of what took place during that conversation comes from Officer Avila. Even taking his testimony at face value, he did not scrupulously honor Mr. Cole's invocation of his right to counsel, but rather took actions that could elicit an incriminating response.

Officer Avila came back into the room and told Mr. Cole "what was going to happen to him," in other words, that he would be booked into the jail, the District Attorney would be called, and formal charges would be filed. DE 6-88 at 152-53. These statements constitute improper statements that were reasonably likely to elicit incriminating responses following Mr. Cole's unambiguous invocation of his right to counsel.

In response, Mr. Cole asked if his ten-year-old son would have to testify, and Officer Avila responded that it was possible. DE 6-88 at 153. Officer Avila should reasonably have known that his statement would elicit further incriminating responses. *See Innis*, 446 U.S. at 301. Even if Officer Avila was unaware of Mr. Cole's previous conversations about that very issue, any officer with Officer Avila's experience would know that telling a suspect that his child

would be put through the trauma of testifying would likely cause that suspect to make statements in order to keep that from happening.

Accordingly, nothing Mr. Cole said after that point should have been admitted against him at trial.  The trial court nevertheless admitted the Harris County statement, thereby violating Mr. Cole's Fifth, Sixth, and Fourteenth Amendment rights.

### E.      Prejudice

Mr. Cole was prejudiced, both individually and cumulatively, by the admission of his statements.  Because the prosecution used all the statements made by Mr. Cole, except the suppressed portion of the Wharton County statement, against him at his trial, the Fifth Amendment violation had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

The improper admission of a confession, even a coerced confession, is not per se prejudicial.  *Fulminante v. Arizona*, 499 U.S. 279, 309-12 (1991).  Nevertheless, a "confession is like no other evidence."  *Id.* at 295; *see Bruton v. United States*, 391 U.S. 123, 139 (1968) ("[T]he defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.").  Here, the State relied heavily on the statements during opening statements, DE 6-91 at 25-26; at the culpability phase closing argument, DE 6-94 at 106-11; and during its punishment phase closing argument.  DE 6-98 at 24-25, 65-67, 72.  It cannot reasonably be questioned that the statements had a major impact on the jury verdicts.

### F.      The State Court Opinion

On direct appeal, the court indicated that it applies a totality of the circumstances analysis in *Miranda* cases.  *Cole I*, 2014 WL 2807710, at *18.  It then found both that the magistrate's warnings and instructions were irrelevant, and that at most the warnings were "potentially"

confusing.  *Id.* at *19-20.  The court then opined that Mr. Cole "did not present any evidence from any source that he was actually confused."  *Id.* at 20.

The state court's decision misapplied *Miranda*.  The magistrate made clear that, whatever anyone else said, in Wharton County Mr. Cole did not have access to counsel.  The police nonetheless questioned him there, contrary to *Miranda*'s command:

> [I]f police propose to interrogate a person they must make known to him that he is entitled to a lawyer and that if he cannot afford one, a lawyer will be provided for him *prior to any interrogation.*  If authorities conclude that they will not provide counsel during a reasonable period of time in which investigation in the field is carried out, they may refrain from doing so without violating the person's Fifth Amendment privilege *so long as they do not question him during that time.*

*Miranda*, 384 U.S. at 474 (emphasis added).

Because Mr. Cole was not going to be afforded counsel in a "reasonable period of time," or at any time while he was in Wharton County, he should not have been interrogated there.  The court's ruling to the contrary is an unreasonable application of *Miranda* and its progeny.

The state court decision was also based on unreasonable determinations of the facts.  The court repeatedly referenced Mr. Cole's waiver of rights during his appearance in magistrate court.  *Cole I*, 2014 WL 2807710, at *13-14, 18.  But the court ignored the significant fact that both the magistrate judge and an officer instructed Mr. Cole to sign the form to indicate that he was not requesting counsel while in Wharton County.  DE 6-88 at 75, 108-10; DE 6-89 at 19.  As Magistrate Kubicek admitted, she "told [Mr. Cole] in this case he would have to request an attorney in Harris County.  So, we check, no."  DE 6-88 at 73.  Thus, it was unreasonable for the state court to assert that "the magistrate simply and accurately stated an administrative fact: should appellant request it, Harris County, rather than Wharton County, would handle the appointment of counsel."  *Cole I*, 2014 WL 2807710, at *9.  In light of the magistrate's

instructions, and the fact that the officers wished to question Mr. Cole in Wharton County, where no counsel was available, this was not merely an "administrative fact."

Moreover, the magistrate's warnings were clearly relevant as part of the totality of the circumstances and violated Mr. Cole's rights under *Miranda* and its progeny.  Therefore, the state court decision was based on an unreasonable application of clearly established Supreme Court law.

The state court ruled that the renewed questioning in Harris County was consistent with *Mosley*, based largely on the passage of time.  *Cole I*, 2014 WL 2807710, at *22.  The state court noted, but then ignored, the important fact that here, unlike *Mosley*, the officers did *not* "restrict[] the second interrogation to a crime that had not been a subject of the earlier interrogation." *Mosley*, 423 U.S. at 106.  Rather, the second interrogation was solely focused on the same crime that had been the "subject of the earlier interrogation."  While that fact alone is not dispositive, here, the totality of the circumstances makes this case much more like *United States v. Hernandez*, 574 F.2d 1362, 1369 (5th Cir. 1978), in which the statement was suppressed, than like *Mosley*.[38]  In these circumstances, the state court decision was an unreasonable application of *Mosley*.

On direct appeal, the state court also ruled that nothing Officer Avila did after Mr. Cole invoked his right to counsel constituted renewed questioning.  *Cole I*, 2014 WL 2807710, at *23-25.  Given the totality of the circumstances set forth above, this ruling was based on an

---

[38] In *Hernandez*, the suspect was confined in a police wagon for several hours, then repeatedly interrogated about a single crime until he confessed.  574 F.2d at 1366, 1369.  Here, Mr. Cole's initial invocation of his right to silence was *not* honored; while time passed, he was incommunicado in a police car during that time; the initial interrogators encouraged the second group of interrogators to keep trying to elicit more details; and the new set of interrogators repeated the interrogation as soon as Mr. Cole arrived in Harris County.

unreasonable determination of the facts and an unreasonable application of clearly established

Supreme Court precedent.

**X.   THE TRIAL COURT'S INSTRUCTIONS AND THE PROSECUTOR'S ARGUMENTS APPLYING ARTICLE 37.071, SECTION 2(F)(4) OF THE TEXAS CODE OF CRIMINAL PROCEDURE LIMITED THE JURY'S ABILITY TO GIVE EFFECT TO MITIGATING EVIDENCE, IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS.**

**A.   The Constitutional Violation**

The Texas capital sentencing statute defines "mitigating evidence" as "evidence that a

juror might regard as reducing the defendant's moral blameworthiness."  Tex. Code Crim. Proc.

art. 37.071 § 2(f)(4).  The statute requires the trial court to instruct the jury that, in determining

whether sufficient mitigating evidence exists to warrant a life sentence, it must filter mitigating

evidence through that definition.  *Id.*  The trial court so instructed the jury.  DE 6-98 at 9.

This instruction unconstitutionally restricted the jury's decision-making process in two

ways: (1) it precluded meaningful consideration of *all* relevant mitigating  evidence and, instead,

required consideration only of evidence which reduces "moral blameworthiness," i.e., guilt, and

(2) it required the jury to consider only evidence that is linked to the           defendant's "moral

blameworthiness," i.e., guilt, for the capital  offense.  As a result, the instruction violated the

Eighth and Fourteenth Amendments to the United States Constitution.

The Supreme Court has long held that a sentence of death cannot stand if an ambiguous

jury instruction fails to allow a jury to give effect to mitigating evidence that might call for a

sentence other than death.  *See Mills*, 486 U.S. at 375-78; *see also Skipper*, 476 U.S. at 4 (a jury

may not "be precluded from considering 'any relevant mitigating evidence'" in determining

whether a defendant is put to death) (citation omitted).  Accordingly, a jury must be able to

consider "whatever mitigating evidence" may be presented by the defendant, including "any

aspect of a defendant's character or record and any circumstances of the offense the defendant proffers as a basis for a sentence less than death or record." *Lockett*, 438 U.S. at 604, 607.  The Court has held that relevant mitigating evidence is "evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Tennard v. Dretke*, 542 U.S. 274, 284 (2004).

The jury instruction likely led the jurors to believe that the only evidence they were permitted to consider as mitigating was evidence that somehow reduces the defendant's "blameworthiness" or guilt.  Besides unconstitutionally restricting the type of evidence the jury could consider mitigating, the instruction also unconstitutionally required the jury to consider only mitigating evidence that was connected to the crime itself.  The court instructed the jury that it could give effect only to mitigating evidence that "reduc[es] the defendant's moral blameworthiness." DE 6-98 at 9.  It is reasonably likely that the jury interpreted this instruction to mean that it could consider only evidence that reduced Mr. Cole's blame for the crime.

The Supreme Court has expressly disavowed limiting consideration of mitigating evidence in this manner.  In *Tennard*, the Supreme Court "unequivocally rejected" any requirement that a mitigating circumstance bear a "nexus to the crime."  542 U.S. at 284.

Here, the "blameworthiness" instruction unconstitutionally precluded the jury from meaningfully considering a wide variety of evidence which may serve as a basis for a sentence less than death, despite having nothing to do with the crime or the defendant's guilt.  For example, a defendant's drug or alcohol abuse, childhood trauma, or past abuse might not make a defendant "less guilty" or have anything to do with the crime, but they might persuade a jury that a defendant is not the type of person that deserves the death penalty.  Positive character traits, such as commitment to family, strong work ethic, or evidence of a reformed life, will also not

reduce a person's guilt or blameworthiness for his crime, but they might make a jury consider him worthy of life rather than death.  The jury instruction effectively put such vital and constitutionally relevant mitigating evidence out of the jury's reach.

