United States District Court
Southern District of Texas
**ENTERED**
September 07, 2021
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JAIME PIERO COLE, | § | |
| | § | |
| *Petitioner*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:17-cv-940 |
| | § | |
| BOBBY LUMPKIN, Director, Texas | § | |
| Department of Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| *Respondent*. | § | |

## MEMORANDUM AND ORDER

In 2011, a Texas jury convicted Jaime Piero Cole of capital murder for killing his estranged wife and 15-year-old stepdaughter. The jury's answers to the Texas special issue questions required a death sentence. After unsuccessfully seeking Texas appellate and habeas remedies, Cole petitioned for federal habeas corpus relief and moved for discovery (Docket Entry No. 71) and a stay to wait for more favorable Supreme Court case law. (Docket Entry No. 77). Respondent Bobby Lumpkin moved for summary judgment, and Cole replied. (Docket Entries Nos. 67, 82). After considering the record, the parties' arguments, and the applicable law, including the Anti-Terrorism and Effective Death Penalty Act standards, the court denies Cole's requests to stay and for discovery and grants the motion for summary judgment. Because Cole has not made the necessary showing, no certificate of appealability is issued.

The reasons for these rulings are set out below.

## BACKGROUND

The facts of this case are simple. In January 2010, Cole's wife moved out of their house, taking their two young sons and her daughter from a prior relationship. On February 3, 2010, Cole purchased a new firearm. The next day, Cole took his sons out for dinner. When he returned them

to his wife's apartment, Cole and his wife began arguing.  After moving their argument outside, Cole suddenly drew his new gun and shot his wife several times.  Cole reentered the apartment, chased his stepdaughter into her bedroom, and shot her.  Cole turned his gun on a visiting niece and fired, but had apparently run out of bullets.

Cole fled with his two-year-old son.  Police officers arrested Cole at a Wal-Mart in Wharton County, where he had just purchased 100 rounds of ammunition and diapers.  Cole would later make inculpatory statements to the police in both Wharton and Harris Counties.

The State of Texas charged Cole with capital murder for the shooting deaths of his wife and stepdaughter during the same criminal transaction.  *See* Tex. Penal Code § 19.03(a)(7)(A). Cole stood trial in the 230th District Court of Harris County under Cause No. 1250754, the Honorable Judge Belinda Hill presiding.  The trial court appointed Robert Loper and Jerald Graber to represent Cole at trial.

Defense trial counsel faced a difficult challenge.  Cole had confessed to police officers, making statements suggesting that he intended to commit the murders.  Both Cole's older son and his niece would testify about his actions.  Trial counsel made vigorous efforts to defend Cole, retaining a fact and a mitigation investigator.  Counsel also consulted with expert witnesses on topics such as confessions, mental health, addiction, and future dangerousness.   State Habeas Record at 519-21.  In the end, counsel based Cole's defense on arguing that he was guilty of a lesser offense than first-degree capital murder because "it was a crime of passion. The emotions were high. It was a highly-charged instance." 20 RR 95.[1]  The jury found Cole guilty of capital murder.

---

[1]      The respondent has submitted copies of the state court record, including pre-trial hearings, the trial proceedings, the Clerk's record, appellate records, and the state habeas papers.  (Docket Entry Nos. 6,7, 80).  To preserve continuity with the state court record, the court will cite to the trial court reporter's record as __ R.R. __; the papers from the trial motions practice Clerk's Record at __; the state habeas proceedings

Texas law determines a capital defendant's punishment in a separate sentencing hearing. The jury was asked two special issue questions: (1) would Cole pose a future threat to society; and (2) did mitigating circumstances warrant a life sentence? Tex. Code Crim. Pro. art. 37.071(b)(1)-(2), (e)(1). The State based its case for a death sentence both on the viciousness of Cole's crime and on his past violent behavior. The State told jurors about Cole's past arrests for public intoxication and disorderly conduct. The State called various witnesses to testify about Cole's history of violence, particularly toward women. The testimony showed that Cole had choked one former girlfriend and had been repeatedly violent toward another former girlfriend, including by punching her in the stomach when she was pregnant with his child and putting a shotgun to her head. That incident resulted in aggravated assault charges. Cole and that girlfriend had a daughter, who testified about the physical and sexual abuse she suffered at his hands. Family members testified about Cole's earlier aggression and violence. The State argued that Cole's lawlessness would extend into prison, noting that prison officials had found controlled substances hidden in his cell during pretrial detention.

Defense trial counsel responded with vigorous attempts to show mitigation. Through 14 witnesses, counsel presented evidence of positive aspects of Cole's life and the negative effects of his substance abuse. Defense counsel told jurors about Cole's birth and early years in rural Ecuador. An American couple adopted him and raised him in a loving home. But even with that nurturing environment, Cole missed his mother and felt a sense of loss from not being with her. His early adult years were spent well, working and raising children. His separation from his wife, however, resurrected his feelings of abandonment. He became an alcoholic, which caused him to handle his feelings "inappropriately, absolutely inappropriately." 24 RR 30, 48. Defense counsel

---

as State Habeas Record at __; and the record of the successive state habeas proceedings as Successive State Habeas Record at __.

pleaded with the jurors to find that Cole had acted with passion because of his emotional state, not from cold calculation. Defense counsel took that background and argued that, while Cole deserved punishment for the murders, the "appropriate" penalty would be to "die in prison." 24 RR 42. Defense counsel emphasized that a life sentence would prevent Cole from committing future violence against members of the public. The jury's answers to the special issues resulted in a death sentence.

Cole sought automatic direct review in the Texas Court of Criminal Appeals, raising 17 grounds for relief. The Court of Criminal Appeals found no reversible error in Cole's conviction or sentence. *See Cole v. State*, 2014 WL 2807710 (Tex. Crim. App. 2014).

Under Texas law, a state habeas action proceeds concurrent with the direct appeal. *See* Tex. Code Crim. Pro. art. 11.071 § 4. Attorneys from the Texas Office of Capital and Forensic Writs represented Cole on state habeas review. Cole's state habeas application raised eight grounds for relief. The state habeas court held hearings and considered the affidavits provided by defense trial counsel in deciding his claims. The state habeas court ordered the parties to submit proposed findings of fact and conclusions of law. The lower state habeas court signed the State's findings and conclusions without alteration. "Based upon the trial court's findings and conclusions and [its] own review," the Court of Criminal Appeals denied relief. *Ex parte Cole*, 2017 WL 562725, at *2 (Tex. Crim. App. 2017).

This court appointed counsel to represent Cole throughout the federal habeas corpus process. Cole filed a timely federal petition for a writ of habeas corpus in 2018. (Docket Entry No. 10). Cole's petition included some issues that he had litigated in state court, but he also raised some issues for the first time on federal review. On Cole's motion, the court stayed this case to allow the exhaustion of state court remedies. (Docket Entry No. 49).

4

Cole filed a successive state habeas application. The Court of Criminal Appeals reviewed Cole's submission and, finding that he did not satisfy the requirements for successive state proceedings under Tex. Code Crim. Pro. art. 11.071 § 5, dismissed the habeas action as an abuse of the writ, without considering the merits. *Ex parte Cole*, 2020 WL 1542118, at *1 (Tex. Crim. App. 2020).

This court reopened the habeas case and Cole filed an amended habeas petition. (Docket Entries Nos. 54, 57, 58). Cole's amended petition raises the following grounds for relief:

1. Trial counsel was deficient in investigating and presenting mitigating evidence, particularly concerning childhood trauma, alcoholism, unstable interpersonal relationships, and feelings of abandonment.

2. Trial counsel was deficient in investigating and presenting expert testimony concerning substance abuse.

3. Trial counsel failed to investigate and present evidence of Cole's exposure to neurotoxins.

4. Trial counsel was deficient in presenting evidence relating to Cole's future threat to society.

5. Trial counsel was deficient in failing to object to the State's use of peremptory strikes on minority prospective jurors.

6. Trial counsel was deficient in failing to object to statements made by the prosecutor.

7. The jury's consideration of extraneous information violated Cole's Sixth Amendment rights.

8. The trial court violated Cole's rights by not instructing the jury that a vote for life by one juror would result in a life sentence.

9.      The trial court violated Cole's rights by allowing his custodial statements to come before the jury.

10.     The trial court's instructions and the prosecutor's statements limited the jury's ability to consider mitigating evidence.

11.     The special issue questions were vague and undefined.

12.     The first special issue unconstitutionally lowers the State's burden of proof.

13.     Cole's rights were violated when the jury considered evidence regarding crimes committed by other inmates.

14.     Texas arbitrarily administers capital punishment.

15.     The Texas death penalty statute unconstitutionally coerces jurors into unanimity.

16.     The cumulative prejudicial effect of Cole's claims amount to a constitutional violation.

This memorandum and opinion addresses Cole's motion for discovery and motion to stay, and the respondent's motion for summary judgment. The court finds that no evidentiary hearing or other factual development is necessary, because the pleadings, the motions and responses, the record, and the law are an ample basis to resolve the legal issues.

## THE APPLICABLE LEGAL STANDARDS

Federal habeas review is secondary to the state court process and limited in scope. Well-established standards guide what a federal habeas court may consider and how it must consider it. Because states "hold the initial responsibility for vindicating constitutional rights," *Engle v. Isaac*, 456 U.S. 107, 128 (1982), how an inmate litigates his claims determines the course of federal habeas adjudication. Federalism guarantees a state "an initial opportunity to pass upon and correct

alleged violations of its prisoners' federal rights." *Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003) (internal citations and quotations omitted). Under 28 U.S.C. § 2254(b)(1), a federal habeas petition "shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State[.]" The exhaustion doctrine precludes federal consideration of a claim raised for the first time in federal court.

As a corollary to exhaustion, the procedural bar doctrine respects a state court's reliance on its own law. *See Dretke v. Haley*, 541 U.S. 386, 392 (2004); *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997); *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). A federal procedural bar results when the inmate fails to follow well-established state procedural requirements for attacking a conviction or sentence. *See Lambrix*, 520 U.S. at 523; *Coleman*, 501 U.S. at 732. A federal court may review an inmate's unexhausted or procedurally barred claims only if the inmate shows: (1) cause and actual prejudice; or (2) that "a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent[.]'" *Haley*, 541 U.S. at 393 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

If an inmate has presented the federal constitutional claims to the state courts in a procedurally proper manner, and the state courts have adjudicated the merits, AEDPA allows federal review, within certain constraints. Under AEDPA, a federal court cannot grant habeas relief on legal issues that a state court has adjudicated on the merits unless its decision was contrary to, or involved an unreasonable application of, clearly established federal law. *Harrington v. Richter*, 562 U.S. 86, 98-99 (2011); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); 28 U.S.C. §§ 2254(d)(1), (2). A state court decision is contrary to federal precedent if it applies a rule that contradicts the governing law set forth by the Supreme Court, or if it confronts a set of facts that are materially indistinguishable from such a decision and arrives at a result different from Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 7-8 (2002).

A state court unreasonably applies Supreme Court precedent if it unreasonably applies the correct legal rule to the facts of a particular case, unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. *Williams*, 529 U.S. at 409. "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102. "If this standard is difficult to meet, that is because it was meant to be." *Id.*

AEDPA affords deference to a state court's resolution of factual issues.[2]  Under 28 U.S.C. § 2254(d)(2), a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless it is objectively unreasonable in light of the evidence presented in the state court proceeding. *Miller-El v. Cockrell*, 537 U.S. 322, 343 (2003).  A federal habeas court must presume the underlying factual determination of the state court to be correct unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Miller-El*, 537 U.S. at 330-31.  This presumption extends both to the state court's express and implicit fact findings.  *See Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006) (citations omitted).

Summary judgment is proper when the record shows "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

---

[2]      Cole repeatedly argues that the lack of an evidentiary hearing makes the state habeas findings unreasonable and unfair.  AEDPA does not require a state evidentiary hearing before granting deference to state court decisions and findings. *See Gallegos v. Quarterman*, 265 F. App'x 300, 303 (5th Cir. 2008) (observing that "the lack of an evidentiary hearing in state court does not effect the presumption that the state court findings of fact are correct"); *Morrow v. Dretke*, 367 F.3d 309, 315 (5th Cir. 2004) ("The AEDPA requires that we presume correct the habeas court's findings of fact unless the petitioner 'rebuts the presumption of correctness by clear and convincing evidence.' This is so even if the hearing was a 'paper' hearing and may not have been full and fair."); *Bass v. Dretke*, 82 F. App'x 351, 354 (5th Cir. 2003) (stating that "deference to a state habeas court's factual determinations is not dependent upon the quality of the state court's evidentiary hearing").

"As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases," *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000), except that a habeas court must view the summary judge evidence through "the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254.  The general summary judgment standards apply to the extent they do not conflict with AEDPA.  *See Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002) ("[Rule 56] applies only to the extent that it does not conflict with the habeas rules."), *abrogated on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).[3]

## ANALYSIS

## I.   Ineffective Assistance of Counsel (Claims One Through Six)

Cole raises six claims that challenge trial counsel's representation.  The state habeas transcript contains various records that detail counsel's efforts, such as billing records and motions for funding to pursue particular investigations.  State Habeas Record at 517-63.  Both trial attorneys provided affidavits in state courts providing details about the decisions they made in representing Cole.  State Habeas Record at 812-24; 816-17.  The record indicates that trial counsel

---

[3]     Cole argues that this court should not defer to the state habeas court's decision because the lower habeas court signed the state's proposed order without alteration.  Cole concedes that "the Fifth Circuit and the federal district courts in Texas have *sometimes* accorded AEDPA deference to state court factual findings, even where those findings were verbatim adoptions of proposes orders written by the State." (Docket Entry No. 58 at 9).  Cole has not identified an instance in which federal courts have refused to apply AEDPA deference under those circumstances.  In other contexts, the Supreme Court has criticized the "verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citation to the record." *Anderson v. City of Bessemer City*, 470 U.S. 564, 572 (1985); *see also Jefferson v. Upton*, 560 U.S. 284, 294-95 (2010) ("Although we have stated that a court's verbatim adoption of findings of fact prepared by prevailing parties should be treated as findings of the court, we have also criticized that practice.") (quotation omitted). The Supreme Court, however, has not raised that criticism in an AEDPA case, recognizing the deference AEDPA requires. AEDPA does not exempt proposed findings signed by a state court from deference.  The Fifth Circuit has repeatedly rejected the argument that habeas findings adopted verbatim from those submitted by the state are not entitled to deference.  *See Freeney v. Davis*, 737 F. App'x 198, 205-06 (5th Cir. 2018); *Basso v. Stephens*, 555 F. App'x 335, 342, 343 (5th Cir. 2014); *Green v. Thaler*, 699 F.3d 404, 416 n. 8 (5th Cir. 2012).

made intensive efforts to mount a vigorous and competent defense for Cole.  Trial counsel filed over 30 pretrial motions.  Trial counsel litigated a motion to suppress Cole's confessions.  During their pretrial investigation, trial counsel retained and consulted with experts witnesses on topics such as confessions, mental health, addiction, and future dangerousness.  Trial counsel retained the services of two investigators.  State Habeas Record at 519-21.  Trial counsel called 14 witnesses during the penalty phase and vigorously cross-examined the State's witnesses.

Cole, nonetheless, argues that trial counsel's representation fell short of constitutional expectations by failing to: (1) investigate Cole's life history of trauma; (2) present evidence of Cole's substance abuse; (3) investigate Cole's exposure to neurotoxins; (4) investigate evidence of Cole's potential for future violence; (5) object to the State's peremptory strikes against minority prospective jurors; (6) and object when the trial court made statements about automatic appellate review of death sentences.  Each is addressed below under the standards governing constitutionally sufficient representation.