Here, the jury was precluded from considering evidence that may not have made Mr. Cole "less guilty," but nevertheless was "proffer[ed] as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982).  The defense presented evidence that Mr. Cole was taken from his mother as a child; that he was distraught about the loss of his current family to divorce; and that he suffered from alcoholism, but that he also was a valuable and hard-working employee, a respected employer, and a trusted friend.  He had never been to prison, and showed no indication of violence toward authorities, or while incarcerated.  *See generally* DE 6-96 at 41-240; DE 6-97 at 7-228.  Yet, the jury was instructed in a way that allowed it to disregard all of this evidence unless it had a nexus to the offense.

The State exploited the instruction to force home the idea that the jury should not consider much of Mr. Cole's mitigation case.  In its closing argument, the State reinforced the idea that the "moral blameworthiness" requirement limited their consideration of mitigating evidence to evidence connected to the crime itself:

> So, when you put it on the balancing scales and you put the mitigating factors that you believe are there on one side and you put the crime on the other, where do you find yourself?  The way the jury charge puts it to you is this way; at the bottom of Page 2 in answering the mitigation issue: *You are to consider whether what you heard reduces the moral blameworthiness of the defendant*.  And I'm sorry, ladies and gentlemen, but I don't think so.  And I hope you don't either.
> . . .
>
> And anyone who could do that, take the mother of his children away while they watched, take their sister away while they watched, there is nothing that could ever take away his moral blameworthiness for that.
> . . .

It was a cold-blooded capital murder. . . .  You know from what you heard and what you saw that there is nothing that reduces his moral blameworthiness for that.  You know that.  And that is why he deserves the death penalty.

. . .

So, now before you could consider anything in answering Special Issue No. 2, you first have to decide if it is even mitigating.  And remember that mitigating means reduces his moral blameworthiness.  Did you hear anything that's even mitigating, let alone sufficiently mitigating?

. . .

Does anything you heard reduce his moral blameworthiness?

DE 6-98 at 16, 17, 25, 61, 73, 74 (emphasis added).

The State repeatedly told the jurors that the law *required* that they first had to determine whether purportedly mitigating evidence reduced Mr. Cole's "moral blameworthiness."  The State thus effectively conveyed to the jurors that the law permitted them to consider evidence about Mr. Cole's life to reduce his guilt *only if* it was sufficiently connected to the crime.

Accordingly, there is a reasonable likelihood that the jury applied the instructions in a way that prevented its consideration of "constitutionally relevant" evidence.  *Boyde*, 494 U.S. at 380.

**B.     The State Court Opinion**

In denying this claim, the CCA relied on *Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010), and its predecessors.  *Cole I*, 2014 WL 2807710, at *36-37.[39]

The *Coble* line of decisions holds that the underlying statutory provision of Tex. Code Crim. Proc. art. 37.071 § 2(f)(4) and the instruction in this case do not violate the Eighth Amendment because the jury would not "be reasonably likely to infer a nexus requirement from the statutory words."  *Coble*, 330 S.W.3d at 296.  While the state court referred to the correct standard under *Boyde*, its conclusion was an unreasonable application of *Boyde* and *Tennard*.

_____

[39] *See Roberts v. State*, 220 S.W.3d 521 (Tex. Crim. App. 2007); *Perry v. State*, 158 S.W.3d 438 (Tex. Crim. App. 2004).

149

Given the clear language of the instruction itself and the prosecutor's even more explicit arguments based on the instruction, there was at a minimum a "reasonable likelihood" of juror confusion. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). The state court decision to the contrary was unreasonable.

Moreover, to the extent that the state court's decision was also based on the unreasonable determination that the state's closing argument did not limit the kind of evidence the jury could give mitigating effect to, the state court decision was also based on an unreasonable determination of the facts in light of the record. § 2254(d)(2).

## XI. THE JURY'S DETERMINATION OF SPECIAL ISSUE ONE LACKED THE GUIDED DISCRETION REQUIRED BY THE EIGHTH AND FOURTEENTH AMENDMENTS, BECAUSE THE TERMS OF THE QUESTION ARE VAGUE AND UNDEFINED, AND THE USE OF "PROBABILITY" UNDERMINES THE STATE'S BURDEN OF PROOF.

The first special issue is unconstitutionally vague, and fails to provide the constitutionally required guided discretion to the sentencing jury. Neither the statute nor the required jury charge define the terms "probability," "criminal acts of violence," or "continuing threat to society." *See* Tex. Code Crim. Proc. art. 37.071 § 2(b)(1).[40] This contravenes the Eighth Amendment principle that a state's aggravating factors may not be defined in such a way that people of ordinary sensibilities could find that nearly every murder met the stated criteria. *Godfrey v. Georgia*, 446 U.S. 420, 428-29 (1980).

---

[40] The vagueness of the term is illustrated by the fact that the CCA has held both that "society" means prison society, to which any life- or death-sentenced prisoner would be confined, *and*, conversely, that it includes society at large. *Compare Berry v. State*, 233 S.W.3d 847 (Tex. Crim. App. 2007) (vacating death sentence for lack of sufficient evidence of future dangerousness where defendant is dangerous only toward her own children, and it is "very unlikely" she will have more children while sentenced to life imprisonment), *with Martinez v. State*, 327 S.W.3d 727, 735 (Tex. Crim. App. 2010) (future dangerousness special issue would be satisfied if defendant would be a threat "whether in or out of prison").

Moreover, the use of "probability" in an issue that the jury is instructed to determine beyond a reasonable doubt improperly lessens the State's burden to prove the aggravating factors beyond a reasonable doubt, which is required by the Sixth Amendment. *See Ring v. Arizona*, 536 U.S. 584, 602-09 (2002).

This issue was raised by the defense pre-trial. *See* Motion to Declare Texas Death Penalty Statute to be Unconstitutional (Juror's Inability to Predict Future Dangerousness), DE 6-29 at 66-69. The trial court denied the motion. *Id.* at 70. Appellate counsel ineffectively failed to review the record and raise this meritorious, preserved issue.

Petitioner raised this issue in the state habeas proceedings, and alleged that direct appeal counsel's failure to raise it constituted ineffective assistance. *See* DE 6-3 at 129 n.28. The state court declined to review the merits of this claim because it had not been raised on direct appeal. *Cole II*, 2017 WL 562725, at *2.

Because the state court did not address the merits of the claim, this Court's review is de novo. *See* Standard of Review, *supra*. To the extent that the failure to raise the claim on direct appeal constitutes a default, the ineffective assistance of appellate counsel is cause and prejudice for the default. *See Coleman v. Thompson*, 501 U.S. 722, 754 (1991).

Appellate counsel raised seventeen issues on direct appeal, including several constitutional challenges to aspects of the Texas death penalty scheme. This is inconsistent with any notion that appellate counsel was inclined to winnow out constitutional issues as a matter of tactics or strategy. Therefore, counsel had no reasonable basis for failing to raise this meritorious claim.

## XII.   SPECIAL ISSUE ONE UNCONSTITUTIONALLY LOWERS THE STATE'S BURDEN OF PROOF TO A PROBABILITY, IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS.

Special Issue One of the Texas capital sentencing statute requires the court to ask the jury "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."  Tex. Code Crim. Proc. art. 37.071 § 2(f)(4). The statute and the jury instructions fail to define the term "probability."  Because jurors are permitted to sentence a defendant to death on an affirmative finding of a "probability of future dangerousness," the statute shifts the State's burden of proof from "beyond a reasonable doubt" to a "probability."

The Texas courts have repeatedly held that "probability" in Special Issue One means "[l]ikelihood," or "true, real, or likely to occur."  *See, e.g.*, *Renteria v. State,* 206 S.W.3d 689, 706 (Tex. Crim. App. 2006) ("This Court has repeatedly held that the trial court need not define this term because the jury is presumed to understand it without further instruction."); *Granviel v. State*, 552 S.W.2d 107, 117 n.11 (Tex. Crim. App. 1976) (noting that "likelihood" is one definition for "probability, and that other definitions include "reasonable ground for presuming"; "true, real, or likely to occur"; "a conclusion that is not proof but follows logically from such evidence as is available"; and "in the doctrine of chance, the likelihood of the occurrence of any particular form of an event.").  Yet, juries are not instructed on the definition of probability or the distinction between probability and beyond a reasonable doubt.  Texas's capital sentencing scheme thus allows the jurors to sentence a defendant to death if they believe that there is a *chance* he poses a continuing threat to society, in violation of the Fifth and Sixth Amendments to the United States Constitution.

The Supreme Court has held that any fact (other than prior conviction) that increases the maximum penalty for a crime must be proven beyond a reasonable doubt. *See Ring*, 536 U.S. at 602; *Jones v. United States*, 526 U.S. 227, 243 (1999). In accordance with due process and the Sixth Amendment, a death sentence may not be imposed unless at least one aggravator is proven beyond a reasonable doubt. *See Ring*, 536 U.S. at 609 (the Sixth Amendment requires that aggravating factors be found by a jury beyond a reasonable doubt); *Apprendi v. New Jersey*, 530 U.S. 466, 482-83, 494 (2000) (each fact that subjects a defendant to a penalty "exceeding the maximum he would receive if punished according to the facts in the jury verdict alone" must be proven beyond a reasonable doubt). The "probability" aspect of Special Issue One impermissibly lowered that burden of proof.

On direct appeal, the state court denied this claim on the ground that it had repeatedly rejected similar claims. *See Cole I*, 2014 WL 2807710, at *32 (citing *Rayford v. State*, 125 S.W.3d 521, 534 (Tex. Crim. App. 2003) (*Ring* has no application to Texas's capital sentencing scheme because the maximum penalty is death, eliminating any enhancement in sentence).

In *Rayford*, the CCA rejected the defendant's claim that *Apprendi* and *Ring* require the State to prove future dangerousness beyond a reasonable doubt. 125 S.W.3d at 533-34. The court found that *Apprendi* and *Ring* only apply when a defendant faces an increased penalty over the statutory maximum. *Id.* ("mitigation issue is designed to allow for the imposition of a life sentence, which is less than the statutory maximum of death").