### A.    The *Strickland* Standard and Doubly Deferential Federal Review

 Courts evaluate challenges to an attorney's representation under *Strickland v. Washington*, 466 U.S. 668 (1984).  A criminal defendant's Sixth Amendment rights are "denied when a defense attorney's *performance* falls below an objective standard of reasonableness and thereby *prejudices* the defense."  *Yarborough v. Gentry*, 540 U.S. 1, 3 (2003) (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).  Courts give deference to the decisions trial attorneys make.  A court's review "of counsel's performance must be highly deferential," without "the distorting effects of hindsight."  *Strickland*, 466 U.S. at 689.  Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Burt v. Titlow*, 571 U.S. 12, 21 (2013).  Courts assess "challenged conduct on the facts of the particular case, viewed as of the

time of counsel's conduct[,]" because otherwise "[i]t is all too tempting for a defendant to second-guess counsel's assistance . . . ." *Strickland*, 466 U.S. at 689.  A federal habeas court defers to an attorney's "conscious and informed decision on trial tactics and strategy," allowing for federal relief only when the tactics or strategy are "so ill chosen [as to] permeate[] the entire trial with obvious unfairness." *Cotton v. Cockrell*, 343 F.3d 746, 752-53 (5th Cir. 2003).  The inmate must show both deficient performance and prejudice; "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*

When the state court has adjudicated ineffective assistance claims on the merits, a federal habeas court reviews those claims under the "doubly deferential" standards of both *Strickland* and AEDPA.  *Dunn v. Reeves*, ___ U.S. ___, 141 S. Ct. 2405, 2010 (2021); *Cullen v. Pinholster*, 563 U.S. 170, 190, 202 (2011); *see also Rhoades v. Davis*, 852 F.3d 422, 434 (5th Cir. 2017).  In fact, deference is "near its apex" in such cases.  *Sexton v. Beaudreaux*, 585 U. S. ____, 138 S. Ct. 2555, 2560-61 (2018); *see also Johnson v. Sec'y, DOC*, 643 F.3d 907, 910-11 (11th Cir. 2011) ("Double deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.").

### B.    Failure to Investigate and Present Life History of Trauma (Claim One)

In his first ground for relief, Cole argues that trial counsel should have focused the punishment phase case on his childhood trauma.  As noted, the defense faced a difficult task in the penalty phase.  The jury had already convicted Cole of shooting his wife numerous times and then his teenage stepdaughter.  Texas law allowed the State to present wide-ranging evidence about a defendant's future threat to society.  Within that framework, the State contrasted the love and

security Cole had experienced in his childhood after adoption with his adult rage, aggression, and violence.  Trial counsel responded with 14 punishment witnesses, including a psychotherapist and an expert in addiction and behavioral medicine.  Cole now claims that trial counsel did not do enough to convince jurors that he deserved a life sentence by failing to present the full extent of the trauma he experienced in his life.  Describing the defense "life history outline" as "basic and limited," Cole argues that "[t]he concept of trauma went virtually unmentioned in the penalty phase testimony."  (Docket Entry No. 58 at 49).  Cole argues that "reasonable counsel would have realized that [his] early life was a fertile source of potential mitigation" and should have emphasized "the effects it had on his behavior and psychological health."  (Docket Entry No. 58 at 26, 28).  Cole exhausted this claim of the failure to investigate his childhood trauma on state habeas review.  Using AEDPA's "focus[] on what a state court knew and did," *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011), the court reviews the state court's adjudication of this claim.

> 1.    State Adjudication

On state habeas review, Cole characterized trial counsel's presentation of the punishment phase testimony as "simplistic," "often times incomplete," and "one-dimensional."  State Habeas Record at 56.  Cole argued that his trial counsel's brief interactions with the penalty phase witnesses meant that they could not convey "the gravity of trauma Cole suffered as a result of his adoption and permanent relocation to the United States."  State Habeas Record at 57.  He criticized "[t]he failure of trial counsel to properly investigate and/or prepare their lay witnesses for Cole's trial," which "resulted in an incomplete presentation of the childhood trauma Cole experienced surrounding his adoption and relocation from rural Ecuador to the United States, as well as the economic social and psychological factors that impacted his development."  State Habeas Record at 54.  Relying on affidavits from his biological family members and others, Cole argues that trial

counsel should have called lay witnesses who could have testified about four categories of information:

> (1)     his early childhood involving an absent father and poor, but happy, upbringing in rural Ecuador;

> (2)     the circumstances of his adoption by the Cole family, which caused him distress, largely manifesting itself as problems communicating and inability to sleep alone, which was renewed on a visit to Ecuador two years after moving to the United States;

> (3)     the good home with his adopted family, the lack of any professional treatment to help him deal with any issues from his adoption, and the problems adjusting to American culture; and

> (4)     concerns Cole "grappled with as an adult— the loss of culture and identity as well as the confusion anxiety and depression [he] faced as a result of years of unanswered questions about his adoption."

State Habeas Record at 69-79.[4]   Cole also argues that trial counsel should have presented more information about his life-long alcohol abuse and how he handled stress well at work, but would

---

[4]     On federal review, Cole argues:

> The jury did not hear about how he was abandoned by his biological father and then by a surrogate father; or how he was taken to the United States when he was about eight years old by a woman he had only recently met and who did not speak his language, returned to Ecuador a year later, and then was ripped from his biological mother's arms by the police. Nor did the jury hear expert testimony about how long-lasting such trauma is, or about how his adoptive parents failed to take any steps to alleviate the effects of the trauma on him. Similarly, the jury did not hear about his identity disturbance, or about how the combination of these factors predisposed him to alcohol abuse and eventual dependence. Nor did trial counsel present the jury with evidence that would have explained

13

become sad angry and depressed when things did not go well in his personal life.  State Habeas Record at 79-81.

Second, Cole argues that "counsel's failure to present an expert witness regarding the trauma theory and its impact on an individual's psychological health precluded the jury from hearing a critical explanation by which they could properly evaluate the lay witness testimony." State Habeas Record at 54.  Cole relies primarily on an affidavit from Dr. David Wachtel, a psychologist.  State Habeas Record at 157.  Cole argues that an expert witness such as Dr. Wachtel could have described how Cole's "arrest for the shooting death of his wife and step-daughter are best understood as the highly probable consequence of profound psychological trauma due to ongoing emotional and social experiences beginning in early childhood."  State Habeas Record at 84.  Dr. Wachtel focused his affidavit on how "[t]he forcible removal of [Cole] from his biological mother's arms was a specific and exacerbating traumatic event of profound separation and loss." State Habeas Record at 88.  A Dr. Wachtel-type of witness, Cole argues, would have linked Cole's childhood trauma with his adult impulsivity, difficulties in relationships, depression, anxiety, and substance abuse.  State Habeas Record at 163. This type of witness could have explained that Cole "found himself in a great deal of unidentified and unrecognized pain with no one to understand or acknowledge the depths and complexity of his early life experiences and without the skill set to regulate his behavior."  State Habeas Record at 170.

The state habeas court extensively summarized the punishment phase testimony presented by trial counsel.  State Habeas Record at 773-80.  Both trial attorneys filed affidavits or declarations stating that they "believed that presenting . . . lay witnesses who actually knew Mr.

---

Petitioner's extreme reaction to his wife's departure and request for a divorce.

(Docket Entry No. 58 at 47).

14

Cole was a very effective strategy, rather than using an expert on childhood trauma who did not personally know Cole." State Habeas Record at 813, 817. The state habeas court found that Cole's trial attorneys "made reasonable trial strategy decisions relating to the presentation of evidence, including expert testimony, and elicitation of testimony about [Cole's] life history." State Habeas Record at 782. The state habeas court found that "trial counsel presented essentially the same evidence at trial that the habeas affidavit of Dr. David Wachtel, psychologist, discusses." State Habeas Record at 780. The state habeas court also found "that trial counsel were thorough and effective in counsel's preparation and presentation of expert testimony to provide the jury with an explanation for [Cole's] aberrant behavior at the time of the offense." State Habeas Record at 781. In sum, the state habeas court found that "trial counsel effectively presented a 'full narrative' of [Cole's] life." State Habeas record at 782.

With that background, the state habeas court concluded:

> based on the credible affidavits of trial counsel that counsel and the defense team thoroughly investigated [Cole's] life history that trial counsel presented numerous punishment witnesses who were fully prepared by [Cole] to testify and who fully and accurately presented [Cole's] life history to the jury and that counsel believed that presenting lay witnesses who actually knew [Coel's] life history was more effective than using an expert on childhood trauma who did not personally know [Cole].

State Habeas Record at 781. The state habeas court concluded that Cole "fail[ed] to show ineffective assistance based on counsel allegedly not presenting a thorough picture of [Cole's] life; [Cole] presented essentially the same evidence through fourteen punishment witnesses, including a psychotherapist and an expert in addiction and behavioral medicine, which [Cole] now asserts should have been presented." State Habeas Record at 800.

15

2.      AEDPA Review

Cole must show that the state habeas court decision was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).  Cole disputes the state habeas court finding that his habeas evidence was "essentially the same" as that presented by trial counsel. (Docket Entry No. 58 at 49).  Cole also argues that trial counsel erred in relying on lay witnesses to relay that information without framing the evidence through psychological testimony about trauma.

Cole's arguments about the representation he received fail to acknowledge the evidence his attorneys presented at trial.  While not using the term "trauma," trial counsel presented ample evidence to allow jurors to understand that Cole's adoption was difficult for him and that its effects reverberated into his adulthood.  Trial counsel urged jurors to give "fair consideration to the whole story, from beginning . . . until right now."  24 RR 27.  Trial counsel presented witnesses who described Cole's childhood, focusing both on the love he received from his adoptive parents and how he felt at the separation from his birth mother.  Cole states that "[t]he jury never heard that as a child Mr. Cole lived in extreme poverty in Ecuador," Docket Entry No. 57 at 1, but this ignores the fact that counsel began arguments in the penalty phase by informing the jurors that they were "going to learn about a little boy who was born in the jungles of Ecuador to a very, very poor mother virtually in the jungles of Ecuador."  21 RR 14.

Cole argues in this court that trial counsel did not present evidence that would allow jurors to understand the emotional response he had to his adoption.  He argues that "[t]he jury . . . never heard that Mr. Cole's adoption was an extremely traumatic event: he was ripped from the arms of his mother and brought to a country where he did not speak the language."  (Docket Entry No. 57 at 1).  But trial counsel put on evidence that Cole "carr[ied] that pain" of "being taken away from his real mother . . . with him in his life as a teenager, as a 20-year-old, and as a 30-something-year-

16

old." 24 RR 29.  Despite his adoption by "good people," "Cole carried with him something, some feelings inside of him that affected him about losing . . . his mother."  24 RR 29.  The separation from his wife resurrected those feelings: "He [was] being abandoned by his family, his wife, and he [was] losing that family again."  24 RR 29.  "As a little boy he was separated from his birth mother and now here it is 30 years later his life is literally coming apart.  His wife, two children, it's all falling apart, they are abandoning him."  21 RR 17. "Unfortunately, [Cole] dealt with it in the wrong way."  24 RR 30.

Other attorneys may have approached the penalty phase differently.  Perhaps others would have used experts to put similar information before the jury. This kind of hindsight is not appropriate.  Trial counsel made a strategic decision to use lay witnesses who knew Cole to connect the suffering resulting from his childhood adoption and move from his biological mother and native country to his adult despair at his wife's departure. AEDPA deference and established law requires deference to this type of strategic decision. *See Batiste v. Davis*, 2017 WL 4155461, at *19 (S.D. Tex. 2017) ("Constitutional law does not require that mitigating evidence come through one specific vehicle."); *Ward v. Stephens*, 777 F.3d 250, 264 (5th Cir. 2015) (because "counsel has wide latitude in deciding how best to represent a client," counsel may decide the best manner in which to put information before jurors).[5]

Moreover, trial counsel did put on expert testimony.  Trial counsel included mitigation testimony from Dr. Terry Rustin, a psychiatrist who specializes in addiction and behavioral medicine.  Dr. Rustin testified that Cole experienced an "adjustment disorder" that resulted from

---

[5]         The respondent extensively argues that Cole has not shown *Strickland* prejudice.  The state habeas court did not elaborate on the prejudice prong.  The court, however, notes that "[f]ailure to present more of the same evidence cannot support a finding of prejudice." *Reynoso v. Lumpkin*, ____ F. App'x ___, 2021 WL 3233919, at *2 (5th Cir. 2021).  The record fails to show that more or different expert testimony would have created a reasonable probability of a different result, given the aggravating evidence presented at trial.

his wife's departure.  22 RR 194.  Dr. Rustin explained to jurors that Cole's alcohol dependence, alcoholism, and period of abstinence from alcohol immediately before the shootings, acted with his adjustment disorder to cause lowered inhibitions, diminished coordination, heightened impulsivity, greater aggression, more focused self-centeredness, and poor decision making.  In short, Dr. Rustin explained how substance abuse combined with other issues to lessen Cole's moral blameworthiness.  The state habeas court found that "Dr. Rustin based his testimony on numerous records and reports relevant to [Cole's] case, including a mitigation report from the defense's mitigation expert, Gina Vitale, prescriptions written for [Cole] by Dr. Glenn Orsak as well as medical records from Dr. Orsak, clinical records from therapist Sharon Boyd, a psychological assessment report from Dr. Steve Rubenzer, [Cole's] medical records from the Harris County Jail, and police reports[.]"  State Habeas Record at 771.

This is "not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, or would have been apparent from documents any reasonable attorney would have obtained[.]" *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009).  The state court's rejection of this claim was not contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

### C.    Failure to Investigate and Present Expert Testimony about Substance Abuse for Use in the Guilt/Innocence Phase (Claim Two)

In his second ground for relief, Cole argues that trial counsel ineffectively addressed the effect of various substances on his cognition and behavior at the time of the offense.  In the time leading up to the murders, Cole argues, he abused diet pills containing phentermine and Zoloft. Cole argues that these substances combined with his heavy alcohol use to impair his cognitive

abilities, and that expert testimony about his substance abuse would have shown that he lacked the criminal intent to kill.

Contrary to Cole's arguments, his trial counsel did investigate and present evidence of Cole's substance abuse. Several months before trial, defense counsel retained a forensic psychologist, Dr. Steve Rubenzer, to evaluate Cole. Dr. Rubenzer reported on Cole's extensive history of alcohol use and opined that Cole's substance abuse made him impulsive and unable to anticipate the consequences of his actions. (Docket Entry No. 58 at 58).

Less than a month before the trial began, trial counsel also retained Dr. Terry A. Rustin, a medical doctor who specializes in addiction. Dr. Rustin reviewed numerous records, including a report prepared by the mitigation expert, medical records, a pretrial psychological assessment, jail medical records, and police reports. State Habeas Record at 771. Dr. Rustin also interviewed Cole and conducted a thorough evaluation. State Habeas Record at 771. Dr. Rustin testified in the penalty phase. As summarized on state habeas review, Dr. Rustin:

> . . . testified that [Cole] showed a great deal of denial, which is common in people with addictions; that [Cole] was unable to see and understand how alcohol has affected him; that [Cole] was consuming twelve to twenty-four bottles of beer a day; that [Cole] dealt with all of his problems by using alcohol; that [Cole] dealt with difficulties with his wife and children by retreating into an alcoholic haze; that [Cole] dealt with stress at work by using alcohol; that all of [Cole's] friendships with people were based on using alcohol; and, that [Cole] had no close friends other than alcohol.
>
> Dr. Rustin further testified that the effect of twelve to twenty-four beers a day on a person would be that it would lower a person's inhibitions; that it would make a person more likely to act on impulses; that it would make a person act more aggressively; that it would make a person more self-centered or egocentric; that a person would become less coordinated and less able to make good decisions;

19

and, that a person who drank twelve to twenty-fours
beers a day would be considered an alcoholic.

State Habeas Record at 770-71.