In Mr. Cole's case, the CCA's decision was contrary to and an unreasonable application of *Ring* and *Apprendi*. The court's decision stands for the notion that the death penalty is the presumed sentence for defendants convicted of capital murder—the burden is on defendants to spare their lives. *Apprendi* and *Ring* both rejected this formalistic approach:

153

This argument overlooks *Apprendi*'s instruction that the relevant inquiry is one of effect, not form. 530 U.S., at 494. In effect, the required finding of an aggravated circumstance exposed Ring to a greater punishment than that authorized by the guilty verdict. *Id.* The Arizona first-degree murder statute authorizes a maximum penalty of death only in a formal sense, *id.*, at 541 (O'Connor, J., dissenting), for it explicitly cross-references the statutory provision requiring the finding of an aggravating circumstance before imposition of the death penalty.

*Ring*, 536 U.S. at 586.

The state court simply refused to apply *Ring* and *Apprendi*. As a result, its decision was contrary to and an unreasonable application of those clearly established precedents. This Court should grant Mr. Cole relief from his unconstitutional death sentence.

## XIII. PETITIONER'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED WHEN THE JURY CONSIDERED EVIDENCE REGARDING CRIMES OF OTHER INMATES TO DETERMINE PETITIONER'S FUTURE DANGEROUSNESS.

### A. The Constitutional Violation

Before a death sentence can be imposed in Texas, a jury must find the aggravating circumstance that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. art. 37.071 § (2)(b)(1). If the jury does not find this aggravating circumstance, the sentence must be life imprisonment. *Id.* at § (2)(g).

Here, the prosecution presented evidence of crimes committed by Texas inmates, unrelated to Mr. Cole, to prove that Mr. Cole would be a future danger.[41] Specifically, the prosecution presented evidence that in August 2011, two months before Mr. Cole's trial, 1,760 serious or unusual incidents occurred within the entire TDCJ prison system. DE 6-97 at 187-88.

---

[41] Defense counsel objected to this line of questioning. DE 6-97 at 167-77. After a voir dire examination of the witness, the objection was overruled by the trial court, which allowed a continuing objection to the testimony. *Id.* at 182-83.

The prosecution detailed those incidents, eliciting testimony that there were 108 possession of weapons offenses, 24 sexual assaults, 3 staff assaults, 127 serious offender assaults, and 41 chunking incidents.  *Id.* at 188-89.  The prosecution then elicited testimony that in 2011, the year of Mr. Cole's trial, 12,550 serious or unusual incidents t occurred within the TDCJ system.  *Id.* Those incidents included 731 possession of weapons offenses, 239 sexual assaults, 58 serious staff assaults, 864 serious offender assaults, and 278 incidents of chunking.  *Id*. at 189-90.

The prosecution used this evidence to argue in closing that Mr. Cole was a future danger, establishing the aggravating circumstance.  "You've heard about all of the violence that goes on in TDC.  You can't possibly think locking him up and throwing away the key is good enough . . . .  You know the evidence has shown you overwhelmingly that he is going to be a continuing threat.  And you know that the answer to [the future danger aggravator] is 'yes.'"  DE 6-98 at 70.

The prosecution's presentation of evidence and argument about the misdeeds of other inmates who were unrelated to Mr. Cole to support the future dangerousness aggravator violated his Eighth and Fourteenth Amendment rights.  If misdeeds committed in prison by other inmates can be a basis for a finding that the defendant—who did not commit any of those misdeeds— would be a future danger, then the future dangerousness aggravating circumstance applies to every defendant convicted of capital murder, and therefore fails to narrow the class of death-eligible defendants.

In *Godfrey v. Georgia*, the Court struck down an aggravating circumstance that was so overly broad that "a person of ordinary sensibility could find that almost every murder fit the stated criteria."  446 U.S at 428-29; *see also id.* at 433 ("There is no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it

was not.").  Allowing the jury to find the future dangerousness aggravator based on the crimes committed by others rendered the aggravator incapable of limiting the class of persons eligible for the death penalty, in violation of Petitioner's Eighth and Fourteenth Amendment rights.

### B.      The State Court Opinion

The state court denied this claim on the ground that because the evidence presented to the jury concerned other inmates' crimes in the aggregate rather than specific instances of crime, it did not violate the Eighth Amendment.  *Cole I*, 2014 WL 2807710, at *31.  But if it is impermissible to present evidence of specific incidents of other inmates' crimes to prove Mr. Cole's future dangerousness, it follows that is impermissible to discuss other inmates' crimes in the aggregate.  Moreover, the fact that the other inmates' crimes were considered in the aggregate is irrelevant, given that the prosecution argued that the jury should rely on the evidence of aggregate crimes to find the future dangerousness factor.  *See* DE 6-98 at 70 (quoted above).  The state court decision upholding Mr. Cole's death sentence—although the aggravating factor as applied did nothing to limit the class of death-eligible defendants—was an unreasonable application of and contrary to *Godfrey* and its progeny.

### XIV.   PETITIONER'S DEATH SENTENCE IS UNCONSTITUTIONAL BECAUSE TEXAS ARBITRARILY ADMINISTERS CAPITAL PUNISHMENT, IN VIOLATION OF THE UNITED STATES CONSTITUTION.

The State of Texas and the Harris County District Attorney's Office have systematically engaged in the geographically disparate and racially discriminatory administration of the death penalty.  Since the reinstatement of the death penalty in 1976, Texas has been responsible for 546 executions, more than any other state.  Harris County, where Jaime Cole was prosecuted, is responsible for more executions than any other county in the nation.  Independently, if Harris County were a state it would "rank second in executions after Texas, outpacing both Virginia . . .

and Oklahoma."  Scott Phillips, *Continued Racial Disparities in the Capital of Capital Punishment: The Rosenthal Era*, 50 Hous. L. Rev. 131, 133 (Fall 2012) (hereinafter "Phillips/Rosenthal Report").

In addition to geographic disparities, Texas's system of administering the death penalty also reflects disparities based on race and ethnicity.  For fourteen years, from 2004 until 2018, the Harris County District Attorney's office did not seek the death penalty against any white defendants.[42]  *See* Tex. Dep't of Crim. Justice, *Death Row Information: Offenders on Death Row*, https://www.tdcj.texas.gov/death_row/dr_offenders_on_dr.html (last visited June 11, 2020).  In that time, the district attorney has pursued the death penalty against twenty-three non-white defendants, and sent eighteen minorities, including Mr. Cole, to death row.  Because he was a Hispanic/Latino defendant in the capital of capital punishment, Mr. Cole's chance of receiving a death sentence was unfairly increased by the location of the crime and his race.

Thus, whereas sentences of death should be reserved only for the most egregious offenses, in Texas this determination is, to a degree both substantial and improper, an arbitrary one.  Capital punishment schemes must have "objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death."  *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976).  But Texas's death penalty scheme fails to "minimize the risk of wholly arbitrary and capricious actions," in violation of Mr. Cole's rights under the Sixth, Eighth and Fourteenth Amendments.  *Gregg*, 428 U.S. at 189; *Godfrey*, 446 U.S. at 433.  Mr. Cole's sentence should be vacated.

---

[42] In October of 2019, a white defendant in Harris County was sentenced to death after being convicted of six murders.

A.     **United States Supreme Court Precedent Requires an Evenhanded and Rational Imposition of Capital Punishment.**

In 1972, the Supreme Court halted the death penalty because states failed to create safeguards to prevent the arbitrary imposition of the death penalty.  *Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam).  Justice Douglas highlighted the historical inequality of the death penalty, noting that:

> [T]here is evidence that the imposition of the death sentence . . . follow[s] discriminatory patterns.  The death sentence is disproportionately imposed and carried out on the poor, the Negro, and the members of unpopular groups.  A study of capital cases in Texas from 1924 to 1968 reached the following conclusions: Application of the death penalty is unequal: most of those executed were poor, young, and ignorant.  Seventy-five of the 460 cases involved codefendants, who, under Texas law, were given separate trials.  In several instances where a white and a Negro were co-defendants, the white was sentenced to life imprisonment or a term of years, and the Negro was given the death penalty.

*Id*. at 250-51 (Douglas, J., concurring) (citation and internal quotation marks omitted).

After *Furman*, Texas changed its death-eligible crimes and bifurcated the guilt and penalty phases of capital trials.  The state's revised death penalty statute was found facially constitutional in *Jurek v. Texas*, 428 U.S. 262 (1976).  The Court emphasized that "the decision to impose death [should be] particularized to the crime and the defendant."  *Id*. at 274.

The Texas state legislature has failed to provide district attorneys with anything like a uniform method for determining which defendants face the death penalty.  Instead, the prevailing factors in determining which defendants will face the death penalty are the location of the crime, the race of the defendant, and the race of the victim.  Because "[t]here is no principled way to distinguish [a] case, in which the death penalty was imposed, from the many cases in which it was not," the entire process is rendered unconstitutional.  *See, e.g.*, *Godfrey*, 446 U.S. at 433. In 2018, seven men were sentenced to death in Texas—all seven of these men were people of color. *See* "Texas Death Penalty Developments in 2018: The Year in Review," https://tcadp.org/wp-

content/uploads/2018/12/Texas-Death-Penalty-Developments-in-2018.pdf (last visited June 11,

2020).  In the past five years, more than 70% of death sentences in Texas were imposed on

people of color.  *Id.*

Prosecutors in Harris County, lacking the necessary guidance to ensure that the death

penalty is fairly administered, have, at times, pursued capital punishment against Hispanic men,

such as Mr. Cole, at a rate as high as four times that of white men, accounting for similar

aggravating factors.  *See* Ray Paternoster, "Racial Disparity in the Case of Duane Edward Buck,"

at 6 (Dec. 28, 2012), https://www.naacpldf.org/wp-content/uploads/Duane-Buck-FINAL-Signed-

Paternoster-Report-00032221-1.pdf (Paternoster's study relied on data from over 500 defendants

indicted for capital murder in Harris County).  Statistics demonstrate that the Harris County

District Attorney's Office, an office that has not sought the death penalty against a white

defendant whose crime was initially charged after 2004, lacks a constitutionally narrow method

for determining which cases are prosecuted as capital or non-capital offenses.