Cole argues that trial counsel should have handled the substance abuse issue differently. Cole argues that trial counsel improperly limited Dr. Rustin's focus to Cole's abuse of alcohol without asking about all the substances Cole took. Cole argues that trial counsel also should have developed information and lay testimony about his substance abuse from family and friends. In essence, Cole argues that trial counsel should have used his substance abuse to raise a question with the jurors about his intent to commit capital murder. Cole argues that trial counsel should have used additional information about his substance abuse in two ways: (1) as a defense in the liability phase to show that he lacked the intent to commit capital murder; and (2) as additional mitigating evidence in the penalty phase.

Cole raised this claim on state habeas review, relying on an affidavit from Dr. William Alexander Morton, an expert in psychopharmacology and psychiatry. Dr. Morton performed a clinical evaluation of Cole, reviewed numerous documents, and read relevant trial testimony. State Habeas Record at 138-55. Dr. Morton's affidavit traced Cole's alcohol use to his early childhood. By his teenage years, Cole drank regularly. As an adult, Cole would drink to excess, frequently consuming 24 beers daily. Cole attempted to stop drinking when his wife left him, but he began again on the day of the murder. By that point, Cole was abusing diet pills to excess. Dr. Morton opined that the alcohol and substance abuse would have compounded impairment of Cole's mental state. At the time of the murders, Cole would have been impulsive, agitated, paranoid, and aggressive. Cole argues that a psycho-pharmacologist would have helped the jury find that Cole "was most likely in an aggressive, survival state" and therefore lacked the intent to commit capital murder. (Docket Entry No. 58 at 63).

The state habeas court rejected this claim.  First, the state habeas court found that Cole's trial counsel made "reasonable trial strategy decisions relating to the presentation of evidence, including expert testimony."  State Habeas Record at 772.  Second, the state habeas court found that trial counsel was not "deficient in the representation of [Cole] or that the presentation of evidence proposed in the instant habeas proceeding would have been any more effective than that elicited by trial counsel."  State Habeas Record at 772.  Third, the state habeas court found unpersuasive Dr. Morton's affidavit opinion that "the testimony from a psycho-pharmacologist would have benefitted the defense by providing an explanation to the jury that [Cole's] impulsivity, agitation, and aggression at the time of the primary offense that stemmed from the combined substances he allegedly ingested would have significantly impaired [Cole's] mental state, including diminishing his ability to make logical decisions."  State Habeas Record at 773.  The state habeas court concluded that Cole had not met *Strickland*'s deficient performance or prejudice prongs.  State Habeas Record at 799.  The record does not show that the Texas court's denial of this claim was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

### 1.   The Liability Phase

Cole asserts that, because trial counsel allegedly did not develop another defense to liability, no strategic reason would justify forgoing a defense that questioned whether substance abuse impaired Cole's intent to kill.  Cole argues that the state court "unreasonabl[y] discount[ed] proffered mitigating evidence."  (Docket Entry No. 58 at 67).  But the record does not show that Cole's trial counsel ignored or failed to present a strong defense for his crime.  As a general matter, Texas law does not allow evidence of voluntary intoxication to negate the specific intent to commit murder.  *See* Tex. Penal Code § 8.04(a); *Thomas v. Lumpkin*, 995 F.3d 432, 452 (5th Cir. 2021).  Cole does not dispute that he voluntarily took the diet pills, Zoloft, and alcohol that allegedly

reduced his mental capacity.  Cole's voluntary abuse of alcohol and diet pills were not a valid defense under Texas law.

Cole's argument hinges on his use of medically prescribed Zoloft, which might have made a defense of involuntary intoxication available.  While "[t]he affirmative defense of involuntary intoxication does not appear in the Texas Penal Code," *Westbrooks v. State*, 2015 WL 10550096, at *3 (Tex.App.-Hous. [14th Dist.], 2015), the Court of Criminal Appeals has recognized involuntary intoxication as an affirmative defense. *See Mendenhall v. State*, 77 S.W.3d 815, 817-18 (Tex. Crim. App. 2002).  Texas law considers the effects of taking a drug under a valid prescription as involuntary intoxication. *Heard v. State*, 887 S.W.2d 94, 98 (Tex. App.–Texarkana 1994, pet. ref'd); *see also Shurbet v. State*, 652 S.W.2d 425, 428 (Tex. App. –Austin 1982, no pet.).

Even so, the record does not show that constitutionally adequate defense counsel would have used expert testimony to present an involuntary intoxication defense.  Texas law has two requirements for an involuntary intoxication affirmative defense: (1) the accused exercised no independent judgment or volition in taking the intoxicant; and (2) as a result of a severe mental disease or defect caused by the involuntary intoxicant, the accused did not know that his conduct was wrong. *See Mendenhall*, 77 S.W.3d at 818; *Torres v. State*, 585 S.W.2d 746, 749 (Tex. Crim. App. 1979).  The fact that Cole bases his claim on prescription use sets another requirement: "Involuntary intoxication by prescription medicine occurs only when the person has no knowledge that the medicine has possibly intoxicating side effects." *Woodman v. State*, 491 S.W.3d 424, 429 (Tex. App.–Hous. [14 Dist.], 2016, pet. ref'd).

Dr. Morton's affidavit and report could have provided a basis for defense counsel to present evidence that "Zoloft can cause initial side effects of increased anxiety restlessness and agitation." State Habeas Record at 58, 148.  Evidence of those side effects, however, would not provide a basis for an involuntary intoxication defense that would make counsel's failure to present such

evidence either deficient performance or prejudicial.  Dr. Morton's testimony about Zoloft, alone or in combination with the other substances Cole took, did not call into question Cole's ability to exercise independent judgment or his knowledge that his conduct was wrong.  Even assuming that Cole was intoxicated when he committed the murders, the record does not show that he could not or did not understand the wrongfulness of his conduct.

In addition, the State presented strong evidence that Cole intended to kill.  Cole bought a gun and brought it to his estranged wife's apartment.  He made statements to the police that he had intended to kill his wife and stepdaughter.  Cole fired his gun into both victims numerous times. Cole has not shown that an impairment defense would have fared better than the throes-of-passion defense trial counsel did present.

The state habeas court reasonably found that Dr. Morton's opinion did not provide a basis for an intoxication defense that made counsel's failure to present such an expert opinion deficient. The record similarly support's the state habeas court's finding that there was no reasonable probability of a different result if counsel had relied on an expert such as Dr. Morton.  Cole has not made a strong showing that, given the evidence in the liability phase, the jury hearing such an expert would have reached a different conclusion about Cole's guilt.  Cole has not shown that the state court's decision was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

## 2.     The Penalty Phase

Cole argues that trial counsel was ineffective in relying on Dr. Rustin alone because he did not discuss "the interaction between alcohol, Zoloft, and stimulants."  (Docket Entry No. 58 at 66). Trial counsel had already put before the jury testimony about impairments Cole suffered from his alcohol abuse.  Additional testimony about the use of other substances would not meaningfully enhance the information that was already before the jurors.  Habeas relief is not available when

the additional mitigation evidence presented on habeas is "largely cumulative and differ[s] from the evidence presented at trial only in detail, not in mitigation thrust." *Villegas v. Quarterman*, 274 F. App'x 378, 384 (5th Cir. 2008).

Cole has not made a strong showing that counsel should have presented additional information about substance abuse or that it would have made a difference in the outcome. Habeas relief is not available on this ground.

### D. The Failure to Investigate and Present Evidence of Exposure to Neurotoxins and Resultant Brain Damage (Claim Three)

Cole argues that trial counsel provided deficient representation by failing to investigate and present evidence of Cole's exposure to neurotoxins and possible resulting brain damage. Cole argues that several red flags should have prompted counsel to seek psychological testing, including that: (1) his parents were cousins; (2) he grew up near Ecuadorian oil fields, which exposed toxins into the environment; (3) he drank alcohol beginning at a young age; and (4) he suffered two serious head injuries as a child. One of the psychologists who examined Cole before trial advised counsel that his possible early exposure to toxins suggested the need for a neuropsychological examination. While trial counsel retained a neuropsychologist a month before trial, that expert performed psychological, not neuropsychological, testing.

Cole did not raise this challenge to trial counsel's handling of neuropsychological testing in his first state habeas proceeding. For the first time on federal review, Cole retained a toxicologist. This expert reviewed his background and opined that Cole had "suffered chronic environmental exposure to neurotoxic and neuro-endocrine disrupting chemicals that are capable of causing brain damage and neuropsychiatric health problems." (Docket Entry No. 58 at 76). Federal counsel also retained a neuropsychologist, who performed tests and determined that Cole

has impaired executive and memory functioning, as well as a learning disability.  (Docket Entry No. 58 at 80).

After the court stayed the case for the exhaustion of state remedies, Cole raised this claim in his successive state habeas application.  The Court of Criminal Appeals applied the Texas abuse-of-the-writ statute, Tex. Code Crim. Pro. 11.071, to this claim, a procedural determination that generally bars federal habeas review.  *See Russell v. Lumpkin*, 827 F. App'x 378, 389 (5th Cir. 2020).  Cole now argues that he can overcome the procedural default of his claim because state habeas counsel performed deficiently by not raising it in his initial habeas action.

1.      *Martinez v. Ryan*

In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court created a narrow exception to the procedural bar doctrine.  The exception "treats ineffective assistance by a prisoner's state postconviction counsel as cause to overcome the default of a single claim."  *Davila v. Davis*, ___ U.S. ___, 137 S. Ct. 2058, 2062 (2017).  A federal habeas petitioner relying on *Martinez* to show ineffective representation by state habeas counsel must make three showings before the court can consider the underlying defaulted *Strickland* claim.  First, the petitioner must show that "his claim of ineffective assistance of counsel at trial is substantial—*i.e.*, has some merit . . . ."  *Cantu v. Davis*, 665 F. App'x 384, 386 (5th Cir. 2016); s*ee also Allen v. Stephens*, 805 F.3d 617, 626 (5th Cir. 2015).  Second, the petitioner must "show that habeas counsel was ineffective" for not raising the underlying *Strickland* claim.  *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013).  In reviewing this issue, the federal habeas court applies *Strickland* to "indulge[s] a strong presumption that [habeas] counsel's conduct falls within the wide range of reasonable professional assistance."  *Strickland*, 466 U.S. at 689.  Federal habeas courts recognize that habeas counsel "'who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.'"  *Vasquez v.*

25

*Stephens*, 597 F. App'x 775, 780 (5th Cir. 2015) (quoting *Smith v. Robbins,* 528 U.S. 259, 288 (2000). To prove ineffective assistance, the petitioner must demonstrate that "'a particular nonfrivolous issue was clearly stronger than issues that counsel did present.'" *Vasquez*, 597 F. App'x at 780 (quoting *Robins*, 528 U.S. at 288).

Third, even after showing cause flowing from habeas counsel's representation, a petitioner must demonstrate "actual prejudice." *Canales v. Stephens*, 765 F.3d 551, 571 (5th Cir. 2014); *see also Martinez*, 566 U.S. at 18 (remanding for an assessment of actual prejudice). The Fifth Circuit has held that, even after showing cause under *Martinez*, a petitioner must show actual prejudice by "establish[ing] not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Hernandez v. Stephens*, 537 F. App'x 531, 542 (5th Cir. 2013); *see also Carrier*, 477 U.S. at 488; *United States v. Frady*, 456 U.S. 152, 170 (1982). At a minimum, actual prejudice under *Martinez* requires the petitioner to show a reasonable probability that he or she would have been granted state habeas relief had his habeas counsel's performance not been deficient. *See Soliz v. Davis*, 750 F. App'x 282, 290 (5th Cir. 2018); *Mamou v. Davis*, 742 F. App'x 820, 828 (5th Cir. 2018); *Barbee v. Davis*, 660 F. App'x 293, 314 (5th Cir. 2016); *Newbury v. Stephens*, 756 F.3d 850, 872 (5th Cir. 2014).

2.      Exposure to Toxins

State habeas counsel provided affidavits explaining why they did not investigate possible brain damage from possible childhood neurotoxin exposure. State habeas counsel hired an expert, neuropsychologist Dr. James Underhill, to examine Cole. Because the results from that expert did not indicate brain dysfunction, state habeas counsel chose not to expend available resources on a toxicologist or similar expert. Successive State Habeas Record at 54-55.

In this court, Cole presents an affidavit from another neuropsychologist, Dr. Daniel Martell. According to Dr. Martell, Dr. Underhill did not score or interpret all the testing he did on Cole. Dr. Martell opines that, properly evaluated, the unscored sections of Dr. Underhill's testimony indicate "specific abnormal brain findings primarily involving frontal lobe/executive functioning, and memory functioning." Successive State Habeas Record at 86.

Cole has not shown that *Martinez* allows him to overcome the procedural bar. Even though trial counsel had several mental health experts evaluate Cole, none diagnosed brain dysfunction. State habeas counsel hired a neuropsychologist, Dr. Underhill. Nothing from Dr. Underhill's evaluation suggested the need for another expert to evaluate Dr. Underhill's own evaluation. *See Green v. Lumpkin*, ___ F. App'x ___, 2021 WL 2786461 *6 (5th Cir. July 2, 2021) (counsel's failure to seek a second expert opinion is unreasonable only "when an expert's evaluation is so clearly deficient or the expert's conclusions so obviously wrong that the shortcomings should be apparent to even defense counsel's untrained eye"). Cole has not shown deficiencies in Dr. Underhill's evaluation that would have been obvious to nonexperts, including his attorneys. "The very fact that an expert opinion is needed to determine whether the defense experts' mental health evaluations were adequate indicates that any deficiency was not so obvious to a lay person that trial counsel's reliance was unreasonable." *Id.* Cole has not shown that habeas counsel was deficient in selecting habeas claims.

Cole also fails to meet *Martinez*'s second prong by showing actual prejudice. Despite spending numerous pages describing the testimony that could have resulted from an investigation into neurotoxin exposure, Cole's arguments for prejudice are cursory and incomplete. Cole summarizes his argument in a way that shows its inadequacy: "[o]rganic brain damage is a highly mitigating condition." (Docket Entry No. 57 at 75). The record does not support a finding that

counsel was deficient in failing to make an argument of Cole's organic brain damage or that, had counsel done so, the outcome would have been different.

Postconviction claims do not exist independent from the trial proceedings.  In the context of claims challenging counsel's representation in the punishment phase of a capital trial, a federal habeas court evaluates the evidence in aggravation against the totality of available mitigating evidence (including the evidence on which the petitioner bases the federal habeas claims).  *See Wong v. Belmontes*, 558 U.S. 15, 20 (2009); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *see also Blanton v. Quarterman*, 543 F.3d 230, 236 (5th Cir. 2008) (a court must "weigh the quality and quantity of the available mitigating evidence, including that presented in post-conviction proceedings, along with . . . any aggravating evidence").  A court must ask if an inmate's new "mitigation evidence is dwarfed by the State's aggravation case." *Reynoso v. Lumpkin*, ___ F. App'x ___, 2021 WL 3233919, at *2 (5th Cir. 2021).

The State based its closing argument on contrasting the mitigating evidence Cole's counsel presented against the strong evidence of Cole's future violence the State presented.  After reviewing the mitigation evidence, the prosecutor argued that the evidence did not "sufficiently mitigate[] against the fact[s]" presented in aggravation.  24 RR 73.  Cole argues how the evidence presented may have mitigated against a death sentence, but he does not address how additional evidence of possible childhood neurotoxin exposure would have likely altered the outcome.

The respondent persuasively argues that "when compared to the . . .  aggravating evidence—excluding the already heinous facts of Cole murdering his wife and stepdaughter in front of his sons and niece—it seems unlikely that any mitigating effect of Cole having somehow been impacted from the toxins to which he was exposed for 7 years in Ecuador before he lived the remainder of his life in the United States would have balanced in favor of a sentence of life[.]"

(Docket Entry No. 67 at 53).  The respondent supports this argument by cataloguing the extensive evidence on which the State based its case for a death sentence.