**B.**    **Texas's Pursuit of the Death Penalty is Disproportionately Centered in Harris County.**

The influence of geographical factors within Texas's capital punishment system has

undermined the Supreme Court's expectation that this system would be an "evenhanded,

rational, and consistent" one.  *See Jurek*, 428 U.S. at 276.  In the post-*Furman* era, Texas has

executed more defendants than any other state, over 569 individuals.  TDCJ, *Death Row

Information: Death Row Facts*, https://www.tdcj.texas.gov/death_row/dr_facts.html (last visited

June 11, 2020); Death Penalty Info. Ctr., *State by State Database*,

https://deathpenaltyinfo.org/state-and-federal-info/state-by-state/texas (last visited June 11,

2020).  A significant percentage of United States death-sentenced prisoners are from Harris

County, Texas.  More than half of the counties in Texas have never sent someone to death row.

TDCJ, *Death Row Information: Total Number of Offenders Sentenced to Death from Each County*, https://www.tdcj.texas.gov/death_row/dr_number_sentenced_death_county.html (last visited June 11, 2020). Harris County is one of four counties (Bexar, Dallas, Harris, and Tarrant) that account for more than 50% of the offenders currently housed on death row and almost 50% of those who have been executed. *See* TDCJ, *Death Row Information: County of Convictions for Offenders Currently on Death Row*, https://www.tdcj.texas.gov/death_row/dr_county_ conviction_offenders.html (last visited June 11, 2020); TDCJ, *Death Row Information: County of Conviction for Executed Offenders*, https://www.tdcj.texas.gov/death_row/dr_county_ conviction_executed.html (last visited June 11, 2020).

Since 1976, nearly one-third of all prisoners condemned to death in Texas were from Harris County; nearly one-quarter of all prisoners executed in Texas were from Harris County; and one-third of the prisoners currently on Texas's death row are from Harris County. *See* TDCJ, *Death Row Information: County of Convictions for Offenders Currently on Death Row*, https://www.tdcj.texas.gov/death_row/dr_county_conviction_offenders.html (last visited June 11, 2020); TDCJ, *Death Row Information: County of Conviction for Executed Offenders*, https://www.tdcj.texas.gov/death_row/dr_county_conviction_executed.html (last visited June 11, 2020); Tex. Dep't of Criminal Justice, *Death Row Information: Number of Offenders Sentenced to Death from Each County*, https://www.tdcj.texas.gov/death_row/dr_number_sentenced_ death_county.html (last visited June 11, 2020).

The geographic disparity of capital punishment in Harris County and in Texas indicates that prosecutorial discretion has not led to consistent and rational application of the law, which is a fundamental requirement of our system of justice. *Marbury v. Madison*, 5 U.S. 137, 163 (1803) ("The government of the United States has been emphatically termed a government of

laws, and not of men."); *see Glossip v. Gross*, 135 S. Ct. 2726, 2761 (2015) (Breyer, J.,

dissenting) (recognizing that intrastate "[g]eography also plays an important role in determining

who is sentenced to death" and that the research showing this "county-by-county" disparity

"suggests that the death penalty is imposed arbitrarily"); *Reed v. Louisiana*, 137 S. Ct. 787

(2017) (Mem) (Breyer, J., dissenting from the denial of certiorari) (referring to Louisiana county

that "has apparently sentenced more people to death per capita than any other county in the

United States," in finding: "The arbitrary role that geography plays in the imposition of the death

penalty, along with the other serious problems I have previously described, has led me to

conclude that the that the Court should consider the basic question of the death penalty's

constitutionality.").

C.    **Mr. Cole's Death Sentence Was Unconstitutional Because It Was Imposed on the Basis of Race.**

There have been two major studies of the impact of race in capital cases in Harris

County, Texas.  A study published in 2008 examined "whether race influenced the District

Attorney's (DA) decision to pursue a death trial or the jury's decision to impose a death sentence

against adult defendants indicted for capital murder in Harris County, Texas from 1992 to 1999,"

under District Attorney Johnny Holmes.  Scott Phillips, *Racial Disparities in the Capital of

Capital Punishment*, 45 Hous. L. Rev. 807, 809 (Summer 2008) (hereinafter "Phillips/Holmes

Report").  A 2012 study reviewed the imposition of the death penalty in Houston between 2001

and 2008 under District Attorney Charles Rosenthal.  Phillips/Rosenthal Report.  Both studies

revealed significant racial disparities in the administration of the death penalty in Harris County.

From 1992 until 1999, the District Attorney sought the death penalty against minority and

"white defendants at the same rate despite the fact that [minority] defendants committed murders

that were less serious" or aggravated.  Phillips/Holmes Report at 833-34.  The office also sought

the death penalty more frequently when victims were white despite "the fact that minority victims were killed in more serious murders with multiple victims." *Id.* at 834. Finally, minority defendants were more likely to receive the death penalty. *Id.* at 838.

Likewise, a study of Harris County from 2001 to 2008 revealed that race continued to impact death penalty proceedings. The District Attorney's Office was 2.5 times as likely to pursue the death penalty if the victim were white and five times as likely to seek the death penalty if the victim were a white woman when compared to similarly-situated victims of different races. Phillips/Rosenthal Report at 131-32.

Mr. Cole was prosecuted less than three years after the second study of the Harris County District Attorney's Office was published. The pervasive influence of racial bias on Harris County's charging decisions prejudiced Mr. Cole's proceedings and led to an arbitrary and capricious administration of the death penalty, in violation of the Eighth Amendment to the United States Constitution.

The Harris County District Attorney's Office's decision to prosecute Mr. Cole for capital murder was based on "an unjustifiable standard such as race . . . or other arbitrary classification," in violation of Mr. Cole's due process rights under the Fifth Amendment. *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *United States v. Batchelder*, 442 U.S. 114, 125 (1979)).

In 2010, there were thirty-five family violence deaths in Harris County and 142 family violence deaths in Texas. But for the race of the defendant, Mr. Cole's case is indistinguishable from others for which the death penalty was not sought in Texas and in Harris County. For example, Richard Glenn Harris, a forty-eight-year-old white man, murdered his former girlfriend, her sister, and a friend in January 2010 in Harris County. *See* A519-21 (Criminal

162

Complaint, *Texas v. Harris*, No. 126570101010-3, Harris County District Court); *Victim's Former Boyfriend Charged in Triple Homicide*, Hous. Chron. (June 4, 2010), https://www.chron.com/news/houston-texas/article/Victim-s-former-boyfriend-charged-in-triple-1623058.php (last visited June 11, 2020).  Like Mr. Cole, Mr. Harris had previous instances of domestic violence, and in addition, he was convicted of assault on a family member the year before the incident occurred. *See Victim's Former Boyfriend*, *supra*.  The Harris County District Attorney's Office allowed Mr. Harris to take a plea; he was sentenced to life in prison without parole.  Likewise, in May of 2010, Michael McDougall, a thirty-seven-year-old white man, shot his six-month pregnant wife in front of the couple's three children, aged two, four, and eight, in Harris County, because "she had it coming."  *See* Kelean Oliver, *She Had It Coming*, CBS News (May 17, 2010), https://www.cbsnews.com/news/she-had-it-coming-police-say-wife-killer-proclaimed-michael-mcdougall-charged-with-murdering-pregnant-wife (last visited June 11, 2020).  Again, the Harris County District Attorney's Office allowed Mr. McDougall to plead guilty and he received a life sentence.  *See* A522 (Criminal Complaint, *Texas v. McDougall*, No. 134332501010-3, Harris County Criminal District Court).

In both of these cases, the defendants were similar in age, offense, and background to Mr. Cole.  The only ascertainable difference was race—the other two defendants were white and Mr. Cole is Latino.

In the last fourteen years, the Harris County District Attorney's office has not sought the death penalty in any new cases with white defendants.  *See* TDCJ, *Death Row Information: Offenders on Death Row*, https://www.tdcj.state.tx.us/death_row/-dr_offenders_on_dr.html (last visited Feb. 5, 2019).  Over the same interval, the district attorney pursued the death penalty against twenty-three black and Hispanic defendants, and eighteen of those defendants, including

Mr. Cole, were sentenced to death. *Id.* From 2004 until 2014, at least twenty-eight white defendants were convicted of capital murder in Harris County. Each of these defendants received life sentences.

Harris County, Texas, has participated in the persistent use of race to determine which defendants receive capital punishment. The studies and statistics from the TDCJ demonstrate that the Texas death penalty statute has been directed at a "particular class of persons," violating Mr. Cole's right to equal protection. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886).

### D.     The State Court Opinion

In Mr. Cole's state habeas petition, he argued that the Texas death penalty scheme is unconstitutional because of the racial and geographic disparities in its application. The CCA majority refused to review this claim on its merits because Mr. Cole "failed to raise [it] on direct appeal." *Cole II*, 2017 WL 562725, at *1. In her dissenting opinion, Judge Alcala argued that Mr. Cole's claim was not procedurally defaulted and she therefore "would [have] permit[ed] [Mr. Cole] to litigate his constitutional challenges to his death sentence on the merits" in his state habeas petition. *Id.* at *2-3 (Alcala, J., dissenting). Judge Alcala wrote:

> Although applicant attempted to litigate some of these issues through pretrial motions in the trial court, these types of as-applied challenges to applicant's death sentence are not ripe until after he has been sentenced to death because his trial for capital murder could result in a life-without-parole sentence or a lower punishment on a lesser-included offense. . . . Because a challenge to a defendant's death sentence is not ripe until after he has been sentenced to death, this Court's instant holding places a burden on a capital defendant to object and present evidence supporting his contentions during an extremely short window of time that occurs after the judge imposes a death sentence against him in open court but before the judge enters his written judgment. This places a heavy burden on a defendant's trial counsel to be prepared to assert objections and present evidence establishing . . . [his claim].

*Id.* at *2.

Judge Alcala correctly concluded that Mr. Cole's state habeas petition was his first opportunity to introduce extra-record evidence to support his claim that Texas arbitrarily and capriciously administers the death penalty. Therefore, the state court's procedural default ruling is not adequate to foreclose federal habeas review. To the extent that this issue should have been raised on direct appeal, Mr. Cole received ineffective assistance of appellate counsel. *See Evitts v. Lucey*, 469 U.S. 387 (1985).