Cole does not counter the respondent's additional argument that evidence of neurotoxin exposure could have been a "double-edged sword," *Martinez v. Dretke*, 404 F.3d 878, 889 (5th Cir. 2005), because jurors could fear that Cole's asserted impairment meant that he could not control his violent behavior. *See Nelson v. Quarterman*, 472 F.3d 287, 307-08 (5th Cir. 2006). "Presenting evidence of 'organic (i.e., permanent) brain damage,' which is associated with poor impulse control and a violent propensity, would have substantiated the state's evidence and increased the likelihood of a future dangerousness finding." *Martinez*, 404 F.3d at 890.  Simply, jurors "may not be impressed with the idea that to know the cause of viciousness is to excuse it; they may conclude instead that when violent behavior appears to be outside the defendant's power of control, capital punishment is appropriate to incapacitate." *Foster v. Schomig*, 223 F.3d 626, 637 (7th Cir. 2000) (quotation omitted).  Cole cites information that may have raised a possibility of brain damage, but the expert evidence he argues should have been presented does not discuss a concomitant risk of future violence or whether medication or treatment could have reduced it. Cole does not explain any way to soften the aggravating edge of the evidence he blames counsel for not presenting.

In sum, Cole's argument for prejudice goes no farther the conclusory statements that more investigation could have shown brain damage.  (Docket Entry No. 58).  That provides no insight into how neuropsychological testing would have influenced jurors, much less the habeas court. The court finds that Cole's evidence of possible brain damage from neurotoxin exposure would neither (1) create a reasonable probability of a different result or (2) change the result of his habeas proceedings had Cole's initial habeas attorney raised that argument.  The court finds that the record

fails to show either cause or actual prejudice that would overcome a procedural bar under *Martinez* or prove ineffective assistance of trial counsel.

### E.     Failure to Develop Evidence to Show Cole Would Not Be a Future Danger (Claim Four)

Cole argues that trial counsel provided deficient representation relating to his future violence. In the penalty phase, a jury must decide "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code. Crim. Proc. art. 37.071 § 2(b). Trial counsel called Frank Aubuchon, a former Texas corrections officer and expert on the Texas prison classification system, to explain how the constraints of prison life reduce the risk of prison violence. Cole faults counsel for not individualizing the expert testimony. Cole argues that trial counsel should have called an expert who would have made an individualized assessment as to whether Cole himself would be violent in prison.

#### 1.     The Future Dangerousness Special Issue

Texas sentencing law allows the parties in a capital penalty hearing to present "any matter the court deems relevant to sentencing." Tex. Code Crim. Pro. art. 37.07 § 3(a). When considering future dangerousness, "it is essential . . . that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." *Jurek v. Texas*, 428 U.S. 262, 275-76 (1976). The Court of Criminal Appeals has recognized a nonexhaustive list of factors a jury may consider in determining whether a capital defendant sentenced to prison will pose a continuing threat of violence, including:

> 1.    the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties;
>
> 2.    the calculated nature of the defendant's acts;

3.     the forethought and deliberateness exhibited by the crime's execution;

4.     the existence of a prior criminal record, and the severity of the prior crimes;

5.     the defendant's age and personal circumstances at the time of the offense;

6.     whether the defendant was acting under duress or the domination of another at the time of the commission of the offense;

7.     psychiatric evidence; and

8.     character evidence.

*Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987); *see also Walbey v. State*, 926 S.W.2d 307, 311 (Tex. Crim. App. 1996); *Devoe v. State*, 354 S.W.3d 457, 461-62 (Tex. Crim. App. 2011). "Often, the circumstances of the crime provide greater probative evidence of a defendant's probability for committing future acts of violence than any other factor relevant to the future dangerousness special issue." *Dewberry v. State*, 4 S.W.3d 735, 741 (Tex. Crim. App. 1999). "[T]he facts of the offense alone may be sufficient to sustain the jury's finding of future dangerousness." *Martinez v. State*, 327 S.W.3d 727, 730 (Tex. Crim. App. 2010); *see also Fuller v. State*, 253 S.W.3d 220, 231-32 (Tex. Crim. App. 2008); *Sonnier v. State*, 913 S.W.2d 511, 517 (Tex. Crim. App. 1995).

The future-dangerousness focus for an inmate convicted of capital murder is usually in the prison context. *See Speer v. Lumpkin*, 845 F. App'x 345, 350 (5th Cir. 2021); *Perkins v. Quarterman*, 254 F. App'x 366, 371 (5th Cir. 2007). A common strategy for capital defense attorneys is to present general testimony suggesting that the strictures of prison life would lessen an inmate's ability to act violently. *See Milam v. Director*, TDCJ-CID, 2017 WL 3537272, at *25 (E.D. Tex. 2017) (calling a witness to testify about a "prison system's classification and statistics was consistent with the prevailing practice"). Capital defense attorneys often call experts on the prison system to describe the inmate-classification system, provide information about the controls the prison environment places on an inmate's behavior, and explain "the statistical fact that inmates

convicted of capital murder are less likely to commit violent acts." *Freeney v. Stephens*, 2016 WL 320768, at *4 (S.D. Tex. 2016).

### 2.   Trial Counsel's Efforts

Trial counsel relied on Frank Aubuchon, the former corrections officer, to discuss the limited opportunities for violence available to a capital defendant serving a life sentence in TDCJ. Aubuchon reviewed Cole's arrest and incarceration history and testified that Cole would be housed in a restricted status. Aubuchon's testimony was intended to allow jurors to find that Cole's opportunities for violence would be reduced in the prison setting.

This testimony also had risks for the defense. General testimony about the prison classification system opens the door to testimony that violence is prevalent within the prison system. *See Threadgill v. State*, 146 S.W.3d 654, 670-71 (Tex. Crim. App. 2004). On cross-examination, the prosecution questioned Aubuchon about the numbers of serious incidents in prison, including escapes, attempted escapes, sexual assaults, staff assaults, and offender assaults. Cross-examination allowed jurors to see that the prison environment would not prevent Cole from violent acts.

### 3.   Cole's Claim and Procedural Bar

Cole's fourth claim argues that his trial counsel should have called an expert in risk assessment to testify that Cole would not be a dangerous inmate. Federal habeas counsel retained Dr. Mark Cunningham, "a forensic psychologist, nationally recognized for his research concerning factors that predict violence in prison and his research in capital sentencing," *Coble v. Davis*, 728 F. App'x 297, 300 (5th Cir. 2018). Dr. Cunningham was asked to perform an individual risk assessment of Cole's future threat of violence in prison. Dr. Cunningham's general approach is to evaluate trends of violence committed by other inmates and compare a defendant's individual characteristics against those trends. Dr. Cunningham has provided an affidavit stating that he

"would have testified that based on [Cole's] age, education, career history, ties with his community, pre-trial jail record, lack of a gang affiliation, and status as a convicted capital offender serving life without parole in TDCJ, [Cole] would present a low risk for future serious violence in prison." Successive State Habeas Record at 38, 171-252.

Cole raised this claim in his successive state habeas application. The Court of Criminal Appeals barred the claim as an abuse of the writ. Federal habeas review is available only if cause and actual prejudice are shown. As with the previous claim, Cole argues that state habeas counsel's representation should forgive the procedural bar of this claim under *Martinez v. Ryan*.

State habeas counsel provided an affidavit explaining why they did not retain an expert like Dr. Cunningham. "It was our office's practice to not hire an expert on the issue of future danger if defense counsel hired one. We did this to save money. There would have been no strategic reason as to why we did not consult with an expert on the issue of Mr. Cole's future danger." Successive State Habeas Record at 57. With that basis, Cole argues that "a rote decision to close off viable avenues of investigation solely for the purpose of saving money is unreasonable." (Docket Entry No. 98 at 96).

Even though state habeas counsel disclaimed a specific strategy behind not hiring a future-dangerousness expert like Dr. Cunningham to add to the expert trial counsel had retained, that is a strategy; if trial counsel had an expert, the presumption is no additional or duplicative one is needed on habeas. This is the type of calculated decisionmaking that a court defers to under *Strickland*. An effective attorney is "entitled to formulate a strategy . . . to balance limited resources in accord with effective trial tactics and strategies." *Harrington v. Richter*, 562 U.S. 86, 107 (2011). Habeas counsel's choice of how to allocate resources is not one to be second guessed on this record. *See Evans v. Davis*, 875 F.3d 210, 218 (5th Cir. 2017).

There is no record basis to find that Dr. Cunningham would have provided testimony stronger than trial counsel had put before the jury. At trial, the State rebutted Aubuchon's testimony by highlighting Cole's history of violence. The State argued: "[Cole] hasn't shown any desire to change, that . . . is how he's going to be. [Incarceration] is not going to change that. . . . And you know from everything he's done in the past and you know from everything that he did that horrible day that [he is a continuing threat]. There is no question about it." 24 RR 18. Like Aubuchon, Dr. Cunningham did not take into account the violent acts Cole had committed. Dr. Cunningham isolated some background evidence and plugged it into an actuarial analysis, but he did not account for Cole's past "violent episodes—including firing his shotgun near his friend, forcefully throwing his daughter Brittnie to the concrete ground once and into the tv another time, choking a former girlfriend, and kicking and punching several former girlfriends, including one while she was pregnant." (Docket Entry No. 67 at 60-61). Dr. Cunningham's testimony would have provided little information about Cole's behavior. *See United States v. Bourgeois*, 537 F. App'x 604, 658 (5th Cir. 2013) (affirming district court's finding in a capital habeas proceeding that "Dr. Cunningham's testimony [was] detached from the extensive testimony that the jury had already heard about" the inmate's violent acts).

Cross-examination would open Dr. Cunningham to questioning that could reinforce the State's case for a death sentence. The State cross-examined Aubuchon about the prison environment in general. Dr. Cunningham's report would have allowed broad cross-examination about Cole's specific violent acts; Dr. Cunningham's testimony could have been more prejudicial to the defense than that presented by trial counsel. Dr. Cunningham's report could have allowed the State to individualize the threat Cole would present in prison.

A habeas attorney who files a brief on the merits is not obligated to raise every nonfrivolous claim. Reasonable habeas counsel may, and should, select the claims that will maximize the

likelihood of success. *Smith v. Robbins*, 528 U.S. 259, 288 (2000). *See Smith v. Murray*, 477 U.S. 527, 536 (1986) ("The process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."). The record fails to show that state habeas counsel was deficient in not retaining Dr. Cunningham and instead focusing on other areas. Nor does the record support finding a likelihood of success had this claim been presented in Cole's initial habeas petition. Because the record shows neither deficient performance nor prejudice, there is no basis to overcome the procedural bar of this claim.[6]

## F.   Failure to Object to the State's Peremptory Strikes Against Two Prospective Jurors (Claim Five)

The jury in Cole's trial consisted of seven white jurors, three Hispanic jurors, one Asian juror, and one black juror. During voir dire, prosecutors exercised only seven of their allotted peremptory strikes. The State used peremptory challenges against three of the four black potential jurors. Cole argues that trial counsel should have objected to striking two prospective jurors—Ms. Robinson and Ms. Roberts—based on *Batson v. Kentucky*, 476 U.S. 79 (1986). Under *Batson*, the prosecution violates the equal protection clause by striking potential jurors based on race. In deciding whether the prosecution's decision to strike potential jurors is impermissible under *Batson*,

> the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Although the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is

---

[6]   For the same reasons, if the court were to reach the underlying *Strickland* claim on the merits, it would be denied for lack of record support.

persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices. Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.

*Rice v. Collins*, 546 U.S. 333, 338 (2006) (quotations and citations omitted); *see also Johnson v. California*, 545 U.S. 162, 168 (2005); *Miller-El v. Dretke*, 545 U.S. 231, 251-52 (2005).

On state habeas review, affidavits from both the trial prosecutors and defense counsel provided insight into why the defense did not make a *Batson* objection. Cole's trial attorneys stated that "[a] *Batson* challenge would have been raised if purposeful discrimination in the State's exercise of a peremptory strike of a potential juror on the basis of race had been detected." State Habeas Record at 817-18. Cole's defense attorneys explained that they "did not perceive that the State used peremptory strikes on prospective jurors [Ms.] Robinson and [Ms.] Roberts on the basis of their race," and that they "believed that these jurors were struck by the State for race-neutral reasons." State Habeas Record at 813. The attorneys based this assessment on the "answers on both the [jury panel] questionnaires and their testimony from the witness stand that these jurors were struck by the State for race-neutral reasons." State Habeas Record at 817-18.

The two prosecutors who handled jury selection stated that they "did not exercise a peremptory strike against Robinson or Roberts, or any other juror, based on their race." Both prosecutors provided race-neutral reasons for striking each of the challenged jurors. Prosecutor Anshu Mitchell stated that during Robinson's voir dire, "it appeared that she was hesitant on all the major issues dealing with the death penalty and sentencing someone to death." State Habeas Record at 572. Prosecutor Tise, who conducted the voir dire, "found [Robinson] to be hesitant in both her answers and her demeanor particularly on her thoughts of assessing the death penalty."

State Habeas Record at 566. Ms. Tise identified four specific instances in the record that "underscored [Robinson's] hesitation." State Habeas Record at 566-67. Most importantly, the prosecutors expressed "concerns with [Robinson's] feelings on premeditation and felt that she had disqualified herself on that issue." State Habeas Record at 572. Even after efforts to rehabilitate Robinson on that issue, the prosecutors still had reservations "about her overall hesitation." State Habeas Record at 572. Robinson related that "she had a close friend, who she referred to as 'someone more like a sister,' under federal indictment for Medicare fraud and she felt like her friend was wrongfully accused." State Habeas Record at 784. The prosecution had continuing concerns about Ms. Robinson. Ms. Tise worried that "Robinson would not under any circumstance answer the special issues so that death would result." State Habeas Record at 572. "In the end[,] I believed Ms. Robinson's hesitation and demeanor indicated to me that coupled with her emotional feelings on the death penalty and her desire to be with her close friend during her upcoming trial, she would have difficulty answering the special issues so that death would result—regardless of her assurance that she could." State Habeas Record at 567.

The prosecutors' explanation for striking Ms. Roberts focused directly on her demeanor. Ms. Tise explained:

> During my voir dire of Roberts I felt she was very defensive. Her juror questionnaire showed conflicting and inconsistent statements and when I attempted to inquire about those inconsistencies she became argumentative. My overall impression of Roberts was that she was saying what needed to be said and was hesitant in being truthful with her feelings on the issue of the death penalty and in particular the special issues. The record reflects that Roberts was so agitated that the trial court excused Roberts in the middle of my voir dire and asked either side if they would like to continue the voir dire of this juror.

State Habeas Record at 598.  Ms. Mitchell agreed. "Regarding Roberts[,] I felt she became more argumentative and frustrated with Ms. Tise particularly when questioned about inconsistencies between her juror questionnaire and voir dire answers.  Roberts['] 'demeanor with Ms. Tise suggested to me that she was unhappy being questioned." State Habeas Record at 572.  According to Ms. Mitchell, "[t]he combination of Ms. Roberts'[s] apparent problems explaining her inconsistent answers on her juror questionnaire, her overall argumentative demeanor when I questioned her, and her seeming inability to be honest with how she truly felt about the death penalty[,] *i.e.* her only saying what she thought we all wanted to hear, all lead to my exercising a strike against her."  State Habeas Record at 568.

The state habeas court found that Cole had "not made a prima facie showing that the State struck a potential juror because of race."  State Habeas Record at 783.  The state habeas court analyzed the voir dire of both challenged prospective jurors.  The court explicitly found the prosecutors' affidavits credible on the reasons for striking Ms. Robinson. State Habeas Record at 785.  The state habeas court noted that Ms. Robinson "was particularly emotional regarding the subject matter of the death penalty," that she "struggled" with concepts, "paused a long time" before giving some answers, and even "agreed with the prosecutor in understanding why the State might have some concerns about her and her ability to serve as a fair and impartial juror in this case."  State Habeas Record at 782, 784.  The court also noted that Robinson hesitated she was told that she could not use a "proof beyond all doubt" standard.  State Habeas Record at 784.