Because the state court did not adjudicate the merits of this claim, this Court's review of the merits—once Petitioner has overcome the default ruling by showing that it was inadequate or that there is cause and prejudice for the default—is de novo.

**XV. THE TEXAS DEATH PENALTY STATUTE, WHICH REQUIRES THAT THE COURT AFFIRMATIVELY MISINFORM JURIES ABOUT THE CONSEQUENCE OF ANY NONUNANIMOUS VOTE, WHILE "GAGGING" THE PARTIES AND THE COURT FROM CORRECTING ANY MISAPPREHENSION, FUNCTIONS TO COERCE JURORS INTO UNANIMITY, IN VIOLATION OF THE SIXTH AMENDMENT UNDER *RAMOS V. LOUISIANA*.**

In *Ramos v. Louisiana*, 140 S. Ct. 1390, 1397 (2020), the Supreme Court recognized for the first time unequivocally that "the Sixth Amendment right to a jury trial is 'fundamental to the American scheme of justice' and incorporated against the States under the Fourteenth Amendment," and includes the unqualified right to a unanimous jury.[43] This pronouncement has profound implications for the Texas death penalty statute, *see* Tex. Code Crim. Proc. art. 37.071.

Texas's death penalty statute, with its unique and affirmatively misleading procedures, and almost exclusive focus on future dangerousness, has survived at the margins of the

---

[43] The case spawned a number of opinions and not all of the justices in the majority joined all sections of Justice Gorsuch's opinion. The core holding, that the Sixth Amendment demands unanimity and this rule is applicable to the states under the Fourteenth Amendment, commanded a majority of the Court.

Constitution.[44]  The statute undermines the right to a unanimous jury verdict on predicate special questions (which control the life/death verdict) by establishing arbitrary numerical goals for the jurors before they can end deliberations and affirmatively misleading them on the effect of their decisions, while "gagging" the parties from correcting these falsities.  Texas's death penalty procedures substantially impair the right to a unanimous verdict and cannot be reconciled with *Ramos*.

Mr. Cole's jury had a holdout who later testified before the Texas House of Representatives' Criminal Jurisprudence Committee confirming that she was "the sole juror that gave – or tried to give – life"; that "being the sole juror that was needing to have nine others come to basically [her] side to be able to get to a closed verdict it . . . was probably the most stressful thing that [she] ever went through"; and that she was never "given the opportunity to know that [she] could stand [her] ground on [her] own and hav[e] the law support [her] . . . ." *Hearing on H.B. 3054*, *supra* (testimony of Karyn Paige Gilbeaux).  Mr. Cole is entitled to a new sentencing.

---

[44] The task of monitoring Texas's administration of its death penalty has consumed much of the Supreme Court's docket through the years.  *See, e.g.*, *Moore v. Texas* (*Moore I*), 137 S. Ct. 1039, 1051-53 (2017) (reversing the CCA for its use of non-clinical criteria to evaluate a defendant's claim of intellectual disability, in violation of *Atkins v. Virginia*, 536 U.S. 304, 321 (2002)); *Moore v. Texas* (*Moore II*), 139 S. Ct. 666, 667 (2019) (per curiam) (reversing the CCA, which utilized the same methods that the Court had rejected in *Moore I*); *Penry v. Lynaugh* (*Penry I*), 492 U.S. 302, 303, 317-19 (1989) (holding that Texas jury instructions failed to allow for adequate consideration of mitigating evidence of intellectual disabilities); *Penry v. Johnson* (*Penry II*), 532 U.S. 782, 797 (2001) (holding that an additional jury instruction did not cure the error in *Penry I*); *Smith v. Texas* (*Smith I*), 543 U.S. 37, 38, 48 (2004) (again rebuking the state for failing to comply with the Supreme Court's decision in *Penry I*); *Smith v. Texas* (*Smith II*), 550 U.S. 297, 300 (2007) (rejecting a decision which used an improper standard to reach the same result that the Court had reversed in *Smith I*); *Tennard v. Dretke*, 542 U.S. 274, 283, 287 (2004) (again rejecting the State's evasion of *Penry I* and the Fifth Circuit's failure to adhere to COA standards established in *Miller El I*).

### A.    Texas's Death Penalty Statute

As explained in Claim VIII, under Texas's unique death penalty scheme, the jury must consider special issues before a death sentence can be imposed.  The first special issue is about future dangerousness.  *See* Tex. Code Crim. Proc. art. 37.071(2)(b)(1).  If the jury unanimously answers "yes," the jury must then answer the "mitigation" issue: "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed."  Art. 37.071(2)(e)(1).  If the jury unanimously answers "no," then the defendant is sentenced to death.  Art. 37.071(2)(g).

But the statute has a further requirement, unique to Texas; the jury is instructed that it must have at least 10 "no" votes to answer "no" on the future dangerousness special issue, and conversely at least 10 "yes" votes to answer "yes" on the mitigation special issue, with either outcome resulting in a life sentence, not death.  *Id.*  If the jury responds "yes" to the future dangerousness issue and "no" to the mitigation issue, the presiding judge must sentence the defendant to death.  Any other mix of "yes" or "no" responses requires the judge to impose a sentence of life in prison without the possibility of parole.  Additionally under Texas law the defendant is also sentenced to life in prison without the possibility of parole if the jury is unable to respond "yes" or "no" to any of the sentencing issues.  However, although a single holdout can prevent a verdict of death, Texas law expressly prohibits informing the jury of the effect of a failure to agree on the special issues.  Art. 37.071(2)(a)(1) ("The court, the attorney representing the state, the defendant, or the defendant's counsel may not inform a juror or a prospective juror

167

of the effect of a failure of a jury to agree on issues submitted under subsection (c) or (e) of this article.").

The potential quagmire for juries seeking to navigate this unusual scheme has long been recognized.  In *Draughon v. State*, 831 S.W.2d 331, 337 (Tex. Crim. App. 1992), the court recognized as constitutionally suspect, "the danger that jurors, unaware of the operation of the law, might mistakenly think a sentence other than death to be impossible unless ten of them agree."  The court conceded that it was "past serious dispute" that the 10-12 rule is "uncommonly enigmatic" because the failure of even one juror to agree with the group would result, not in a hung jury, but in an automatic sentence of life without parole, yet Texas capital "jurors don't know this."  *Id*.

Despite its artificial, unbalanced, and confusing rules, and the requirement that the jury be affirmatively misled, the statute has survived constitutional attacks, made almost exclusively under the Eighth and Fourteenth Amendments.  *See, e.g.*, *Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir. 2000); *but see* Claim VIII, *supra*.[45]

### B.    *Ramos v. Louisiana*

The Supreme Court has now recognized that "the Sixth Amendment right to a jury trial is 'fundamental to the American scheme of justice' and incorporated against the States under the

---

[45] Comparable claims invoking the Sixth Amendment largely failed to develop discrete grounds for relief.  *Davila v. Stephens*, No. 4:13-CV-506-O, 2015 WL 1808689, at *29 (N.D. Tex. Apr. 21, 2015) ("Davila appears to extend the [Sixth Amendment] arguments advanced with respect to the Eighth Amendment to the instant argument.  Davila fails to offer any new case law or arguments apart from those that he previously offered."); *Martin v. State*, No. AP-76,317, 2012 WL 5358862, at *19 (Tex. Crim. App. Oct. 31, 2012) ("Appellant presents no argument or authority applying the Sixth Amendment to this provision of Article 37.071; therefore, this issue is inadequately briefed."); *Garza v. State*, No. AP-75,217, 2008 WL 1914673, at *10 (Tex. Crim. App. Apr. 30, 2008) (rejecting claim that statute violated right to "fair and impartial jury and effective assistance of counsel under the Sixth Amendment").

Fourteenth Amendment." *Ramos*, 140 S. Ct. at 1397.  And because "the Sixth Amendment's right to a jury trial requires a unanimous verdict to support a conviction in federal court, it requires no less in state court."  *Id*.  At issue in *Ramos* was the right to a unanimous jury verdict in criminal cases.  Specifically in question was the practice in Louisiana (and Oregon) of permitting criminal convictions on the basis of less-than-unanimous jury verdicts.  The verdict at issue in *Ramos* was 10-2 in favor of conviction.  The Court held the practice unconstitutional and in so doing abrogated its earlier opinion in *Apodaca v. Oregon*, 406 U.S. 404 (1972).

Justice Gorsuch wrote the plurality opinion in *Ramos*.  He noted that the *Apodaca* opinion had taken a "functionalist approach" to the jury-unanimity question by engaging in a cost-benefit analysis:

> [In *Apodaca*], four Justices, pursuing the functionalist approach Louisiana espouses, began by describing the "essential" benefit of a jury trial as "the interposition . . . of the commonsense judgment of a group of laymen" between the defendant and the possibility of an "overzealous prosecutor."  And measured against that muddy yardstick, they quickly concluded that requiring 12 rather than 10 votes to convict offers no meaningful improvement. Meanwhile, these Justices argued, States have good and important reasons for dispensing with unanimity, such as seeking to reduce the rate of hung juries.

140 S. Ct. 1401.

Justice Gorsuch found that the "breezy cost-benefit analysis" that marked the *Apodaca* decision had no place in the Sixth Amendment analysis:

> Our real objection here isn't that the *Apodaca* plurality's cost-benefit analysis was too skimpy.  The deeper problem is that the plurality subjected the ancient guarantee of a unanimous jury verdict to its own functionalist assessment in the first place.  And Louisiana asks us to repeat the error today, just replacing *Apodaca*'s functionalist assessment with our own updated version.  All this overlooks the fact that, at the time of the Sixth Amendment's adoption, the right to trial by jury included a right to a unanimous verdict.  When the American people chose to enshrine that right in the Constitution, they weren't suggesting fruitful topics for future cost-benefit analyses.  They were seeking to ensure that their children's children would enjoy the same hard-won liberty they enjoyed.  As judges, it is not our role to reassess whether the right to a unanimous jury is

> "important enough" to retain.  With humility, we must accept that this right may serve purposes evading our current notice.  We are entrusted to preserve and protect that liberty, not balance it away aided by no more than social statistics.