The state habeas court made detailed findings on the reasons for striking Ms. Roberts as well. The court noted that, when questioned about inconsistencies,

> [Ms.] Roberts almost immediately became argumentative and frustrated and said that she was probably exhausted by the time she got to page nine and maybe did not fully understand the question regarding her feelings on capital punishment;

> moreover, the records reflect that Roberts became so
> agitated, confused, and inconsistent regarding her
> juror questionnaire that the trial court sent Roberts
> out to the hall with her questionnaire during voir dire,
> called the attorneys up to the bench, and asked,
> "Does either side want this woman?"  (XI R.R. at 9,
> 15).

State Habeas Record at 786.  The state habeas court found the prosecutors' affidavits credible,

particular because of their concerns about her argumentative demeanor.  State Habeas Record at

786.

Cole's habeas application also emphasized a comparative analysis between those two

prospective jurors and the others.  Cole argued that the stricken jurors' responses "are favorable

and nearly indistinguishable from those of venire members accepted by the State."  (Docket Entry

No 58 at 101).  The state habeas court specifically addressed Cole's juror comparison analysis.

State Habeas Record at 787-89.  The state habeas court found "that a comparative analysis of the

prospective jurors struck by the State and other jurors named by [Cole] shows no purposeful

discrimination."  State Habeas Record at 790.  Additionally, the state habeas court found that,

"based on the credible affidavits of Tise and Mitchell[,] that the State's strikes against Robinson

and Roberts were race-neutral."  State Habeas Record at 790.

The state habeas court concluded that, "[b]ased on the absence of a *Batson* challenge at

trial," Cole "fail[ed] to make a prima facie showing that the State struck a potential juror based on

race, and, "[i]n the alternative," that he "fail[ed] to show that the State lodged peremptory strikes

against prospective jurors [] Robinson or [] Roberts for reasons based on race"; and failed to "show

that the State's strikes were not race-neutral."  State Habeas Record at 801.  The state habeas court

found that a "comparative analysis of jurors shows that [Cole] fails to establish discrimination" or

"disparate treatment" between prospective jurors.  State Habeas Record at 801-02.  The court

concluded that Cole failed to show his "constitutional rights were violated by the State's neutral

strikes of prospective jurors Robinson and Roberts," and failed "to show ineffective assistance of trial counsel based on trial counsel not lodging a meritless *Batson* challenge." State Habeas Record at 802.

This court reviews the state court's resolution of Cole's *Batson* arguments under the double deference of *Strickland*. The question before this court is not whether Cole has met the three-pronged *Batson* test; the question is whether the state courts were reasonable in deciding whether trial counsel was deficient in this aspect of jury selection.

Cole challenges the state habeas court's comparative analysis as unreasonable and criticizes the reliance on the prosecutors' affidavits. (Docket Entry No. 58 at 112). Cole attempts to link the actions in his case with a history of alleged discrimination in jury selection by Harris County prosecutors. (Docket Entry No. 58 at 108-11). Cole, however, has not shown that the state habeas court was unreasonable in its assessment of the law and facts. Cole has not shown that the state habeas court unreasonably relied on the prosecutors' opinions about the prospective jurors' demeanor. The record supports the state habeas court. The record fails to show that the state habeas court was unreasonable in finding that trial counsel provided constitutionally sufficient representation during jury selection, and fails to show that the state court decision was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1). This claim provides no basis for relief.

### G.    Failure to Object to Statements about the Automatic Review of Death Sentences (Claim Six)

Cole argues that trial counsel provided deficient representation by not raising an objection during voir dire based on *Caldwell v. Mississippi*, 472 U.S. 320 (1985). In *Caldwell*, the Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the

appropriateness of the defendant's death sentence rests elsewhere." *Id.* at 329; *see also Dugger v. Adams*, 489 U.S. 401, 407 (1989) (a *Caldwell* violation occurs when a defendant shows that "the remarks to the jury improperly described the role assigned to the jury by local law"). In *Caldwell,* the prosecutor had urged jurors that, because the state supreme court would review any appeal, they should not view themselves as the ones determining whether the defendant would die. The Supreme Court found a constitutional violation because the prosecutor's arguments minimized the sentencing jury's sense of responsibility for determining a death sentence.

Cole claims that the trial court made comments in voir dire that minimized the jury's responsibility. The trial court told one panel of prospective jurors that "[i]f there is a death sentence there is automatic review whether the defendant wants it or not. It's automatically reviewed if there is a death sentence in a capital case. Okay?" 7 RR 134. Cole argues that this minimized the jury's role in deciding the case, and he faults counsel for not objecting.

Cole did not raise this claim in his first state habeas petition. To raise it now, Cole must show cause under *Martinez* and actual prejudice. The record fails to show that Cole's habeas attorney was deficient in not raising a *Strickland* claim based on an alleged *Caldwell* violation.

As an initial matter, the Texas Court of Criminal Appeals has not extended *Caldwell* to remarks made during voir dire. *See Sattiewhite v. State*, 786 S.W.2d 271, 282 (Tex. Crim. App. 1989); *see also Miniel v. Cockrell*, 339 F.3d 331, 344 (5th Cir. 2003) (a *Caldwell* violation during voir dire was not likely to affect sentencing). Cole has not shown that a reasonable attorney would raise a claim that is not favored under state law.

A *Caldwell* violation requires showing that the jury is provided an incorrect characterization of its role under applicable law. *See Adams*, 489 U.S. at 407. There is no *Caldwell* violation when a jury is correctly informed about its duty. *See Caldwell*, 472 U.S. at 328-39; *Sawyer v. Butler*, 881 F.2d 1273, 1282 (5th Cir. 1989) ("The evil of *Caldwell*-type prosecutorial

arguments is not that they divest juries of their responsibility, but rather that they distort the jury's understanding of a power which it in fact retains."), *aff'd sub. nom., Sawyer v. Smith*, 497 U.S. 227 (1990).  Cole does not, and could not, argue that the trial court incorrectly stated Texas law.  Article 37.071 § 2(h) of the Texas Code of Criminal Procedure states that "[t]he judgment of conviction and sentence of death shall be subject to automatic review by the Court of Criminal Appeals." *See also Adams*, 489 U.S. at 407 (1989) (a defendant must "show that the remarks to the jury improperly described the role assigned to the jury by local law" to establish a *Caldwell* violation). The trial court correctly told the jury that the Texas Court of Criminal Appeals automatically reviews all death sentences.  The record does not show that a habeas attorney could have reasonably believed—or that habeas counsel did believe—that a successful *Caldwell* claim could be raised, because the trial court gave the jury a correct description of the Texas law.

A habeas court evaluates a *Caldwell* claim by looking to the "'total trial scene,' including jury selection, the guilt phase of trial, and the sentencing hearing, examining both the court's instructions and counsel's argument to the jury." *Montoya v. Scott*, 65 F.3d 405, 420 (5th Cir. 1995) (quoting *Sawyer v. Butler*, 881 F.2d 1273, 1286-87 (5th Cir. 1989)).  Cole has not alleged that the trial judge made other incorrect statements during the trial.  The court and counsel for both the prosecution and defense repeatedly provided jurors a correct understanding of their roles in determining Cole's sentence.  The jury instructions accurately stated the jury's role in deciding whether Cole would receive a life sentence. *See Cotton v. Cockrell*, 343 F.3d 746, 755 (5th Cir. 2003) (there was no prejudice when "[t]hroughout voir dire and during closing arguments the court and counsel repeatedly informed the jury that whether [the defendant] received a death sentence would be based on the jury's answers to the special issues submitted to them at the end of the punishment phase of the trial").

The record does not show that Cole's habeas counsel should have raised a *Caldwell* claim or that, if he had, the state habeas court would have granted relief.  The court finds that Cole has not overcome the procedural bar of this claim, and that, if this court considered the *Strickland* claim on the merits, it would fail.

The record does not provide a basis for relief on this ground.

## II.   Jury Deliberations (Claim Seven)

In his seventh ground for relief, Cole argues that extraneous evidence infected the jury's deliberations.  Cole relies on an affidavit from one juror stating that, during deliberations, she considered the fact that Cole would receive an automatic appeal if sentenced to death.  Cole argues that a juror's use of extraneous information to determine his sentence violated his Sixth Amendment right to a fair trial.

Cole raised this claim on state habeas review.  The Texas Court of Criminal Appeals found that it "may not consider the juror's affidavit under Rule 606(b) of the Texas Rules of Evidence" and, "without more, [the] claim[] ha[d] no merit."  *Cole*, 2017 WL 562725, at *1.  Texas law bars review of juror deliberations in postverdict proceedings. Texas Rule of Evidence 606(b)(1) states:

> During an inquiry into the validity of a verdict . . ., a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

Tex. R. Evid. 606(b)(1).

The Fifth Circuit has similarly held that a federal habeas court may not probe a jury's deliberative process.  Because Rule 606(b) of the Federal Rules of Civil Procedure and the Texas Rules of Civil Procedure "bar all juror testimony concerning the juror's subjective thought

process," *Salazar v. Dretke*, 419 F.3d 384, 402 (5th Cir. 2005), the Fifth Circuit has stated that the "post-verdict inquiry of jury members, as live witnesses or by affidavit, is inappropriate and precluded . . . ." *Williams v. Collins*, 16 F.3d 626, 636 (5th Cir. 1994).

Even considering the substance of the juror's affidavit, the state habeas court found that she "did not assert anything that would be considered outside influence constituting jury misconduct." State Habeas Record at 769. Texas law considers an "outside influence" to be "something originating from a source outside of the jury room and other than from the jurors themselves." *McQuarrie v. State*, 380 S.W.3d 145, 154 (Tex. Code App. 2012). Cole has not shown that a juror's correct understanding of Texas law may be an improper outside influence on deliberation.

Cole does not show what in the record provides admissible evidence of an improper extraneous influence on the jury's deliberative process. The state habeas court's application of Rule 606(b) was not contrary to, or an unreasonable application of, clearly established law as determined by the Supreme Court. This claim is denied.

## III.    Jury Instructions on the 10-12 Rule (Claim Eight)

Cole's eighth claim argues that the Texas capital sentencing instructions confused jurors by not informing them that a single juror's vote could result in a life sentence. The jury answered two questions in the penalty phase: (1) will the defendant be a future danger to society; and (2) do sufficient circumstances mitigate against a death sentence? *See* Tex. Crim. Code art. 37.071 § 2(b). The Texas statute requires jurors to answer the future-dangerousness issue first. *See id*. at § 2(d). In a provision called the "10-12" or "12-10" Rule, the statute requires instructing the the jury that an affirmative answer to the future-dangerousness issue must be unanimous and the jury "may not answer any issue 'no' unless 10 or more jurors agree." *See id*. at § 2(d)(2). Under the statute, "if the jury returns an affirmative finding" on the future-dangerousness issue, then jurors must

consider whether mitigating circumstances provide for a life sentence. *See id*. at § 2(e)(1). A "no" answer on the mitigation question requires unanimity, but a "yes" answer requires only 10 votes. *See id*. at § 2(f).[7] An answer resulting in a death sentence must be unanimous, but an answer that would result in a life sentence requires only ten votes.

Texas law specifies that if the jurors are "unable to answer any issue . . . the court shall sentence the defendant to confinement in the institutional division of the Texas Department of Criminal Justice for life imprisonment without parole." *Id*. at § 2(g). A life sentence results when jurors cannot reach the required number of votes on answers that would result in a death sentence. Texas law, however, forbids the court or counsel from informing the jury "of the effect of a failure of a jury to agree" on the special issues. *Id*. § 2(a)(1). Cole argues that Texas' sentencing instructions confuse jurors.

Inmates have repeatedly challenged the 10-12 Rule in both state and federal courts, generally alleging that "that the failure to explain to the jury important elements of the sentencing scheme creates an intolerable risk of confusing the jury." *Druery v. Thaler*, 647 F.3d 535, 544 (5th Cir. 2011). On state habeas review, the Court of Criminal Appeals rejected this claim, noting that it had "repeatedly upheld the '10-12 Rule' as constitutional." *Cole*, 2017 WL 562725, at *1 (citing *Leza v. State*, 351 S.W.3d 344, 362 (Tex. Crim. App. 2011) and *Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005)). The Fifth Circuit has similarly repeatedly denied 10-12 Rule claims. *See Allen v. Stephens*, 805 F.3d 617, 632 (5th Cir. 2015); *Holiday v. Stephens*, 587 F. App'x 767, 789 (5th Cir. 2014); *Reed v. Stephens*, 739 F.3d 753, 779 (5th Cir. 2014); *Parr*

---

[7] Jurors do not need unanimity to find that mitigating circumstances support a life sentence. Because the Constitution requires that jurors be able to consider mitigating evidence, *see Lockett v. Ohio*, 438 U.S. 586, 604 (1978), the Supreme Court in *Mills v. Maryland*, 486 U.S. 367, 384 (1988), prohibited sentencing instructions that preclude jurors "from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Smith v. Spisak*, 558 U.S. 139, 148 (2010); *Beard v. Banks*, 542 U.S. 406, 408 (2004); *McKoy v. North Carolina*, 494 U.S. 433, 439-40 (1990).

*v. Thaler*, 481 F. App'x 872, 878 (5th Cir. 2012); *Druery*, 647 F.3d at 542-43; *Greer v. Thaler*, 380 F. App'x 373, 389 (5th Cir. 2010).

Cole attempts to distinguish his case from the overwhelming precedent by relying on an affidavit from a juror stating that she would have voted for a life sentence but believed that she would have to get nine other jurors to agree with her.  The Court of Criminal Appeals held that it could "not consider the juror's affidavit under Rule 606(b) of the Texas Rules of Evidence." *Cole*, 2017 WL 562725, at *1.  Like the state courts, federal courts "will not inquire into the jury's deliberative process absent a showing of external influences on the jurors." *Greer v. Thaler*, 380 F. App'x 373, 382 (5th Cir. 2010); *see also Williams v. Collins*, 16 F.3d 626, 636 (5th Cir. 1994) (finding that the "post-verdict inquiry of jury members, as live witnesses or by affidavit, is inappropriate and precluded by Federal Rules of Evidence 606(b)").  Cole's reliance on the juror's affidavit does not change the settled law on his claim.

With the overwhelming precedent against Cole's arguments, and the lack of evidence showing improper influences on the deliberative process, the court finds that Cole has not shown that the state court's adjudication was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).  There is no basis for relief on this claim.

## IV.    Admission of Cole's Statements (Claim Nine)

The State introduced and relied on statements Cole made to law enforcement officers after his arrest.[8]  Late on the evening of the murders, police officers arrested Cole in a Wal-Mart in Wharton County after he had purchased 100 rounds of ammunition.  Cole was taken before a magistrate in Wharton County and informed of his constitutional rights.  Cole subsequently made statements to police officers in Wharton County.  A few hours later, police transported Cole to

---

[8]       The court takes the facts in this section from the record of the state suppression hearing, the trial transcript, and the relevant state court opinions.

Harris County, where Cole gave a videotaped statement in which he described the killings. Cole insisted that he had not planned any of the violence.

Trial counsel moved to suppress Cole's statements before trial.[9] The trial court suppressed some of the statements Cole had made in Wharton County, but admitted his other statements. Cole's federal petition argues that "the admission of petitioner's statements violated his Fifth, Sixth, and Fourteenth Amendment rights." (Docket Entry No. 58 at 135). Cole first argues that he did not validly waive his right to counsel before making his statement in Wharton County. Second, Cole argues that the Houston police officers failed to honor the invocation of his right to remain silent which he made in Wharton County. Finally, Cole contends that the Houston police officers ignored his right to counsel at the outset of their interrogation. The state habeas court rejected these arguments.