*Id.* at 1401-02.

Justice Gorsuch's harshest criticism was levied at the pernicious motives of the architects of the scheme:

> Why do Louisiana and Oregon allow nonunanimous convictions? Though it's hard to say why these laws persist, their origins are clear. Louisiana first endorsed nonunanimous verdicts for serious crimes at a constitutional convention in 1898.  According to one committee chairman, the avowed purpose of that convention was to "establish the supremacy of the white race," and the resulting document included many of the trappings of the Jim Crow era: a poll tax, a combined literacy and property ownership test, and a grandfather clause that in practice exempted white residents from the most onerous of these requirements.
>
> Nor was it only the prospect of African-Americans voting that concerned the delegates. Just a week before the convention, the U. S. Senate passed a resolution calling for an investigation into whether Louisiana was systemically excluding African-Americans from juries.  Seeking to avoid unwanted national attention, and aware that this Court would strike down any policy of overt discrimination against African-American jurors as a violation of the Fourteenth Amendment, the delegates sought to undermine African-American participation on juries in another way. With a careful eye on racial demographics, the convention delegates sculpted a "facially race-neutral" rule permitting 10-to-2 verdicts in order "to ensure that African-American juror service would be meaningless."

*Id.* at 1394 (internal citations and footnotes omitted).

**C.** **The Texas Death Penalty Statute, Which Affirmatively Misleads Jurors About the Consequences of Their Vote, While Preventing Correction of Any Misapprehension, Functions to Coerce Jurors into Unanimity, and Cannot Be Reconciled with *Ramos*.**

A necessary corollary to the unqualified right to a unanimous jury verdict is that any procedures that unduly diminish this right are also unconstitutional.  This proposition should not be controversial. For example, the right to counsel would mean little without a guarantee that counsel perform effectively.  *Strickland*, 466 U.S. at 686.  The right to a jury verdict based on proof beyond a reasonable doubt would mean little if key fact-finding was reserved to the judge

rather than a jury. *Apprendi*, 530 U.S. at 490. The right to an unbiased jury would mean little if racial animus was allowed to take root in the deliberation room. *Buck*, 137 S. Ct. at 776. And so the right to a unanimous jury would also ring empty if a state's procedures unduly diminish that right, as Texas's do.

The material misrepresentations and omissions in the mandatory jury instructions encourage jurors who doubt whether the defendant is a future danger and who favor a life sentence to abandon their conscientiously held positions in the false belief that further deliberations would be futile, thus putting a thumb on the unanimity scale. *See, e.g.*, *Hearing on H.B. 3054*, *supra* (testimony of Karyn Paige Gilbeaux) ("I felt that the defendant was the epitome of life in prison with no parole. . . . And I felt that he was harmful to no one other than himself."). This violates the Sixth Amendment under *Ramos*.

> ### 1. The unique and peculiar way Texas channels the discretion of capital jurors.

Texas jurors are never explicitly instructed to decide whether the defendant should be given a death sentence or a sentence of life in prison without the possibility of parole; they are only asked to give "yes" or "no" answers to the statutory special issues. Art. 37.071 §§ 2 (c), (d)(2), (f)(1)-(2). The statute explains, "If the jury . . . is unable to answer any issue . . . the court shall sentence the defendant to . . . life imprisonment without parole." *Id.* § 2(g). But critically, the jury is not told this information, i.e., the consequence of failing to agree. Instead of giving jurors the information they need to be able to understand the effect of any deadlock, the statute expressly precludes the jury from hearing the truth about the consequences of a failure to achieve unanimity: "The court, the attorney representing the state, the defendant, or the defendant's counsel may not inform a juror or a prospective juror of the effect of a failure of a jury to agree on issues submitted under Subsection (c) or (e) [the special issues]." *Id.*, § 2 (a)(1).

The Texas sentencing statute requires the trial judge to instruct the jury that it "may not answer" the future dangerousness special issue "'yes' unless it agrees unanimously and may not answer any issue 'no' unless 10 or more jurors agree." Conversely, the jury "may not answer" the mitigation special issue "'no' unless it agrees unanimously and may not answer the issue 'yes' unless 10 or more jurors agree." *Id.*, §§ 2(d)(2) & (f)(2). The obvious implication of these confusing instructions is that the law requires a consensus of ten or more jurors to effect a life sentence; that is, the jurors are expressly told that they "may not" answer the issues in any way that would avoid a death sentence unless ten or more jurors agree.

This instruction is at odds with the law. Under Texas law, the effect of a single holdout juror is the same as a consensus of ten jurors:

> If the jury returns a negative finding on any issue submitted under Subsection (b) or an affirmative finding on an issue submitted under Subsection (e) (1) *or is unable to answer any issue submitted* under Subsection (b) or (e), the court shall sentence the defendant to confinement in the Texas Department of Criminal Justice for life imprisonment without parole.

*Id.*, § 2(g) (emphasis added). Therefore, "[a] single juror thus has the power to prevent a death sentence based on his personal view of the mitigation evidence." *Allen v. Stephens*, 805 F.3d 617, 631 (5th Cir. 2015). Yet, the mandatory jury instructions lead jurors to believe that they have to convince at least nine other jurors to vote a certain way to avoid sentencing the defendant to death or causing a mistrial. *Hearing on H.B. 3054*, *supra* (testimony of Karyn Paige Gilbeaux).

## 2. The combined effect of the misleading and inaccurate instructions is to coerce the jury to a unanimous verdict.

The instructions and omissions regarding the effect of jurors holding to their conscientiously held positions functions to distort the deliberation process by creating undue

pressure to reach a verdict, one unsupported by the true measure of juror sentiments, and thus undermines a capital defendant's right to unanimity.

The coercive effect is unavoidable. Jurors are first told that they "shall" answer "yes" or "no" to each issue presented; they are subsequently told that ten or more jurors must be in agreement to give one set of answers and that they must be unanimous to give another. This necessarily raises the question of what happens if the jury, despite being instructed that it must answer each question, is unable to get the necessary votes to give either answer. A few minority jurors favoring life, however firm in their convictions, could well recognize the futility of protracted deliberations toward the numerical cessation point, and thus feel pressured, in the cauldron of the deliberation room, to surrender to the majority.

The risk inherent in procedures that patently misinform the jury becomes outsize in combination with the gag rule. Not only does the statute fail to do everything possible to ensure that decisions regarding life and death do not result from this manufactured confusion, it prohibits clarification by preventing jurors from being informed about the effect of failing to reach the prescribed benchmarks. The statute clearly provides that in the event of a non-answer, the defendant is to receive the same sentence as when there is an actual verdict in favor of life, but the jury is not given an accurate statement of that operative law. This robs the juror of full appreciation of the power of his or her vote. A single vote can compel a life sentence. If a juror is led to believe that his or her vote is meaningless, there is little incentive to resist acquiescing to the majority.

This Court should also be guided by the body of social science that confirms that the Texas procedures engender confusion, are inherently coercive, and risk undermining the reliability of any verdict. Empirical studies have demonstrated that when faced with an

informational vacuum, jurors tend not only to fill the gap with their own misperceptions, but also act on those misperceptions when making decisions. *See, e.g.*, William J. Bowers & Benjamin D. Steiner, *Death by Default: An Empirical Demonstration of False and Forced Choices in Capital Sentencing*, 77 Tex. L. Rev. 605, 670 (1999) ("In every state examined here, capital jurors vastly underestimate the time that convicted first-degree murderers not given the death penalty will stay in prison."); *see also* William J. Bowers & Wanda D. Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing*, 39 Crim. L. Bull. 51, 68, 71, 72-73 (2003). The flaws in the system have prompted scholars in the legal community to urge Texas to amend its procedures. *See generally* Stephen P. Garvey, Sheri Lynn Johnson, and Paul Marcus, *Correcting Deadly Confusion: Responding to Jury Inquiries in Capital Cases*, 85 Cornell L. Rev. 627, 635-37 (2000); Am. Bar Ass'n, *Evaluating Fairness and Accuracy in State Death Penalty Systems: The Texas Capital Punishment Assessment Report—An Analysis of Texas's Death Penalty Laws, Procedures and Practices* 315-16 (2013), http://tidc.texas.gov/media/28375/ tx_complete_reportauthcheckdam.pdf (last visited June 15, 2020).

Misinforming jurors and forcing them to deliberate without knowledge of what happens in the event of a deadlock presents them with a false dilemma. Because the jury is told that a death sentence follows from one set of answers and a life sentence follows from another, a reasonable juror will conclude that the *only* way to get either of these punishments is to answer the questions posed to them with the number of votes indicated in their instructions.   This leaves jurors to speculate as to what would occur should they be unable to provide an answer to the issues. While they might, despite the jury charge, correctly guess that a failure to agree will result in a life sentence, they could just as well conclude that a non-answer will lead to a costly retrial or resentencing proceeding. Worse, an ill-informed jury could believe that a deadlock—its inability

to achieve the requisite consensus under the 10-12 rule—may result in the defendant receiving a sentence less severe than life without possibility of parole. *See Beck v. Alabama*, 447 U.S. 625, 644 (1980) ("It is extremely doubtful that juries will understand the full implications of a mistrial or will have any confidence that their choice of the mistrial option will ultimately lead to the right result."). Jurors acting under this misinformed assumption are saddled with the false belief that if they are unable to gain unanimity for a death sentence or ten or more votes for a life sentence, an unacceptable third option will result. The only way the life-holdouts can be assured the defendant will remain in prison for life is by adhering to the 10-12 rule and convincing the requisite number of their fellow jurors to vote "no" to the future dangerousness issue or "yes" to the mitigation issue. If the artificial deadlock cannot be resolved, acquiescence is the only alternative for an otherwise misinformed juror who honestly believes that a life sentence without parole is the minimum punishment society will tolerate.[46]

---

[46] The Supreme Court has found forcing the jury into such a Hobson's choice can violate the Fourteenth and Eighth Amendments. *Beck*, 447 U.S. at 627. Under Alabama law felony murder is a non-capital lesser included offense of the capital crime of robbery-intentional killing. But, under the statute the judge was specifically prohibited from giving the jury the option of convicting the defendant of a lesser included offense. This presented the jury with the unpalatable choice of either convicting the defendant of the capital crime, even if the facts warranted only conviction of a lesser offense, or acquitting altogether, thus allowing the defendant to escape all retribution. *Id.* at 628-29. The Court noted, "Alabama's failure to afford capital defendants the protection provided by lesser included offense instructions is *unique* in American criminal law." *Id.* at 635 (emphasis added). It concluded, "[I]f the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, Alabama is constitutionally prohibited from withdrawing that option from the jury in a capital case." *Id.* at 638. The interest in ensuring the process does not unfairly force the jury's hand, resulting in an "unwarranted" verdict, is just as compelling under our Sixth Amendment jurisprudence as it is under the Fourteenth and Eighth Amendments.