### A.    Waiver of Counsel in Wharton County

Cole argues that he did not validly waive his right to counsel before making his statement to police officers in Wharton County, where he was arrested. The police officer who arrested Cole did not immediately deliver the *Miranda* warnings. Cole appeared before a Wharton County justice of the peace in the early morning hours. 14 RR 52, 54. The justice of the peace informed Cole of his rights and warned him about the consequences of waiving them. Cole signed a written waiver. Cole claims that the warnings caused him to make an invalid waiver of his right to counsel.

Testimony in the suppression hearing indicated that, when going over the written forms with Cole, the justice of the peace "show[ed] him where to initial not requesting an attorney, since

---

[9]     Trial counsel based the suppression arguments on three theories: (1) when the first magistrate judge informed Cole of his rights, the judge told Cole that no attorney would be appointed for him in Wharton County because the crime occurred in Harris County; (2) the Houston Police Department officers did not scrupulously honor Cole's right to silence while initially interrogating him in Wharton County; and (3) the Houston Police Department officers did not scrupulously honor his invocation of the right to counsel when interrogating him in Harris County.

he was going into another county, and where to sign." 14 RR 62. The justice of the peace explained "that if [Cole] requested an attorney to be appointed, it would have to be in Harris County," and "asked him to sign that he understood and to initial that Wharton County would not be appointing an attorney for him." 14 RR 69-70. The justice of the peace testified that she "would have told him . . . he would have to request an attorney in Harris County" because "the offenses didn't happen in Wharton County . . . ." 14 RR 70, 75.

Police officers were present during the hearing and then took Cole to a separate room for interrogation. Houston Police Department Sergeant Roger Chappell informed Cole of his rights. Cole appeared to understand the warnings. Cole did not ask for a lawyer.

A suspect waiving his right to counsel must do so "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Cole contends that the justice of the peace signaled that he "did not have an effective right to counsel as long as he was in Wharton County." (Docket Entry No. 58 at 138). Cole argues that the police officers "went through the motions of advising Mr. Cole that he had a right to counsel," but their warnings were "meaningless, since Mr. Cole had just been advised in the officers' presence that he actually had no right to counsel in Wharton County." (Docket Entry No. 58 at 138-39) (citation omitted). He argues that the justice of the peace "advised Mr. Cole that he could request counsel once he arrived in Harris County, and that is exactly what he did." (Docket Entry No. 58 at 139) (citation omitted). Cole contends that a reasonable person would not have understood that a lawyer was available before the interrogation began in Wharton County.

Cole raised this claim on appeal. The Court of Criminal Appeals took issue with Cole's "characterization of the magistrate's statements regarding the appointment of counsel in Wharton County." *Cole*, 2014 WL 2807710, at *19. The Court of Criminal Appeals found that the justice

48

of the peace did not discourage Cole from exerting his right to counsel.  Instead, "[t]he record

supports a finding that the magistrate simply and accurately stated an administrative fact: should

[Cole] request it, Harris County, rather than Wharton County, would handle the appointment of

counsel." *Id.*

The Court of Criminal Appeals explained:

> [Cole] was essentially in the same situation as a
> defendant who is arrested after a roadside stop and
> read his *Miranda* rights.  The Fifth Amendment does
> not require police to have, in tow, lawyers who are
> ready to be appointed at a moment's notice to assist
> such defendants.  *See Davis v. United States*, 512
> U.S. 452, 460[ ] (1994) ("In *Miranda* itself, we
> expressly rejected the suggestion 'that each police
> station must have a "station house lawyer" present at
> all times to advise prisoners,' and held instead that a
> suspect must be told of his right to have an attorney
> present and that he may not be questioned after
> invoking his right to counsel.") (internal citation
> omitted).  "[T]he primary protection afforded
> suspects subject to custodial interrogation is the
> *Miranda* warnings themselves. 'Full comprehension
> of the rights to remain silent and request an attorney
> [is] sufficient to dispel whatever coercion is inherent
> in the interrogation process.'" *Id.* (quoting *Burbine*,
> 475 U.S. at 427).  Nor does the Constitution require
> immediate magistration. *See County of Riverside v.
> McLaughlin*, 500 U.S. 44, 56, 111 S. Ct. 1661, 114
> L.Ed.2d 49 (1991) (stating the general rule that
> jurisdictions that provide judicial determinations of
> probable cause within forty-eight hours of arrest
> comply with the Fourth Amendment).  What is
> critical is the individual's immediate ability to
> invoke his *Miranda* rights upon being placed in
> custody.  The actual appointment of counsel—
> assuming that it occurs within a constitutionally
> reasonable time after the invocation of this right—is
> of lesser importance.

> At the very most, this record supports a finding that
> there may have been some potential for confusion on
> [Cole]'s part regarding his ability to obtain appointed
> interrogation counsel in Wharton County.  But it was

entirely within the zone of reasonable disagreement for the trial judge to find, as it implicitly did, that [Cole] experienced no actual confusion. Defense counsel argued that it was reasonable for [Cole] to interpret the magistrate's statement to mean that he could not obtain appointed counsel in Wharton County. However, [Cole] did not present any evidence from any source that he was actually confused by the magistrate's statements. The record is thus devoid of evidence that he was actually confused by the magistrate's statements and that, but for them, he would have invoked his right to counsel when [police officers] approached him.

*Cole*, 2014 WL 2807710, at 19-20.

Cole has not shown that the state court's rejection of his claim was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1). The record shows that Cole presented no evidence in state court that he was confused about his right to legal representation, either when informed of his rights by the justice of the peace or when interrogated by police officers. At best, Cole shows that some confusion might have been possible because the justice of the peace in Wharton County assured him that he could ask for and obtain legal representation when he was taken to Harris County, and police officers questioned him while he was still in Wharton County. Cole points to no record evidence that he was pressured, or felt pressured, to give the police a statement in Wharton County, without legal representation, knowing that he would be taken to Harris County and provided legal representation.

A court considering whether an inmate waived his right to counsel during custodial interrogation looks at "what happens when the defendant is approached for interrogation, and (if he consents) what happens during the interrogation—not what happened at any preliminary hearing." *Montejo v. Louisiana*, 556 U.S. 778, 797 (2009). The record does not show that Cole failed to understand when told by police officers in Wharton County that he did not have to speak with them without an attorney present. The testimony in state court indicated that he understood

the warnings and made a valid waiver before speaking to police officers.  The state court was reasonable in finding that he made an informed and voluntary waiver of his right to counsel before speaking with police officers in Wharton County.

### B.    The Harris County Statement

When interrogated by police officers in Wharton County, Cole extensively talked about not wanting his young son to testify against him.  When police officers informed Cole that his son would likely have to testify, Cole began crying and asked the officers to "just kill me now."  Cole then said, "I don't want to talk anymore."  The police questioning continued.  The trial court suppressed the remainder of the statement Cole made to the officers in Wharton County.

After the Wharton County interview ended, Cole was transported to Harris County. Houston Police Department Officer Xavier Avila began interrogating Cole again about three hours after he said, in Wharton County, that he did not want to talk anymore.  The Houston Police Officer began by reading Cole his rights again.  When asked if wanted to waive his rights and voluntarily talk about what happened, Cole said that he wanted an attorney appointed.  Officer Avila told Cole that the interview was over and left the room to turn off the video.

Office Avila turned the video back on 15 minutes later.  In the suppression hearing, Officer Avila testified about what happened in the 15 minutes between stopping and starting the video recording.  After turning the video off, Officer Avila returned to the interview room and told Cole that he would be transported to the Harris County Jail, and that the Harris County District Attorney's Office would take over the case. Cole asked if his ten-year-old son would have to testify.  Officer Avila responded that the son's testimony was a possibility. Cole then said that he wanted to give a statement.

Officer Avila began recording again.   On the tape, Cole acknowledged that he had voluntarily changed his mind about speaking to the police without counsel.  Cole said that he

wanted to give a statement to explain what had happened.  Cole then gave a videotaped statement with specific details about how he committed the murders.

Trial counsel moved to suppress the statements Cole made in Harris County.  The trial court found that Cole had reinitiated discussion with the police and consented to the interrogation and sentence after learning that his son might have to testify.  The trial court also found that the police fully informed Cole of his rights, that he understood and waived his rights, and that he made his taped statement voluntarily and knowingly.[10]

Cole now raises two arguments relating to the admissibility of his Harris County statement. First, Cole argues that the police violated his rights by continuing any interrogation, in both Wharton and Harris Counties, after he said in Wharton County that he did not "want to talk anymore."  Second, Cole argues that the trial court should not have admitted the statements that followed Cole's reinitiation of the interrogation by the police in Harris County.

1.      Cole's Invocation of the Right to Silence in Wharton County

The police must "scrupulously honor" an inmate's invocation of the right to remain silent. *Michigan v. Mosley*, 423 U.S. 96, 104 (1975).  Cole argues that the police in Wharton County should have stopped questioning him after he said, "I don't want to talk anymore," and that the

---

[10]     The state habeas court summarized the facts leading up to Cole's Harris County police statement:

> When [Cole] arrived at HPD homicide, Officer Avila read [Cole] his *Miranda* warnings, and [Cole] initialed each warning indicating that he understood them (XVII R.R. at 164, 166-68).  Initially, [Cole] said he wanted to talk to Avila, then requested an attorney, at which time Avila stopped the interview (XVfll R.R. at 171-73).  After expressing concern that [his young son] would be required to testify against him, [Cole] re-initiated the interview, waived his *Miranda* warnings, and described in a recorded statement how he shot [the two victims] (XVIII R.R. at l 7 l-73).

State Habeas Record at 761.

police in Harris County should not have interrogated him at all because he had invoked his right to silence in Wharton County.

The trial court suppressed the portion of Cole's Wharton County statement that occurred after he had said he did not want to continue talking, invoking his right to silence. The court focuses on the Harris County statement. The Supreme Court's decision in *Michigan v. Mosley*, 423 U.S. 96, 104 (1975) governs this claim. *Mosely* did not "iss[ue] a bright-line rule for determining when police were scrupulous in honoring a suspect's rights . . . ." *Hebert v. Cain*, 2005 WL 147260, at *2 (5th Cir. 2005). Whether the police "scrupulously honored" Cole's rights by taking his later statement "hinges on an unweighted, multifactor test." *Madrid v. Vannoy*, 2018 WL 3968203, at *1 (5th Cir. 2018) (citing *Mosley*, 423 U.S. at 106; *Charles v. Smith*, 894 F.2d 718, 726 (5th Cir. 1990)). Courts have organized the *Mosley* factors into four categories:

> (1) whether the suspect was advised prior to initial interrogation that he was under no obligation to answer question [sic]; (2) whether the suspect was advised of his right to remain silent prior to the reinterrogation; (3) the length of time between the two interrogations; [and] (4) whether the second interrogation was restricted to a crime that had not been the subject of earlier interrogation . . . .

*United States v. Alvarado-Saldivar*, 62 F.3d 697, 699 (5th Cir. 1995) (citing *Mosley*, 423 U.S. at 104-05); *see also Gutierrez v. Stephens*, 590 F. App'x 371, 376 (5th Cir. 2014).[11]

The Court of Criminal Appeals applied *Mosley* to Cole's constitutional arguments:

> We may quickly dispose of the first, second, and fourth *Mosley* factors. As [Cole] concedes and the record reflects, he was advised of his right to remain silent before both his Wharton and Harris County interviews. Thus, *Mosley*'s first and second factors weigh in favor of a finding that the officers

---

[11]     The Fifth Circuit has read *Mosley* to include a fifth factor, implicit in the third, that "the suspect was advised prior to initial interrogation that he was under no obligation to answer question[s]." *Alvarado-Saldivar*, 62 F.3d at 699.

> scrupulously honored his right to silence.  Because the questioning by Sgts. Chappell and Bush in Wharton County and by Officer Avila in Harris County related to the same offense, we find that the fourth *Mosley* factor weighs against a finding that law enforcement scrupulously honored [Cole's] invocation of his right to silence.

*Cole*, 2014 WL 2807710, at *21.  The Court of Criminal Appeals discussed the third *Mosley* factor, "the length of time that passed between [the] initial questioning of [Cole] in Wharton County and Officers Avila's subsequent request to interview appellant in Harris County," *id*., observing

> The trial court found that roughly three hours passed between these two events.  [Cole] offered no contrary evidence at the suppression hearing.  We note that in *Mosley* itself, "an interval of more than two hours" passed between the initial and subsequent questioning at issue.  423 U.S. at 104. Moreover, the Supreme Court described this interval as "the passage of a significant period of time."  *Id*. at 106.  Because the passage of almost three hours in [Cole's] case exceeds the "significant period of time" in *Mosley*, the third *Mosley* factor weighs in favor of a finding that law enforcement 'scrupulously honored' [his] right to cut off questioning.

*Id*. at *22.

The Court of Criminal Appeals resolution of the *Mosley* factors was not unreasonable.  The first two factors weigh in favor of admitting Cole's statement: the police advised Cole of his rights before the interrogations in both counties. The three hours between interrogations was longer than the two-hour interval the court in *Mosley* found to be a significant passage of time.  *Mosely*, 423 U.S. at 06; *see also Hatley v. Lockhart*, 990 F.3d 1070, 1074 (8th Cir. 1993).  The fourth factor weighed in Cole's favor because the interrogations all involved the same crime.  Looking at the totality of the circumstances, the Court of Criminal Appeals reasonably found that the police sufficiently respected Cole's right to remain silent.  Cole has not identified or cited clearly

established Supreme Court precedent supporting his argument that the state court erred or was unreasonable in its analysis. Cole has not shown a basis for relief under AEDPA on this claim.

        2.      Cole's Invocation of the Right to Counsel at the Beginning of the Harris County Interrogation

Cole unambiguously invoked his right to counsel at the outset of the Harris County interrogation. The law required the police then to cease all interrogation unless Cole reinitiated the conversation. *See Davis v. United States*, 512 U.S. 452, 458 (1994) ("[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation."). The record developed in state court showed that, after Cole invoked his right to counsel, Officer Avila ceased questioning, left the room, and turned off the recorder.

Officer Avila testified in the suppression hearing that Cole reinitiated the conversation. Officer Avila told Cole that he would be transferred to jail and that the District Attorney's Office would handle his case. Cole asked if his ten-year-old son would have to testify. After being told that it was possible, Cole said that he had changed his mind and wanted to give a statement. "Officer Avila, whom the trial court found to be a credible witness, asserted that this exchange represented the entirety of the conversation that he had with [Cole] before restarting the videotape." *Cole*, 2014 WL 2807710, at *25.

Cole weakly challenges Officer Avila's testimony because "[t]he only evidence of what took place during that conversation comes from Officer Avila." (Docket Entry No. 58 at 142). Cole, however, has never presented any contrary evidence regarding what happened. The record does not provide a basis to question or raise significant doubt as to the state court's reliance on Officer Avila's testimony.

Cole argues that Officer Avila "did not scrupulously honor Mr. Cole's invocation of his right to counsel" because he "took actions that could elicit an incriminating response." (Docket Entry No. 58 at 141). Cole argues that when Officer Avila told Cole that "he would be booked into the jail, the District Attorney would be called, and formal charges would be filed," these statements were "likely to elicit incriminating responses[.]" (Docket Entry No. 58). The Court of Criminal Appeals rejected Cole's argument because these statements by Office Avila did not occur during an interrogation of Cole.

"'[I]nterrogation' for *Miranda* purposes means express questioning or 'its functional equivalent'" including "[a]ny words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Cole*, 2014 WL 2807710, at *24 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980)). The Court of Criminal Appeals found that Officer Avila's statements about taking Cole to jail—as he described "the process, what was going to happen to him"—were not ones that "could reasonably be expected to elicit an incriminating response." *Cole*, 2014 WL 2807710, at *24. Simply, "Officer Avila's statement is akin to a question normally attendant to arrest and custody, which is excluded from the self-incrimination privilege that the Fifth Amendment protects." *Id*. Cole has not pointed to record evidence or clearly established Supreme Court precedent showing that those informational statements about procedure were an interrogation or were likely to compel an incriminating response.