**D.      The Coercion Inherent in the Texas Death Penalty Statute Creates an Undue Risk that Racial and Ethnic Discrimination Infects Jury Deliberation.**

Protection against invidious discrimination is not the sole province of the equal protection clause.  The right to be free from racial discrimination has been voiced through the Eighth Amendment, *Furman v. Georgia*, 408 U.S. 238, 242 (1972) (Douglas, J., concurring) ("It would seem to be incontestable that the death penalty inflicted on one defendant is 'unusual' if it discriminates against him by reason of his race, religion, wealth, social position, or class, or if it is imposed under a procedure that gives room for the play of such prejudices"), and the due process clause of the Fourteenth Amendment.  *Loving v. Virginia*, 388 U.S. 1, 12 (1967) (state anti-miscegenation statute invalid under both the equal protection and due process clauses).  And the Sixth Amendment is no less a bulwark against this scourge.

The Supreme Court recently addressed the intersection of race and the Sixth Amendment in *Peña-Rodriguez*, 137 S. Ct. at 871.  At issue was the traditional rule that, short of undue extrinsic influence, a jury's verdict may not be impeached. The question was whether the "no impeachment" rule could shield a juror's admitted racial animus from constitutional scrutiny. The Court, relying on the Sixth Amendment, ruled it could not, characterizing racial bias as a "familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice."  *Id*. at 868.  The Court was uncompromising in its resolve: "It must become the heritage of our Nation . . . to purge racial prejudice from the administration of justice."  *Id.* at 867.

Likewise, race played no small part in the *Ramos* decision. Justice Gorsuch noted that the convention that led to the Louisiana statute had "all the trappings of the Jim Crow era" and that the Oregon Statute could be "traced to the rise of the Ku Klux Klan."  140 S. Ct. at 1394. Notably, Justice Gorsuch pointed out the drafters of the Louisiana and Oregon statutes were

hoping to dilute the expected inclusion of blacks on future juries (presumably on the assumption they would be reluctant to convict fellow black defendants). *Id.* at 1394 & n.4 (citing Frampton, *The Jim Crow Jury*, 71 Vand. L. Rev. 1593, 1614 (2018) ("Such calls for jury reform sometimes left implied that it was black jurors who wielded 'the one-man power' to thwart convictions; more often it was explicit")). Justice Gorsuch's concerns have strong parallels here. The core teaching of *Ramos* is that the Sixth Amendment requires that every vote must be given full effect. In *Ramos*, the voices of one or two holdouts who harbored a reasonable doubt were nullified.

There is no reason to be confident that the inventors of the 10-12 rule escaped similar influences. The process was a hurried one that ultimately produced a statute that eschewed the weighing process marking the vast majority of the post-*Furman* statutes in favor of the almost exclusive emphasis on "a probability" that the defendant would be a "continuing threat." *See* Eric F. Citron, *Sudden Death: The Legislative History of Future Dangerousness and the Texas Death Penalty*, 25 Yale L. & Pol'y Rev. 143, 144 (2006) ("[F]uture dangerousness arose from a last-minute conference committee compromise that was never debated on the floor of either chamber of the Texas Legislature."). It would be difficult to imagine a more virulent invitation for the pernicious effects of racial discrimination than one that depends on the uncertain prediction of future criminality, rather than the defendant's moral blameworthiness. The enduring stereotype of racial minorities as violent and dangerous finds ready haven in such a framework.[47] Coercion alone is enough to render the statute unconstitutional, but under the

---

[47] Ian F. Haney López, *"A Nation of Minorities": Race, Ethnicity, and Reactionary Colorblindness*, 59 Stan. L. Rev. 985, 1062 (2007) ( "Colorblindness . . . protects and validates as 'not-racism' the actions of intentional discriminators who exercise the smallest modicum of caution as well as, much more significantly, the inertial persistence of entrenched patterns of racial hierarchy."); Robin Walker Sterling, *"Children Are Different": Implicit Bias,*

Texas scheme, as the manufactured pressure to reach unanimity increases, the future dangerousness issue—predicting whether a particular human being of recent acquaintance will react violently to unknown future stressors—provides a thin shield from whim and caprice.  *See* Michael R. Cavanaugh, Marilyn McShane & Frank P. Williams III, *Confronting the Demons of Future Dangerousness*, 2 J. L. & Crim. Just. 47, 47-66 (2014) (collecting research, concluding "While future dangerousness determinations in death penalty cases are used in only a few states, the potential for bias, particularly racial bias, is undeniable").

When a jury is forced beyond the point of legitimate debate, the law invites reliance on illegitimate factors, racial stereotypes chief among them.  The Texas statute incubated in a racially-toxic era and became law with little time to expose its now-patent flaws.  The natural consequence of this morally porous and ill-conceived statute is that the effect of race on Texas's capital punishment system remains unacceptably high.  *See, e.g.*, Deon Brock et al., *Arbitrariness in the Imposition of Death Sentences in Texas: An Analysis of Four Counties by Offense Seriousness, Race of Victim, and Race of Offender*, 28 Am. J. of Crim. L. 43 (2000); Phillips/Rosenthal Report; Phillips/Holmes Report.  As conceived and applied, the statute

---

*Rehabilitation, and the "New" Juvenile Jurisprudence*, 46 Loy. L.A. L. Rev. 1019, 1067 (2013) ("[I]mplicit biases based on racial stereotypes conflate assessments of youth culpability, maturity, sophistication, future dangerousness, and severity of punishment."); William J. Bowers, Benjamin D. Steiner & Marla Sandys, *Death Sentencing in Black and White: An Empirical Analysis of the Role of Jurors' Race and Jury Racial Composition*, 3 U. Pa. J. Const. L. 171, 260 (2001) ("[W]hites more often than blacks see the [black] defendant as likely to be dangerous to society in the future and as likely to get back on the streets if not sentenced to death."); Kathryn Roe Eldridge, *Racial Disparities in the Capital System: Invidious or Accidental*?, 14 Cap. Def. J. 305, 317 (2002) (arguing that jury selection procedures lead African American capital defendants to face juries that are more likely "to sentence [them] to death on the future dangerousness predicate[d] out of subconscious" racial bias); *see also Buck v. Davis*, 137 S. Ct. 759, 776 (2017) (recognizing the "powerful" racial stereotype of black men as "violence prone") (citation omitted).

perches on the brink of offending equal protection;[48] a flaw so exploited by its coercive aspects that it now stands beyond the point of constitutional redemption.

### E. *Ramos v. Louisiana* Requires Petitioner's Death Sentence Be Vacated.

*Ramos* makes clear that however benign the intent of the Texas legislature may have been by "encouraging" unanimity, it does not change the undeniable fact that the procedures impaired Mr. Cole's Sixth Amendment right to a unanimous jury by employing artificial, legally misleading, and ultimately coercive means to achieve this end.  The State's interest in finality must yield to the fundamental right to a unanimous jury embodied by the Sixth Amendment. *Ramos*, 140 S. Ct. at 1402 ("When the American people chose to enshrine that right in the Constitution, they weren't suggesting fruitful topics for future cost-benefit analyses.").

Because the 10-12 rule substantially impairs the Sixth Amendment's strict guarantee of a unanimous verdict, one unfettered by statutory vehicles that function to encourage jurors to capitulate to the death-majority once it is clear the life-jurors cannot achieve the artificial threshold set forth in the statute, it is unconstitutional.  Our robust body of Sixth Amendment jurisprudence concerning the jury's fact-finding role also demonstrates this.  The Supreme Court has been steadfast and uncompromising in ensuring critical fact-finding remains solely the province of the jury, and has not hesitated to declare procedures that hamper this right to be unconstitutional.  For example, in *Apprendi*, 530 U.S. at 490, it held that, other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to the jury and proved beyond a reasonable doubt.  In *Apprendi*, the legitimate tension between the right to a jury determination of facts and the duty of the court to

---

[48] *Washington v. Davis*, 426 U.S. 229, 241 (1976) ("A statute, otherwise neutral on its face, must not be applied so as invidiously to discriminate on the basis of race.").

fashion the appropriate sentence was resolved definitively in favor of giving force to the Sixth Amendment.  In so ruling, the Court specifically remarked on the "*novelty of a legislative scheme* that removes the jury from the determination of a fact that, if found, exposes the criminal defendant to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone."  *Id.* at 482-83 (emphasis added).

The *Apprendi* rule was extended to capital sentencing in *Ring*, 536 U.S. at 589, where the Court held that aggravating circumstances, required for the imposition of the death penalty, are effectively elements of an enhanced crime, and they must therefore be submitted to a jury and proved beyond a reasonable doubt.  *Ring* overturned long-standing precedent in order to give force to the principles announced in *Apprendi*.  *Id.* ("Capital defendants, no less than noncapital defendants, we conclude, are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment.").  There was also recognition, as in *Ramos*, that our Sixth Amendment capital jurisprudence had strayed too far from the founders' intent.  *Id.* at 599 ("If th[e] question had been posed in 1791, when the Sixth Amendment became law . . . the answer would have been clear . . . ." (quoting *Walton v. Arizona*, 497 U.S. 639, 710 (1990) (Stevens, J., dissenting)).  Critically, Texas's death penalty statute (i.e., the 10-12 rule) applies to a jury's finding of the only statutory aggravating factor.  Just as the Court in *Ring* applied *Apprendi*'s beyond-a-reasonable-doubt requirement to a jury's finding of aggravating circumstances, *Ramos*'s unanimity requirement should be applied to the jury's finding of future dangerousness.