Simply, the Court of Criminal Appeals was not unreasonable in finding that Cole reinitiated communication with the police. The record shows no basis to find a violation of Cole's right to counsel or to suppress the statement he gave to Officer Avila. The court denies relief on this claim.

## V.        The Jury's Ability to Consider Mitigating Evidence (Claim Ten)

Cole argues that the Texas capital sentencing statute impaired the jury's ability to consider factors that would result in a life sentence.  Jurors decide an inmate's fate in the penalty phase of a capital murder trial by answering whether sufficient mitigating circumstances warrant a life sentence.   The Texas Criminal Procedure statute on capital sentencing defines "mitigating evidence" as "evidence that a juror might regard as reducing the defendant's moral blameworthiness."  Tex. Code Crim. Pro. art. 37.071 § 2(f)(4).

In accordance with the statute, the trial court informed jurors that:

> In answering Special Issue No.2 you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness, including evidence of the defendant's background character or the circumstances of the offense that mitigates against the imposition of the death penalty.

24 RR 8.  The State reminded jurors that "mitigating means reduces his moral blameworthiness." 24 RR 72.

Cole argues that the use of the term "moral blameworthiness" violates the Constitution by: (1) precluding meaningful consideration of some mitigating evidence unrelated to that term; and (2) creating an improper nexus between mitigating evidence and evidence connected to the crime itself. (Docket Entry No. 58 at 146).   Numerous capital inmates have raised similar arguments before.  Cole raised this claim on direct appeal.  The Texas Court of Criminal Appeals relied on prior law and found no error, either in the Texas definition of mitigating evidence generally or in how the parties and court addressed the issue in this case.  *Cole*, 2014 WL 2807710, at *37 (citing *Coble v. State*, 330 S.W.3d 253, 296 (Tex. Crim. App. 2010)); *Roberts v. State*, 220 S.W.3d 521, 534 (Tex. Crim. App. 2007); *Perry v. State*, 158 S.W.3d 438, 449 (Tex. Crim. App. 2004)).

Cole has not pointed to evidence or law showing that the state court decision was contrary to, or an unreasonable application of, federal law.  28 U.S.C. § 2254(d)(1).  The Fifth Circuit has routinely held that the Texas definition of mitigating factors "encompasses 'virtually any mitigating evidence.'"  *Roach v. Quarterman*, 220 F. App'x 270, 277 (5th Cir. 2007) (quoting *Beazley*, 242 F.3d at 260).  The Fifth Circuit has repeatedly rejected similar attacks on this description of mitigating evidence.  *See Blue v. Thaler*, 665 F.3d 647, 666 (5th Cir. 2011); *Cantu v. Quarterman*, 341 F. App'x 55, 60-61 (5th Cir. 2009); *Roach v. Quarterman*, 220 F. App'x 270, 277 (5th Cir. 2007); *Jackson v. Dretke*, 181 F. App'x 400, 412-13 (5th Cir. 2006); *O'Brien v. Dretke*, 156 F. App'x 724, 735-36 (5th Cir. 2005).  The Supreme Court itself has used the term "moral blameworthiness" as a way to describe what a jury considers in its mitigation inquiry. *See Schriro v. Landrigan*, 550 U.S. 465, 499 (2007); *South Carolina v. Gathers*, 490 U.S. 805, 818 (1984). The Supreme Court has used the term to describe how a jury gives effect to good-character evidence that is not "directly relevant" to the crime.  *Gathers*, 490 U.S. at 818.  "Far from rejecting the current scheme regarding mitigation, . . . the Supreme Court implicitly endorsed it" in *Penry v. Johnson*, 532 U.S. 782 (2001); *see Oliver v. Quarterman*, 254 F. App'x 381, 387 (5th Cir. 2007). Given the precedent, the statute, and the instructions in this case, the court finds no basis for relief on this claim.

## VI.    Future Dangerousness (Claims Eleven, Twelve, and Thirteen)

Cole raises three challenges to the presentation and determination of his future dangerousness.  None meets the AEDPA standards for relief.

### A.    Vagueness and Lack of Definition in Future Dangerousness Issue (Claim Eleven)

Cole argues that the Texas special issue questions are unconstitutionally vague because neither the statute nor the jury instructions define the terms "probability," "criminal acts of

violence," or "continuing threat to society."  *See* Tex. Code Crim. Proc. art. 37.071 § 2(b)(1).  The Court of Criminal Appeals denied this claim on direct appeal, noting that it had "repeatedly overruled such challenges."  *Cole*, 2014 WL 2807710, at *32.  The Fifth Circuit has similarly rejected this "far from novel" claim.  *Green v. Johnson*, 160 F.3d 1029, 1043 (5th Cir. 1998); *Sprouse v. Stephens*, 748 F.3d 609, 622-23 (5th Cir. 2014); *Kerr v. Thaler*, 384 F. App'x 400, 404 (5th Cir. 2010); *Paredes v. Quarterman*, 574 F.3d 281, 294 (5th Cir. 2009); *Scheanette v. Quarterman*, 482 F.3d 815, 827-28 (5th Cir. 2007); *Turner v. Quarterman*, 481 F.3d 292, 299-300 (5th Cir. 2007); *Leal v. Dretke*, 428 F.3d 543, 553 (5th Cir. 2005); *Rowell v. Dretke*, 398 F.3d 370, 379 (5th Cir. 2005).  Cole has not shown that the decision by the Texas Court of Criminal Appeals to deny this claim was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

### B.      Burden of Proof (Claim Twelve)

In his twelfth claim, Cole argues that the specific language of the future dangerousness special issue lowers the prosecution's burden below the beyond-a-reasonable-doubt standard.  The Texas statute states that the jury may not answer "yes" unless it unanimously agrees that the prosecution proved the issue beyond a reasonable doubt. Tex. Code Crim. Pro. art. 37.071 § 2(c),(d).  Cole argues that "[b]ecause jurors are permitted to sentence a defendant to death on an affirmative finding of a 'probability of future dangerousness,' the statute shifts the State's burden of proof from 'beyond a reasonable doubt' to a 'probability.'"  (Docket Entry No. 58 at 152).

Cole bases his arguments on *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).  In *Apprendi*, the Supreme Court held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  The Supreme Court extended *Apprendi* to capital cases in *Ring v. Arizona*, 536 U.S. 584 (2002).  Cole argues that the future-dangerousness issue violates *Apprendi* by asking whether there

is "a probability that the defendant will commit future acts of violence," rather than holding the State's burden to the beyond-a-reasonable-doubt standard.

The Fifth Circuit has rejected the argument that the language of the future dangerousness issue runs afoul of *Apprendi*.  In *Rowell v. Dretke*, 398 F.3d 370, 379 (5th Cir. 2005), the Fifth Circuit held:

> Texas's use of special issue no. 1 in the punishment phase of Rowell's capital case, which required the jury to answer "yes" only if the State had proven "beyond a reasonable doubt that there is a probability that [Rowell] would commit criminal acts of violence that would constitute a continuing threat to society," does not 'violate *Blakely*, *Apprendi*, or *Ring*. Accepting Rowell's argument that special issue no. 1 is unconstitutional because the term "probability" swallows the reasonable doubt standard under an extension of *Apprendi* and *Ring* by *Blakely* would be a violation of *Teague* [*v. Lane*].

*Rowell v. Dretke*, 398 F.3d 370, 379 (5th Cir. 2005).

*Apprendi* does not make the use of the term "probability" in the future dangerousness issue unconstitutional.  *See id*.  This court could not grant relief on Cole's *Apprendi*-based claim without creating a new rule of constitutional law, in violation of *Teague v. Lane*, 489 U.S. 288 (1989).  There is no basis for relief on this ground.

## C.     Evidence of Crimes Committed by Other Defendants (Claim Thirteen)

In his thirteenth claim, Cole argues that the State violated his Eighth and Fourteenth Amendment rights by presenting punishment phase testimony about violent acts committed by other inmates.  The prosecution based its penalty-phase case on showing that the prison setting would not keep Cole from violent acts.  The prosecution supported this argument with information about the rates of violence in TDCJ prisons.  The prosecution also questioned the defense expert

witness Frank Aubuchon, the former Texas corrections officer, who testified about a report containing data on offenses committed by Texas inmates.

In rejecting this claim on direct appeal, the Texas Court of Criminal Appeals stated that "[t]he trial court did not permit the state to question Aubuchon regarding specific incidents of conduct by other inmates, nor did it allow the state to suggest that [Cole] was responsible for any of the incidents reflected in the . . . report." *Cole*, 2014 WL 2807710, at *31.  Cole states in his habeas petition that "the prosecution presented evidence that in August 2011, two months before Mr. Cole's trial, 1,760 serious or unusual incidents occurred within the entire TDCJ prison system." (Docket Entry No. 58 at 154).  The prosecution explained that these offenses included weapon offenses, sexual assaults, attacks on staff, and other violent acts.  The prosecution told jurors that 12,550 serious or unusual incidents had occurred in Texas prisons during the previous year.  The prosecution relied on that evidence to argue that Cole's future violence could extend into the prison setting.  Cole now argues that "[t]he prosecution's presentation of evidence and argument about the misdeeds of other inmates who were unrelated to Mr. Cole to support the future dangerousness aggravator violated his Eighth and Fourteenth Amendment rights." (Docket Entry No. 58 at 155).

### 1.      Exhaustion of State Court Remedies

The respondent first urges that Cole has not exhausted this claim because his argument— "that his Eighth and Fourteenth Amendment rights were violated when, in support of Cole's future-dangerousness, evidence was presented to the jury of the violence within TDCJ prison units"— was not part of his previously raised claims. (Docket Entry No. 67 at 104).  Cole correctly observes that, in both federal and state court, his claims have relied on the Eighth and Fourteenth Amendments. (Docket Entry No. 82 at 4; *see also* Docket Entry No. 6, Exhibit 37 at 87).  In state court, Cole focused on Supreme Court precedent addressing individualized sentencings.  Cole now

argues that the challenged testimony "fail[ed] to narrow the class of death-eligible defendants." (Docket Entry No. 58 at 155). Cole's change in argument has made his claim unexhausted. Because Cole presumably could not raise the claim again in state court, his federal claim is procedurally barred, and Cole has not shown a basis to overcome the bar. The court nonetheless also addresses the merits of the claim.

2.      The Merits

Alternatively, the court finds that Cole's argument lacks merit. As an initial matter, the court observes that the challenged testimony does not differ in some ways from that which Cole argued trial counsel should have presented through Dr. Cunningham—an assessment of an inmate's future violence based on what other inmates have done. Dr. Cunningham's testimony depends on analyzing the rates and risks of violence within the prison population and what prisoner factors correlate to, or are indicators of, violence in prison. Like Dr. Cunningham's affidavit, the challenged testimony is based on the violent acts of other inmates. The challenged testimony differs from Dr. Cunningham's affidavit testimony in its conclusions, not in its reliance on the acts of other inmates. Cole is now challenging the introduction of testimony similar to testimony that he faults his trial counsel for not presenting.

The respondent argues that Aubuchon's testimony was directly relevant to the jury's job in capital sentencing. "General testimony as to the number and types of disorderly and violent incidents provides the jury with evidence to consider whether an individual who has been convicted of capital murder will be capable of not posing a danger to others in the future—that is, whether acts of violence may be instigated by him, or in response to others, in what may be unstable conditions." (Docket Entry No. 67 at 106). This court's concern, however, is not whether the information is relevant under Texas evidentiary law. The Texas courts have determined that this type of general statistical evidence is relevant in a capital murder trial, to inform the jury's

assessment of whether a defendant would commit acts of violence in prison society. *See Muhammad v. State*, 2015 WL 6749922, at *32 (Tex. Crim. App. 2015); *Lucero v. State*, 246 S.W.3d 86, 97 (Tex. Crim. App. 2008); *see also Milam v. Director, TDCJ-CID*, 2017 WL 3537272, at *25 (E.D. Tex. 2017) ("The question of whether a defendant will pose a future danger if given a life sentence, instead of death, is a basic issue that is raised in capital murder cases, and the [Court of Criminal Appeals] has specifically found that testimony regarding the possibility of violence in prison is relevant and admissible to the future dangerousness issue."). The question is whether the testimony violated Cole's federal constitutional rights.

Cole has not identified established constitutional or federal law that would preclude the State from putting before jurors factual information about prison misconduct to assess an inmate's likelihood of commiting violent acts. Cole only cites a Supreme Court case to support his argument, *Godfrey v. Georgia*, 446 U.S. 420 (1980). In *Godfrey*, the Supreme Court found error in evidence of an aggravating circumstance that was so broad that "a person of ordinary sensibility could find that almost every murder fit the stated criteria." 446 U.S at 428-29. The evidence at issue was not similar to that challenged here. *Godfrey* did not address the evidence a jury could consider in deciding a defendant's sentence in an otherwise-constitutional sentencing system. The claim provides no basis for relief on the merits.

## VII.   The Allegedly Arbitrary Administration of Capital Punishment (Claim Fourteen)

In his fourteenth claim, Cole argues that both the State of Texas and Harris County have engaged in a systemic pattern of discrimination in capital sentencing, based on geography and race. Cole relies on studies reporting the differences between the use of capital punishment against minorities in Texas and Harris County compared to other states and jurisdictions. Cole argues that this arbitrariness and unfairness in capital prosecutions and sentences violates his constitutional rights. The court finds that this claim is both procedurally barred from review and without merit.

A.       **Procedural Bar**

Cole raised this claim on state habeas review.  Both the state habeas trial court and the Court of Criminal Appeals found the claim procedurally barred, although for different reasons. The lower state habeas court barred this claim because trial counsel did not object at trial.  State Habeas Record at 805.  The Court of Criminal Appeals refused to "review the merits of [that] habeas claim[] because [Cole] failed to raise [it] on direct appeal."  *Cole*, 2017 WL 562725, at *2 (citing *Ex parte Nelson*, 137 S.W.3d 666, 667 (Tex. Crim. App. 2004), and *Ex parte Goodman*, 816 S.W.2d 383, 385 (Tex. Crim. App. 1991)).  The respondent argues that the Court of Criminal Appeals decision bars federal habeas review.

Cole disputes whether the Court of Criminal Appeals procedural determination is an adequate basis to bar federal review.  "Texas courts have long held that 'the writ of habeas corpus should not be used to litigate matters which should have been raised on direct appeal.'"  *Buntion v. Lumpkin*, 982 F.3d 945, 951 (5th Cir. 2020) (quoting *Nelson*, 137 S.W.3d at 667).  The Fifth Circuit has held that the Texas direct appeal requirement "sets forth an adequate state ground capable of barring federal habeas review."  *Dorsey v. Quarterman*, 494 F.3d 527, 532 (5th Cir. 2007); *see also Buntion*, 982 F.3d at 951; *Luna v. Davis*, 793 F. Appx 229, 233 (5th Cir. 2019); *Aguilar v. Dretke*, 428 F.3d 526, 535 (5th Cir. 2005); *cf. Sanchez-Llamas v. Oregon*, 548 U.S. 331, 350-51 (2006) ("The general rule . . . that a defendant who fails to raise a claim on direct appeal is barred from raising the claim on collateral review . . . constitute[s] an adequate and independent state-law ground preventing us from reviewing the federal claim.").

The record shows no basis to find either cause or actual prejudice to overcome the procedural bar of this claim.  Cole's default of this claim bars federal habeas review of its merits.