Similarly, in *Hurst v. Florida*, 136 S. Ct. 616 (2016), again overruling long-standing precedent, the Court held unconstitutional the Florida death penalty procedure, which provided that, although the jury would make "recommendations," the trial judge ultimately made the

necessary findings to impose the death penalty.  *Id.* at 619 ("We hold this sentencing scheme unconstitutional.  The Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death.  A jury's mere recommendation is not enough.").

The statutes embodying the 10-12 and gag rules place too great a premium on achieving a verdict.  In *Ramos*, Justice Gorsuch spoke of mistrials as the natural, and constitutionally compelled, result when the jury fails to reach unanimity.  140 S. Ct. at 1394 (due to the procedures employed in Louisiana, "instead of the mistrial he would have received almost anywhere else, Mr. Ramos was convicted and sentenced to life in prison").  This criticism applies with equal, if not greater, force to the Texas procedures, which compel deadlocked juries that have faithfully deliberated to the point of uncompromised and conscientious stasis—justifying a life sentence—to nevertheless continue to debate and argue until an artificial numerical goal is reached.  Mistrials are an inevitable cost associated with the American judicial system.  *Arizona v. Washington*, 434 U.S. 497, 509 (1978); *Downum v. United States*, 372 U.S. 734, 736 (1963).  In *Allen v. United States*, 164 U.S. 492, 501 (1896), the Supreme Court found that it was the "duty [of the jurors] to decide the case if they could conscientiously do so" and instructed that jurors "should listen, with a disposition to be convinced, to each other's arguments."  But it affirmed that in the end, "the verdict must be the verdict of each individual juror" and not the result of "mere acquiescence" to fellow jurors.  *Id.*  And "mere acquiescence" is the inevitable result if, as under the Texas procedures, juries are compelled to deliberate with a numerical benchmark as the final whistle, rather than to give force, even if that means a non-verdict, to positions reached after the open-minded and conscientious deliberations the Constitution requires.  A defendant is entitled to a mistrial (in the case of a guilt-phase) if the

deadlock persists after such earnest deliberation, and the State's interest in a final resolution must yield to the clear Sixth Amendment guarantees of a properly reached unanimous verdict.

For several reasons, *Jones v. United States*, 527 U.S. 373, 382 (1999), frequently cited in opinions upholding the Texas scheme, does not preclude relief. There the question was whether the jury must be informed at the sentencing phase of the consequence of a deadlock. Justice Thomas concluded that the Eighth Amendment did not require that the jury be "given any bit of information that might possibly influence an individual juror's voting behavior." *Id.* at 382. First, the concern in *Jones* was whether the lack of all information would lead to arbitrary results, implicating a capital defendant's right to be free of cruel and unusual punishment, rather than, as here, the right to a unanimous verdict. Second, the Court reaffirmed the procedures endorsed in *Allen*, which accommodated the preference for unanimous verdicts while setting forth a standard for the appropriate declaration of a mistrial, just as Mr. Cole advocates here. Third, the Court concluded that in *Jones* the jury was not affirmatively misled, something that, as demonstrated above, cannot be said about the Texas statute at issue.

Rather, Texas procedures extend the process beyond the natural exhaustion of deliberations. As Justice Ginsberg noted in dissent in *Jones*, the obligation of even a single juror, after due deliberation to stand behind his or her reasoned response to the evidence (and not to merely acquiesce to the majority), should not be "a game of 'chicken,' in which life or death turns on the . . . happenstance of whether the particular 'life' jurors or 'death' jurors in each case will be the first to give in, in order to avoid a perceived third sentencing outcome unacceptable to either set of jurors"—i.e., a mistrial. *Jones*, 527 U.S. at 417 (Ginsburg, J., dissenting). *Ramos* controls.

###### F. This Claim Was Previously Unavailable to Petitioner.

This claim was not presented or adjudicated in Petitioner's state habeas proceedings. It arises from the Supreme Court's decision in *Ramos*, which was decided this year. To the extent the claim is deemed procedurally defaulted, the previous unavailability of the claim's legal basis establishes cause to overcome the default. *See* 28 U.S.C. § 2244(b)(2)(a); *see also* § 2244(d)(1)(c).

*Ramos* left open the question of retroactivity. 140 S. Ct. at 1407 ("Nor is the *Teague* question even before us. Whether the right to jury unanimity applies to cases on collateral review is a question for a future case where the parties will have a chance to brief the issue and we will benefit from their adversarial presentation." (citing *Teague v. Lane*, 489 U.S. 288, 311 (1989))). The Supreme Court has now granted certiorari to decide that question. *Edwards v. Vannoy*, No. 19-5807, 2020 WL 2105209 (U.S. May 4, 2020) (granting certiorari to decide "[w]hether this Court's decision in *Ramos v. Louisiana*, 590 U.S. —— (2020), applies retroactively to cases on federal collateral review").

The right to a unanimous verdict can be considered no less than a watershed rule. *Ramos* itself answers that question by emphasizing the fundamental role the Sixth Amendment has played in our history. 140 S. Ct. at 1397 ("[T]he Sixth Amendment right to a jury trial is 'fundamental to the American scheme of justice' and incorporated against the States under the Fourteenth Amendment."). As Justice Gorsuch noted, unanimity has been integral to this right since its adoption. *Id.* Because *Ramos* is a new interpretation of the United States Constitution, extending the rights guaranteed under the Sixth Amendment to the states, the decision is a watershed rule of fundamental fairness, and should be applied retroactively. The right is every bit as fundamental as the Sixth Amendment right to counsel for indigent defendants. *See Saffle*

*v. Parks*, 494 U.S. 484, 495 (1990) (suggesting that *Gideon v. Wainwright*, 372 U.S. 335 (1963) represented a watershed rule).  There can be no legitimate debate that the right to a unanimous jury, and its extension to the states, announced in *Ramos*, "constitute[s] a previously unrecognized bedrock procedural element that is essential to the fairness of a proceeding." *Whorton v. Bockting*, 549 U.S. 406, 421 (2007).

Given this claim is potentially unexhausted, Mr. Cole reserves the right to file a motion seeking to stay and abey these proceedings in order to exhaust this claim in state court.

## XVI. THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS DESCRIBED HEREIN AT BOTH THE GUILT PHASE AND THE PENALTY PHASE DENIED PETITIONER DUE PROCESS OF LAW AND THE EFFECTIVE ASSISTANCE OF COUNSEL.

The errors set forth in this pleading each independently entitle Mr. Cole to relief.  Should this Court disagree, it should proceed to analyze the cumulative prejudicial impact of the errors set forth herein.  Petitioner is entitled to relief under this analysis because the cumulative effect of these errors was to deny him a fair trial.  Courts have long recognized that constitutional claims of error are to be considered cumulatively as well as individually, and that cumulative error or prejudice may provide a basis for relief whether or not the effect of individual errors warrants relief.  *See, e.g.*, *Kyles v. Whitley,* 514 U.S. 419, 437-38 (1995) (cumulative prejudice from state's failure to reveal multiple pieces of exculpatory evidence undermined fairness of trial and entitled defendant to relief); *Strickland*, 466 U.S. at 694 (prejudice assessed from effect of "counsel's unprofessional errors"); *Taylor v. Kentucky*, 436 U.S. 478, 488 (1978) (cumulative prejudicial effect of prosecutor's misstatements and improper jury instructions undermined fairness of trial, necessitating relief); *Derden v. McNeel*, 978 F.2d 1453, 1456 (5th Cir. 1992).

The cumulative effect of the several constitutional violations of Mr. Cole's right to effective assistance of counsel and due process of law under the Fifth, Sixth, Eighth, and Fourteenth Amendments warrants habeas relief.  Among the violations described herein are:

- Trial counsel ineffectively failed to fully investigate and accurately present Piero Cole's life history of trauma at the punishment phase of his capital trial;

- Trial counsel were ineffective for failing to discover evidence of brain damage and neurotoxin exposure;

- Trial counsel were ineffective for failing to adequately develop and present reliable evidence that Petitioner would not be a future danger to society;

- Trial counsel were ineffective for failing to object to the state's unconstitutional use of peremptory strikes to remove minority prospective jurors in violation of Petitioner's constitutional rights;

- The admission of Petitioner's statements violated his Fifth, Sixth, and Fourteenth Amendment rights;

- Mr. Cole's Sixth Amendment rights were violated where the jury considered extraneous information and used that information as a basis to sentence him to death; and

- Petitioner's Eighth and Fourteenth Amendment rights were violated when the jury considered evidence regarding crimes of other inmates to determine Petitioner's future dangerousness.

The circumstances of this case demonstrate that the cumulative effect of counsel's serious failures, and the constitutional errors committed by the trial court, so undermined the fairness of the trial that Petitioner's sentence and conviction cannot stand.  Collectively these errors denied Petitioner his right to due process of law and his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  Relief is warranted.

## REQUEST FOR RELIEF

Wherefore, based on the foregoing, Petitioner respectfully requests that the Court grant him the following relief:

(1)     Such discovery as is necessary for full and fair resolution of the claims contained in this Petition;

(2)     An evidentiary hearing on all claims involving disputed issues of fact;

(3)     Should it assist the Court, a status conference to discuss the timing of the above;

(4)     An order holding in abeyance the federal proceedings should the Court deem it appropriate for Petitioner to first exhaust Claim XV in state court; and

(5)     A Writ of Habeas Corpus to vacate Petitioner's convictions and sentences.

Respectfully submitted,

/s/ Shawn Nolan
Shawn Nolan
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West, The Curtis Center
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520

Dated: June 15, 2020

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I served the foregoing on the following person by ECF

filing:

Cara Hanna
Assistant Attorney General
Office of the Attorney General of Texas
Post Office Box 12548, Capitol Station
Austin, Texas 78711-2548


/s/ Shawn Nolan
Shawn Nolan

Dated: June 15, 2020