### B.     The Merits

Alternatively, the court finds that this claim lacks merit.   The Constitution requires "eliminating total arbitrariness and capriciousness in" imposing a death sentence.   *Proffitt v. Florida*, 428 U.S. 242, 258 (1976); *see also Gregg v. Georgia*, 428 U.S. 153 (1976); *Furman v. Georgia*, 408 U.S. 238 (1972).   The Constitution does not require uniformity in all features of capital sentencing.   The Constitution tolerates discretion at various stages of the capital punishment process: "the prosecutor's decision whether to charge a capital offense in the first place, his decision whether to accept a plea to a lesser offense, the jury's consideration of lesser included offenses, and, after conviction and unsuccessful appeal, the Executive's decision whether to commute a death sentence." *Proffitt*, 428 U.S. at 254.   This discretion does not "render[] the capital sentences imposed arbitrary and capricious."   *McCleskey v. Kemp*, 481 U.S. 279, 307 (1987) (quoting *Gregg*, 428 U.S. at 199); *see also Spinkellink v. Wainwright*, 578 F.2d 582, 608 (5th Cir. 1978); *Proffitt*, 428 U.S. at 254. To obtain relief on this ground, a defendant sentenced to death must show that the discretion was "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification[.]"   *Wayte v. United States*, 470 U.S. 598, 608 (1985) (quotations omitted); *see also United States v. Armstrong*, 517 U.S. 456, 465 (1996).

The Fifth Circuit has rejected similar constitutional challenges, stating as follows:

> Texas's capital-sentencing regime focuses the decision to impose the death penalty on the circumstances of the crime and the characteristics of the defendant.   Moreover, the Supreme Court has specifically held that, "absent a showing that [a] capital punishment system operates in an arbitrary and capricious manner, [a defendant] cannot prove a constitutional violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty," and "opportunities for discretionary leniency [do not render] the capital sentences imposed arbitrary and capricious." *McCleskey,* 481 U.S. at 306-07, 107 S.

> Ct. 1756.  The court in *McCleskey* further noted that
> "[n]umerous legitimate factors may influence the
> outcome of a trial and a defendant's ultimate
> sentence, even though they may be irrelevant to his
> actual guilt"; for example, "[t]he capability of the
> responsible law enforcement agency can vary
> widely." *Id.* at 307 n. 28, 107 S. Ct. 1756.

*Allen v. Stephens*, 805 F.3d 617, 631 (5th Cir. 2015); *abrogated on other grounds by Ayestas v.*

*Davis,* 138 S. Ct. 1080 (2018).  The Fifth Circuit has noted that "no Supreme Court case has held

that the Constitution prohibits geographically disparate application of the death penalty due to

varying resources across jurisdictions."  *Allen*, 805 F.3d at 629; *see also United States v. Lightly*,

616 F.3d 321, 370 (4th Cir. 2010) (recognizing "the amount of resources required to convict a

defendant" and "the extent of prosecutorial resources" as "legitimate prosecutorial factors that

would justify" the use of discretion); *Jennings v. City of Stillwater*, 383 F.3d 1199, 1214 (10th Cir.

2004) (noting "the optimal deployment of prosecutorial resources" as among the permissible "host

of variables" in deciding to prosecute).

     Citing studies finding that certain racial groups are more likely than others to be sentenced

to death, Cole also claims that racism makes the Texas capital sentencing scheme arbitrary and

unconstitutional.  The Supreme Court has held that a defendant claiming an equal protection

violation in a death penalty case must prove that prosecutors acted with a discriminatory purpose

in that defendant's case.  *See McCleskey,* 481 U.S. at 292; *see also Lincecum v. Collins*, 958 F.2d

1271, 1282 (5th Cir. 1992).  "[T]o prevail under the Equal Protection Clause, [Cole] must prove

that the decisionmakers in his case acted with discriminatory purpose."  *McCleskey*, 481 U.S. at

292-93; *see also Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 489 (1999)

(requiring "a criminal defendant to introduce 'clear evidence' displacing the presumption that a

prosecutor has acted lawfully.").  Cole "offers no evidence specific to his own case that would

support an inference that racial considerations played a part in his sentence."  *McCleskey*, 481 U.S.

at 292-93.  Cole's alleged crimes easily fit the statutory requirements for capital murder.  Nothing suggests that the prosecutor in this case considered anything other than the severity of the crimes in deciding the severity of the punishment to seek.  Cole speculates that the relatively large amount of resources in Harris County compared to other, smaller jurisdictions made it more likely that he would be charged with capital murder because he was prosecuted in Harris County.

The record provides no support for finding that impermissible racial discrimination, rather than a legitimate exercise of prosecutorial discretion, was the motivating factor in the State's decision to seek a sentence of death.  There is no legal or factual support for his claim that Texas arbitrarily sought his capital conviction and sentence.  In addition to the procedural bar that forecloses full review, the court alternatively finds that Cole's thirteenth claim lacks merit.

## VIII.   Consequences of a Non-Unanimous Jury Verdict (Claim Fifteen)

For the first time on federal review, Cole argues that recent Supreme Court precedent requires jury unanimity in answering the Texas special issues.  During the period that this case was stayed, from 2019 until early 2020, the United States Supreme Court decided *Ramos v. Louisiana*, ___ U.S. ___, 140 S. Ct. 1390 (2020).[12]  The *Ramos* Court found "that the Sixth Amendment, as incorporated against the states in the Fourteenth Amendment, requires a unanimous verdict to convict a defendant of a serious offense."  *In re Sharp*, 969 F.3d 527, 528 (5th Cir. 2020).  In 2020, Cole filed an amended federal petition, raised a new claim based on *Ramos*.  (Docket Entry No. 58).  In reasoning that mirrors his 10-12 Rule claim, Cole argues that the Texas capital-sentencing statute violates *Ramos* because it confusingly forces jurors into

---

[12]     After Cole submitted his federal petition in 2018, he moved to stay the federal proceedings to allow the exhaustion of state court remedies on certain claims.  (Docket Entry No. 35).  The court subsequently stayed and administratively closed this case to allow the exhaustion.  (Docket Entry No. 49).  After the Texas Court of Criminal Appeals refused to permit the filing of a successive habeas application, *Ex parte Cole*, 2020 WL 1542118 (Tex. Crim. App. 2020), this court reopened Cole's federal proceeding (Docket Entry No. 54).

unanimity.  (Docket Entry No. 58 at 165-84).  This claim is neither exhausted in state court nor persuasive in light of the *Teague* ban on retroactivity.

Beginning with the premise that "[a] necessary corollary to the unqualified right to a unanimous jury verdict is that any procedures that unduly diminish this right are also unconstitutional," Cole argues that the Texas statute encourages jurors whose vote would result in a life sentence to switch their vote because others did not agree with them.  Cole looks beyond the holding in *Ramos* to argue that "however benign the intent of the Texas legislature may have been by 'encouraging' unanimity, it does not change the undeniable fact that the procedures impaired [his] Sixth Amendment right to a unanimous jury by employing artificial, legally misleading, and ultimately coercive means to achieve this end."  (Docket Entry No. 58 at 179).  Cole's argument would extend *Ramos* to a case in which the sentencing statute had the potential to confuse, coerce, or mislead jurors into arriving at a unanimous verdict.

*Ramos* does not directly apply to the Texas sentencing statute.  *Ramos* held that "the Sixth Amendment's right to a jury trial requires a unanimous verdict to support a conviction . . . ."  *Ramos*, 140 S. Ct. at 1397.  Cole has not identified precedent extending *Ramos* to sentencing. *See Ruiz v. Davis*, 819 F. App'x 238, 246 n.9 (5th Cir. 2020) (emphasizing that *Ramos* requires unanimity for a conviction but does not discuss sentencing); *Woods v. Warden, Holman Correctional Facility*, 951 F.3d 1296, 1298 (11th Cir. 2020) (*Ramos* would not apply to sentencing).

Even assuming that *Ramos* applies to the Texas capital sentencing statute, the Supreme Court has recently "conclude[d] that the *Ramos* jury-unanimity rule . . . does not apply retroactively on federal collateral review."  *Edwards v. Vannoy*, ___ U.S. ___, 141 S. Ct. 1547, 1552 (2021).[13]

---

[13]   The Supreme Court decided the *Edwards* case, which conclusively forecloses relief, before Cole filed his reply to the summary judgment motion.  Cole does not address the *Edwards* case in his reply.

*Ramos* created a new rule of constitutional law that cannot apply to Cole's federal habeas petition. This claim is denied as unexhausted and barred by *Teague*'s nonretroactivity principle.

## IX.    Cumulative Error (Claim Sixteen)

Cole contends that the cumulative effect of the errors requires habeas relief.   An independent claim based on cumulative error is viable only when: "(1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors 'so infected the entire trial that the resulting conviction violates due process.'"   *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).   "Meritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised."   *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996); *see also Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir. 1987) ("Twenty times zero equals zero.").

Because Cole has not demonstrated an error of constitutional magnitude at his trial, he "has presented nothing to cumulate."   *Yohey v. Collins*, 985 F.2d 222, 229 (5th Cir. 1993).   Cole's cumulative-error claim is denied.

## X.    PENDING MOTIONS

Two motions remain pending: Cole's motion for discovery (Docket Entry No. 71), and for another stay of these proceedings (Docket Entry No. 77).   The court will deny both claims.

### A.    Discovery

Cole moves for discovery that would support three of his claims.   Specifically, Cole wants to issue subpoenas to Texaco/Chevron to obtain evidence that would support his third claim by showing that he grew up in an area polluted by neurotoxins in the 1970's.   Cole also wants to support claim five with material including the prosecutors' jury selection notes.   Finally, Cole

wants documents and materials from the Harris County District Attorney's Office to prove in claim fourteen that racism permeated his prosecution.  (Docket Entry No. 71).

The law is "clear that there was no intention to extend to habeas corpus, as a matter of right, the broad discovery provisions" available to other civil litigants.  *Harris v. Nelson*, 394 U.S. 286, 295 (1969).  Under Rule 6(a) of the Rules Governing Section 2254 Cases, an inmate must receive leave of the court for discovery, which the court may authorize only "for good cause" and with limits on the extent.  The Supreme Court has linked the "good cause" clause of Rule 6(a) to an inmate's burden to show an entitlement to federal habeas relief, *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997).

The record shows no basis to find good cause for the discovery Cole seeks.  Claims three and fourteen are procedurally barred.  Cole has not shown that the court can reach the merits of those claims.  A petitioner cannot show good cause for discovery on a claim in federal court if procedural impediments preclude considering the merits of that claim.  *See Rucker v. Norris*, 563 F.3d 766, 771 (8th Cir. 2009); *Williams v. Bagley*, 380 F.3d 932, 975 (6th Cir. 2004); *Campbell v. Dretke*, 117 F. App'x 946, 959 (5th Cir. 2004); *Royal v. Taylor*, 188 F.3d 239, 249 (4th Cir. 1999); *Calderon*, 144 F.3d at 621; *In re Pruett*, 133 F.3d 275, 277 n.1 (4th Cir. 1997); *see also Thompson v. Stephens*, 2014 WL 2765666, at *2 (S.D. Tex. 2014) ("As a threshold matter, however, a court must also take into account the procedural posture of an inmate's claims.  A petitioner cannot show good cause if a federal court cannot reach the merits of the disputed claims.").  Cole has not shown that factual development would likely help Cole overcome the procedural bar.

To the extent that Cole seeks discovery on the habeas claims he exhausted in state court, the Supreme Court in *Cullen v. Pinholster*, 563 U.S. 170 (2011), held that a federal court's AEDPA review may look only at the facts developed in state court.  Under *Pinholster,* new "evidence introduced in federal court has no bearing on § 2254(d)(1) review . . . ."  563 U.S. at 185; *see also*

*Williams v. Thaler*, 684 F.3d 597, 603 (5th Cir. 2012).   Federal habeas courts have relied on *Pinholster* to limit a petitioner's ability to develop new facts in the federal habeas process, including through discovery.  *See Soffar v. Stephens*, 2014 WL 12642575, at *2 (S.D. Tex. 2014) ("Presumably, good cause cannot exist for discovery that would result in evidence a court cannot consider.").   Because Cole has not overcome section 2254(d)'s requirements, he is not entitled to the discovery he seeks.

Nor has Cole shown that an evidentiary hearing is necessary to resolve his claims.  Requests for discovery "in habeas proceedings normally follow the granting of an evidentiary hearing . . . ." Advisory Committee Notes to Rule 6. The record in this case was voluminous and detailed.  The court has been able to resolve Cole's claims without discovery or an evidentiary hearing.

Because Cole is not entitled to an evidentiary hearing in this case, Supreme Court precedent prevents the introduction of new facts for claims adjudicated on the merits, and Cole has not shown that this court can reach the merits of his procedurally barred claims, the court denies Cole's request for discovery.

### B.    The Motion to Stay

Cole asks this court to stay the case again while the Supreme Court decides *Shinn v. Ramirez*, No. 20-1009, ___ S. Ct. ___, 2021 WL 1951793 (May 17, 2021) (Docket Entry No. 77). In *Shinn*, the Supreme Court has granted review to decide whether "application of the equitable rule this Court announced in *Martinez v. Ryan* render[s] 28 U.S.C. § 2254(e)(2) inapplicable to a federal court's merits review of a claim for habeas relief?"  *Shinn v. Ramirez*, 2021 WL 294337 (Jan. 20, 2021).

Cole has not shown that a stay would be necessary.  The Fifth Circuit has long shown reluctance to stay capital cases based on the possibility of a change in Supreme Court precedent. *See Neville v. Johnson*, 440 F.3d 221, 222 (5th Cir. 2006) (holding that Fifth Circuit precedent

"remains binding until the Supreme Court provides contrary guidance"); *Cantu v. Collins*, 967 F.3d 1006, 1012 n.10 (5th Cir. 1992) (holding that "[t]he [Supreme] Court's grant of certiorari in a capital case does not cause us to deviate from circuit law, nor is it grounds for a stay of execution").  And *Martinez* does not allow for consideration of any procedurally barred claim. Any change in federal law on evidentiary development would not change the reasoning or result in this court.  Cole's motion for a stay is denied.

## XI.  CERTIFICATE OF APPEALABILITY

Under AEDPA, a prisoner cannot seek appellate review from a lower court's judgment without receiving a Certificate of Appealability ("COA").  *See* 28 U.S.C. § 2253(c).  Cole has not yet requested that this court grant him a COA, though this court can consider the issue *sua sponte*. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).  "The COA statute establishes procedural rules and requires a threshold inquiry into whether the circuit court may entertain an appeal."  *Slack v. McDaniel*, 529 U.S. 473, 482 (2000).  A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

The Fifth Circuit holds that the severity of an inmate's punishment, even a sentence of death, "does not, in and of itself, require the issuance of a COA."  *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).  The Fifth Circuit anticipates that a federal habeas court will resolve any questions about a certificate in the death-row inmate's favor.  *See Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000).  The Supreme Court has explained the standard for evaluating the propriety of granting a certificate on claims rejected on their merits as follows: "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack*, 529 U.S. at 484;

*Miller-El*, 537 U.S. at 336-38.  A district court that has denied habeas relief on procedural grounds should issue a certificate of appealability only "when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.  *Slack*, 529 U.S. at 484; *Miller-El*, 537 U.S. at 336-38.  If a prisoner does not meet this standard, "no appeal would be warranted."  *Slack*, 529 U.S. at 484.

Cole's petition was thorough and well presented.  The issues he raised warranted, and received, careful review.  The results of that review, with the AEDPA standards and controlling precedent, lead this court to determines that a certificate of appealability should not issue on any of Cole's claims.

## XII.   CONCLUSION AND ORDER

The court grants the respondent's motion for summary judgment, (Docket Entry No. 67), and dismisses Cole's petition for a writ of habeas corpus, with prejudice.  A certificate of appealability is not issued.  The court denies all other pending motions.

SIGNED on September 7, 2021, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge

`